## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BEARBOX LLC and AUSTIN STORMS, | |
| Plaintiffs, | |
| v. | C.A. No. 21-534-MN |
| LANCIUM LLC, MICHAEL T. MCNAMARA, and RAYMOND E. CLINE, Defendants. | **REDACTED VERSION** |

### DEFENDANTS' AMENDED ANSWER TO AMENDED COMPLAINT AND COUNTERCLAIMS[1]

Defendants Lancium LLC ("Lancium"), Michael T. McNamara ("McNamara"), and

Raymond E. Cline Jr. ("Cline") (collectively, "Defendants") by and through their undersigned

counsel, hereby answer the Amended Complaint of Plaintiffs BearBox LLC and Austin Storms,

as follows:

### INTRODUCTION

1.      This case is about the Defendants' theft of inventions that rightfully belong to
Plaintiffs.

**RESPONSE:** Denied.

2.      Plaintiffs developed proprietary technology relating to cryptocurrency mining
systems (the "BearBox Technology"). By way of background, the BearBox Technology generally
relates to an energy-efficient cryptocurrency mining system and related methods that reduce the
inefficiency and environmental impact of energy-expensive mining operations by better utilizing
available energy resources to increase stability of the energy grid, minimize a mining operation's
impact on peak-demand, and also alleviate energy over-supply conditions. The BearBox
Technology can be used to mine cryptocurrency, such as Bitcoin.

**RESPONSE:** Defendants lack knowledge sufficient to admit or deny the allegations in

this paragraph and therefore deny.

3.      The Defendants induced the Plaintiffs to disclose the BearBox Technology to them
under the guise of a possible business deal between Defendants and Plaintiffs to jointly

---

[1] The Counterclaims in this Amended Answer have not been modified or amended.

commercialize the BearBox Technology. Before disclosing the BearBox Technology to Defendants, Plaintiffs obtained assurances of confidentiality from Defendants.

**RESPONSE:** Denied.

4.     The Defendants stole the BearBox Technology from Plaintiffs by converting and misappropriating it and claiming it as their own. Defendants filed a U.S. patent application that wrongfully disclosed the BearBox Technology to the U.S. Patent and Trademark Office and ultimately to the public. The claimed subject matter of the '433 Patent falls fully within the scope of the BearBox Technology. And by obtaining the '433 Patent with claims directed to the BearBox Technology, the Defendants have wrongfully obtained a patent covering the BearBox Technology and wrongfully claimed the BearBox Technology as their own.

**RESPONSE:** Denied.

5.     Plaintiffs bring this action to correct the named inventors on the '433 Patent. The inventions claimed in the '433 Patent are inventions conceived by Storms, founder and president of BearBox.

**RESPONSE:** Defendants admit that Plaintiffs have brought an action to correct inventorship of the '433 patent. Defendants deny that the inventorship of the '433 patent is incorrect. Defendants deny all remaining allegations in this paragraph.

## PARTIES

6.     Plaintiff BearBox LLC ("BearBox") is a limited liability company organized and existing under the laws of Louisiana with its principal place of business at 4422 Highway 22, Mandeville, Louisiana 70471.

**RESPONSE:** Defendants lack knowledge sufficient to admit or deny the allegations in this paragraph and therefore deny.

7.     Plaintiff Austin Storms is an individual residing in Mandeville, Louisiana.

**RESPONSE:** Defendants lack knowledge sufficient to admit or deny the allegations in this paragraph and therefore deny.

8.     On information and belief, Defendant Lancium is a Delaware limited liability company with its principal place of business at 6006 Thomas Rd, Houston, Texas 77041. On information and belief, Lancium has a registered agent capable of accepting service in this district, Harvard Business Services, Inc. with a place of business at 16192 Coastal Highway, Lewes, DE 19958.

20282726v1

**RESPONSE:** Admitted.

9.      On information and belief, Defendant Michael T. McNamara is the Chief Executive Officer and a founder of Lancium and resides in Newport Beach, California. Defendant McNamara is named as a purported inventor on the face of the '433 Patent.

**RESPONSE:** Admitted.

10.     On information and belief, Defendant Raymond E. Cline, Jr. is the Chief Computing Officer of Lancium and resides in Houston, Texas. Defendant Cline is named as a purported inventor on the face of the '433 Patent.

**RESPONSE:** Defendants admit that Raymond E. Clinet, Jr. is the Chief Technology

officer of Lancium and resides in Houston, Texas, and is named as inventor on the fact of the '433

Patent. Defendants deny all remaining allegations in this paragraph.

## JURISDICTION

11.     This is an action seeking correction of the named inventors of a United States patent under 35 U.S.C. § 256. As such, this action arises under the laws of the United States.

**RESPONSE:** Defendants admit that Plaintiffs' complaint seeks to correct inventorship

under 35 U.S.C. § 256 and thus arises under the laws of the United States. Defendants deny all

remaining allegations in this paragraph.

12.     This Court has exclusive subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because the matter arises under an Act of Congress relating to patents, specifically 35 U.S.C. § 256.

**RESPONSE:** Defendants do not challenge the Court's subject matter jurisdiction at this

time. Defendants deny all remaining allegations in this paragraph.

13.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over all asserted claims under state law because those claims are so related to the claims in this action that arise under federal law that they form part of the same case or controversy.

**RESPONSE:** Defendants do not challenge the Court's subject matter jurisdiction at this

time. Defendants deny all remaining allegations in this paragraph.

14.     The Court also has jurisdiction pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists among the parties, and the amount in controversy exceeds $75,000. Plaintiff

BearBox is a citizen of the State of Louisiana because it is organized under the laws of the State of Louisiana and has its principal place of business in the State of Louisiana. Plaintiff Storms is a citizen of the State of Louisiana because he resides in the State of Louisiana. In contrast, none of the Defendants are citizens of the State of Louisiana. Defendant Lancium is a citizen of the States of Delaware and Texas because it is organized under the laws of the State of Delaware and has its principal place of business in the State of Texas. Defendant McNamara is a citizen of the State of California because he resides in the State of California. Defendant Cline is a citizen of the State of Texas because he resides in the State of Texas. Therefore, because the Plaintiffs are both citizens of the State of Louisiana (and no other states) for purposes of diversity jurisdiction, and none of the Defendants are citizens of the State of Louisiana, complete diversity exists among the parties.

**RESPONSE:** Defendants admit that Lancium is a citizen of the State of Delaware, that McNamara is a citizen of the State of California, and that Cline is a citizen of the State of Texas. Defendants lack knowledge sufficient to admit or deny the allegations in this paragraph and therefore deny.

15.     This Court has general personal jurisdiction over Lancium because it is organized under the laws of the State of Delaware and because it maintains an ongoing presence in this District at least through its registered agent.

**RESPONSE:** Lancium does not challenge this Court's personal jurisdiction over it for purposes of this matter only. Defendants deny that Lancium maintains an ongoing presence in this District. Defendants deny any remaining allegations in this paragraph.

16.     This Court has specific personal jurisdiction over each of Defendants McNamara and Cline at least under Title 6 of the Delaware Code, § 18-109(a).

**RESPONSE:** McNamara and Cline do not challenge this Court's personal jurisdiction over them for purposes of this matter only. Defendants deny any remaining allegations in this paragraph.

17.     On information and belief, Defendant McNamara is the Chief Executive Officer of Lancium. On information and belief, as the Chief Executive Offer, McNamara participates materially in the management of Lancium, has control and/or decision-making authority over Lancium, and is a key individual who takes actions on behalf of Lancium.

4

**RESPONSE:** Defendants admit that McNamara is the CEO of Lancium and participates

in the management of Lancium. To the extent understood, Defendants deny the remaining

allegations in this paragraph.

18.     McNamara is a necessary or proper party to this action because he has a legal
interest in the dispute that is separate from the interests of Lancium and because Plaintiffs' claims
against him arise out of the same facts and occurrences as the claims against Lancium.
Accordingly, it serves judicial economy to consider the claims against Lancium and Defendant
McNamara together. Plaintiffs' claims against Defendant McNamara arise out of his exercise of
his powers as Chief Executive Officer of Lancium.

**RESPONSE:** This paragraph contains legal conclusions and thus no response is

required. To the extent a response is required, denied.

19.     On information and belief, Defendant Cline is the Chief Computing Officer of
Lancium. On information and belief, as the Chief Computing Officer, Cline participates materially
in the management of Lancium, has control and/or decision-making authority over Lancium, and
is a key individual who takes actions on behalf of Lancium.

**RESPONSE:** Defendants admit that Cline is the Chief Technology Officer of Lancium

and that he participates in the management of Lancium. To the extent understood, Defendants

deny the remaining allegations of this paragraph.

20.     Cline is a necessary or proper party to this action because he has a legal interest in
the dispute that is separate from Lancium's interest and because Plaintiffs' claims against him arise
out of the same facts and occurrences as the claim against Lancium. Accordingly, it serves judicial
economy to consider the claims against Lancium and Defendant Cline together. Plaintiffs' claims
against Defendant Cline arise out of his exercise of his powers as Chief Computing Officer of
Lancium.

**RESPONSE:** This paragraph contains legal conclusions and thus no response is required.

To the extent a response is required, denied.

21.     The actions of Defendants McNamara and Cline establish sufficient minimum
contacts with Delaware under Delaware law and the United States Constitution to give this Court
personal jurisdiction over each of them.

