IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BEARBOX LLC and AUSTIN STORMS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-534-MN-CJB |
| | ) | |
| LANCIUM LLC, MICHAEL T. MCNAMARA, and RAYMOND E. CLINE, JR. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiffs BearBox LLC ("BearBox") and Austin Storms (collectively, "Plaintiffs" or "BearBox") bring this action against Lancium LLC ("Lancium"), Michael T. McNamara, and Raymond E. Cline, Jr. (collectively "Defendants") to correct the inventorship of U.S. Patent No. 10,608,433 (the "'433 Patent") and to recover damages, injunctive relief, declaratory relief, and other remedies for Defendants' wrongful actions to obtain, convert, misuse, disclose, and claim as their own Plaintiffs' proprietary cryptocurrency mining technology. Plaintiffs further allege as follows:

## INTRODUCTION

1.     This case is about the Defendants' theft and unauthorized use of system designs, data, know-how, and physical documents describing those designs, data, and know-how, as well as inventions that rightfully belong to Plaintiffs.

2.     Plaintiffs developed proprietary technology relating to cryptocurrency mining systems.  By way of background, BearBox's technology generally relates to an energy-efficient cryptocurrency mining system and related methods that reduce the inefficiency and

environmental impact of energy-intensive mining operations by better utilizing available energy resources to increase the stability of the energy grid, minimize a mining operation's impact on peak-demand, and also alleviate energy oversupply and undersupply conditions. BearBox's technology can be used to mine cryptocurrency, such as Bitcoin.

3.     The Defendants deceptively induced the Plaintiffs to disclose  BearBox's technology to them under the guise of a possible business deal or "collaboration," a word used by McNamara in encouraging Plaintiffs' disclosures, between Defendants and Plaintiffs to jointly commercialize the BearBox Technology.

4.     The Defendants stole BearBox's technology, including system designs, documents, data, and know-how, from Plaintiffs by converting it and using it to modify Defendants' software, e.g. Smart Response™, to operate as BearBox's technology did, and then selling, licensing, seeking investments in support of, and otherwise monetizing that modified Smart Response™ software for great profit.

5.     Defendants went even further, by filing a U.S. patent application, which later matured into the '433 Patent, that wrongfully disclosed portions of BearBox's technology to the U.S. Patent and Trademark Office and ultimately to the public as technology that was invented by Defendants. The claimed subject matter of the '433 Patent falls fully within the scope of BearBox's technology, though is not a complete representation of the BearBox technology. By obtaining the '433 Patent with claims directed to portions of BearBox's technology, the Defendants have wrongfully obtained a patent that prevents Plaintiffs from building their own system, or otherwise monetizing their system designs, data, documents, and know-how.

6.      Plaintiffs bring this action to recover damages caused by Defendants' theft and unauthorized use, and subsequent exploitation of Plaintiffs system design, data, documents, and know-how.

7.      Plaintiffs also bring this action to correct the named inventors on the '433 Patent. The inventions claimed in the '433 Patent are inventions conceived by Storms, founder and president of BearBox.

## PARTIES

8.      BearBox LLC is a limited liability company organized and existing under the laws of Louisiana with its principal place of business at 4422 Highway 22, Mandeville, Louisiana 70471.

9.      Plaintiff Austin Storms is an individual residing in Mandeville, Louisiana.

10.      On information and belief, Defendant Lancium is a Delaware limited liability company with its principal place of business at 6006 Thomas Rd, Houston, Texas 77041. On information and belief, Lancium has a registered agent capable of accepting service in this district, Harvard Business Services, Inc. with a place of business at 16192 Coastal Highway, Lewes, DE 19958.

11.      On information and belief, Defendant Michael T. McNamara is the Chief Executive Officer and a founder of Lancium and resides in Newport Beach, California. Defendant McNamara is named as a purported inventor on the face of the '433 Patent.

12.      On information and belief, Defendant Raymond E. Cline, Jr. is the Chief Computing Officer of Lancium and resides in Houston, Texas. Defendant Cline is named as a purported inventor on the face of the '433 Patent.

## JURISDICTION

13.     This is an action seeking correction of the named inventors of a United States patent under 35 U.S.C. § 256. As such, this action arises under the laws of the United States.

14.     This Court has exclusive subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because the matter arises under an Act of Congress relating to patents, specifically 35 U.S.C. § 256.

