**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BEARBOX LLC and AUSTIN STORMS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-534-MN-CJB |
| | ) | |
| LANCIUM LLC, MICHAEL T. MCNAMARA, and RAYMOND E. CLINE, JR. | ) | **PUBLIC VERSION** |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

Dated:  June 15, 2022
**Public Version filed on June 29, 2022**

BARNES & THORNBURG LLP
Chad S.C. Stover (No. 4919)
1000 N. West Street, Suite 1500
Wilmington, Delaware 19801-1050
Telephone: (302) 300-3474
E-mail: chad.stover@btlaw.com

Mark C. Nelson (admitted *pro hac vice*)
2121 N. Pearl Street, Suite 700
Dallas, TX  75201
Tel:  (214) 258-4140
E-mail:  mark.nelson@btlaw.com

Adam M. Kaufmann (admitted *pro hac vice*)
Darrick Hooker (admitted *pro hac vice*)
Dana Amato Sarros (admitted *pro hac vice*)
One North Wacker Drive, Suite 4400
Chicago, IL 60606
Tel:  (312) 214-8319
Email: adam.kaufmann@btlaw.com
Email: darrick.hooker@btlaw.com
Email:  dana.sarros@btlaw.com

*Attorneys for Defendants Lancium LLC, Michael T. McNamara, and Raymond E. Cline Jr.*

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.   FACTUAL BACKGROUND ...................................................................................... 2

    A.    Lancium and Its Technology ............................................................................ 2

    B.    United States Patent No. 10,608,433 ............................................................... 3

    C.    Austin Storms and BearBox............................................................................. 5

    D.    Storms' Communications with McNamara ...................................................... 5

    E.    Procedural History ........................................................................................... 7

III.  LEGAL STANDARD.................................................................................................. 8

IV.   ARGUMENT .............................................................................................................. 8

    A.    Plaintiffs' Sole Inventorship Claim Fails As A Matter Of Law Because There Is No Evidence Austin Storms Conceived Of The Inventions Claimed In The '433 Patent Or Communicated The Inventions To Defendants............................. 9

        1.    Applicable Legal Principles.................................................................... 9

        2.    There Is No Evidence That Austin Storms Communicated The Inventions Of The '433 Patent To Defendants. ........................................ 12

    B.    Plaintiffs' Joint Inventorship Claim Fails As A Matter Of Law Because Plaintiffs Cannot Meet Their Burden Of Proving Collaboration.......................... 24

        1.    Applicable Legal Principles.................................................................... 24

        2.    Plaintiffs Cannot Prove By Clear And Convincing Evidence That Storms Collaborated With Messrs. McNamara and Cline On The Claimed Inventions ................................................................................. 25

        3.    Plaintiffs Cannot Prove By Clear And Convincing Evidence That Storms Made A Significant Contribution To The '433 Patent. ............... 30

    C.    Plaintiffs' Conversion Claim Is Prescribed By The One Year Statute Of Limitations. ...................................................................................................... 30

    D.    Plaintiffs' Conversion Claim Is Preempted By Federal Patent Law.................... 33

V.    CONCLUSION............................................................................................................ 36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc*,
No. 5:17-CV-1295-RCL, 2022 WL 980791 (W.D. Tex. Mar. 31, 2022)..........................28, 35

*Acromed Corp. v. Sofamor Danek Group, Inc.*,
253 F.3d 1371 (Fed. Cir. 2001)...................................................................................11, 24, 27

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................................................................8

*BASF Agrochemical Prods. v. Unkel*,
No. 05-1478, 2006 WL 3533133 (W.D. La. Dec. 7, 2006) ...................................................35

*Bihm v. Deca Systems, Inc.*,
226 So.3d 466 (La. 2017) .......................................................................................................31

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989)................................................................................................................34

*Brand Coupon Network, LLC v. Catalina Mktg. Corp.*,
No. 11-00556, 2014 WL 6674034 (M.D. La. Nov. 24, 2014)................................................35

*CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*,
916 F.3d 1350 (Fed. Cir. 2019)..............................................................................................10

*Dorsey v. Money Mack Music, Inc.*,
304 F. Supp. 2d 858 (E.D. La. 2003).................................................................................34, 35

*Dual Drilling Co. v. Mills Equip. Invs., Inc.*,
721 So. 2d 853 (La. 1998) ......................................................................................................34

*Eli Lilly and Co. v. Arandigm Corp.*,
376 F.3d 1352 (Fed. Cir. 2004)....................................................................................9, 10, 30

*Ethicon, Inc. v. U.S. Surgical Corp.*,
135 F.3d 1456 (Fed. Cir. 1998).........................................................................................11, 22

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*,
383 F.3d 1352 (Fed. Cir. 2004)...............................................................................10, 11, 24, 30

*Hammons v. City of Tallulah*,
708 So.2d 502 (La.App. 2d Cir. 1998) ..................................................................................32

*Iceotope Grp. Ltd. v. LiquidCool Sols., Inc.*,
No. 20-CV-2644, 2022 WL 204923 (D. Minn. Jan. 24, 2022)................................................10

*Imprenta Servs., Inc. v. Karll*,
No. 220CV06177GWPVCX, 2021 WL 4555333 (C.D. Cal. July 13, 2021) ........................20

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
256 F.3d 1323 (Fed. Cir. 2001)...........................................................................................16

*Jefferson v. Crowell*,
956 So.2d 746 (La. App. 2d Cir. 2007) ...............................................................................31

*Kimberly-Clark Corp. v. Procter & Gamble Distributing Co., Inc.*,
973 F.3d 911 (Fed. Cir. 1992).............................................................................................25

*Lancium LLC v. Layer1 Technologies, Inc.*,
Case No. 6:20-cv-739 (W.D. Texas) ...................................................................................32

*Level Sleep LLC v. Sleep No. Corp.*,
No. 2020-1718, 2021 WL 2934816 (Fed. Cir. July 13, 2021)..............................................11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).............................................................................................................8

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)....................................................................................11, 13

*Philips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)......................................................................11, 12, 13, 17

*Pronova Biopharma Norge AS v. Teva Pharms. USA, Inc.*,
549 F. App'x 934 (Fed. Cir. 2013) ...............................................................................29, 34

*Quealy v. Paine, Webber, Jackson & Curtis, Inc.*,
475 So.2d 756 (La. 1985) ..............................................................................................34, 35

*Rubin v. General Hospital Corp.*,
No. 09-10040-DJC, 2011 WL 1625024 (D. Mass. Apr. 28, 2011) ......................................25

*Rubin v. General Hospital Corp.*,
523 Fed. Appx. 719 (Fed. Cir. 2013) ..................................................................................29

*Scott v. Zimmer, Inc.*,
889 F. Supp. 2d 657 (D. Del. 2012).............................................................................9, 10, 11

*Sortiumusa LLC v. Hunger*,
No. 3:11-cv-1656, 2013 WL 11730655 (N.D. Tex. Mar. 31, 2013)................................29, 35

*Symantec Corp. v. Computer Associates Intern., Inc.*,
     522 F.3d 1279 (Fed. Cir. 2008)................................................................9, 11

*Trovan Ltd. v. Sokymat SA, Irori*,
     299 F.3d 1292 (Fed. Cir. 2002)...................................................................10

*Ultra-Precision Mfg., Ltd v. Ford Motor Co.*,
     411 F.3d 1369 (Fed. Cir. 2005)................................................33, 34, 35, 36

*University of Utah v. Max-Planck-Gesellschaft Zur Foerderung Der*
     *Wissenschaften E.V.*,
     851 F.3d 1317 (Fed. Cir. 2017)...............................................10, 25, 26, 27

*Wagner v. Ashline*,
     No. 2021-1715, 2021 WL 5353889 (Fed. Cir. Nov. 17, 2021) ................10, 20, 23

*Wagner v. Simpson Performance Prod., Inc.*,
     Civ. No. 5:18-CV-00123-KDB-DCK, 2021 WL 411144 (W.D.N.C. Feb. 5,
     2021) ....................................................................................................10, 23

*Waner v. Ford Motor Co.*,
     331 F.3d 851 (Fed. Cir. 2003)...............................................................34, 36

*Weaver v. Houchin*,
     467 Fed. App'x 878 (Fed. Cir. 2012)...........................................................20

**Statutes**

35 U.S.C. § 102 ...............................................................................................34

35 U.S.C. § 112 ...............................................................................................16

35 U.S.C. § 256 ..........................................................................................10, 24

Louisiana Civil Code Article 3492 ...................................................................31

**Other Authorities**

Fed. R. Civ. P. 56(a) .........................................................................................8