20282726v1

**RESPONSE:**  McNamara and Cline do not challenge this Court's personal jurisdiction

over them for purposes of this matter only. Defendants deny any remaining allegations in this

paragraph.

22.     As described below, each Defendant has committed acts giving rise to this action.

**RESPONSE:** Denied.

## VENUE

23.     Venue is proper in this District under 28 U.S.C. § 1391(b)(3) because there is no
district in which an action may otherwise be brought as provided in § 1391(b) and Defendant
Lancium is subject to the Court's personal jurisdiction with respect to this action.

**RESPONSE:** Defendants do not contest venue for purposes of this matter only.

## PLAINTIFFS' PROPRIETARY
## CRYPTOCURRENCY MINING TECHNOLOGY

24.     As of 2018, the amount of energy required to process computer algorithms to mine
cryptocurrencies like Bitcoin was three times greater than the energy required to physically mine
gold. Conventional mining of "copper, gold, platinum, and rare earth oxides are 4, 5, 7, and 9
megajoules to generate one U.S. dollars," while "it costs an average of 17 megajoules to mine $1
worth of bitcoin."[2]  The large amount of energy required to mine cryptocurrencies can make such
mining financially prohibitive, and even when financially lucrative, the large energy requirements
make cryptocurrency mining harmful to the global environment, with studies showing carbon
dioxide emissions from cryptocurrency mining "single-handedly raising] global temperatures by
2 degrees by 2023." *Id*.

**RESPONSE:** Defendants admit that this paragraph appears to accurately but

incompletely quote the website it cites to. Defendants lack knowledge sufficient to admit or deny

the remaining allegations in this paragraph and therefore deny.

25.     At the same time, some forms of electrical power generation are terribly inefficient.
When producers of electrical power are unable to quickly adjust their operations in response to
dynamically changing grid conditions, these producers frequently sell power at low or even
negative prices until demand and market prices increase.

---

[2] https://www.marketwatch.com/story/mning-bitcoin-is-3-times-more-expensive-than-mining-gold-research-paper-finds-2018-11-06.

**RESPONSE:** Defendants admit that some forms of electrical power generation are less efficient than others. Defendants also admit that producers sometimes sell power at low or even negative prices, depending on grid conditions and other factors. Defendants lack knowledge sufficient to admit or deny the remaining allegations in this paragraph and therefore deny.

26.     Because cryptocurrency mining is a computationally demanding process, it requires significant energy. As a result, industrial-scale cryptocurrency mining places a large energy burden on the power grid, driving demand and costs as well as increasing the likelihood of grid component failure.

**RESPONSE:** Defendants admit that cryptocurrency mining can require significant energy, and may under certain circumstances place an energy burden on the power grid. Defendants deny the remaining allegations in this paragraph.

27.     In late 2018 and early 2019, Austin Storms sought to address these problems by developing energy-efficient cryptocurrency mining systems and methods that reduce the environmental impact of energy-intensive mining operations. Storms conceived of a system that better uses available energy resources to increase the stability of the energy grid, minimize a mining operation's impact on peak-demand, and alleviate energy over supply conditions, all while decreasing the overall energy costs of the mining operation and increasing its profitability.

**RESPONSE:** Defendants deny that Storms conceived of a system that better uses available energy resources to increase the stability of the energy grid, minimize a mining operation's impact on peak-demand, and alleviate energy oversupply conditions, all while decreasing the overall energy costs of the mining operation and increasing its profitability. Defendants lack knowledge sufficient to admit or deny the remaining allegations in this paragraph and therefore deny.

28.     Austin Storms conceived of and developed the BearBox Technology. Storms is the president and founder of BearBox. The BearBox Technology includes hardware and software components. Structurally, the BearBox Technology includes a housing for a plurality of miners (such as ASICs, graphics cards, or the like) under the direction of a smart controller(s).

**RESPONSE:** Defendants lack knowledge sufficient to admit or deny the allegations in this paragraph and therefore deny.

20282726v1

29.     The smart controller monitors various external factors, such as current and expected energy demand and pricing information, current and expected cryptocurrency pricing, and the like. Based on these external factors, the system may determine whether conditions are appropriate to mine cryptocurrency and, if so, subsequently mines the cryptocurrency. Optionally, the system also includes other components for cooling, air-filtration, and related features.

**RESPONSE:** Defendants lack knowledge sufficient to admit or deny the allegations in

this paragraph and therefore deny.

30.     In the BearBox Technology, a controller (such as a power distribution unit, network interface, or the like) monitors various external factors, such as current and expected energy demand/pricing information, current and expected cryptocurrency pricing, and the like. Based on these external factors, the controller(s) determines appropriate times to mine cryptocurrency in accordance with a desired performance strategy (for example, profitability thresholds). At the appropriate times, the controller initiates mining, for example, by powering on the miners.

**RESPONSE:** RESPONSE:  Defendants lack knowledge sufficient to admit or deny the

allegations in this paragraph and therefore deny.

## DEFENDANTS WRONGFULLY CLAIM THE
## BEARBOX TECHNOLOGY AS THEIR OWN

31.     In May 2019, Storms attended the Fidelity FCAT Mining Summit in Boston, Massachusetts on behalf of BearBox to promote the BearBox Technology and seek potential customers for his revolutionary system.

**RESPONSE:** RESPONSE:  Defendants lack knowledge sufficient to admit or deny the

allegations in this paragraph and therefore deny.

32.     While at the conference, Storms met Defendant McNamara. Defendant McNamara showed immediate interest in the BearBox Technology. Under the rouse of a potential business relationship, McNamara pumped Storms for details about the BearBox Technology over the course of several exchanges, which included conversations, emails, and text messages about the BearBox Technology. Storms took McNamara to dinner where McNamara continued to pump Storms for details about the BearBox Technology. At all times before and during Storms's disclosure of this information, Storms told McNamara that the BearBox Technology was confidential, and Storms relied on McNamara's good faith assurances that he would keep confidential the information he received from Storms about the BearBox Technology.

**RESPONSE:** Defendants admit that McNamara met Storms for the first time in May

2019 at the Fidelity FCAT Mining Summit in Boston. Defendants deny all remaining allegations

in this paragraph.

33.     Following the conference, McNamara continued to press Storms for additional details about the BearBox Technology via text messaging and email. Again relying on Defendant McNamara's assurances of confidentiality, Storms provided annotated system diagrams, component specifications, and modeled data sets to mimic real-world Bitcoin and energy prices. Storms included express confidentiality notices in his communications with Defendant McNamara.

**RESPONSE:** Defendants admit that Storms and McNamara exchanged some text

messages and McNamara received a single email from Storms after the conference, and that the

email from Storms contained a two-page PDF entitled BearBox Product Details Summary v1, an

Excel spreadsheet containing a single set of purported modeling data with a third-party's name,

two third-party "spec" sheets for commercially available air filters, and a "spec" sheet for a

commercially available exhaust fan. Defendants deny all remaining allegations in this paragraph.

In particular, Defendants deny that Storms included express confidentiality notices in any of his

communications with McNamara.

34.     After Storms disclosed the BearBox Technology to McNamara, McNamara abruptly ended all communications with Storms.

**RESPONSE:** Defendants admit that communications between Storms and McNamara

ended. Defendants deny all remaining allegations in this paragraph.

35.     Storms last communicated with McNamara on May 9, 2019 via e-mail, and after sending that message, Storms did not hear from McNamara again.

**RESPONSE:** Defendants admit that communications between Storms and McNamara

ended. Defendants deny all remaining allegations in this paragraph.

36.     At that time, Storms understood that McNamara was not interested in investing in the BearBox Technology. He had no reason to suspect that McNamara would steal the BearBox Technology and claim it as his own.

**RESPONSE:** Defendants deny that they stole anything or that Storms or BearBox had

anything capable of being stolen. Defendants lack knowledge sufficient to admit or deny the

remaining allegations in this paragraph and therefore deny.

37.     On information and belief, Defendants filed U.S. provisional patent application No. 62/927,119 on October 28, 2019, naming Defendants McNamara and Cline as the purported sole joint inventors of the inventions disclosed in the application.

**RESPONSE:** Defendants admit that U.S. provisional patent application No. 62/927,119 was filed on October 28, 2019 and it named McNamara and Cline as inventors. Defendants deny all remaining allegations in this paragraph.

38.     In addition to falsely claiming to be the inventors of the inventions disclosed in the application, Defendants wrongfully disclosed, without authorization, the confidential BearBox Technology to the United States Patent and Trademark Office.

**RESPONSE:** Denied.

39.     Likewise, on December 4, 2019, Defendants filed U.S. Patent Application Serial No. 16/702,931, once again naming Defendants McNamara and Cline as the purported sole joint inventors of the inventions disclosed in the application.

**RESPONSE:** Defendants admit that U.S. Patent Application Serial No. 16/702,931 was filed on December 4, 2019 and named McNamara and Cline as inventors. Defendants deny all remaining allegations in this paragraph.

40.     The '433 Patent issued on March 31, 2020 naming Defendants McNamara and Cline as the sole purported inventors on the face of the patent. A true and correct copy of the '433 Patent is attached hereto as Exhibit A.

**RESPONSE:** Defendants admit that the '433 patent issued on or about March 31, 2020 and names McNamara and Cline as inventors. Defendants also admit that a copy of the '433 patent appears to be attached to the complaint as Exhibit A. Defendants deny all remaining allegations in this paragraph.