15.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over all asserted claims under state law because those claims are so related to the claims in this action that arise under federal law that they form part of the same case or controversy.

16.     The Court also has jurisdiction pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists among the parties, and the amount in controversy exceeds $75,000. Plaintiff BearBox is a citizen of the State of Louisiana because it is organized under the laws of the State of Louisiana and has its principal place of business in the State of Louisiana. Plaintiff Storms is a citizen of the State of Louisiana because he resides in the State of Louisiana. In contrast, none of the Defendants are citizens of the State of Louisiana. Defendant Lancium is a citizen of the States of Delaware and Texas because it is organized under the laws of the State of Delaware and has its principal place of business in the State of Texas. Defendant McNamara is a citizen of the State of California because he resides in the State of California. Defendant Cline is a citizen of the State of Texas because he resides in the State of Texas. Therefore, because the Plaintiffs are both citizens of the State of Louisiana (and no other states) for purposes of diversity jurisdiction, and none of the Defendants are citizens of the State of Louisiana, complete diversity exists among the parties.

17.     This Court has general personal jurisdiction over Lancium because it is organized under the laws of the State of Delaware and because it maintains an ongoing presence in this District at least through its registered agent.

18.     This Court has specific personal jurisdiction over each of Defendants McNamara and Cline at least under Title 6 of the Delaware Code, § 18-109(a).

19.     On information and belief, Defendant McNamara is the Chief Executive Officer of Lancium. On information and belief, as the Chief Executive Offer, McNamara participates materially in the management of Lancium, has control and/or decision-making authority over Lancium, and is a key individual who takes actions on behalf of Lancium.

20.     McNamara is a necessary or proper party to this action because he has a legal interest in the dispute that is separate from the interests of Lancium and because Plaintiffs' claims against him arise out of the same facts and occurrences as the claims against Lancium. Accordingly, it serves judicial economy to consider the claims against Lancium and Defendant McNamara together. Plaintiffs' claims against Defendant McNamara arise out of his exercise of his powers as Chief Executive Officer of Lancium.

21.     On information and belief, Defendant Cline is the Chief Computing Officer of Lancium. On information and belief, as the Chief Computing Officer, Cline participates materially in the management of Lancium, has control and/or decision-making authority over Lancium, and is a key individual who takes actions on behalf of Lancium.

22.     Cline is a necessary or proper party to this action because he has a legal interest in the dispute that is separate from Lancium's interest and because Plaintiffs' claims against him arise out of the same facts and occurrences as the claim against Lancium. Accordingly, it serves judicial economy to consider the claims against Lancium and Defendant Cline together.

Plaintiffs' claims against Defendant Cline arise out of his exercise of his powers as Chief Computing Officer of Lancium.

23.     The actions of Defendants McNamara and Cline establish sufficient minimum contacts with Delaware under Delaware law and the United States Constitution to give this Court personal jurisdiction over each of them.

24.     As described below, each Defendant has committed acts giving rise to this action.

### VENUE

25.     Venue is proper in this District under 28 U.S.C. § 1391(b)(3) because there is no district in which an action may otherwise be brought as provided in § 1391(b) and Defendant Lancium is subject to the Court's personal jurisdiction with respect to this action.

### PLAINTIFFS' PROPRIETARY
### CRYPTOCURRENCY MINING TECHNOLOGY

26.     As of 2018, the amount of energy required to process computer algorithms to mine cryptocurrencies like Bitcoin was three times greater than the energy required to physically mine gold. Conventional mining of "copper, gold, platinum, and rare earth oxides are 4, 5, 7, and 9 megajoules to generate one U.S. dollars," while "it costs an average of 17 megajoules to mine $1 worth of bitcoin."[1] The large amount of energy required to mine cryptocurrencies can make such mining financially prohibitive, and even when financially lucrative, the energy required for cryptocurrency mining can be harmful to the environment, with studies showing potential carbon dioxide emissions from cryptocurrency mining "single-handedly rais[ing] global temperatures by 2 degrees by 2023." *Id.*

---

[1] https://www.marketwatch.com/story/mining-bitcoin-is-3-times-more-expensive-than-mining-gold-research-paper-finds-2018-11-06

27.     At the same time, some forms of electrical power generation, such as wind, solar, or other types of variable renewable energy sources, are inefficient and suffer from a timing imbalance between peak demand and energy production. Additionally, these non-dispatchable renewable energy sources cannot be controlled by operators in response to dynamically changing grid conditions. As a result, these renewable energy sources and their operators frequently sell power at low or negative prices, sometimes even being curtailed or shut down entirely, until demand increases and grid conditions change.