## INDEX OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | Expert Report of Frank McCamant, dated April 5, 2022 |
| 2 | Reply Report of Frank McCamant, dated May 19, 2022 |
| 3 | Expert Report of Dr. Stan McClellan, dated April 5, 2022 |
| 4 | Reply Expert Report of Dr. Stan McClellan, dated May 20, 2022 |
| 5 | Excerpts from Deposition Transcript of Stanley A. McClellan |
| 6 | Excerpts from Ercot Market Mechanisms Report prepared by Shams Siddiqi, Ph.D., dated May 6, 2022 |
| 7 | Excerpts from Deposition Transcript of Austin Storms |
| 8 | Confidentiality Agreement between BearBox, LLC and Glidepath Development LLC dated December 10, 2018, produced by BearBox in this case with Bates numbers BB10000736 – BB10000741 |
| 9 | Email from Austin Storms to Todd @buysellads attaching files, produced by BearBox in this case with Bates numbers BB00000911 – BB00000923 |
| 10 | Email from Austin Storms to Michael McNamara attaching BearBox's Product Details Summary, produced by BearBox in this case with Bates numbers BB00000090 – BB00000097 |
| 11 | BearBox tweets, produced by BearBox in this case with Bates numers BB00000717 – BB00000731 |
| 12 | WO 2019/139632 Patent Application, produced by Lancium in this case with Bates numbers LANCIUM00000050 - LANCIUM00000093 |
| 13 | U.S. Patent No. 11,016,456, produced by Lancium in this case with Bates numbers LANCIUM00013636 – LANCIUM00013658 |
| 14 | Email from Michael McNamara to Eric Kutscha, Jon Cohen and Raymond Cline attaching BearBox product details summary, produced by Lancium in this case with Bates numbers LANCIUM00014645 |
| 15 | Excerpts from the File History of U.S. Patent 10,608,433, produced by BearBox in this case with Bates numbers BB00000319 - BB00000667 |
| 16 | Excerpts from a Text message report between Austin Storms and Ben Hakes dated between 12/5/2018 – 4/28/2021, produced by BearBox in this case with Bates numbers BB10003955 – BB10004026 |
| 17 | U.S. Patent No. 10,608,433 |
| 18 | Text message report between Austin Storms and Michael McNamara dated between 5/4/2019 – 5/9/2019, produced by BearBox in this case with Bates numbers BB10004959 – BB10004961 |

| 19 | Complaint filed by Lancium against Layer1 Technologies in the Western District of Texas on August 14, 2020, produced by Lancium in this case with Bates numbers LANCIUM00016546 – LANCIUM00016554 |
|----|----|
| 20 | Excerpts from Plaintiffs' Supplemental Objections and Responses to Defendants' First Set of Interrogatories (Nos. 1-9), dated November 9, 2021 |
| 21 | Excerpts from Defendants' Second Set of Supplemental Response to Plaintiffs' Interrogatory No. 3, dated December 23, 2021 |
| 22 | Excerpts from Hearing Transcript re: Motion to Strike and Discovery Dispute, dated April 22, 2022 |
| 23 | Excerpts from Plaintiff's Objections and Responses to Defendants' First Set of Requests For Admission (Nos. 1-33), dated November 22, 2021 |

## I.   INTRODUCTION

Plaintiffs Austin Storms ("Storms") and BearBox LLC ("BearBox") have three remaining claims against Defendants Lancium LLC ("Lancium"), Michael T. McNamara ("McNamara"), and Raymond E. Cline, Jr. ("Cline"). First, Plaintiffs assert a claim that Storms is the sole inventor of U.S. Patent No. 10,608,433 (the "'433 patent") (Count I of the Second Amended Complaint). Second, in the alternative, Plaintiffs assert a claim that Storms is a joint inventor of the '433 patent (Count II). Third, Plaintiffs assert a claim for conversion of so-called "BearBox technology" (Count V). All of these claims are based on information allegedly provided by Storms to McNamara via their only three communications: (1) a May 3, 2019 conversation at a group dinner attended by several other competitors following a cryptocurrency mining summit; (2) a series of text messages from May 3-9, 2019 following the dinner; and (3) a single email that Storms sent McNamara on May 9, 2019. Based on these extremely limited communications, and despite Defendants' years of innovation and investment in research and development, Plaintiffs allege that Defendants wrongly filed a patent on Storms' alleged invention more than five months after Storms and McNamara last communicated. Likewise, Plaintiffs seek millions of dollars in damages for Defendants' alleged conversion of a small amount of allegedly confidential information in one attachment to Storms' email by purportedly using that information to modify Defendants' Smart Response$^{TM}$ software that is used to control datacenters.

Plaintiffs' claims, however, all fail as a matter of law. Indeed, Plaintiffs' inventorship claims are based on a fundamentally incorrect interpretation of two key claim terms found in every claim of the '433 patent. Plaintiffs rely on this misinterpretation to assert that Storms' "BearBox technology" discloses the inventions of the '433 patent even though these technologies are not only different, they are inconsistent. Plaintiffs' sole inventorship claim thus fails as a matter of law because there is no evidence, much less clear and convincing evidence that could meet their heavy

burden, that Storms conceived of or communicated the inventions of the '433 patent, as properly construed, to Defendants. Likewise, regarding Plaintiffs' joint inventorship claims, they cannot prove, much less by clear and convincing evidence, that Storms made a significant contribution to the '433 patent. In addition, the limited communications between Storms and McNamara cannot, as a matter of law, establish that Storms and McNamara collaborated on the inventions of the '433 patent, as is required for a joint inventorship claim. Furthermore, Plaintiffs' conversion claim is barred by the applicable one-year statute of limitations and is preempted by federal patent law because it is based on the alleged use of information that, as a matter of law, is not confidential. Accordingly, the Court should grant summary judgment for Defendants on all three of Plaintiffs' remaining claims.

## II.    FACTUAL BACKGROUND

### A.    Lancium and Its Technology

Lancium is a technology company founded in 2017, to, among other things, create software and intellectual property solutions that enable more renewable energy on the nation's power grid, and Lancium began to do so immediately. For example, in February 2018, Lancium, including McNamara and Cline, filed a patent application titled "Method and System for Dynamic Power Delivery To a Flexible Datacenter Using Unutilized Energy Sources," that published as International Publication No. WO 2019/139632A1 (the "'632 application") and later issued as U.S. Patent No. 11,016,456. SOF ¶¶6-9; Ex. 12; Ex. 13. Lancium's technology, as explained in the '632 patent, permits a "flexible data center" to "ramp-up to a fully online status, ramp-down to a fully offline status, or dynamically reduce power consumption," where "the flexible datacenter may perform computational operations, such as blockchain hashing operations" (e.g., Bitcoin mining) "with little to no energy costs, using clean and renewable energy that would otherwise be wasted." Ex. 12 at [0022].

Lancium continued to innovate and by the end of 2018 had filed numerous other patent applications that led to numerous patents such as U.S. Patent No. 10,873,211 (filed September 13. 2018) titled "Systems and Methods for Dynamic Power Routing with Behind-the-Meter Energy Storage," U.S. Patent No. 10,444,818 (filed October 30, 2018) titled "Methods and Systems for Distributed Power Control of Flexible Datacenters," and U.S. Patent No. 10,367,353 (filed October 30, 2018) and "Managing Queue Distribution between Critical Datacenter and Flexible Datacenter." D.I. 28 ¶ 24.

**B.     United States Patent No. 10,608,433**

Through 2019, Lancium continued to innovate and invest in research and development, eventually leading to the filing of U.S. Provisional Patent Application No. 62/927,119 on October 28, 2019 (SOF ¶1; Ex. 21 at 32-33 and documents cited therein) and the follow-on U.S. Nonprovisional Patent Application No. 16/702,931 on December 4, 2019, which issued as the '433 patent, titled "Methods and Systems for Adjusting Power Consumption Based on A Fixed-Duration Power Option Agreement." SOF ¶¶2-4; Ex. 17.

The technology of the '433 patent at issue in this case relates to systems and methods for adjusting the amount of power available on the electrical grid. As depicted in its Figure 1, of which an excerpted version is shown below, an electrical grid typically includes: (i) power generation stations (e.g., nuclear power plants 102a) that produce electricity, (ii) transmission lines 104 that carry the power from the generation stations to demand centers (i.e., consumers), and (iii) distribution networks 106 that carry power to individual consumers. Ex. 17 at 1:26-4:8. To maintain stability on the grid, the grid operator strives to maintain a balance between the amount of power entering the grid (via generators) and the amount of grid power used by loads (e.g., customers in the distribution segment 106). Ex. 17 at 4:9-13.



PRIOR ART
FIGURE 1

In an effort to maintain this balance, grid operators, such as Independent Service Organizations ("ISOs") have various tools at their disposal, some of which are called ancillary services. Ancillary services are programs that give ISOs some amount of control over the amount of power being consumed by loads on the grid in real time in order to balance the amount of power being consumed with the amount of power available.[1] In order to provide this ability, specially qualified loads can bid into the "day-ahead" ancillary services market[2] where the loads offer a specific minimum amount of load (i.e., power in megawatts (MW)) that they commit to use during specific hourly periods the following day (i.e., the "operating day"). If the offer is accepted (i.e., "awarded") by the ISO, the ISO will pay the load for guaranteeing that the load will use the committed minimum amount of power during each specific hourly period the next day while simultaneously providing the ISO with the option to reduce (i.e., "curtail") that power use in real

---

[1] *See, e.g.,* Ex. 1 at 18 ("ERCOT needs system capacity for two reasons: first for energy dispatch to meet real time system demand, and second as a reserve available to respond to large and small operational fluctuations. This reserve capacity is what is used for Ancillary Services…")

[2] *See, e.g.,* Ex. 1 at 24 ("Qualified LRs ... may provide operating reserves in the ERCOT AS markets.")

time that next day by up to the committed amount, in order to balance generation and consumption of power on the grid.[3] The load is obligated to use at least the committed minimum power amount;[4] otherwise, the ISO could not exercise its option in real time to reduce load on the network up to the committed power amount.  Plaintiffs do not dispute how ancillary service programs work.[5]

### C.     Austin Storms and BearBox

Austin Storms and his company BearBox, in late 2018 and early 2019, sought to develop cryptocurrency mining technology. D.I. 103 at ¶ 29. In particular, Plaintiffs worked to develop a portable container called a "BearBox" that contained cryptocurrency miners (i.e., computers that can perform cryptocurrency mining operations). Ex. 7 at 45:2-17. BearBox, however, only ever built one BearBox, which it eventually sold for no profit. Ex. 7 at 45:18-23; 48:6-7.