41.     The inventions claimed in the '433 patent fall within the scope of the BearBox Technology, yet Defendants falsely identified themselves as the inventors of the claimed inventions, when, in fact, Storms is the sole inventor of the claimed inventions.

**RESPONSE:** Denied.

42.     On information and belief, McNamara and Cline assigned their purported rights in the '433 patent to Lancium. On information and belief, at all times, Lancium was aware that

10

20282726v1

McNamara and Cline, both officers of Lancium, were not the rightful inventors of the BearBox Technology disclosed in the patent and the inventions claimed in the patent.

**RESPONSE:** Defendants admit that McNamara and Cline assigned their rights in the

'433 patent to Lancium. Defendants deny all remaining allegations in this paragraph.

43.    Defendants McNamara and Cline each submitted signed declarations falsely swearing that they were "an original joint inventor" of the claimed subject matter. A true and correct copy of Defendant McNamara's and Defendant Cline's declarations are attached as Exhibit B.

**RESPONSE:** Defendants admit that Exhibit B appears to be a copy of declarations by

McNamara and Cline. Defendants deny all remaining allegations in this paragraph.

44.    On August 14, 2020, Lancium filed a lawsuit in the U.S. District Court for the Western District of Texas against Layerl Technologies, Inc. ("Layerl") asserting that Layerl infringes the '433 patent. That case is captioned *Lancium LLC v. Layerl Technologies, Inc.*, Case No. 6:20-cv-739 (W.D. Texas) (the "Layerl Lawsuit").

**RESPONSE:** Defendants admit that they filed the Layer1 Lawsuit against Layer1

Technologies, Inc. on August 12, 2020. The complaint in that matter speaks for itself.

Defendants deny any remaining allegations in this paragraph.

45.    As part of the Layerl Lawsuit, Defendants falsely asserted that McNamara and Cline are the sole inventors of the inventions claimed in the '433 patent.

**RESPONSE:** Defendants admit that they have asserted, and continue to assert, that

McNamara and Cline are the sole and properly named inventors of the '433 patent. Defendants

deny all remaining allegations of this paragraph.

46.    Plaintiffs became aware of Defendants' wrongful use of the BearBox Technology on or about August 17, 2020, when they learned about the Layerl Lawsuit through a press release dated August 14, 2020, posted by Lancium on PRNewswire. That press release is available at the following URL: https://www.prnewswire.com/news-releases/controllable-load-  resource-clr-market-leader-lancium-files-patent-infringement-lawsuit-against-layerl- 301112687.html.

**RESPONSE:** Defendants admit that a press release dated August 14, 2020 was posted

on PRNewswire. Defendants lack knowledge sufficient to admit or deny the remaining

allegations in this paragraph and therefore deny.

20282726v1

47.     Before seeing the August 14, 2020 press release, Plaintiffs were unaware of Defendants' wrongful use of the BearBox Technology and was unaware of the '433 patent.

**RESPONSE:** Defendants deny that they have used any technology of BearBox or

Storms. Defendants lack knowledge sufficient to admit or deny the remaining allegations in this

paragraph and therefore deny.

48.     On March 5, 2021, Lancium and Layerl entered a Stipulation to Dismiss with Prejudice in the Layerl Lawsuit. According to the stipulation, the parties had entered a Settlement Agreement to resolve the Layerl Lawsuit.

**RESPONSE:** Defendants admit that Lancium and Layer1 entered into a settlement

agreement and, around March 5, 2021, a stipulation to dismiss the Layer1 Lawsuit. The

stipulation speaks for itself. Defendants deny any remaining allegations in this paragraph.

49.     According to a press release issued by Lancium on March 8, 2021, Lancium and Layer 1 "have entered into a mutually beneficial partnership. Layer 1 has licensed Lancium's intellectual property and Lancium will provide Smart Response™ software and services to Layerl." The press release is available at the following URL: https://www.prnewswire.com/ news-releases/1 ancium-and4ayerl-settle-patent-infringement-suit-301242602.html

**RESPONSE:** The press release speaks for itself. This paragraph appears to accurately

quote from the press release. Defendants deny any remaining allegations in this paragraph.

50.     On information and belief, as part of the Settlement Agreement between Lancium and Layerl to settle the Layerl Lawsuit, Lancium received and continues to receive valuable consideration from Layerl, all of which rightly belongs to Plaintiffs, the rightful owners of the inventions claimed in the '433 Patent.

**RESPONSE:** Defendants deny that Plaintiffs are the rightful owners of the inventions

claimed in the '433 Patent and deny that any consideration related to the '433 Patent rightly

belongs to Plaintiffs. The terms of Lancium's settlement agreement with Layer1 are confidential.

Defendants deny any remaining allegations in this paragraph.

## COUNT I
## CORRECTION OF INVENTORSHIP FOR THE '433 PATENT:
## AUSTIN STORMS AS SOLE INVENTOR

51.     Plaintiffs incorporate the above paragraphs by reference.

**RESPONSE:** Defendants incorporate by reference all of their answers above.

52. Storms is the sole inventor of the subject matter claimed in the '433 Patent.

**RESPONSE:** Denied.

53. Through omission, inadvertence, and/or error, Storms was not listed as an inventor on the '433 patent and the currently listed inventors on the '433 patent were improperly listed. The omission, inadvertence, and/or error occurred without any deceptive intent on the part of Storms or BearBox.

**RESPONSE:** Denied.

54. Unless Defendants Lancium, McNamara, and Cline are enjoined from asserting that McNamara and Cline are the sole inventors of the '433 Patent in violation of U.S. federal patent laws, Plaintiffs will suffer irreparable injury. Plaintiffs have no adequate remedy at law.

**RESPONSE:** Denied.

**COUNT II**
**IN THE ALTERNATIVE, CORRECTION OF INVENTORSHIP FOR THE '433 PATENT: AUSTIN STORMS AS JOINT INVENTOR WITH THE CURRENTLY NAMED INVENTORS**

55. Plaintiffs incorporates the above paragraphs by reference.

**RESPONSE:** Defendants incorporate by reference all of their answers above.

56. In the alternative, Storms is a joint inventor of the subject matter claimed in the '433 Patent and should be added to the individuals currently named as inventors on the '433 Patent.

**RESPONSE:** Denied.

57. Through omission, inadvertence, and/or error, Storms was not listed as an inventor on the '433 patent and the currently listed inventors on the '433 patent were improperly listed. The omission, inadvertence, and/or error occurred without any deceptive intent on the part of Storms.

**RESPONSE:** Denied.

58. Unless Defendants Lancium, McNamara, and Cline are enjoined from asserting that McNamara and Cline are the sole inventors of the '433 Patent in violation of U.S. federal patent laws, Plaintiffs will suffer irreparable injury. Plaintiffs have no adequate remedy at law.

**RESPONSE:** Denied.

20282726v1

## COUNT III
## CONVERSION BY LANCIUM, MCNAMARA, AND CLINE

59.     Plaintiffs incorporates the above paragraphs by reference.

**RESPONSE:** Defendants incorporate by reference all of their answers above.

60.     Austin Storms, in his capacity as founder and President of BearBox, conceived, developed, and reduced to practice the BearBox Technology. Plaintiffs own the BearBox Technology, related know-how, and related intellectual property. Plaintiffs owned this property during all relevant time periods in this suit. Information on the BearBox Technology was provided to Defendants solely for the purposes of evaluation for a potential business relationship and under strict confidentiality obligations.

**RESPONSE:** Defendants deny that Storms conceived what he now refers to as the

"BearBox Technology." Defendants deny all remaining allegations in this paragraph.

61.     Defendants assumed dominion and control over the BearBox Technology by claiming it as their own in the '433 patent. Through their wrongful conduct in obtaining the '433 Patent and claiming the BearBox Technology as their own, the Defendants have wrongfully obtained the purported ability to exclude Plaintiffs and others from using the BearBox Technology. This constitutes unauthorized and unlawful conversion by Defendants.

**RESPONSE:** Denied.

62.     As a result of Defendants' wrongful actions, Plaintiffs will suffer imminent and irreparable damages in an amount to be proven at trial. In particular, Plaintiffs have been damaged by losing valuable intellectual property from which Plaintiffs would have derived substantial revenue via licensing and/or selling patented products.

**RESPONSE:** Denied.

## COUNT IV
## UNJUST ENRICHMENT BY LANCIUM, MCNAMARA, AND CLINE

63.     Plaintiffs incorporate the above paragraphs by reference.

**RESPONSE:** Defendants incorporate by reference all of their answers above.

64.     Plaintiffs conferred a benefit on Defendants by providing them valuable intellectual property about cryptocurrency mining systems and related confidential information and materials under the boundaries of a potential collaboration between BearBox and Lancium.

**RESPONSE:** Denied.

20282726v1

65.     Defendants accepted that cryptocurrency mining intellectual property and, indeed, continuously asked Storms to provide more information and materials, having recognized the benefit that Defendants received by having access to the BearBox Technology.

**RESPONSE:** Denied.

66.     Defendants accepted and retained the BearBox Technology, and used it to their own advantage, at Plaintiffs' expense.

**RESPONSE:** Denied.

67.     Defendants have been and continue to be unjustly enriched by profiting from their wrongful conduct. In particular, Defendants have unlawfully used Plaintiffs' property by asserting inventorship over the BearBox Technology, and deriving an unjust benefit from exploiting Storms's cryptocurrency mining inventions. It would be inequitable for Defendants to retain these benefits under these circumstances.