28.     Because cryptocurrency mining using proof-of-work is a computationally demanding process, it requires a significant amount of energy to operate. As a result, industrial-scale cryptocurrency mining places a large energy burden on the power grid, driving demand and costs as well as increasing the likelihood of transmission or other grid component failure if not managed correctly.

29.     In late 2018 and early 2019, Austin Storms sought to address these problems by developing energy-efficient cryptocurrency mining systems and methods that reduce the environmental impact of energy-intensive mining operations. Storms conceived of a system that better uses available energy resources to increase the stability of the energy grid, minimize a mining operation's impact on peak-demand, and help alleviate energy oversupply and undersupply conditions, all while decreasing the overall energy costs of the mining operation and increasing its profitability.

30.     Austin Storms conceived of and developed BearBox's technology. Storms is the president and founder of BearBox. BearBox's technology includes hardware and software components. Structurally, BearBox's technology includes a housing for a plurality of miners (such as ASICs, graphics cards, or the like) under the direction of a smart controller(s).

31.     In BearBox's technology, a controller (such as a power distribution unit, network interface, computer, and/or the like) monitors various external factors, such as current and expected energy demand/pricing information, current and expected cryptocurrency pricing, current and expected network hashrate and difficulty, and the like. Based on these external factors, the controller(s) determines appropriate times to mine cryptocurrency in accordance with a desired performance strategy (for example, profitability thresholds). At the appropriate times, the controller initiates mining, for example, by powering on a number of miners based on various conditions internal and external conditions.

## DEFENDANTS WRONGFULLY STOLE
## BEARBOX'S TECHNOLOGY

32.     In May 2019, Storms attended the Fidelity FCAT Mining Summit in Boston, Massachusetts on behalf of BearBox to promote BearBox's technology and seek potential customers for his revolutionary system.

33.     While at the conference, Storms met Defendant McNamara. Defendant McNamara showed immediate interest in BearBox's technology. Under the ruse of a potential business relationship, McNamara deceptively pumped Storms for details about BearBox's technology over the course of several exchanges, which included conversations, emails, and text messages about BearBox's technology. Storms took McNamara to dinner where McNamara continued to pump Storms for details about BearBox's technology.

34.     Following the conference, McNamara continued to press Storms for additional details about BearBox's technology via text messaging and email. Storms described BearBox's technology and provided annotated system diagrams, component specifications, and modeled data sets to mimic real-world Bitcoin variables such as Bitcoin price and network hashrate, energy prices, time intervals, and power thresholds, and computed profitability figures. Storms

communications to McNamara about BearBox's technology was for the sole purpose of potential partnership. Storms included express confidentiality notices in his email communications with Defendant McNamara.

35.     After Storms disclosed BearBox's technology to McNamara, McNamara abruptly ended all communications with Storms.

36.     Storms last communicated with McNamara on May 9, 2019 via e-mail, and after sending that message, Storms did not hear from McNamara again.

37.     At that time, Storms understood that McNamara was not interested in investing in or collaborating with BearBox's technology. But Storms had no reason to suspect that Defendants were being deceptive and would steal BearBox's technology, including the system designs, diagrams, data, documents, and know-how, and use it to build Defendants' own system that would function as BearBox's technology did.

38.     In the days, weeks, and months following Plaintiffs' disclosures to McNamara, Defendants began working with partners, outside consultants, and vendors to help Defendants bring BearBox's technology to market, labeled as Defendants' own system. Defendants efforts included working internally to modify their Smart Response™ software to work as BearBox's technology did.

39.     Defendants soon became confident they could exploit BearBox's technology for profit by modifying their Smart Response™ software, and then using, selling, licensing, and otherwise monetizing that modified Smart Response™ software, but Defendants also realized that others would eventually learn of Defendants' new-and-improved Smart Response™ software, now with the benefits of BearBox's technology, and may copy it in order to compete with Defendants.

40.     Defendants believed that the profits they would realize from exploiting their modified Smart Response™ software would be significantly reduced if outside competitors were allowed to copy Defendants' unauthorized use of BearBox's technology and compete directly with Defendants.