### D.     Storms' Communications with McNamara

On May 3, 2019, Storms attended the Fidelity FCAT Mining Summit in Boston where he explained he was "[g]onna poke around and figure out if anyone else is doing what we're working on."  Ex. 16 at BB10003996.  At the conference, Storms met McNamara and the two went to a group dinner attended by approximately six others, including competitors in the Bitcoin mining field. SOF ¶¶10-11; D.I. 41 at ¶¶ 38, 40-41; D.I. 28 at ¶¶ 38, 40-41. Storms and McNamara's conversation at the dinner occurred in front of these other attendees, and this was their only oral

---

[3] Ex. 6 at 17 ("Awarded Ancillary Service Offers, specifying … MW … and price, for each hour of the awarded offer."); Ex. 1 at 24 ("Load Resources that are scheduled or selected in the ERCOT Day-Ahead AS Markets are eligible to receive a capacity payment regardless of whether they are actually curtailed.")

[4] Ex. 6 at 14 ("Ancillary Service (AS) awards are physically binding.")

[5] Dr. Siddiqi describes ancillary service market operation in significant detail in his expert report; Plaintiff's ISO market expert Mr. McCamant states that Dr. Siddiqi's "report is an accurate account of how the ERCOT market functions," and does not dispute the factual operation of the ancillary service market.  Ex. 2 at 5.

communication. SOF ¶¶11, 14; D.I. 41 at ¶ 43; D.I. 28 at ¶ 43; Ex. 23 at 9. Shortly thereafter, Storms wrote to an individual, Ben Hakes, with whom he had been working and explained that: "The guys at Lancium ***are doing*** what ***we are trying to do exactly***, but they don't have a container builder or software team yet.  Mike's pretty interested in my solution."[6] Ex. 16 at BB10004001.[7]

Following the dinner, from May 3 to May 9, 2019, Storms and McNamara exchanged a handful of text messages, which mostly involved McNamara's request for specifications on the BearBox container. SOF ¶12; Ex. 18. And on May 9, 2019, Storms emailed McNamara a specification sheet for his BearBox as well as a handful of other documents. *See* SOF ¶13; Ex. 10. This was the last communication between Storms and any of Defendants. SOF ¶13; D.I. 103 at ¶ 36.

Following receipt of Storms' email, McNamara forwarded it to a few others at Lancium on May 9, 2019, explaining that "[w]e met this guy at the fidelity conference. … His box seems very expensive though." Ex. 14. There were no responses to McNamara's email.

In addition, none of the attachments to Storms' email were marked as confidential and Storms has testified that three of the attachments were publicly available product specification sheets. SOF ¶16; Ex. 7 at 213:5-214:5; Ex. 10. The fourth attachment contains the BearBox product specification sheet as well as a drawing titled "BearBox Automatic Miner Management System Version 1.0" that Storms also posted on BearBox's public Twitter account. SOF ¶¶19-20; *Compare* Ex. 10 at BB00000092, *with* Ex. 11 at BB00000718. Plaintiffs also do not assert that this attachment is confidential. SOF ¶18; Ex. 7 at 217:13-23. The only reference to confidentiality in

---

[6] All emphases added unless otherwise noted.

[7] Storms also stated "[T]hey want my logic for curtailing miners on DA and RTMB LMP – all over dinner Friday night and several bottles of wine, they told me they were looking into Digital Shovel, but their Schneider Electric/Siemens engineer was worried about 480/277v because of potential liability…."  Ex. 16 at BB10004002.

6

the email or its attachments was a boilerplate "confidentiality notice" at the bottom of email stating that "[t]his email communication *may* contain private, confidential, or legally privileged information intended for the sole use of the designated and/or duly authorized recipient(s)." SOF ¶16; Ex. 7 at 217:6-12; Ex. 10 at BB00000090. Moreover, Storms did not have a confidentiality or nondisclosure agreement with McNamara or any of Defendants although he did have such agreements with other third parties. *See, e.g.*, Ex. 7 at 70:4-6, 124:7-13; Ex. 8.

Plaintiffs learned of the '433 patent and Defendants allegedly wrongful use of BearBox's technology on August 17, 2020 when Storms saw a press release about a lawsuit Lancium filed for infringement of the '433 patent. SOF ¶22; D.I. 103 at ¶¶ 52-54. Nonetheless, and despite the fact that Storms never sought to file a patent on his alleged invention, Plaintiffs waited until April 14, 2021 to file this lawsuit. Ex. 7 at 290:7-16. Indeed, Plaintiffs did not file this lawsuit until after a press release was issued announcing the settlement of the earlier infringement suit regarding the '433 patent and that the defendant in that lawsuit licensed Lancium's intellectual property. D.I. 103 at ¶¶ 56-57.

### E.    Procedural History

Plaintiffs' claims in this case have continually changed since the original Complaint was filed on April 14, 2021. D.I. 1. Plaintiffs' originally asserted claims, *inter alia*, for trade secret misappropriation, but a little over a month later withdrew these claims and filed an Amended Complaint. *See* D.I. 19. Defendants then moved for judgment on the pleadings regarding Plaintiffs' claims for conversion, unjust enrichment, and negligent misrepresentation, which the Court granted dismissing Plaintiffs' conversion and unjust enrichment claims without prejudice as preempted by federal patent law and dismissing the negligent misrepresentation claim with prejudice. D.I. 92; D.I. 97. Two days before the close of fact discovery, Plaintiffs then filed the Second Amended Complaint asserting new, different conversion and unjust enrichment claims and

7

re-asserting claims for trade secret misappropriation. D.I. 89 (order adopting stipulated, amended scheduling order); D.I. 103 (Second Amended Complaint). The Court, however, granted Defendants' motion to strike the re-asserted trade secret claims. *See* 4/25/22 Minute Entry. Magistrate Judge Burke has also recommended granting Defendants' motion to dismiss the new unjust enrichment claim, and Plaintiffs have not objected to this recommendation.[8] D.I. 143.

Accordingly, Plaintiffs have three remaining claims: First, Plaintiffs' claim that Storms should be substituted as the sole inventor of the '433 patent (Count I). Second, Plaintiffs' alternative claim that Storms should be found to be a joint inventor of the '433 patent (Count II). Third, Plaintiffs' claim that Defendants converted certain technology relating to energy arbitrage that Storms purports to have provided to McNamara (Count V). D.I. 103. As explained herein, summary judgment is appropriate because each of these claims fail as a matter of law.

## III.    LEGAL STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A factual dispute is only genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.*

## IV.    ARGUMENT

---

[8] Defendants also have pending objections to Magistrate Judge Burke's recommendation to deny Defendants' motion to dismiss Plaintiffs' new conversion claim. D.I. 146.

**A.** **Plaintiffs' Sole Inventorship Claim Fails As A Matter Of Law Because There Is No Evidence Austin Storms Conceived Of The Inventions Claimed In The '433 Patent Or Communicated The Inventions To Defendants.**

The '433 patent invented systems and methods that can be used to adjust power consumption of computing systems (e.g., cryptocurrency or Bitcoin miners) that can be used, *inter alia*, to participate in ancillary services programs. Although Plaintiffs have previously avoided specifically explaining how they claim Storms' so-called "BearBox technology" encompasses and relates to the claimed technology of the '433 patent, during expert discovery it became clear that Plaintiffs' inventorship claims are premised on a fundamentally incorrect interpretation of two key claim terms appearing in every claim of the '433 patent: (1) "power option agreement"; and (2) "minimum power threshold." This is significant because resolution of Plaintiffs' inventorship claims requires proper construction of these claim terms, and there is simply no evidence that Storms conceived of, much less communicated, the inventions of the '433 patent as properly construed. Thus, summary judgment denying Storms claim of sole inventorship of the '433 patent should be granted.

**1.** **Applicable Legal Principles**

**a.** **Inventorship**

Inventorship is a question of law premised on underlying questions of fact. *Eli Lilly and Co. v. Arandigm Corp.*, 376 F.3d 1352, 1362 (Fed. Cir. 2004). Patent issuance creates a presumption that the named inventors are the true and only inventors, and that people not named are not to be inventors. *Scott v. Zimmer, Inc.*, 889 F. Supp. 2d 657, 662 (D. Del. 2012). A person seeking to add himself/herself as an inventor, therefore, "must meet the heavy burden of proving [his/her] case by clear and convincing evidence." *Id.*; *Eli Lilly*, 376 F.3d at 1358. Inventorship, therefore, is often decided as a matter of law, including at summary judgment. *See, e.g.*, *Symantec Corp. v. Computer Associates Intern., Inc.*, 522 F.3d 1279, 1295-96 (Fed. Cir. 2008) (affirming

summary judgment of no inventorship); *Univ. of Utah v. Max-Planck-Gesellschaft Zur Foerderung Der Wissenschaften E.V.*, 851 F.3d 1317 (Fed. Cir. 2017) (same); *Wagner v. Simpson Performance Prod., Inc.*, Civ. No. 5:18-CV-00123-KDB-DCK, 2021 WL 411144, at *2 (W.D.N.C. Feb. 5, 2021), aff'd sub nom. *Wagner v. Ashline*, No. 2021-1715, 2021 WL 5353889 (Fed. Cir. Nov. 17, 2021) (granting summary judgment of no inventorship because Plaintiff failed to provide sufficient evidence to corroborate its claim of co-inventorship); *Eli Lilly*, 376 F.3d at 1364 (reversing jury's verdict that unnamed inventor was a joint inventor because the evidence was insufficient to meet the clear and convincing standard).

The inventorship analysis first requires construction of each disputed claim to determine the subject matter encompassed. *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1381-82 (Fed. Cir. 2004). Then, "[t]o state a claim for complete substitution of inventors under Section 256," a plaintiff must establish that "(1) the erroneously omitted inventor conceived the invention claimed in the patent *and* (2) the named inventor on the patent did *not* conceive the invention." *Iceotope Grp. Ltd. v. LiquidCool Sols., Inc.*, No. 20-CV-2644, 2022 WL 204923, at *2 (D. Minn. Jan. 24, 2022) (emphasis in original) (citing to *CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1358 (Fed. Cir. 2019)).