**RESPONSE:** Denied.

68.     Plaintiffs have incurred, and continue to incur, detriment in the form of loss of money and property as a result of Defendants' wrongful use of Plaintiffs' intellectual property, including the right to any patent based on their own intellectual property. The intellectual property, including the right to any patents based on Plaintiffs' intellectual property and to any patent documents (including assignment documents), U.S. and foreign, are unique and there is no adequate remedy at law.

**RESPONSE:** Denied.

69.     The harm to Plaintiffs is continuous, substantial, and irreparable.

**RESPONSE:** Denied.

## COUNT V
## NEGLIGENT MISREPRESENTATION BY LANCIUM AND MCNAMARA

70.     Plaintiffs incorporate the above paragraphs by reference.

**RESPONSE:** Defendants incorporate by reference all of their answers above.

71.     In connection with the potential work involving cryptocurrency mining systems and related methods, Storms told Defendant McNamara that the cryptocurrency mining systems and related methods were proprietary to Plaintiffs and not to be used or shared outside of Lancium. Defendant McNamara gave his word that he would abide by this confidentiality. On information and belief, Defendant McNamara agreed to keep the BearBox Technology confidential despite later recklessly incorporating the BearBox Technology into his own patent applications and swearing, as recently as December 4, 2019, that he is an inventor of the BearBox Technology.

Storms relied on Defendant McNamara's assurances of confidentiality and continued to share details about the BearBox Technology with Defendants.

**RESPONSE:** Denied.

72.    If Plaintiffs had known that Defendants would secretly incorporate the BearBox Technology into Defendants' own patent applications to claim them as Defendants' intellectual property, Plaintiffs would not have continued working with and sharing intellectual property with Defendants.

**RESPONSE:** Denied.

73.    Plaintiffs suffered a pecuniary loss based on this reliance including the loss of potential patent rights, and the costs of Plaintiffs' know-how converted under the guise of a potential business relationship.

**RESPONSE:** Denied.

## AFFIRMATIVE DEFENSES

### *First Affirmative Defense*
### (Failure to State a Claim - Counts I and II)

Plaintiffs' Counts I and II fail to state a claim to correct inventorship of the '433 patent

with Austin Storms as the sole inventor (Count I) or Austin Storms as a joint inventor (Count II),

at least because:

A.  The alleged BearBox Technology was not conceived of or reduced to practice by

Storms, as evidenced by at least PCT Application No. PCT/US2018/017950, which

was filed February 3, 2018, and which published July 18, 2019 as WO2019139632A1,

and which predates any alleged conception or development by Storms;

B.  Storms did not contribute to the subject matter claimed by the '433 patent, either

through conception or reduction to practice; and

C.  Plaintiffs' cannot satisfy one or more requirements of 35 U.S.C. § 256, including

omission, inadvertence, and/or error for which Storms was not listed as an inventor of

the '433 patent.

16

***Second Affirmative Defense***
**(Failure to State a Claim - Count III)**

Plaintiffs' Count III fails to state a claim for conversion by Lancium, McNamara, or Cline, at least because:

A.  Plaintiffs cannot establish legal ownership over any property that was allegedly acquired, transferred, removed, altered, or destroyed by Defendants in an unauthorized manner; and

B.  Plaintiffs cannot identify any property over which Plaintiffs had legal ownership that Defendants have improperly used or asserted improper ownership.

***Third Affirmative Defense***
**(Failure to State a Claim – Count IV)**

Plaintiffs' Count IV fails to state a claim for unjust enrichment by Lancium, McNamara, orCline, at least because:

A.  Plaintiffs have pled other available remedies at law and/or cannot establish no other remedy available at law, and thus, as a matter of law are precluded from asserting an unjust enrichment claim;

B.  There is no absence of justification or cause for the alleged enrichment and/or alleged impoverishment; and

C.  Unjust enrichment is not an independent cause of action.

***Fourth Affirmative Defense***
**(Failure to State a Claim – Count V)**

Plaintiffs' Count V fails to state a claim for negligent misrepresentation by Lancium and McNamara, at least because:

A.  Defendants had no legal duty to Plaintiffs;

B.  Defendants did not breach any legal duty owed to Plaintiffs; and

20282726v1

C.  None of Defendants' actions can be said to be the legal cause of Plaintiffs' alleged injury.

### Fifth Affirmative Defense
### (No Merger of Intangible Rights)

Plaintiffs did not transfer intangible rights to Defendants that can be said to have been merged into any tangible property, and which satisfy the requirements of conversion, nor can intangible or intellectual property be converted.

### Sixth Affirmative Defense
### (Consent or Approval)

Any alleged exchange or transfer of property between the parties was performed with Plaintiffs' full consent and/or approval and, thus precludes Plaintiffs' claim for conversion.

### Seventh Affirmative Defense
### (Equitable Defenses)

Plaintiffs' Counts I through V are barred, in whole or in part, by laches, equitable estoppel,estoppel, implied license, waiver, ratification, acquiescence, unclean hands, and/or other related equitable doctrines.

### Eighth Affirmative Defense
### (Unavailability of Injunctive Relief)

Plaintiffs are not entitled to injunctive relief because any injury to them is not immediate and irreparable, they would have an adequate remedy at law, the balance of hardships favors no injunction, and the public interest is best served by no injunction.

20282726v1

### *Ninth Affirmative Defense*
**(Failure to Mitigate Damages)**

To the extent any damages to Plaintiffs exist, Plaintiffs have failed to mitigate such

damages, as required by law.

### *Tenth Affirmative Defense*
**(No Exemplary or Punitive Damages)**

Plaintiffs are precluded from recovering exemplary or punitive damages that are

inconsistent with Defendants' rights of due process and equal protection under the Fifth and

Fourteenth Amendments to the U.S. Constitution, and under the Delaware Constitution. No

alleged act or omission of Defendants was done willfully or maliciously with regard to any right

of Plaintiffs; therefore, any claim for exemplary damages is barred. Further, no punitive or

exemplary damages may be awarded in this case because there was no outrageous or malicious

conduct nor any willful and wanton misappropriation.

### *Eleventh Affirmative Defense*
**(No Attorneys' Fees, Enhanced or Other Damages)**

Plaintiffs' claim that this case is exceptional and that an award of attorneys' fees pursuant

to 35 U.S.C. § 285 is justified has no basis in fact or law and should be denied. Likewise,

Plaintiffs claims for costs, consequential damages, disgorgement of any ill-gotten gains, unjust

enrichment, restitution, reasonable royalty damages, lost profits damages, reliance damages,

interest, and attorneys' fees against Defendants have no basis in fact or law and thus should be

denied.

20282726v1

### *Twelfth Affirmative Defense*
### (Additional Defenses)

The Defendants reserve all affirmative defenses under Rule 8(c) of the Federal Rules of

Civil Procedure and any other defenses, at law or in equity, that may now exist or in the future be

available based on discovery and further factual investigation in this case.

### *Thirteenth Affirmative Defense*
### (Preemption)

Plaintiffs' claims for conversion, unjust enrichment, and negligent misrepresentation are

preempted by federal patent law and should be dismissed, including because inventorship is

essential to resolution of these claims, the claims are based on conduct that is protected or

governed by federal patent law, and the claims seek patent-like protection to subject matter

addressed by federal patent law.

20282726v1

## COUNTERCLAIMS

Counter-Plaintiff Lancium LLC ("Lancium"), for its Counterclaims against Counter-Defendants BearBox LLC ("BearBox") and Austin Storms ("Storms"), hereby alleges as follow:

### INTRODUCTION

1.      Lancium is a leading innovator in the field of flexible datacenters to perform blockchain hashing operations with little to no energy costs using clean and renewable energy that would otherwise be wasted.

2.      Storms and BearBox's claims in their Complaint against Lancium and its founders are nothing more than an attempt to extort money from, and tarnish the reputation of, Lancium, a market leader.

3.      The Complaint alleges that Storms developed the "BearBox Technology" in "[i]n late 2018 and early 2019."  Complaint ¶ 27.

4.      According to the Complaint, "[i]n the BearBox Technology, a controller (such as a power distribution unit, network interface, or the like) monitors various external factors, such as current and expected energy demand/pricing information, current and expected cryptocurrency pricing, and the like. Based on these external factors, the controller(s) determines appropriate times to mine cryptocurrency in accordance with a desired performance strategy (for example, profitability thresholds). At the appropriate times, the controller initiates mining, for example, by powering on the miners."  Complaint ¶ 30.

5.      The Complaint goes on to describe the "BearBox Technology" as including "hardware and software components. Structurally, the BearBox Technology includes a housing for a plurality of miners (such as ASICs, graphics cards, or the like) under the direction of a smart controller(s)."  Complaint ¶ 28.  And "[t]he smart controller monitors various external factors, such as current and expected energy demand and pricing information, current and expected

cryptocurrency pricing, and the like. Based on these external factors, the system may determine whether conditions are appropriate to mine cryptocurrency and, if so, subsequently mines the cryptocurrency."  Complaint ¶ 29.

6.   The Complaint alleges that Storms disclosed the "BearBox Technology" to Lancium representatives in May 2019, and that Lancium stole the technology, claimed it as its own, and received a patent on the "BearBox Technology," U.S. Patent No. 10,608,433 (the '433 Patent).

7.   The fatal flaw in Storms's story is that all of the "BearBox Technology" was old news to Lancium, a leading innovator in this space.