41.     Because of these realizations, Defendants hatched a plan to patent some of the profitable attributes of BearBox's technology.  If such a patent was obtained, Defendants believed that such a patent would effectively grant Defendants a monopoly to exploit significant portions of BearBox's technology for profits that would far exceed any profits should Defendants be left to compete with others, including BearBox.

42.     On information and belief, Defendants filed U.S. provisional patent application No. 62/927,119 on October 28, 2019, naming Defendants McNamara and Cline as the purported sole joint inventors of the inventions disclosed in the application.

43.     In addition to falsely claiming to be the inventors of the inventions disclosed in the application, Defendants wrongfully disclosed, without authorization, portions of BearBox's technology to the United States Patent and Trademark Office.

44.     Likewise, on December 4, 2019, Defendants filed U.S. Patent Application Serial No. 16/702,931, once again naming Defendants McNamara and Cline as the purported sole joint inventors of the inventions disclosed in the application.

45.     The '433 Patent issued on March 31, 2020 naming Defendants McNamara and Cline as the sole purported inventors on the face of the patent. A true and correct copy of the '433 Patent is attached hereto as Exhibit A.

46.     The inventions claimed in the '433 patent fall within the scope of BearBox's technology, yet Defendants falsely identified themselves as the inventors of the claimed

inventions, when, in fact, Storms is the sole inventor of the claimed inventions. Not all aspects of BearBox's technology that was stolen and used by Defendants was described and claimed in the '433 Patent. For example, Defendants theft and unauthorized use included confidential aspects of BearBox technology's system design, diagrams, data, and know-how to modify Defendants' Smart Response software to develop and exploit, among other things, methods for energy value arbitrage, including cryptocurrency mining systems and arbitraging related energy values.

47.     On information and belief, McNamara and Cline assigned their purported rights in the '433 patent to Lancium. On information and belief, at all times, Lancium was aware that McNamara and Cline, both officers of Lancium, were not the rightful inventors of BearBox's technology disclosed in the patent and the inventions claimed in the patent.

48.     Defendants McNamara and Cline each submitted signed declarations falsely swearing that they were "an original joint inventor" of the claimed subject matter. A true and correct copy of Defendant McNamara's and Defendant Cline's declarations are attached as Exhibit B.

49.     On June 19, 2020, Defendants announced that its Smart Response™ software allowed it to qualify as the "first successful load-only Controllable Load Resource (CLR) designation," which Defendants described as a "breakthrough achievement," that allows for dispatching "excess energy into the grid during times when energy is most expensive," adding that "with this revolutionary advancement, data centers will also be able to earn additional revenue providing ancillary services to ERCOT."

50.     Since then, Defendants have used BearBox's technology, including the stolen system designs, diagrams, data, and know-how, and its subsequently-modified Smart Response™ software to function as it did, to allow Defendants to profit significantly from use,

license, sale, and investments related to its modified Smart Response™ software. Defendants are not, and have never, been entitled to these profits.

51.     In addition to illegally profiting from its theft and subsequent use of BearBox's technology, Defendants made use of its ill-gotten '433 patent.

52.     On August 14, 2020, Lancium filed a lawsuit in the U.S. District Court for the Western District of Texas against Layer1 Technologies, Inc. ("Layer1") asserting that Layer1 infringes the '433 patent, and stating that "Lancium's Controllable Load Resource Technology attracted the interest of many companies, including, upon information and belief, Layer1." That case is captioned *Lancium LLC v. Layer1 Technologies, Inc.*, Case No. 6:20-cv-739 (W.D. Texas) (the "Layer1 Lawsuit").

53.     As part of the Layer1 Lawsuit, Defendants falsely asserted that McNamara and Cline are the sole inventors of the inventions claimed in the '433 patent.

54.     Plaintiffs became aware of Defendants' wrongful use of BearBox's technology on or about August 17, 2020, when they learned about the Layer1 Lawsuit through a press release dated August 14, 2020, posted by Lancium on PRNewswire. That press release is available at the following URL: https://www.prnewswire.com/news-releases/controllable-load-resource-clr-market-leader-lancium-files-patent-infringement-lawsuit-against-layer1-301112687.html.

55.     Before seeing the August 14, 2020 press release, Plaintiffs were unaware of Defendants' wrongful use of BearBox's technology and was unaware of the '433 patent.