Ultimately, conception is the touchstone of inventorship. *Gemstar*, 383 F.3d at 1381. Conception is "the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention." *Id.* Conception is complete when one of ordinary skill in the art could construct the apparatus, perform the process, or make the composition without unduly extensive research or experimentation. *Trovan Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292, 1302 (Fed. Cir. 2002). A would-be inventor's contribution must have been to the conception of the claims, not something outside the claims. *Scott*, 889 F. Supp. 2d, at 662.

A would-be inventor's proof of conception, however, must be more than simply his/her testimony. "To prove [his or her] contribution, the purported inventor must provide corroborating evidence of any asserted contributions to the conception." *Acromed*, 253 F.3d at 1379 (internal citations and quotations omitted); *see also Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998). Indeed, a would-be inventor's testimony regarding their own inventorship claim is "regarded with skepticism." *Scott*, 889 F. Supp. 2d at 664. Would-be inventors, therefore, must supply evidence to corroborate their testimony. *Symantec*, 552 F.3d at 1295. The sufficiency of the corroborating evidence is evaluated under a rule of reason analysis, which requires that an evaluation of all pertinent evidence be made so that a sound determination of the credibility of the alleged inventor's story may be reached. *Id.*; *Gemstar*, 383 F.3d at 1382.

### b.    Claim Construction

"When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351, 1360 (Fed. Cir. 2008). A district court "may engage in claim construction during various phases of litigation" and is "well within its power to clarify, supplement, and even alter its construction" of disputed terms "in its summary judgment order." *Level Sleep LLC v. Sleep No. Corp.*, No. 2020-1718, 2021 WL 2934816, at *3 (Fed. Cir. July 13, 2021).

"Words of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention." *O2 Micro*, 521 F.3d at 1360 (citing *Philips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005)). "A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* at 1361. "To determine the meaning of the claims, courts start by considering the

intrinsic evidence," which "includes the claims themselves, the specification, and the prosecution history." *Philips*, 415 F.3d at 1312-1314. "[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. Expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, *unsupported* assertions as to a term's definition are entirely unhelpful to a court. *Phillips*, 415 F.3d at 1317 (emphasis in original).

### 2. There Is No Evidence That Austin Storms Communicated The Inventions Of The '433 Patent To Defendants.

#### a. Proper Claim Construction of "Power Option Agreement"

| Claim Term | Defendants' Construction | Plaintiffs' Construction |
|---|---|---|
| "power option agreement" ('433 patent, independent claims 1, 17, & 20) | an agreement between a power entity associated with the delivery of power to a load and the load, wherein the load provides the power entity with the option to reduce the amount of power delivered to the load up to an agreed amount of power during an agreed upon time interval such that the load must use at least the amount of power subject to the option during the time interval | Plain and ordinary meaning |

On October 15, 2021, the parties indicated to the Court that they did not seek claim construction at that time and would advise, or seek construction, if developments suggested otherwise. *See* D.I. 61; D.I. 63. During expert discovery it has become apparent that Plaintiffs seek to ignore the clear meaning of "power option agreement" as established by the intrinsic evidence, and instead assert a purported "plain and ordinary" meaning that they contort to support their

inventorship claims. The intrinsically-supported clear meaning of power option agreement is: "an agreement between a power entity associated with the delivery of power to a load and the load, wherein the load provides the power entity with the option to reduce the amount of power delivered to the load up to an agreed amount of power during an agreed upon time interval such that the load must use at least the amount of power subject to the option during the time interval." However, Plaintiffs improperly depart from the intrinsic evidence and instead use a purported "plain and ordinary" meaning under which their expert, Dr. Stanley McClellan, describes the power option agreement as "an agreement [by the load] to purchase a certain amount of power at a certain time at a certain price." Ex. 3 at ¶ 49; Ex. 5 (McClellan Dep. Tr.) at 90:2-13. Dr. McClellan further contends that the "option" is the load "buying power ahead of time," which the load can then decide to use the power or not. Ex. 5 at 157:1-18. Plaintiffs' interpretation of "power option agreement" is fundamentally inconsistent with the patent specification, which specifically describes and provides examples related to the term. As such, construction of this term is needed because "[a] determination a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro*, 521 F.3d at 1361.

It is well-established that "claims must be read in view of the specification, of which they are a part" and "the specification is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotations omitted). Here, the specification is dispositive and explains in great detail that a "power option agreement" is an agreement between a power entity (such as a grid operator) and a load (such as a datacenter) that gives the power entity the option to reduce the

13

amount of power delivered to the load, up to an agreed amount during an agreed time interval.[9]

Indeed, the '433 patent explains that:

> "In general, a power option agreement is an agreement between a power entity 1140 associated with the delivery of power to a load (e.g., a grid operator, power generation station, or local control station) and the load (e.g., the datacenters 1102-1106). As part of the power option agreement, the load (e.g., load operator, contracting agent for the load, semi-automated control system associated with the load, and/or automated control system associated with the load) provides the power entity 1140 with the right, but not obligation, to reduce the amount of power delivered (e.g., grid power) to the load up to an agreed amount of power during an agreed upon time interval." Ex. 17 at 43:46-57.

The specification further explains that the power option agreement gives the power entity this

optionality as a tool to balance the supply and demand for power on the grid:

> "The power option agreement may be used by the power entity 1140 to reserve the right to reduce the amount of grid power delivered to the load during a set time frame (e.g., the next 24 hours). For instance, the power entity 1140 may exercise a predefined power option to reduce the amount of grid power delivered to the load during a time when the grid power may be better redirected to other loads coupled to the power grid. As such, the power entity 1140 may exercise power option agreements to balance loads coupled to the power grid." Ex. 17 at 44:3-12.

The '433 patent even gives an example of how a power option agreement could work:

> "To illustrate an example, a power option agreement may specify that a load (e.g., the datacenters 1102-1106) is required to use at least 10 MW or more at all times during the next 12 hours. … In order to comply with the agreement, the load must subsequently operate using 10 MW or more power at all times during the next 12 hours. This way, the load can accommodate a situation where the power entity 1140 exercises the option. Particularly, exercising the option may trigger the load to reduce the amount of power it consumes by an amount up to 10 MW at any point during the 12 hour interval. By establishing this power option agreement, the power entity 1140 can manipulate the amount of power consumed at the load during the next 12 hours by up to 10 MW if power needs to be redirected to another load or a reduction in power consumption is needed for other reasons." Ex. 17 at 44:17-35.

Furthermore, the '433 patent explains that a load may enter into a power option agreement and

---

[9] The prosecution history does not alter the meaning of "power option agreement" as established by the specification because the '433 patent issued without any rejections by the examiner. *See* SOF ¶5; Ex. 15 at BB0000553-62 (1/27/20 Notice of Allowance)

give the power entity the ability to exercise the option in return for monetary consideration from the power entity, such as payment from the power entity or a reduced price for power. Ex. 17 at 43:65-44:2.

The meaning of the term that Plaintiffs apply is flatly inconsistent with the meaning established by the '433 patent's specification. As an initial matter, although Plaintiffs' expert, Dr. McClellan, purported to apply the "plain and ordinary meaning" of the term to his inventorship analysis, he asserts that a system that "calculated profitability at distinct time intervals" demonstrates conception of claim elements including this term, even though that has nothing do with a "power option agreement" as described by the '433 patent. Ex. 3 at ¶¶ 49, 62. And Dr. McClellan confirmed his misinterpretation of the claim at his deposition. Indeed, Dr. McClellan testified that he interpreted "power option agreement" to mean "essentially a contract to buy power at a certain price. It's like a wholesale purchase. I'm going to buy X number of units at X price." Ex. 5 at 83:5-10. Dr. McClellan further testified that his understanding of the "plain and ordinary meaning" of the term is "opting to purchase power ahead of time at a certain rate and then I'm going to pay for that power, and then when it comes for that time I'm going to pay for that power whether I use it or not." Ex. 5 at 157:1-18. He then gave the example of "I'm going to pay for that power, that's the option. When it comes time, I'm going to pay for that whether I use it or not. I don't have to use it. I can screw in that light bulb and turn off the switch, and I'm still paying for that minimum power." Ex. 5 at 157:1-18. Thus, Plaintiffs and their expert misinterpret "power option agreement" as an agreement that gives the purchaser (i.e., the load) the option to use power rather than an agreement that requires the load to use a certain amount of power and gives a power entity the option to reduce the amount of power used by the load.

Based on the clear guidance the specification of the '433 patent provides to a person of

ordinary skill in the art regarding the meaning of "power option agreement," the Court should resolve the parties' dispute and construe this term using Defendants' proposed construction.

**b.      Proper Claim Construction of "Minimum Power Threshold"**

| Claim Term | Defendants' Construction | Plaintiffs' Construction |
|---|---|---|
| "minimum power threshold" ('433 patent, claims 1, 17, & 20) | a minimum amount of power a load must use during an associated time interval | Plain and ordinary meaning |

As with "power option agreement," Plaintiffs purport to apply the "plain and ordinary" meaning of the term "minimum power threshold" but ignore the guidance the specification provides for the meaning of this term. Based on the meaning established by the intrinsic evidence, the Court should construe "minimum power threshold" to mean "a minimum amount of power a load must use during an associated time interval."