8.   Storms fails to appreciate what was abundantly clear when Storms first approached Michael McNamara:  the so-called "BearBox Technology" was far behind Lancium's documented development efforts.

9.   In fact, Lancium years ago developed all of the technology that Storms claims makes up the "BearBox Technology," as evidenced at least by Lancium's published patent application, WO 2019/139632 A1 (attached as Exhibit A) (the '632 application).

10.   The '632 application was filed on February 13, 2018 based on work that began even earlier—long before Storms claims to have developed the BearBox Technology, and over 15 months before Storms ever spoke to anyone from Lancium.

11.   The inventions in the '433 patent (attached as Exhibit B) are much more advanced than the so-called "BearBox Technology."

12.   Because Lancium's Michael T. McNamara and Raymond E. Cline, Jr. are the true and correct inventors of the invention claimed in the '433 patent, all of Storms's claims fail and

the Court should declare McNamara and Cline the sole inventors of the '433 patent and Lancium the sole assignee of the '433 patent.

## PARTIES

13.     On information and belief, BearBox is a limited liability company organized and existing under the laws of Louisiana with its principal place of business at 4422 Highway 22, Mandeville, Louisiana 70471.

14.     On information and belief, Storms is an individual residing in Mandeville, Louisiana.

15.     Lancium is the leader in truly carbon-neutral computing and using computing to solve over-generation problems caused by the growth of renewable energy. Lancium is a Delaware limited liability company with its principal place of business at 6006 Thomas Rd, Houston, Texas 77041.

## JURISDICTION

16.     The Court has subject matter jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

17.     Having filed suit in this Court, BearBox and Storms have consented to personal jurisdiction in this Court and availed themselves of the privileges and benefits of this Court.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) as BearBox and Storms are subject to personal jurisdiction in this District, based, among other things, on their actions in affirmatively seeking the benefit of this Court in filing this civil action.

19.     As BearBox and Storms have alleged in their Complaint, there is an actual and justiciable case or controversy before this Court as to the inventorship of the '433 Patent.

20282726v1

## LANCIUM IS THE TRUE INNOVATOR IN THIS FIELD

20.    Lancium is a technology company creating software and intellectual property solutions that enable more renewable energy on the nation's power grid. Lancium's products include Lancium Smart Response™ for rapid server power management, and Lancium Compute™, a platform for high throughput computing applications. Lancium's solutions help ensure that renewable energy can power our future.

21.    Lancium is the leader in data center power ramping software.

22.    As data center power demand continues to escalate, Lancium Smart Response™ software can unlock huge power costs savings for data center owners. The software also provides critical services to the power grid ensuring reliability and resiliency.  As every grid takes on more renewable energy, the power market will need much greater quantities of flexible load, and in particular, Controllable Loads enabled by Lancium Smart Response™.   Lancium Smart Response™ functionality enables data centers to provide this crucial service.

23.    Lancium has numerous issued and pending patents.

24.    Lancium's issued patents include the following:

- U.S. Patent No. 10,873,211 (filed Sept. 13. 2018) "Systems and Methods for Dynamic Power Routing with Behind-the-Meter Energy Storage"

- U.S. Patent No. 10,444,818 (filed Oct. 30, 2018) "Methods and Systems for Distributed Power Control of Flexible Datacenters"

- U.S. Patent No. 10,367,353 (filed Oct. 30, 2018) "Managing Queue Distribution between Critical Datacenter and Flexible Datacenter"

- U.S. Patent No. 10,452,127 (filed Jan. 11, 2019) "Redundant Flexible Datacenter Workload Scheduling"

- U.S. Patent No. 10,618,427 (filed Oct. 8, 2019) "Behind-the-Meter Branch Loads for Electrical Vehicle Charging

- U.S. Patent No. 10,608,433 (filed Dec. 4, 2019) "Methods and Systems for Adjusting Power Consumption Based on a Fixed-Duration Power Option

24

Agreement"

- U.S. Patent No. 10,857,899 (filed Mar. 4, 2020) "Behind-the-Meter Branch Loads for Electrical Vehicle Charging"

25.     One of Lancium's patent applications, International Application Number PCT/US2018/0 17950, was filed on February 13, 2018 and published as the '632 application on July 18, 2019.

26.     The '632 application describes a method and system for dynamic power delivery to a flexible datacenter using unutilized energy sources. In one embodiment of the invention:

> a method and system for dynamic power delivery' to a flexible datacenter uses unutilized behind-the-meter power sources without transmission and distribution costs. The flexible datacenter may be configured to modulate power delivery to one or more computing systems based on the availability of unutilized behind-the-meter power or an operational directive. For example, the flexible datacenter may ramp-up to a fully online status, ramp-down to a fully offline status, or dynamically reduce power consumption, act a load balancer, or adjust the power factor. Advantageously, the flexible datacenter may perform computational operations, such as blockchain hashing operations, with little to no energy costs, using clean and renewable energy that would otherwise be wasted.

*See* '632 application ¶ [0022].

27.     Put simply, and as discussed more thoroughly below, the '632 application describes the so-called "BearBox technology."

28.     The '632 application claims priority to U.S. Provisional Application No. 62/616,348 (the "'348 Provisional"), filed on Jan. 11, 2018.

29.     The '632 application lists the following Lancium current or former personnel as inventors:  David Henson, Michael McNamara, and Raymond Cline.

30.     The '632 application lists the "Applicant" as Lancium LLC.

31.     On information and belief, BearBox LLC knew of the '632 application before filing the Complaint in this action.

32.     On information and belief, Austin Storms knew of the '632 application before filing the Complaint in this action.

33.     The '632 application was filed before Storms admits he developed the alleged "BearBox Technology."

34.     The '632 application and '348 Provisional were each filed well before "late 2018 and early 2019," when BearBox and Storms aver that Storms first conceived of the so-called "BearBox Technology."

35.     The '632 application and '348 Provisional were each filed over a year before "May 2019," when BearBox and Storms aver that Storms met and allegedly "disclosed" the so-called "BearBox Technology" to McNamara.  Complaint ¶¶ 31-34.

36.     The '632 application is only one example of the Lancium's innovations and the intellectual property covering those innovations.

### AUSTIN STORMS PROVIDED NOTHING OF VALUE TO LANCIUM

37.     In May 2019, Lancium representatives, including McNamara, attended the Fidelity Center for Advanced Technology Bitcoin Mining Conference in Boston, MA ("Conference").

38.     McNamara and Austin Storms first met the evening of May 3, 2019 at a cocktail reception for the Conference.

39.     McNamara was mingling with a group of third-party individuals in the Bitcoin mining field and suggested they all go to dinner.  Storms was in that group.

40.     Dinner attendees in the group included competitors in the Bitcoin mining field.

41.     At the dinner, there were approximately eight people in attendance at McNamara's table.   The dinner attendees engaged in friendly table discussions regarding their various businesses.

26

42.     Storms sat across the table from McNamara and promoted his Bitcoin mining containers.

43.     Conversations between Storms and McNamara occurred in front of the other attendees, which included Bitcoin mining competitors.

44.     At no point did Storms state or suggest that anything he told or shared with McNamara and the dinner attendees was confidential.

45.     At no point did McNamara tell Storms that he would keep the conversations, or any purported information exchanged between them, confidential.

46.     Storms and McNamara exchanged a series of text messages between May 3 and May 9, 2019.

47.     A true and correct copy of the text messages between Storms and McNamara is attached as Exhibit C.

48.     The texts do not indicate that any information shared between the parties is confidential or should be kept confidential.

49.     Storms sent McNamara a single email.  The email is dated May 9, 2019.

50.     A true and correct copy of the email from Storms to McNamara, with attachments, is attached as Exhibit D.

51.     The email from Storms does not state that any of the information being provided was confidential or a trade secret.

52.     One of the email attachments provided by Storms to McNamara was a purported modeled data set for a third-party wind farm operator.

53.     On information and belief, most of the information in the modeled data set was provided to Storms by the third-party wind farm operator.

20282726v1

54.     On information and belief, the "modeled" aspect of the data from Storms were trivial math calculations in cell columns.

55.     At least as early as November 2018, Lancium had provided advanced modeling data to the same third-party wind farm operator, for the same wind farm site, using the same data received from the wind farm operator that was also provided by the wind farm operator to Storms.

56.     After review of the limited material sent by Storms, Lancium decided that its in-house containers were more cost-effective than those Storms was trying to sell and thus did not communicate further with Storms.

57.     The materials provided to McNamara by Storms were never used by Lancium.

58.     None of Lancium's intellectual property, products, or services were derived from or developed from any of the materials sent by Storms to McNamara.

## THE BEARBOX TECHNOLOGY WAS OLD NEWS TO LANCIUM

59.     The Complaint recites that Storms conceived and developed the alleged "BearBox Technology." The Complaint does not describe or allege any further subject matter which Storms allegedly might have conceived or developed.