56.     On March 5, 2021, Lancium and Layer1 entered a Stipulation to Dismiss with Prejudice in the Layer1 Lawsuit. According to the stipulation, the parties had entered a Settlement Agreement to resolve the Layer1 Lawsuit.

57.     According to a press release issued by Lancium on March 8, 2021, Lancium and Layer 1 "have entered into a mutually beneficial partnership. Layer1 has licensed Lancium's intellectual property and Lancium will provide Smart Response™ software and services to Layer1." The press release is available at the following URL: https://www.prnewswire.com/news-releases/lancium-and-layer1-settle-patent-infringement-suit-301242602.html.

## COUNT I
### CORRECTION OF INVENTORSHIP FOR THE '433 PATENT: AUSTIN STORMS AS SOLE INVENTOR

58.     Plaintiffs incorporate the above paragraphs by reference.

59.     Storms is the sole inventor of the subject matter claimed in the '433 Patent.

60.     Through omission, inadvertence, and/or error, Storms was not listed as an inventor on the '433 patent and the currently listed inventors on the '433 patent were improperly listed. The omission, inadvertence, and/or error occurred without any deceptive intent on the part of Storms or BearBox.

61.     Unless Defendants Lancium, McNamara, and Cline are enjoined from asserting that McNamara and Cline are the sole inventors of the '433 Patent in violation of U.S. federal patent laws, Plaintiffs will suffer irreparable injury. Plaintiffs have no adequate remedy at law.

## COUNT II
### IN THE ALTERNATIVE, CORRECTION OF INVENTORSHIP FOR THE '433 PATENT: AUSTIN STORMS AS JOINT INVENTOR WITH THE CURRENTLY NAMED INVENTORS

62.     Plaintiffs incorporates the above paragraphs by reference.

63.     In the alternative, Storms is a joint inventor of the subject matter claimed in the '433 Patent and should be added to the individuals currently named as inventors on the '433 Patent.

64.     Through omission, inadvertence, and/or error, Storms was not listed as an inventor on the '433 patent and the currently listed inventors on the '433 patent were improperly listed. The omission, inadvertence, and/or error occurred without any deceptive intent on the part of Storms.

65.     Unless Defendants Lancium, McNamara, and Cline are enjoined from asserting that McNamara and Cline are the sole inventors of the '433 Patent in violation of U.S. federal patent laws, Plaintiffs will suffer irreparable injury. Plaintiffs have no adequate remedy at law.

### COUNT III
### TRADE SECRET MISAPPROPRIATION UNDER
### FEDERAL DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

66.     Plaintiffs incorporate the above paragraphs by reference.

67.     At all relevant times, Plaintiffs and Defendants were engaged in interstate commerce. For example, Plaintiffs and Defendants are engaged in trade and business, developing and testing, among other things, cryptocurrency mining systems and related methods in interstate commerce throughout the United States.

68.     In the course of the interactions between Austin Storms and Defendants, Defendants obtained confidential information about BearBox's technology relating to certain features, including methods for energy value arbitrage, including cryptocurrency mining systems and arbitraging related energy values. Such information constitutes trade secrets of substantial economic value, at least because methods for energy value arbitrage may be used for substantial profit. This confidential technical information was not known to the public or to other persons who can obtain economic value from its disclosure or use. This information constituted a trade secret under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836.

69.     Defendants knew the information they received from Austin Storms about BearBox's technology was confidential, as Storms specifically informed Defendant McNamara that the information given to him was to be held in confidence, and was not to be used for any other purpose beyond those necessary to carry out an evaluation in advance of a potential business relationship, and was in no way the information received to be used by Defendants' for their own profit. McNamara himself referred to the exchanges with Plaintiffs' "lots of stuff to collaborate on." Defendants further knew the technical information they received from Storms about BearBox's technology was confidential based upon Defendants' own actions taken to protect that information once they possessed it, and misappropriated it by using in modification of their Smart Response™ software. Defendants' restricted access to the information, including as it was represented in the Smart Response™ software, required confidentiality agreements for third party customers, potential customers, and licensees, and other internal measures were taken.