The claim construction analysis "must begin and remain centered on the language of the claims themselves, for it is that language the patentee chose to use to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'" *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112). Here, the claim language itself supports Defendants' proposed construction. Exemplary claim 1 is instructive:

> 1.  A system comprising:
>     a set of computing systems, wherein the set of computing systems is configured to perform computational operations using power from a power grid;
>     a control system configured to:
>     monitor a set of conditions;
>     receive power option data based, at least in part, on a power option agreement, wherein the power option data specify: (i) a set of **minimum power thresholds**, and (ii) a set of time intervals, wherein each **minimum power threshold** in the set of **minimum power thresholds** is associated with a time interval in the set of time intervals;

> responsive to receiving the power option data, determine a performance
> strategy for the set of computing systems based on a combination of at
> least a portion of the power option data and at least one condition in
> the set of conditions, wherein the performance strategy comprises a
> power consumption target for the set of computing systems for each
> time interval in the set of time intervals, wherein each power
> consumption target is equal to or greater than the **minimum power
> threshold** associated with each time interval; and
>
> provide instructions to the set of computing systems to perform one or
> more computational operations based on the performance strategy.

Ex. 17 at 59:2-28. Thus, consistent with Defendants' proposed construction, the claim language generally sets forth a system where a load—pursuant to a power option agreement and data received under that agreement—determines a performance strategy for a set of computing systems in order to ensure that they use at least a minimum amount of power during specified time intervals (i.e., minimum power thresholds).

The specification, which "is always highly relevant to the claim construction analysis" and "is the single best guide to the meaning of a disputed term," also supports Defendants' construction. *Phillips*, 415 F.3d at 1315. For example, the specification explains that in order to provide a power entity with the option contemplated by a power option agreement—i.e., "the right, but not obligation, to reduce the amount of power delivered (e.g., grid power) to the load"—"the load needs to be using at least the amount of power subject to the option (e.g., a minimum power threshold)." Ex. 17 at 43:50-60. The '433 patent further explains that:

> "To illustrate an example, a power option agreement may specify that a load (e.g., the datacenters 1102-1106) is required to use at least 10 MW or more at all times during the next 12 hours. Thus, the **minimum power threshold** according to the power option agreement is 10 MW and this minimum threshold extends across the time interval for the next 12 hours. In order to comply with the agreement, the load must subsequently operate using 10 MW or more power at all times during the next 12 hours." Ex. 17 at 44:17-25; *see also id.* at 44:26-35.

The '433 patent also provides an example in Figure 12, which depicts a graph line 1206 indicating "the set of time intervals associated with minimum power thresholds" where "time 1202

increases along the X-axis and minimum power thresholds 1204 increase along the Y-axis of the graph 1200." Ex. 17 at 50:56-59; 50:66-51:5; *see also* 50:53-56; 51:8-52:11.



FIGURE 12

In relation to Figure 12, the '433 patent further explains that:

> "To further illustrate, an initial minimum power threshold 1206A is shown associated with the time interval starting at hour 0 and extending to hour 8. In particular, the minimum power threshold 1206A is set at 5 MW during this time interval. Thus based on the power option data shown in FIG. 12, the loads must be able to operate at a target power consumption level that is equal to or greater than the 5 MW minimum power threshold 1206A at all times during the time interval extending from hour 0 to hour 8, in order to be able to satisfy the power option if it is exercised for that time interval. Similarly, the power entity could reduce the power consumed by loads by any amount up to 5 MW at any point during the time interval from hour 0 to hour 8 in accordance with the power option agreement. For instance, the power entity could exercise its option at any point during this time interval to reduce the power consumed by the loads by 3 MW as a way to load balance the power grid."

Ex. 17 at 51:24-40; *see also id.* at 51:8-23; 51:41-52:11.

Plaintiffs and their expert, Dr. McClellan purport to apply the "plain and ordinary meaning of "minimum power threshold," but Dr. McClellan made clear at his deposition that his interpretation of "minimum power threshold" is not based on how the term is used in the '433 patent. Ex. 3 at ¶ 49. In particular, Dr. McClellan testified that:

Q.  What specifically is a minimum power threshold?

A.  That's the amount of power that you're contracted to consume.

Q. And by consume you don't mean use, correct?

A. ***I may not use it***, but I'm going to consume it. I'm purchasing it. ***Whether I use it or whether I sell it, that's a completely separate issue***. I'm agreeing to purchase it at that threshold.

Ex. 5 at 82:18-85:1. As a further example of his interpretation of the term, Dr. McClellan also testified that "[w]ell, if I purchase one kilowatt at $1, I'm going to pay that $1 whether I use that kilowatt or not," thus "[t]he power threshold is the kilowatt." Ex. 5 at 87:16-88:17. Dr. McClellan, however, also testified that he was not sure whether or not there was actually a requirement to use the amount of power set by a minimum power threshold. Rather than being a requirement established by the '433 patent, however, he testified that "[f]undamentally it's a business question." Ex. 5 at 90:14-91:21; *see also id.* at 87:2-15. Dr. McClellan also asserted that "this is a question for McCamant"—another of Plaintiffs' experts, Mr. Frank McCamant. Ex. 5 at 91:22-92:24; *see also id.* at 155:13-156:11. But Mr. McCamant did not offer any opinions regarding claim construction or the meaning of "minimum power threshold." *See generally* Ex. 1; Ex. 2 (McCamant Reply Report). As such, Plaintiffs' and their experts' interpretation of this claim term is somewhat unclear, but nonetheless is not based on the intrinsic record.

It is thus apparent that Plaintiffs at the very least to take an ambiguous position on whether a "minimum power threshold" sets an amount of power a load must actually use. Accordingly, and based on the meaning established by the intrinsic evidence, the Court should resolve the parties' dispute and construe "minimum power threshold" to mean "a minimum amount of power a load must use during an associated time interval."

c.  **None of the documents Storms sent to Lancium disclose the claimed inventions  of the '433 patent.**

To prevail on their claim that Storms is the sole true inventor of the '433 patent, Plaintiffs

must prove by clear and convincing evidence that Storms "is the sole inventor of each of the claims of the patent" and that "any contribution by defendant[s] to the conception of each and every claim was insignificant." *See, e.g., Imprenta Servs., Inc. v. Karll*, No. 220CV06177GWPVCX, 2021 WL 4555333, at *6 (C.D. Cal. July 13, 2021). Moreover, it is axiomatic that because Plaintiffs seek to have Storms substituted as the sole inventor of a patent filed by Defendants, they must also prove—again by clear and convincing evidence—that they communicated the inventions of the '433 patent to Defendants. *See Weaver v. Houchin*, 467 Fed. App'x 878, 880 (Fed. Cir. 2012); *Wagner v. Ashline*, No. 2021-1715, 2021 WL 5353889, at *4 (Fed. Cir. Nov. 17, 2021).

As a matter of law, however, Plaintiffs cannot meet this "heavy burden" because there is no evidence that Storms conceived of the properly construed inventions of the '433 patent, much less that he communicated these inventions to Defendants.[10]

The only written communications between Storms and any of Defendants were a handful of text messages exchanged from May 3-9, 2019 and a single email that Storms sent to McNamara on May 9, 2019. SOF ¶14; Ex. 20; *see also* D.I. 103 at ¶¶ 34-36. Plaintiffs cannot establish that any of these written communications demonstrate, by clear and convincing evidence, possession of the inventions of the '433 patent by Storms or conveyance of the claimed inventions to Defendants. For example, because Plaintiffs rely on a misinterpretation of "power option agreement" and "minimum power threshold" they cannot establish that Storms' communications show possession or communication of a system that can:

- "receive power option data based, at least in part, on a power option agreement, wherein the power option data specify: (i) a set of minimum power thresholds, and (ii) a set of time intervals, wherein each minimum power threshold in the set of

---

[10] Likewise, Plaintiffs cannot prove that McNamara and Cline—the '433 patent's named inventors—did not provide a significant contribution to conception of any claim. Indeed, Plaintiffs' expert, Dr. McClellan does not offer any opinions or analysis that McNamara and Cline did not provide a significant contribution to any of the claims. *See, e.g.*, Ex. 3 at ¶ 14 (summary of opinions).

minimum power thresholds is associated with a time interval in the set of time intervals"; or

- "responsive to receiving the power option data, determine a performance strategy for the set of computing systems based on a combination of at least a portion of the power option data and at least one condition in the set of conditions, wherein the performance strategy comprises a power consumption target for the set of computing systems for each time interval in the set of time intervals, wherein each power consumption target is equal to or greater than the minimum power threshold associated with each time interval"

as required by independent claim 1 of the '433 patent—or the similar requirements of the other two independent claims (claims 17 and 20). Indeed, Plaintiffs' expert, Dr. McClellan provides no explanation how of the written communications and documents Storms sent to McNamara disclose or convey the properly construed requirements of the claims. *See generally* Ex. 3 (McClellan Opening Report); Ex. 4 (McClellan Reply Report).

Fundamentally, the alleged "invention" that Storms purportedly conceived of and communicated to Defendants does not pertain to the claimed inventions of the '433 patent. Rather, as Dr. McClellan asserts, it pertains to "a system that utilizes a set of Bitcoin miners under the direction of a control system" that based on certain information "periodically determinine[s] mining profitability" and then "may either instruct some or all of the miners to mine Bitcoin or sell power to the grid (power arbitrage)." Ex. 3 at ¶ 9. Dr. McClellan thus relies on his misinterpretation of "power option agreement" and "minimum power threshold" to mistakenly conclude that Storms' written communications with McNamara demonstrate the above claim requirements because these communications show a system that "calculated profitability at distinct time intervals, each with an associated power threshold, such as comparing mining profitability based on, inter alia, current power usage and energy price conditions on the one hand with profitability based, inter alia, on expected future power usage and energy price conditions" and then "determin[es] performance strategies … to determine, for example, whether to mine Bitcoin"

based on whether that is the most profitable use of purchased power. Ex. 3 at ¶¶ 188-189; *see also id.* at ¶¶ 62, 66. But the claim elements—and indeed the claimed inventions—have no requirements relating to profitability calculations.