60.     The alleged BearBox Technology is defined at Complaint ¶¶ 2, 28

61.     The chart below proves that the "BearBox Technology" alleged in Storms and BearBox's complaint was previously conceived by Lancium and described in Lancium's WO'632 application.

|  | Alleged BearBox Technology | Lancium's WO'632 Application |
|---|---|---|
|  | **BearBox Technology Definition. Complaint at ¶2.** |  |
| 1 | an energy-efficient cryptocurrency mining system and related methods | Method and system for dynamic power delivery to a flexible datacenter using unutilized energy sources. **WO'632 Title.** |

28

| | | One of ordinary skill in the art will recognize that computing system 100 may be a conventional computing system or an application-specific computing system. In certain embodiments, an application-specific computing system may include one or more ASICs (not shown) that are configured to perform one or more functions, such as hashing, in a more efficient manner. **WO'632 at [0027].** |
|---|---|---|
| 2 | that reduce the inefficiency and environmental impact of energy-expensive mining operations | The intensive computational demand of blockchain applications makes the widespread adoption of blockchain technology inefficient and unsustainable from an energy and environmental perspective.  WO'632 at [0020]. |
| | | … the issue remains, the widespread adoption of blockchain technology will require substantially more power than is economically and environmentally feasible. **WO'632 at [0021]**. |
| | | Advantageously, the flexible datacenter may perform computational operations, such as blockchain hashing operations, with little to no energy costs, using clean and renewable energy that would otherwise be wasted. **WO'632 at [0022].** |
| 3 | by better utilizing available energy resources to increase stability of the energy grid, minimize a mining operation's impact on peak-demand, and also alleviate electricity undersupply and/or oversupply conditions. | Datacenter control system 220 may monitor unutilized behind-the-meter power availability at the local station (not independently illustrated) and determine when a datacenter ramp-up condition is met. Unutilized behind-the-meter power availability may include one or more of excess local power generation, excess local power generation that the grid cannot accept, local power generation that is subject to economic curtailment, local power generation that is subject to reliability curtailment, local power generation that is subject to power factor correction, situations where local power generation is prohibitively low, start up situations, transient situations, or testing situations where there is an economic advantage to using locally generated behind-the-meter power generation, specifically power available at little to no cost and with no associated transmission or distribution costs.  **WO'632 at [0041]**. |

20282726v1

| | | Another example of unutilized behind-the-meter power availability is when wind farm 600 is producing power to grid 660 that is unstable, out of phase, or at the wrong frequency, or grid 660 is already unstable, out of phase, or at the wrong frequency for whatever reason.  **WO'632 at [0055].** |
|---|---|---|
| | | Another example of unutilized behind-the-meter power availability is when wind farm 600 is selling power to grid 660 at a negative price because grid 660 is oversupplied or is instructed to stand down and stop producing altogether.  **WO'632 at [0054].** |

62.     The '632 application discloses energy-efficient cryptocurrency mining systems and related methods.  See, e.g., '632 Application, Title; '632 application at [0027]; '632 application claims 1-34.

63.     The '632 application discloses mining systems and methods for reducing the inefficiency and environmental impact of energy-expensive mining operations. See, e.g., '632 application at [0020], [0021], [0022].

64.     The '632 application discloses improved mining systems and methods for better utilization of available energy resources to increase stability of the energy grid, minimize a mining operation's impact on peak-demand, and also alleviate electricity undersupply and/or oversupply conditions.  See, e.g., '632 application at [0041], [0054], [0055].

65.     Consequently, the '632 Application discloses each aspect of the alleged "BearBox Technology."

66.     The Complaint further describes technology allegedly created by Storms at Complaint ¶¶ 27-30.  This technology was previously conceived by Lancium and described in the WO'632 application, as shown in the table below.

|  | Alleged Cryptocurrency Mining Technology | Lancium's WO'632 Application |
|---|---|---|
|  | Alleged BearBox Mining Technology. Complaint at ¶¶27-30. |  |
| 4 | In late 2018 and early 2019, Austin Storms sought to address these problems by developing energy-efficient cryptocurrency mining systems and methods that reduce the environmental impact of energy-intensive mining operations. Storms conceived of a system that better uses available energy resources to increase the stability of the energy grid, minimize a mining operation's impact on peak-demand, and alleviate electricity undersupply and/or oversupply conditions, all while decreasing the overall energy costs of the mining operation and increasing its profitability. **Complaint at ¶27.** | See #1-#3 above.<br><br>As such, the flexible datacenter may perform computational operations, such as hashing function operations, with little to no energy cost. **WO'632 at [0077].** |
| 5 | The BearBox Technology includes hardware and software components. Structurally, the BearBox Technology includes a housing for a plurality of miners (such as ASICs, graphics cards, or the like) under the direction of a smart controller(s). **Complaint at ¶28.** | A flexible datacenter includes a mobile container, a behind-the-meter power input system, a power distribution system, a datacenter control system, a plurality of computing systems, and a climate control system. The datacenter control system modulates power delivery to the plurality of computing systems based on unutilized behind-the-meter power availability or an operational directive. **WO'632 at Abstract.**<br><br>Computing system 100 may include one or more central processing units (singular "CPU" or plural "CPUs") 105, host bridge 110, input/output ("IO") bridge 115, graphics processing units (singular "GPU" or plural "GPUs") 125, and/or application-specific integrated circuits (singular "ASIC or plural "ASICs") (not shown) disposed on one or more printed circuit boards (not shown) that are configured to perform computational operations. **WO'632 at [0023].** |

| | | CPU 105 may be a general purpose computational device typically configured to execute software instructions. **WO'632 at [0024].** |
|---|---|---|
| 6 | The smart controller monitors various external factors, such as current and expected energy demand and pricing information, current and expected cryptocurrency pricing, and the like. Based on these external factors, the system may determine whether conditions are appropriate to mine cryptocurrency and, if so, subsequently mines the cryptocurrency. **Complaint at ¶30.** | Datacenter control system 220 may be a computing system (e.g., 100 of Figure 1) configured to dynamically modulate power delivery to one or more computing systems 100 disposed within flexible datacenter 200 based on unutilized behind-the-meter power availability or an operational directive from a local station control system (not shown), a remote master control system (not shown), or a grid operator (not shown). **WO'632 at [0030].**<br><br>Datacenter control system 220 may independently, or cooperatively with one or more of local station control system 410, remote master control system 420, and grid operator 440, modulate power delivery to flexible datacenter 200. Specifically, power delivery' may be dynamically adjusted based on conditions or operational directives. **WO'632 at [0039].**<br><br>Remote master control system 420 may be a computing system (e.g., 100 of Figure 1) that is located offsite, but connected via a network connection 425 to datacenter control system 220, that is configured to provide supervisory or override control of flexible datacenter 200 or a fleet (not shown) of flexible datacenters 200. **WO'632 at [0040].**<br><br>Datacenter control system 220 may monitor and determine when there is insufficient, or anticipated to be insufficient, behind-the-meter power availability. As noted above, sufficiency may be specified by remote master control system 420 or datacenter control system 220 may be programmed with a predetermined preference or criteria on which to make the determination independently. An operational directive may be based on current dispatchability, forward looking forecasts for when unutilized behind-the-meter power is, or is expected to be, available, economic considerations, reliability considerations, operational considerations, or the discretion of the local station 410, remote master control 420, or grid operator 440. **WO'632 at [0044].** |

| | | |
|---|---|---|
| 7 | Optionally, the system also includes other components for cooling, air-filtration, and related features. **Complaint at ¶29.** | A flexible datacenter includes a mobile container, a behind-the-meter power input system, a power distribution system, a datacenter control system, a plurality of computing systems, and a climate control system. **WO'632 at Abstract.** |
| 8 | In the BearBox Technology, a controller (such as a power distribution unit, network interface, or the like) monitors various external factors, such as current and expected energy demand/pricing information, current and expected cryptocurrency pricing, and the like. Based on these external factors, the controller(s) determines appropriate times to mine cryptocurrency in accordance with a desired performance strategy (for example, profitability thresholds). At the appropriate times, the controller initiates mining, for example, by powering on the miners **Complaint at ¶30.** | See #7 above.<br><br>For example, local station control system 410, remote master control system 420, or grid operator 440 may issue an operational directive to flexible datacenter 200 to go offline and power down. When the datacenter ramp-down condition is met, datacenter control system 220 may disable power delivery to the plurality of computing systems (100 of Figure 2). Datacenter control system 220 may disable 435 behind-the-meter power input system 210 from providing three- phase nominal AC voltage to the power distribution system (215 of Figure 2) to power down the plurality of computing systems (100 of Figure 2), while datacenter control system 220 remains powered and is capable of rebooting flexible datacenter 200 when unutilized behind-the-meter power becomes available again. **WO'632 at [0044].** |

67.    The '632 application discloses better use of available energy resources to increase the stability of the energy grid, minimize a mining operation's impact on peak-demand, and alleviate electricity undersupply and/or oversupply conditions, all while decreasing the overall energy costs of the mining operation and increasing its profitability. *See, e.g.,* '632 application at [0041], [0054], [0055], [0077].

68.    The '632 application discloses hardware and software components, including, structurally, a housing for a plurality of miners (such as ASICs, graphics cards, or the like) under the direction of a control system. *See, e.g.,* '632 application, Abstract, '632 application at [0023], [0024].

33

69.     The '632 application discloses a control system monitoring various external factors, such as current and expected energy demand and pricing information, current and expected cryptocurrency pricing, and the like. Based on these external factors, the systems and/or methods of the '632 application may determine whether conditions are appropriate to mine cryptocurrency and, if so, subsequently mine the cryptocurrency. ).  *See, e.g.,* '632 application at [0030], [0039], [0040], [0044].

70.     The '632 application discloses that its systems may also include other components for cooling, air-filtration, and related features.  *See, e.g.,* '632 application, Abstract.