70.     Plaintiffs included a confidentiality designation on communications to which the confidential trade secret information was attached. Plaintiffs took additional reasonable steps to preserve secrecy via these explicit guidelines regarding confidentiality and by limiting the number of individuals that Plaintiffs allowed to access this information. Plaintiffs also had systems in place to maintain confidentiality with respect to third parties, by, for example, limiting access to its computers. The confidential information was, at all other times, secured on a password protected computer.  The confidential information was not externally accessible through the internet.  When that password protected computer was not attended, it was secured in a locked building at Storms residence, which included other security measures such as a concierge and elevator keys.

71.     For the very limited number of additional occasions the confidential, trade secret information was shared, it was shared with a person or entity subject to contractual obligations regarding confidentiality and/or prohibitions on unauthorized use.  For the limited number of occasions BearBox shared the confidential, trade secret information with potential customers, it was done only with BearBox management approval.

72.     Defendants misappropriated Plaintiffs' trade secrets when they used BearBox technology, without Plaintiffs' authorization, in at least its Smart Response™ software. Defendants have disclosed and/or used the confidential information without the express or implied consent of Plaintiffs. The acts of taking Plaintiffs' confidential information, and using it as Defendants' own, and without permission was improper. Further, Defendant McNamara agreed to abide by Plaintiffs' confidentiality terms, only to violate these terms in secret. Defendant McNamara's deception led to Storms continuing to disclose confidential information to Defendants.

73.     As a result of Defendants' misappropriation of Plaintiffs' trade secrets, Plaintiffs' have suffered and will suffer damages or other financial harm in an amount to be proven at trial including, but not limited to, damages for actual loss caused by the misappropriation of the trade secrets, financial loss for any unjust enrichment caused by the misappropriation of the trade secrets, and/or damages caused by the misappropriation measured by imposition of liability.

74.     The Defendants willfully and maliciously misappropriated the Plaintiffs' trade secrets, and Plaintiffs are therefore entitled to an award of exemplary damages and an award of reasonable attorney's fees under 18 U.S.C. § 1836(b)(3)(C), (D).

## COUNT IV
## TRADE SECRET MISAPPROPRIATION UNDER
## LOUSIANA CIVIL PRACTICE AND REMEDIES CODE, TITLE 51, SECTION 13-A

75.     Plaintiffs incorporate the above paragraphs by reference.

76.     At all relevant times, Plaintiffs and Defendants were engaged in trade or commerce within the meaning of La. R.S. 51:1431-39 (2011), the Louisiana Uniform Trade Secrets Act. For example, Plaintiffs and Defendants are engaged in trade and business, developing and testing, among other things, cryptocurrency mining systems and related methods.

77.     In the course of the interactions between Austin Storms and Defendants, Defendants obtained confidential information about BearBox's technology relating to certain features, such as methods for energy value arbitrage, including cryptocurrency mining systems and arbitraging related energy values. Such information constitutes trade secrets of substantial economic value, at least because methods for energy value arbitrage, including cryptocurrency mining systems and arbitraging related energy valuesmay be used for substantial profit. This confidential technical information was not known to the public or to other persons who can obtain economic value from its disclosure or use. This information constituted a trade secret under the Louisiana Uniform Trade Secret Act.

78.     Defendants knew the technical information they received from Austin Storms about BearBox's technology was confidential, as Storms specifically informed Defendant McNamara that the information given to him was to be held in confidence, and was not to be used for any other purpose beyond those necessary to carry out an evaluation in advance of a potential business relationship, and was in no way the information received to be used by Defendants' for their own profit. Defendants further knew the information they received from Storms about BearBox's technology was confidential based upon Defendants' own actions taken to protect that information once they possessed it. Defendants' restricted access to the

information, required confidentiality agreements for third party customers, potential customers, and licensees, and other internal measures were taken. Defendants further took these actions to protect Plaintiffs' confidential information after Defendants misappropriated it by including it for use in Defendants' Smart Response™ software.

79.     Plaintiffs included a confidentiality designation on communications to which the confidential trade secret information was attached. Plaintiffs took additional reasonable steps to preserve secrecy via these explicit guidelines regarding confidentiality and by limiting the number of collaborators that Plaintiffs allowed to access this information. Plaintiffs also had systems in place to maintain confidentiality with respect to third parties, by, for example, limiting access to its computers. The confidential information was, at all other times, secured on a password protected computer.  The confidential information was not externally accessible through the internet.  When that password protected computer was not attended, it was secured in a locked building.