Furthermore, the claims set forth requirements that a load (e.g., a Bitcoin mining operation) must use the amount of power set by the minimum power thresholds regardless of profitability, which is the opposite of the system contemplated by Storms' communications. Indeed, when asked whether the system described in Storms' communications "contemplate[s] a performance strategy where X amount of power must be utilized by the miners, they must mine and use X amount of power, regardless of whether or not it's profitable for the miners to do so?", Dr. McClellan testified that "[t]he simulation kind of ignores" what he called a "nonsensical case … because it's focusing on ways to make positive dollars … ." Ex. 5 at 238:7-23.

Thus, for the reasons above, Plaintiffs cannot establish that any written communications between Storms and Defendants demonstrate conception of the inventions of the '433 patent by Storms or communication of the inventions to Defendants.

### d.    There is no corroboration that Storms verbally communicated the claimed inventions to Defendants.

Plaintiffs also cannot prove by clear and convincing evidence that Storms orally communicated the inventions of the '433 patent, as properly construed, to Defendants, including McNamara, because they have no evidence to corroborate any such assertion. *See Ethicon*, 135 F.3d at 1461.

As an initial matter, even Plaintiffs' expert, Dr. McClellan testified that "I think it's unlikely that an enormous amount of pertinent information was communicated at the dinner" where Storms and McNamara spoke in person because for "dinners like that there's not normally an enormous amount of information that's passed back and forth." Ex. 5 at 186:24-187:20.

Moreover, as set forth above, because none of the written communications that Storms had with Defendants disclose the claimed inventions of the '433 patent, these communications cannot corroborate that Storms communicated the inventions of the '433 patent to Defendants.

*Wagner v. Ashline* is instructive on this point. No. 2021-1715, 2021 WL 5353889 (Fed. Cir. Nov. 17, 2021). In *Wagner*, the Federal Circuit affirmed summary judgment of no inventorship by a purported inventor, concluding that purported corroborating evidence of a discussion between the purported inventor and the named inventor "corroborate[d] only the undisputed fact that [the named inventor] and [the purported inventor] met and that they discussed" other topics, but "[i]t does not corroborate [the purported inventor]'s testimony in support of her claim of joint inventorship." 2021 WL 5353889, at *5. In other words, the Federal Circuit concluded that in order for an unnamed inventor's testimony to meet the clear and convincing evidence of proving an inventorship claim, there must be evidence that corroborates what was actually communicated between the purported inventor and the named inventor(s).

Here, as a matter of law, Plaintiffs cannot prove by clear and convincing evidence that Storms orally communicated the claimed inventions of the '433 patent to Defendants because they have no corroborating evidence of what was actually communicated. Plaintiffs have not deposed or offered testimony from any other attendees of the dinner where Storms and McNamara spoke, and McNamara certainly does not corroborate Storms' claim. In addition, as set forth above, none of the written communications between Storms and McNamara corroborate that Storms possessed or communicated the inventions of the '433 patent as properly construed.

In addition, evidence in the case demonstrates that Storms did not conceive of the inventions of the '433 patent, much less communicate these inventions to Defendants. Indeed, two days after meeting McNamara, Storms texted another person he was working with, Ben Hakes,

and admitted "[t]he guys at Lancium ***are doing*** what ***we are trying to do*** exactly … . *See* Ex. 16 at BB10004001.

Thus, for the reasons above, Storms' oral communications with Defendants do not establish conception or communication of the claimed inventions of the '433 patent, because as a matter of law, Storms has no clear and convincing evidence corroborating any such communication. Likewise, Plaintiffs cannot establish that the written communications between Storms and Defendants establish conception or communication of the claimed inventions. Accordingly, summary judgment should be granted on Plaintiffs' Count I that Storms is not the sole inventor of the '433 patent.

### B. Plaintiffs' Joint Inventorship Claim Fails As A Matter Of Law Because Plaintiffs Cannot Meet Their Burden Of Proving Collaboration.

#### 1. Applicable Legal Principles

The law regarding claims for correction of inventorship under 35 U.S.C. § 256 is generally the same whether the claim is for complete substitution of inventors or addition of unnamed joint inventors. However, for joint inventorship claims, the alleged contribution of the purported co-inventor is compared with the subject matter of the properly construed claims to determine whether the alleged inventor contributed in some "significant manner" to the conception of the claimed invention. *Gemstar*, 383 F.3d at 1381. To meet this standard, the would-be co-inventor must demonstrate that she/he made a contribution that "is not insignificant in quality, when that contribution is measured against the dimension of the full invention," as opposed to merely explaining well-known concepts and/or the state of the art to the real inventors. *Acromed Corp. v. Sofamor Danek Group, Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001) (reversing a jury verdict of invalidity for improper inventorship due to insufficiency of evidence).

A would-be co-inventor must also demonstrate some element of joint behavior, such as

collaboration or working under common direction. *See, e.g.*, *Kimberly-Clark Corp. v. Procter & Gamble Distributing Co., Inc.*, 973 F.3d 911, 917 (Fed. Cir. 1992). Stated differently, "a joint invention is 'a product of a collaboration between two or more persons working together to solve the problem addressed.'" *Rubin v. Gen. Hosp. Corp.*, No. 09-10040-DJC, 2011 WL 1625024, at *6 (D. Mass. Apr. 28, 2011) (quoting *Kimberly-Clark*, 973 F.2d at 917).

### 2. Plaintiffs Cannot Prove By Clear And Convincing Evidence That Storms Collaborated With Messrs. McNamara and Cline On The Claimed Inventions

Plaintiffs' joint inventorship claim fails because the claim is not supported by clear and convincing evidence that there was "joint behavior" or "collaboration" between putative inventor Storms and named inventors McNamara and Cline as to the '433 patent's claimed inventions. The only communications—and thus potential collaboration—between Storms and any of Defendants were: (1) a conversation during a group dinner on May 3, 2019; (2) a series of text messages following the dinner sent from May 3 to May 9, 2019; and (3) an email that Storms sent McNamara on May 9, 2019. *See* SOF ¶14; D.I. 103 at ¶¶ 32-36; D.I. 41 at ¶¶ 38, 40-41, 43, 46-50; D.I. 28 at ¶¶ 38, 40-41, 43, 46-50, Exs. C-D. But these communications, as a matter of law, cannot establish the required collaboration.

*University of Utah v. Max-Planck-Gesellschaft Zur Foerderung Der Wissenschaften E.V.*, is instructive. 851 F.3d 1317 (Fed. Cir. 2017). In *University of Utah*, the putative inventor, Dr. Bass, wrote a "mini-review" of research of others relating to RNA interference ("RNAi") and included her "own hypotheses about enzymatic processes that may be responsible for the RNAi activity reported in" prior work by another, Dr. Tuschl. *Id.* at 1320. "It [was] undisputed that Dr. Tuschl read Dr. Bass' mini-review, recognized her hypothesis … and tested that hypothesis." *Id.* In addition, "Dr. Bass and Dr. Tuschl met for dinner during a conference and discussed Dr. Tuschl's research in relation to Dr. Bass' hypothesis." *Id.* at 1321. And based on Dr. Tuschl's test

results that confirmed Dr. Bass' hypothesis, Dr. Tuschl and his colleagues filed and received a patent on their discovery. *Id.* at 1320. Based on these facts, the plaintiff filed suit seeking to add Dr. Bass as a joint inventor on the patent-at-issue, but the district court granted summary judgment against this claim reasoning that "there was no evidence to support a finding of collaboration between Dr. Bass and the [named] inventors." *Id.* at 1321. This was because the court found that Dr. Bass' mini-review paper "was already in the public domain by the time the [named] inventors relied on it" so it "could not, on its own, support a finding of collaboration," and the single discussion between Dr. Bass and Dr. Tuschl "at an academic conference could not constitute the collaboration needed to establish joint inventorship." *Id.* The Federal Circuit also did not dispute the district court's reasoning. *Id.*

The basis of Plaintiffs' joint inventorship claim here is analogous to *University of Utah* and also warrants summary judgment based on the lack of collaboration. As an initial matter, just as the dinner conversation in *University of Utah* did not demonstrate collaboration, neither does Storms and McNamara's dinner conversation here. Indeed, although the dinner conversation in *University of Utah* occurred while the named inventors' work on the patent-at-issue was ongoing, the dinner conversation between Storms and McNamara was the ***first*** communication they had. Moreover, Plaintiffs admit that Storms' conversation with McNamara occurred in front of other of the approximately eight attendees at the May 3, 2019 dinner, which included competitors in the Bitcoin mining field. SOF ¶11; D.I. 41 at ¶¶ 38, 40-41, 43; D.I. 28 at ¶¶ 38, 40-41, 43. Thus, this dinner provides even less support for collaboration than the dinner in *University of Utah*.

Turning to the handful of text messages between Storms and McNamara, these messages plainly do not disclose any elements of the '433 patent claims, and thus do not show collaboration on the inventions of the '433 patent. *See* D.I. 41 at ¶¶ 46-48; D.I. 28 at ¶¶ 46-48, Ex. C. Moreover,

Plaintiffs do not contend otherwise. Indeed, Plaintiffs' expert Dr. McClellan does not point to any of these text messages in support of his opinions that Storms is an unnamed inventor of the '433 patent. *See generally* Ex. 3 at Sections VII-VIII.