71.     The '632 application discloses a control system that monitors various external factors, such as current and expected energy demand/pricing information, current and expected cryptocurrency pricing, and the like. Based on these external factors, the control system of the '632 application may determine times to mine cryptocurrency in accordance with a desired performance strategy, and the control system may initiate mining, for example, by powering on the miners. *See, e.g.,* '632 application, Abstract; '632 application at [0044].

72.     Consequently, the '632 application discloses each aspect of the "BearBox Technology."

73.     The Complaint alleges that Storms sent McNamara "annotated system diagrams, component specifications, and modeled data sets to mimic real-world Bitcoin and energy prices." Complaint ¶ 33.  The Complaint does not allege that Storms sent any additional information to McNamara.

74.     Austin Storms sent McNamara a total of seven text messages.  The messages are dated May 3, 2019 through May 9, 2019.   The text messages contain no proprietary, technology, or confidential information.  *See* Exhibit C.

75.    Storms sent Lancium a single email.  The email was dated May 9, 2019.  The body of the email contained no proprietary, technology, or confidential information.  *See* Exhibit D.  The attachments to the email were:

- a two-page PDF entitled BearBox Product Details Summary v1,
- an Excel spreadsheet containing purported modeling data with a third-party's name,
- two publically available third-party "spec" sheets for commercially available air filters, and
- a publically available third-party "spec" sheet for a commercially available exhaust fan.

76.    The chart below proves that any alleged "BearBox Technology" in the email that Storms sent to McNamara had been previously conceived by Lancium and described in Lancium's WO'632 application.

| 10 | **May 9, 2019 Email – Storms to McNamara** | **WO'632 Application** |
|---|---|---|
| 10A | 20' BearBox product details BearBox Product Details Summary v1.PDF discloses: <br>• A 20' shipping container with networked miners, electrical system, cooling system. <br>• Software for marketplace data (i.e., power pricing) and alerts (restart, reboot, and maintenance) | A flexible datacenter includes a mobile container, a behind-the-meter power input system, a power distribution system, a datacenter control system, a plurality of computing systems, and a climate control system. The datacenter control system modulates power delivery to the plurality of computing systems based on unutilized behind-the-meter power availability or an operational directive. **WO'632 at Abstract.** <br><br>Datacenter control system 220 may monitor and determine when there is insufficient, or anticipated to be insufficient, behind-the-meter power availability. As noted above, sufficiency may be specified by remote master control system 420 or datacenter control system 220 may be programmed with a predetermined preference or criteria on which to make the determination independently. An operational directive may be based on current dispatchability, forward looking forecasts for when unutilized behind-the-meter power is, or is expected to be, available, economic considerations, reliability considerations, operational considerations, or the discretion of the local station 410, remote master control 420, or grid operator 440. **WO'632 at [0044].** |

| | | |
|---|---|---|
| | | For example, local station control system 410, remote master control system 420, or grid operator 440 may issue an operational directive to flexible datacenter 200 to go offline and power down. When the datacenter ramp- down condition is met, datacenter control system 220 may disable power delivery to the plurality of computing systems (100 of Figure 2). Datacenter control system 220 may disable 435 behind-the-meter power input system 210 from providing three- phase nominal AC voltage to the power distribution system (215 of Figure 2) to power down the plurality of computing systems (100 of Figure 2), while datacenter control system 220 remains powered and is capable of rebooting flexible datacenter 200 when unutilized behind-the-meter power becomes available again. **WO'632 at [0044].** |
| 10B | Modeling Data discloses:<br>• Bitcoin price data<br>• Power price data<br>• Hashrate | A method of dynamic power delivery to a flexible datacenter using unutilized behind-the-meter power includes monitoring unutilized behind-the-meter power availability, determining when a datacenter ramp-up condition is met, enabling behind-the-meter power delivery to one or more computing systems when the datacenter ramp-up condition is met, and directing the one or more computing systems to perform predetermined computational operations. **WO'632 at Abstract.**<br><br>Datacenter control system 220 may monitor and determine when there is insufficient, or anticipated to be insufficient, behind-the-meter power availability. As noted above, sufficiency may be specified by remote master control system 420 or datacenter control system 220 may be programmed with a predetermined preference or criteria on which to make the determination independently. An operational directive may be based on current dispatchability, forward looking forecasts for when unutilized behind-the-meter power is, or is expected to be, available, economic considerations, reliability considerations, operational considerations, or the discretion of the local station 410, remote master control 420, or grid operator 440. **WO'632 at [0044].**<br><br>Advantageously, the flexible datacenter may perform computational operations, such as blockchain hashing operations, with little to no energy costs, using clean and |

36

| | | renewable energy that would otherwise be wasted. **WO'632 at [0022].** For example, if the one or more computing systems (100 of Figure 2) are configured to perform blockchain hashing operations, datacenter control system 220 may direct them to perform blockchain hashing operations for a specific blockchain application, such as, for example, Bitcoin, Litecoin, or Ethereum.  **WO'632 at [0042].** |
|---|---|---|

77.    The '632 application discloses a container with networked miners, electrical system, and climate control system.

78.    The '632 application discloses control systems for monitoring data, including economic data, and issuing commands.

79.    The '632 application discloses control systems for starting and stopping computing systems within the container in response to changes in monitored data.

80.    The '632 application discloses consideration of modeling parameters such as cryptocurrency price data, power price data, and hashrate of miners in the methods and/or systems of the '632 application.

81.    Other than the above disclosed seven text messages and single email, Counter-Defendants had no other written communication with Counter-Plaintiffs until the filing of the Complaint approximately two years later.

82.    Consequently, the '632 application discloses each aspect of the information contained in written communications from Counter-Defendants to Counter-Plaintiffs.

## COUNT I

## DECLARATORY JUDGMENT: AUSTIN STORMS IS NOT AN INVENTOR OF THE '433 PATENT

83.　　Lancium repeats and restates paragraphs 1-82 of its Counterclaim as if fully set forth herein.

84.　　There is an actual controversy between Lancium and both BearBox and Storms regarding inventorship of the '433 Patent, which relates to methods and systems for adjusting power consumption based on power option agreements.  The subject matter claimed in the '433 Patent was invented by Michael T. McNamara and Raymond E. Cline, Jr. and is assigned to Lancium, LLC.

85.　　Storms is properly not named as an inventor of the '433 Patent because, among other reasons, he did not contribute to, or collaborate with Messrs. McNamara and Cline in any way in the conception of the inventive subject matter claimed in the '433 Patent. Nor did Storms assist McNamara or Cline with reducing to practice (actually or constructively) the inventive subject matter claimed in the '433 Patent.

86.　　As sole assignee of the '433 Patent, Lancium owns all rights, title, and interest to the '433 Patent and, thus, has a recognized interest in the patent that could be adversely affected by the action brought by BearBox and Storms "seeking correction of the named inventors of a United States patent under 35 U.S.C. § 256." Complaint at ¶ 11.

87.　　Specifically, BearBox and Austin Storms have alleged in the Complaint that:

- "The inventions claimed in the '433 Patent are inventions conceived by Storms," Complaint at ¶ 5;

- "Defendants falsely identified themselves as the inventors of the claimed inventions, when, in fact, Storms is the sole inventor of the claimed inventions,"

38

Complaint at ¶ 42; *see also id.* at ¶¶ 38, 45;

- "McNamara and Cline, both officers of Lancium, were not the rightful inventors of the [] Technology disclosed in the ['433] patent and the inventions claimed in the patent," Complaint at ¶ 42

- "Defendants McNamara and Cline each submitted signed declarations falsely swearing that they were 'an original joint inventor' of the claimed subject matter," Complaint at ¶ 43.

88.    Count 1 of the Complaint seeks "Correction of Inventorship for the '433 Patent: Austin Storms as Sole Inventor." Complaint at ¶¶ 51-54. In Count 1, BearBox and Storms each allege that "Storms is the sole inventor of the subject matter claimed in the '433 Patent," that Storms "was not listed as an inventor of the '433 patent" while "the currently listed inventors on the '433 patent were improperly listed," and that "[u]nless Defendants Lancium, McNamara, and Cline are enjoined from asserting that McNamara and Cline are the sole inventors of the '433 Patent in violation of U.S. federal patent laws, Plaintiffs will suffer irreparable injury." Complaint at ¶¶ 52-54

89.    Count 2 of the Complaint seeks "In the Alternative, Correction of Inventorship for the '433 Patent: Austin Storms as Joint Inventor with the Currently Named Inventors." Complaint at ¶¶ 55-58. In Count 2, BearBox and Storms each allege that, "[i]n the alternative, Storms is a joint inventor of the subject matter claimed in the '433 Patent and should be added to the individuals currently named as inventors on the '433 Patent," and that "[u]nless Defendants Lancium, McNamara, and Cline are enjoined from asserting that McNamara and Cline are the sole inventors of the '433 Patent in violation of U.S. federal patent laws, Plaintiffs will suffer irreparable injury." Complaint at ¶¶ 56-58.

90.     Counts 4 through 7 of the Complaint are each predicated on Counter-Defendants' unfounded assertion that McNamara and Cline misappropriated Plaintiffs' valuable intellectual property and incorporated it into the '433 Patent.  *See* Complaint at ¶¶ 63-88.  Once the Court declares that Storms is not an inventor of the subject matter claimed in the '433 Patent, Counter-Defendants ancillary causes of action necessarily fail.