80.     For the very limited number of additional occasions the confidential, trade secret information was shared, it was shared with a person or entity subject to contractual obligations regarding confidentiality and/or prohibitions on unauthorized use.  For the limited number of occasions BearBox shared the confidential, trade secret information with potential customers, it was done only with BearBox management approval.

81.     Defendants misappropriated Plaintiffs' trade secrets when they used BearBox technology, without Plaintiffs' authorization, in at least its Smart Response™ software. Defendants have disclosed and/or used the confidential technical information without the express or implied consent of Plaintiffs. The acts of taking Plaintiffs' confidential information, and using it as Defendants' own, and without permission was improper. Further, Defendant McNamara

agreed to abide by Plaintiffs' confidentiality terms, only to violate these terms in secret. Defendant McNamara's deception led to Storms continuing to disclose confidential information to Defendants.

82.     As a result of Defendants' misappropriation of Plaintiffs' trade secrets, Plaintiffs' have suffered and will suffer damages or other financial harm in an amount to be proven at trial including, but not limited to, damages for actual loss caused by the misappropriation of the trade secrets, financial loss for any unjust enrichment caused by the misappropriation of the trade secrets, and/or damages caused by the misappropriation measured by imposition of liability.

83.     The Defendants willfully and maliciously misappropriated the Plaintiffs' trade secrets, and Plaintiffs are therefore entitled to an award of exemplary damages and an award of reasonable attorney's fees under § 51:1434.

**COUNT V**
**CONVERSION BY LANCIUM, MCNAMARA, AND CLINE**

84.     Plaintiffs incorporates the above paragraphs by reference.

85.     Austin Storms, in his capacity as founder and President of BearBox, conceived, developed, and reduced to practice BearBox's technology. Plaintiffs own BearBox's technology, including system designs, documents, data, and know-how. Plaintiffs owned this property during all relevant time periods in this suit.

86.     Defendants induced Plaintiffs to provide information and documents regarding BearBox's technology to Defendants by misrepresenting that Defendants were interested in investing in or otherwise collaborating with BearBox. Information and documents regarding BearBox's technology were provided to Defendants solely for the purposes of evaluation for a potential business relationship.

87.     Without Plaintiffs' consent, Defendants intentionally and willfully assumed dominion and control over BearBox's technology, including system designs, documents, data, and know-how, and improperly used it to modify their Smart Response™ software, and corresponding system designs, to function as reflected in BearBox's system designs, documents, data, and know-how, and subsequently used, sold, licensed, and procured investments related to, and otherwise monetized, that software for substantial profit.

88.     Defendants' unlawful exercise of dominion over confidential Bearbox technology, including system designs, documents, data, and know-how not otherwise found to be a trade secret, or having value beyond the value of the trade secret(s), has permanently interfered with Plaintiffs' valuable property rights.

89.     Despite providing Defendants with the system designs, documents, data, and know-how that allowed Defendants to modify their Smart Response™ software, and corresponding system designs, Defendants have not compensated or recognized Plaintiffs for the use of BearBox's technology. Defendants' actions constitute an improper and unauthorized use of Plaintiffs' property.

90.     As a result of Defendants' improper and unauthorized use of Plaintiffs' system designs, documents, data, and know-how to reconstruct and use Bearbox's technology, Plaintiffs have suffered and will continue to suffer damages and other financial harms in an amount to be proven at trial. As such, Plaintiffs are entitled to damages resulting from Defendants' improper and unauthorized use.

## COUNT VI
## UNJUST ENRICHMENT BY LANCIUM, MCNAMARA, AND CLINE

91.     Plaintiffs incorporate the above paragraphs by reference.

92.     Plaintiffs conferred a benefit on Defendants by providing them valuable technology, specifically BearBox's technology, including system designs, documents, data, and know-how.

93.     Defendants pressed Storms to provide more information and materials, having recognized the benefit that Defendants received by having access to system designs, documents, data, and know-how reflecting BearBox's technology.

94.     Defendants induced Plaintiffs to provide these system designs, documents, data, and know-how by misrepresenting that Defendants were interested in investing in or otherwise collaborating with Bearbox. Defendants' actions in obtaining Plaintiffs' system designs, documents, data, and know-how were deceptive.

95.     Defendants retained BearBox's technology, including system designs, documents, data, and know-how, and used it to their own advantage, and at BearBox's expense.