In addition, the email that Storms sent to McNamara cannot establish collaboration for several reasons. First, one of the five attachments to the email included a drawing titled "BearBox Automatic Miner Management System Version 1.0" that Storms also posted on BearBox's Twitter account on June 24, 2019—more than three months before the provisional application leading to the '433 patent was filed on October 28, 2019. SOF ¶¶1, 3, 19-20; *Compare* Ex. 10 at BB00000092, *with* Ex. 11 at BB00000718. Storms testified that this Twitter account, which had its first tweet on November 1, 2018, was "public for maybe two years or so." *See* Ex. 7 at 247:8-248:21; Ex. 11 at BB00000718. Thus, this drawing was publicly available before the filing of the '433 patent. *See* SOF ¶¶19-20. Plaintiffs, including through their expert Dr. McClellan, assert that this publicly available drawing discloses numerous claim elements of the '433 patent. *See, e.g.*, Ex. 3 at ¶¶ 185, 186, 188, 190, 192, 196, 200, 230, 237, 241, 244, 248, 250, 262. But just as in *University of Utah*, this publicly available document cannot support a finding of collaboration. *University of Utah*, 851 F.3d at 1321.

Second, Storms admitted that three of the other five email attachments were publicly available product specification sheets. Ex. 7 at 213:5-214:5; Ex. 10; *see also* SOF ¶18. Thus, these documents also cannot support a finding of collaboration because they only disclose information about the state of the art in the field.[11] *See Acromed*, 253 F.3d at 1379; *University of Utah*, 851 F.3d at 1321.

---

[11] Plaintiffs also cannot establish that these documents disclose a significant contribution to the claimed inventions.

Third, although Storms testified that the only allegedly confidential information in the email was in the fifth attachment, an Excel spreadsheet, this document also cannot support a finding of collaboration. As an initial matter, this document contains much of the same information as the publicly available drawing, and Dr. McClellan cites the documents as both disclosing many of the same claim elements. *See, e.g.*, Ex. 3 at ¶¶ 190, 196, 200, 230, 237, 241, 244, 248, 250. Moreover, Plaintiffs' only basis for asserting that the Excel file is confidential is a boilerplate "confidentiality notice" at the bottom of Storms' cover email—the Excel file itself contains no confidentiality marking—stating that "[t]his email communication **may** contain private, confidential, or legally privileged information intended for the sole use of the designated and/or duly authorized recipient(s)." SOF ¶16; Ex. 10 at BB00000090. Storms did not have a confidentiality or nondisclosure agreement with McNamara or any of Defendants. And Plaintiffs admit that "Storms last communicated with McNamara on May 9, 2019 via e-mail, and after sending that message, Storms did not hear from McNamara again." SOF ¶13; D.I. 103 at ¶ 36. Thus, Storms did not, and could not, have asked McNamara to treat the Excel file as confidential after emailing it to him.

Storms also sent the information he claims to be confidential to others. Specifically, Storms emailed similar spreadsheets to an individual named Todd Garland. Ex. 7 at 186:17-189:12, 214:6-12 Ex. 9. These spreadsheets include the same column headers and categories of information as the spreadsheet sent to Mr. McNamara only from different times. *Compare* Ex. 9 at BB10000912, *with* Ex. 10 at BB00000097. Storms admitted that he did not have a nondisclosure agreement with Garland or Garland's company, and Garland did not give his word to keep it confidential. Ex. 7 at 71:18-23; 188:1-189:2. Moreover, as with his email to McNamara, Plaintiffs' only basis for asserting that this email was confidential is the boilerplate confidentiality notice that Storms

included on all of his emails. Ex. 7 at 72:4-9; 188:18-21.

But courts have found that "[a] boilerplate confidentiality statement" in an email "does not constitute a reasonable measure to keep secrecy—especially when [it] use[s] the phrase 'may contain information that is … confidential.'" *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc*, No. 5:17-CV-1295-RCL, 2022 WL 980791, at *10 (W.D. Tex. Mar. 31, 2022) (dismissing trade secret claim); *Sortiumusa LLC v. Hunger*, No. 3:11-cv-1656, 2013 WL 11730655, at *11-12 (N.D. Tex. Mar. 31, 2013) (dismissing trade secret claims and finding that a "confidentiality statement" at the bottom of an email stating it "*may* contain information that is confidential or otherwise protected from disclosure … bears no relevance, as a matter of law, as to whether [plaintiff] took appropriate steps to safeguard its alleged trade secrets" (emphasis in original)). And under federal patent law, an idea is considered publicly available if "given to a member of the public without restriction." *See Pronova Biopharma Norge AS v. Teva Pharms. USA, Inc*., 549 F. App'x 934, 940 (Fed. Cir. 2013). Thus, Storms' Excel file was also publicly disclosed and cannot support a finding of collaboration.

*Rubin v. General Hosp. Corp.*, is also instructive. 523 Fed. Appx. 719 (Fed. Cir. 2013). In *Rubin*, a group of researchers (the Rubin group), authored a paper identifying two specific gene mutations that caused the disease Familial Dysautonomia (FD), and contrary to their request the abstract of this paper was sent to another group of researchers (the Gusella group), who were also working on identifying the cause of FD. *Id.* at 721. When the Gusella group filed a patent claiming a diagnostic method for FD using these gene mutations, the Rubin group sought to be added as joint inventors. *Id.* at 722. The Federal Circuit, however, affirmed summary judgment of no joint inventorship, concluding that "the nature of this communication of information, do[es] not support joint invention." *Id.* at 723. Just as in *Rubin*, Storms' transmission of documents to McNamara,

29

with no further discussion or communication, cannot support a finding of collaboration or support a claim of joint inventorship.

Thus, summary judgment should be granted in Defendants' favor on Plaintiffs' joint inventorship claims (Count II).

### 3. Plaintiffs Cannot Prove By Clear And Convincing Evidence That Storms Made A Significant Contribution To The '433 Patent.

To be named as a joint inventor of a patent, one must "contribute in some significant manner to the conception of the invention." *Gemstar*, 383 F.3d at 1381. And "[t]he general rule is that a party alleging misjoinder or non-joinder of inventors must meet the heavy burden of proving its case by clear and convincing evidence." *Eli Lilly*, 376 F.3d at 1358. Here, as set forth above in Section IV.A.2, Plaintiffs premise their inventorship claims on misinterpretations and misconstructions of two key claim terms of the '433 patent. Indeed, Plaintiffs' experts offer no analysis or opinions supporting any significant contribution by Storms to the claims of the '433 patent as properly construed. Thus, Plaintiffs have not met and cannot meet their "heavy burden" of proving a significant contribution to the claims of the '433 patent. Accordingly, summary judgment should be granted to Defendants on Plaintiffs' joint inventorship claim (Count II).

### C. Plaintiffs' Conversion Claim Is Prescribed By The One Year Statute Of Limitations.

Plaintiffs' conversion claim (Count V) is premised on Defendants' alleged conversion of a power arbitrage method disclosed in the documents that Storms emailed to McNamara. But Plaintiffs' own allegations in this case demonstrate that they knew or should have known of Defendants' alleged use of their purported power arbitrage method more than one year before bringing this claim. Therefore, summary judgment should be granted for Defendants on Plaintiffs' conversion claim because this claim is prescribed by Louisiana's applicable one-year statute of limitations.

It is well-established that under Louisiana law, "[a] conversion action sounds in tort and is subject to a one-year liberative prescriptive period" under Louisiana Civil Code Article 3492.[12] *Bihm v. Deca Systems, Inc.*, 226 So.3d 466, 480 (La. 2017); *see also Jefferson v. Crowell*, 956 So.2d 746, 749 (La. App. 2d Cir. 2007). In addition, "[a] prescriptive period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same. Prescription commences upon whatever notice is enough to excite attention and put the party on guard or call for inquiry." *Bihm*, 226 So.2d at 480 (internal citations omitted). In other words, "[t]he prescriptive period commences on the date the aggrieved party has actual or constructive knowledge of the facts that would entitle him to bring suit." *Jefferson*, 956 So.2d at 749.

Here, Plaintiffs' conversion claim is based on Defendants' alleged use of Plaintiffs' so-called "power arbitrage" method, which Dr. McClellan explains is "a system that utilizes a set of Bitcoin miners under the direction of a control system" that will "periodically determine mining profitability" and "may either instruct some or all of the miners to mine Bitcoin or sell power back to the grid (power arbitrage)."[13] Ex. 3 at ¶ 9. This conversion claim was also first pled in Plaintiffs' Second Amended Complaint, which was filed on February 16, 2022[14] after the Court dismissed

---

[12] The Court has previously found that Louisiana law applies to Plaintiffs' conversion claim and that "both sides agree" on this point. *See* D.I. 143.

[13] Dr. McClellan's opening report explicitly states that "[i]n my opinion, Lancium is using BearBox's power arbitrage trade secrets," and his reply report—issued after the Court struck Plaintiffs' trade secret misappropriation claims—clarifies that "[m]y opinions, in this report and my opening report, are not dependent on whether the cause of action in this lawsuit is trade secret misappropriation, which I understand is no longer at issue in this case, or conversion." *See* Ex. 3 at ¶ 302; Ex. 4 at ¶ 215

[14] *See* D.I. 103-3 at 20-22 (providing a comparison of Plaintiffs' newly pled conversion claim against the previously pled conversion claim).

Plaintiffs' original conversion claim as preempted by federal patent law.[15] Plaintiffs further admit in the Second Amended Complaint that they "became aware of Defendants' wrongful use of BearBox's technology on or about August 17, 2020, when they learned about the Layer1 Lawsuit" (i.e., *Lancium LLC v. Layer1 Technologies, Inc.*, Case No. 6:20-cv-739 (W.D. Texas) "through a press release dated August 14, 2020." D.I. 103 at ¶ 54; *see also id.* ¶ 52. And the publicly available complaint in the Layer1 Lawsuit explains that Lancium's technology allows "computationally intensive activities requiring significant amounts of electricity such as Bitcoin mining" to "ceas[e] (or reduc[e]) Bitcoin mining operations" during "times of high-priced electricity" and thereby "receive[] the difference in value of the real time electricity versus the data center's pre-existing power purchase agreement price." *See* Ex. 19 (Layer1 Lawsuit complaint) at ¶ 10; *see also* ¶¶ 8-9, 11. In other words, the complaint in the Layer1 Lawsuit explains that Lancium's technology can do what Plaintiffs now allege is their purported power arbitrage method, by ceasing Bitcoin mining operations and selling the power that would otherwise be used to mine Bitcoin, when doing so is more profitable.