91.     The facts set forth herein show that there is a substantial and actual controversy between the parties in that they assert adverse legal interests regarding the inventorship of the '433 Patent, as demonstrated by Counter-Defendants' Complaint, which has caused, and will continue to cause, uncertainty, insecurity, and controversy regarding the inventorship of the '433 Patent.

92.     The controversy is sufficiently immediate and real to warrant the issuance of a declaratory judgment because Counter-Defendants BearBox and Storms are both currently disparaging the inventorship of the '433 Patent, which adversely affects Lancium's business, including its efforts to enforce and license the '433 Patent.  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201. This Court is vested with the power to declare the rights, status, and other legal relations of the parties to this action with reference to the inventorship issues raised by Counter-Defendants in the Complaint, and to clarify and settle those issues.

93.     Pursuant to 28 U.S.C. § 2201, et seq., and 35 U.S.C. § 256, Counterclaimants Lancium, McNamara, and Cline are entitled to a judgment declaring that Austin Storms properly was not named as an inventor on the '433 Patent.

WHEREFORE, Lancium, McNamara, and Cline, having answered Counter-Defendants' Complaint and Lancium having set forth its Counterclaim against Counter-Defendants, respectfully pray for the following relief:

40

A.    That all of Counter-Defendants' claims be dismissed, with prejudice, and that judgment be entered in favor of Lancium, McNamara, and Cline, and against Counter-Defendants BearBox and Storms on all counts;

B.    That the Court issue a declaratory judgment that Storms is not an inventor of the subject matter claimed in the '433 Patent;

C.    That the Court issue a declaratory judgment that Storms was properly not named an inventor on the '433 Patent;

D.    That Lancium, McNamara, and Cline be awarded their reasonable attorneys' fees and expenses in defending this action and in prosecuting the Counterclaims; and

E.    That the Court award Lancium, McNamara, and Cline such other and further relief as the Court deems just and proper.

## COUNT II

## DECLARATORY JUDGMENT: BEARBOX HAS NO OWNERSHIP RIGHTS IN THE '433 PATENT

94.    Lancium repeats and restates paragraphs 1-93 of its Counterclaim as if fully set forth herein.

95.    There is an actual controversy between Lancium and both BearBox and Storms regarding ownership of the '433 Patent, which relates to methods and systems for adjusting power consumption based on power option agreements. The subject matter claimed in the '433 Patent was invented by Michael T. McNamara and Raymond E. Cline, Jr. and is assigned to Lancium, LLC.

96.    BearBox and Storms are each properly not assignees of the '433 Patent because, among other reasons, Storms is not an inventor of the subject matter claimed in the '433 Patent.

20282726v1

97.     As sole assignee of the '433 Patent, Lancium owns all rights, title, and interest to the '433 Patent and, thus, has a recognized interest in the patent that could be adversely affected by the action brought by BearBox and Storms seeking to name Storms as sole inventor or, in the alternative, as joint inventor of the '433 Patent.

98.     Specifically, Counts 1 and 2 of the Complaint seek "Correction of Inventorship for the '433 Patent." Complaint at ¶¶ 51-58. In these counts, BearBox and Storms allege that Storms is either the sole inventor (Count 1) or a joint inventor (Count 2) of the subject matter claimed in the '433 Patent. See id.; see also, generally, Complaint at ¶¶ 5, 11, 38, 42, 43, 45 (alleging that Storms, and not Messrs. McNamara and Cline, invented the subject matter claimed in the '433 Patent).

99.     In Count 3 of the Complaint (for conversion), Counter-Defendants allege that Storms "conceived, developed, and reduced to practice the '[433 Patent] Technology" and that "Plaintiffs own [this] Technology, related know-how, and related intellectual property." Complaint at ¶ 61. Counter-Defendants further allege that they "owned this property during all relevant time periods in this suit," and that Defendants assumed dominion and control over the [] Technology by claiming it as their own in the '433 patent," thereby "obtain[ing] the purported ability to exclude Plaintiffs and others from using the [] Technology. Complaint at ¶¶ 60-61. According to Counter-Defendants, "[t]his constitutes unauthorized and unlawful conversion by Defendants" and "Plaintiffs have been damaged by losing valuable intellectual property from which Plaintiffs would have derived substantial revenue via licensing and/or selling patented products." Complaint at ¶¶ 61-62.

100.     Counts 4 and 5 of the Complaint are predicated on Counter-Defendants' unfounded assertion that Messrs. McNamara and Cline misappropriated Counter-Defendants' valuable

intellectual property and incorporated it into the '433 Patent.  *See* Complaint at ¶¶ 63-73.  Once the Court declares that Lancium is the sole owner of the intellectual property in question, Counter-Defendants ancillary causes of action necessarily fall.

101.   The facts set forth herein show that there is a substantial and actual controversy between the parties in that they assert adverse legal interests regarding the ownership and enforceability of the '433 Patent, as demonstrated by Counter-Defendants' Complaint, which has caused, and will continue to cause, uncertainty, insecurity, and controversy regarding the ownership and enforceability of the '433 Patent.

102.   The controversy is sufficiently immediate and real to warrant the issuance of a declaratory judgment because Counter-Defendants BearBox and Storms are both currently disputing the ownership of the '433 Patent, which adversely affects Lancium's business, including its efforts to enforce and license the '433 Patent. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201. This Court is vested with supplemental jurisdiction over this Counterclaim and the power to declare the rights, status, and other legal relations of the parties to this action with reference to the ownership and enforceability issues raised by Counter-Defendants in the Complaint, and to clarify and settle those issues.

WHEREFORE, Lancium, McNamara, and Cline, having answered Counter-Defendants' Complaint and Lancium having set forth its Counterclaim against Counter-Defendants, respectfully pray for the following relief:

A.   That all of Counter-Defendants' claims be dismissed, with prejudice, and that judgment be entered in favor of Lancium, McNamara, and Cline, and against Counter-Defendants BearBox and Storms on all counts;

B.   That the Court issue a declaratory judgment that Lancium is the only owner

20282726v1

of all right, title, and interests to the '433 Patent;

        C.    That the Court issue a declaratory judgment that Counter-Defendants BearBox and Storms, either individually or collectively, have no ownership rights in the '433 Patent;

        D.    That Lancium, McNamara, and Cline be awarded their reasonable attorneys' fees and expenses in defending this action and in prosecuting the Counterclaims; and

        E.    That the Court award Lancium, McNamara, and Cline such other and further relief as the Court deems just and proper.

## COUNT III

### DECLARATORY JUDGMENT THAT LANCIUM, MCNAMARA, AND CLINE DID NOT STEAL OR OTHERWISE IMPROPERLY OBTAIN OR USE ANY INFORMATION FROM BEARBOX AND STORMS

103.    Lancium repeats and restates paragraphs 1-102 of its Counterclaim as if fully set forth herein.

104.    The Complaint filed by BearBox and Storms against Lancium, McNamara, and Cline accuses each of them of "theft of inventions" belonging to BearBox and Storms.

105.    The Complaint at paragraphs 25-31 describes the "inventions" allegedly stolen from BearBox and Storms by Lancium, McNamara, and Cline.

106.    As described above, Lancium, McNamara, and Cline did not steal, improperly obtain, or use any information from BearBox or Storms.

107.    Any information given to McNamara from Storms was provided without any claims that BearBox or Storms owned the information and without any claim or notice that the information was confidential.

108.     Further, the information described in paragraphs 25-31 of the Complaint could not have been confidential to BearBox or Storms because it was publicly available.

109.     There is an actual controversy between Lancium and both BearBox and Storms in that they assert adverse legal interests regarding whether Lancium, McNamara, and Cline stole or otherwise improperly obtained or used confidential information from BearBox and Storms.

110.     The controversy is sufficiently immediate and real to warrant the issuance of a declaratory judgment because BearBox and Storms are both currently asserting that Lancium, McNamara, and Cline have stolen technology and confidential information, which adversely affects Lancium's business. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201. This Court is vested with supplemental jurisdiction over this Counterclaim and the power to declare the rights, status, and other legal relations of the parties to this action with reference to the theft and trade secret misappropriation issues raised by BearBox and Storms in their Complaint, and to clarify and settle those issues.

WHEREFORE, Lancium, having answered Counter-Defendants' Complaint and having set forth its Counterclaim against Counter-Defendants, respectfully prays for the following relief:

A.     That all of Counter-Defendants' claims be dismissed, with prejudice, and that judgment be entered in favor of Lancium, McNamara, and Cline, and against Counter-Defendants BearBox and Storms on all counts;

B.     That the Court issue a declaratory judgment that Lancium has not stolen or otherwise improperly obtained or used any information from BearBox or Storms;

D.     That Lancium be awarded its reasonable attorneys' fees and expenses in defending this action and in prosecuting the Counterclaims; and

E.     That the Court award Lancium, McNamara, and Cline such other and further relief as the Court deems just and proper.

Dated:  June 25, 2021                         BARNES & THORNBURG LLP
**Redacted Version filed on June 25, 2021**

                                               _/s/ Chad S.C. Stover_____
                                               Chad S.C. Stover (No. 4919)
                                               1000 N. West Street, Suite 1500
                                               Wilmington, Delaware 19801-1050
                                               Telephone: (302) 300-3474
                                               E-mail: chad.stover@btaw.com

                                               *Attorneys for Lancium LLC, Michael T.*
                                               *McNamara, and Raymond E. Cline Jr.*

46