96.     Defendants have been and continue to be unjustly enriched by profiting from their wrongful conduct. For example, without Plaintiffs' consent, Defendants used Plaintiffs' system designs, documents, data, and know-how to modify their Smart Response™ software to function as BearBox's technology did. As a result, Defendants are deriving an unjust benefit from exploiting BearBox's property.

97.     Despite providing Defendants with the system designs, documents, data, and know-how that allowed Defendants to modify their system designs and Smart Response™ software to function as BearBox's technology did, Defendants have not compensated Plaintiffs for the use of BearBox's technology.  It would be inequitable for Defendants to retain these benefits under these circumstances.

98.     Defendants' unauthorized use of Bearbox's technology has impoverished Plaintiffs by depriving them of the fruits of their labor. In addition to the costs incurred and labor expended in creating Bearbox's technology, Plaintiffs are no longer able to obtain any economic benefit from any use of Bearbox's technology.

99.     Defendants' enrichment through the use of Plaintiffs' system designs, documents, data, and know-how to reconstruct and use Bearbox's technology is directly connected to Plaintiffs' impoverishment because Defendants have failed to compensate Plaintiffs for their efforts.

100.    There is no justification at law or in contract for Defendants' uncompensated use of Plaintiffs' unique and novel invention.

101.    Because Plaintiffs have incurred, and continue to incur, detriment in the form of loss of money and property as a result of Defendants' wrongful use of system designs, documents, data, and know-how reflecting BearBox's technology, Plaintiffs are entitled to compensation to the extent Defendants have been enriched or Plaintiffs have been impoverished.

## JURY DEMAND

102.    Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, BearBox respectfully requests the following relief:

A.      An order that the Director of the United States Patent and Trademark Office correct the inventorship of the '433 Patent to name Austin Storms as the sole inventor, or, in the alternative, as a joint inventor to one or both of the individuals currently listed as inventors on the '433 Patent;

B.      Alternatively, an order that Defendants sign the requisite documents to correct inventorship of the '433 Patent to name Austin Storms as the sole inventor, or, in the alternative, as a joint inventor to one or both of the individuals currently listed as inventors on the '433 Patent;

C.      A declaration that Austin Storms is the sole inventor, or, in the alternative, is a joint inventor to one or both of the individuals currently listed as inventors on the '433 Patent;

D.      A preliminary and a permanent injunction enjoining Defendants Lancium, McNamara, and Cline from asserting that McNamara or Cline are inventors of the '433 Patent in violation of the United States federal patent laws;

E.      An order that Defendants immediately transfer to Plaintiffs all right, title, and interest in all information, patent applications, patents, technology, products, and other materials in the possession, custody, or control of Defendants that wrongfully constitute, contain, were based on, and/or derived in whole or in part from the use of BearBox's technology;

F.      An order for a constructive trust over all information, patent applications, patents, technology, products, and other materials in the possession, custody, or control of Defendants that wrongfully constitute, contain, were based on, and/or derived in whole or in part from the use of BearBox's technology or any system designs, documents, data, and know-how reflecting BearBox's technology;

G.      Financial relief including damages, consequential damages, disgorgement of Defendants' ill-gotten profits, Defendants' unjust enrichment, reliance damages, and/or all other appropriate financial relief, all in an amount to be determined at trial, with interest;

H.      An award of the amount by which Defendants have been unjustly enriched by their actions set forth in this Complaint;

I.      A finding that this is an exceptional case warranting imposition of attorney fees against Defendants and an award to Plaintiffs of its reasonable costs and attorney fees incurred in bringing this action pursuant to 35 U.S.C. § 285;

J.      An award of exemplary damages and/or an award of reasonable attorney's fees under 18 U.S.C. § 1836(b)(3)(C), (D) and/or under La. R.S. § 51:1434; and

K.      An award of such further relief at law or in equity, such as preliminary and/or permanent injunctive relief, as the Court deems just and proper.

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

_____
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
amayo@ashbygeddes.com

*Attorneys for Plaintiffs*
*BearBox LLC and Austin Storms*

*Of Counsel:*

Benjamin T. Horton
John R. Labbe
Raymond R. Ricordati, III
Chelsea M. Murray
MARSHALL, GERSTEIN & BORUN LLP
233 South Wacker Drive
6300 Willis Tower
Chicago, IL 60606-6357
(312) 474-6300

Dated:  February 16, 2022