Thus, through their knowledge of the Layer1 Lawsuit and their knowledge of the information Storms provided to McNamara, by August 17, 2020 Plaintiffs had actual knowledge, or at the very least constructive knowledge, of facts that would have enabled them to bring the present claim. And because Plaintiffs had this knowledge well over a year before they pled their conversion claim on February 16, 2022, this claim is prescribed by the statute of limitations.

Moreover, Plaintiffs' currently pled conversion claim does not "relate back" to the filing of the original complaint in this case because it does not "arise[] out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." *See Hammons v. City*

---

[15] *See* D.I. 92 at 12 (recommending dismissal); D.I. 97 (adopting recommendation of D.I. 92).

*of Tallulah*, 708 So.2d 502, 504 (La.App. 2d Cir. 1998) (finding conversion claim did not relate back to original complaint). As pled, Plaintiffs' current conversion claim is based upon Defendants' allegedly using "Bearbox's technology" to "modify their Smart Response$^{TM}$ software." D.I. 103 at ¶ 87. This is entirely different than the claim pled in their original Complaint, which did not assert any claims based on Lancium's Smart Response$^{TM}$ software or the alleged use of Plaintiffs' power arbitrage method. Rather, all of the claims of the original Complaint (and the First Amended Complaint) were based on Lancium's alleged patenting of Plaintiffs' invention. *See generally* D.I. 1; D.I. 19. Indeed, at the hearing on Defendants' motion to strike the trade secret claims in the Second Amended Complaint, Magistrate Judge Burke explained that:

> "Like a key issue here is defendants say that plaintiffs were basically talking about the types of arbitrage methods that are referred to in the second amended complaint back in the original complaint. And the plaintiff is saying, No, we weren't. No, no, we were talking about something else. … But I'm still struggling to understand what it was you were talking about in the first complaint."

In response to this, Plaintiffs' counsel made clear that "[f]irst of all, it had nothing to do with energy value arbitrage methods" Ex. 22 at 22:16-23:21. And when the Court followed up, Plaintiffs' counsel confirmed "it didn't have anything to do with arbitrage methods at all." Ex. 22 at 24:1-3. As such, Plaintiffs' conversion claim does not arise out of the same conduct pled in the original Complaint, and thus does not "relate back" to the original Complaint.

Accordingly, summary judgment should be granted that Plaintiffs' conversion claim (Count V) is prescribed by the applicable one-year statute of limitations.

### D.    Plaintiffs' Conversion Claim Is Preempted By Federal Patent Law

Plaintiffs' conversion claim is based upon Defendants' use of information in documents that, as a matter of law, was not confidential. But because Plaintiffs' claim seeks to restrict the use of non-confidential information, it conflicts with federal patent law. Accordingly, the Court should grant summary judgment that Plaintiffs' conversion claim is preempted by federal patent law.

It is well-established that "[f]ederal law preempts state law that offers patent-like protection to discoveries unprotected under federal patent law." *Ultra-Precision Mfg., Ltd v. Ford Motor Co.*, 411 F.3d 1369, 1377-78 (Fed. Cir. 2005) (noting that "Federal Circuit law governs whether federal patent law preempts a state law claim") (internal quotations and citation omitted). The Supreme Court has also explained that "[a] state law that substantially interferes with the enjoyment of an unpatented utilitarian or design conception which has been freely disclosed by its author to the public at large impermissibly contravenes the ultimate goal of public disclosure and use which is the centerpiece of federal patent policy." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156-57 (1989). Thus, "[a]bsent secrecy, state law cannot create a collateral set of rights available as an adjunct or expansion to patent rights." *Ultra- Precision*, 411 F.3d at 1379 (quoting *Waner v. Ford Motor Co.*, 331 F.3d 851, 856 (Fed. Cir. 2003)). Moreover, under federal patent law, an idea is considered publicly available if "given to a member of the public without restriction." *See Pronova Biopharma Norge AS v. Teva Pharms. USA, Inc.*, 549 F. App'x 934, 940 (Fed. Cir. 2013); *see also Bonito Boats*, 489 U.S. at 149 (under 35 U.S.C. § 102, "[o]nce an inventor has decided to lift the veil of secrecy from his work, he must choose the protection of a federal patent or the dedication of his idea to the public at large").

Plaintiffs' Second Amended Complaint alleges that Defendants are liable for conversion because:

> "[w]ithout Plaintiffs' consent, Defendants intentionally and willfully assumed dominion and control over BearBox's technology, including system designs, documents, data, and know-how, and improperly used it to modify their Smart Response$^{TM}$ software, and corresponding system designs, to function as reflected in BearBox's system designs, documents, data, and know-how … ."

D.I. 103 at ¶ 87. Under Louisiana law, however, a claim for conversion applies only to "goods" or "chattel." *See Quealy v. Paine, Webber, Jackson & Curtis, Inc.*, 475 So.2d 756, 760 (La. 1985);

*Dual Drilling Co. v. Mills Equip. Invs., Inc.*, 721 So. 2d 853, 857 (La. 1998); *Dorsey v. Money Mack Music, Inc.*, 304 F. Supp. 2d 858, 866 (E.D. La. 2003) ("[T]he torts of conversion and trespass relate to interference with tangible rather than intangible property."); *Brand Coupon Network, LLC v. Catalina Mktg. Corp.*, No. 11-00556, 2014 WL 6674034, at *6 (M.D. La. Nov. 24, 2014) ("[C]onversion requires unlawful interference with *chattel*.") (emphasis in original). And chattel "is deemed 'corporeal movable' property." *BASF Agrochemical Prods. v. Unkel*, No. 05-1478, 2006 WL 3533133, at *7 (W.D. La. Dec. 7, 2006). Thus, Plaintiffs' conversion claim is premised on the "conversion" of information contained in electronic files that Storms emailed to McNamara in a single email sent on May 9, 2019.[16] Ex. 7 at 113:24-114:6; 212:7-10; *see also* D.I. 103 at ¶ 36.

As set forth above in Section IV.B.2, although the email that Storms sent to McNamara had several attachments, Plaintiffs only contend that one of the attachments, an Excel file, contained confidential information. SOF ¶17. And as also set forth above in Section IV.B.2, the only basis for Plaintiffs' assertion that this Excel file is confidential—the "confidentiality notice" at the bottom of the cover email, which states only that "that "[t]his email communication *may* contain private, confidential . . . information" (SOF ¶16; Ex. 10 at BB00000090)—does not, as a matter of law, make it confidential. *See, e.g., Acad. of Allergy & Asthma*, 2022 WL 980791, at *10; *Sortiumusa*, 2013 WL 11730655, at *11-12 Thus, Plaintiffs cannot establish that the allegedly converted information was confidential.

The Federal Circuit has also repeatedly found state law claims based on the use of non-

---

[16] To the extent Plaintiffs' conversion claim is premised on Defendants' alleged conversion of intangible "system designs, … data, and know-how" that are not contained in a physical, tangible property, the Court should grant summary judgment in Defendants' favor because the claim does not satisfy the elements of conversion and fails as a matter of law. *See, e.g., Quealy*, 475 So.2d at 760; *Dorsey* 304 F. Supp. 2d at 866.

confidential information to be preempted. For example, in *Ultra-Precision*, the court held plaintiff's unjust enrichment claim, which was premised upon the defendant's "using, manufacturing, and selling vehicles equipped with [Ultra-Precision's] technology" was preempted because the idea/technology was not kept confidential and was therefore "free for all the world to enjoy." *Id.* at 1380-82. Additionally, in *Waner* the Federal Circuit affirmed dismissal of the plaintiff's unjust enrichment claim premised upon the use of his non-confidential idea because such "ideas can only be protected under intellectual property law by the patent system." *Waner*, 331 F.3d at 856–57.

Therefore, because Plaintiffs' conversion claim is based on the alleged use of information that as a matter of law was not confidential, the Court should grant summary judgment that Plaintiffs' conversion claim (Count V) is preempted by federal patent law.

## V.    CONCLUSION

For at least the foregoing reasons, Plaintiff's claims for correction of inventorship (Counts I and II) and for conversion (Count V) fail as a matter of law. Accordingly, summary judgment should be granted for Defendants on all three claims.

Dated:  June 15, 2022                              BARNES & THORNBURG LLP
**Public Version filed on June 29, 2022**

                                                   */s/ Chad S.C. Stover*
                                                   Chad S.C. Stover (No. 4919)
                                                   1000 N. West Street, Suite 1500
                                                   Wilmington, Delaware 19801-1050
                                                   Telephone: (302) 300-3474
                                                   E-mail: chad.stover@btlaw.com

                                                   Mark C. Nelson (admitted *pro hac vice*)
                                                   2121 N. Pearl Street, Suite 700
                                                   Dallas, TX  75201
                                                   Tel:  (214) 258-4140
                                                   E-mail:  mark.nelson@btlaw.com

                                                   Adam M. Kaufmann (admitted *pro hac vice*)
                                                   Darrick Hooker (admitted *pro hac vice*)
                                                   Dana Amato Sarros (admitted *pro hac vice*)
                                                   One North Wacker Drive, Suite 4400
                                                   Chicago, IL 60606
                                                   Tel:  (312) 214-8319
                                                   Email:  adam.kaufmann@btlaw.com
                                                   Email: darrick.hooker@btlaw.com
                                                   Email:  dana.sarros@btlaw.com

                                                   *Attorneys for Defendants Lancium LLC,*
                                                   *Michael T. McNamara, and Raymond E. Cline*
                                                   *Jr.*