# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

BEARBOX LLC and AUSTIN STORMS,     )
               )
         Plaintiffs,         )
               )
     v.               )     C.A. No. 21-534-MN-CJB
               )
LANCIUM LLC, MICHAEL T.       )
MCNAMARA, and RAYMOND E. CLINE,  )
JR.               )
               )
         Defendants.     )

<u>**EXPERT REPORT OF MARK EHSANI, Ph. D.**</u>

**OUTSIDE COUNSEL'S EYES ONLY  -  SUBJECT TO PROTECTIVE ORDER**

## I.     INTRODUCTION

1.      My name is Mark Ehsani, Ph.D.  I hold several academic professorships at Texas A&M University, including the Robert M. Kennedy Endowed Professorship of Electrical Engineering.  I am also the Director of Advanced Vehicle Systems Research Program and the Power Electronics and Motor Drives Laboratory at Texas A&M, a lifetime fellow of the Institute of Electrical and Electronics Engineers (IEEE), and one of the founders of the IEEE Power Electronics Society (PELS), which I chaired for many years.  I have been retained by Defendants Lancium, LLC ("Lancium"), Michael T. McNamara, and Raymond E. Cline, Jr. (collectively, "Defendants") as a technical expert is this litigation.  In this report, I provide opinions regarding Defendants' independent development, conception, and reduction to practice of the inventions that were disclosed and claimed in U.S. Patent No. 10,608,433 ("the '433 patent").  I also address BearBox, LLC's and Mr. Austin Storms' (collectively, "Plaintiffs")[1] allegations that Mr. Storms should have been named sole inventor and/or a joint inventor on the '433 patent, as well as Plaintiffs' allegations of conversion and unjust enrichment.  As part of my analysis I provide opinions regarding the BearBox "technology" that Mr. Storms allegedly disclosed to Mr. McNamara, the technological capabilities of the BearBox "technology" that Mr. Storms and BearBox possessed as of May 9, 2019, which I understand is the last date of contact between Mr. Storms and Mr. McNamara prior to this lawsuit, and whether such "technology" was already known at that time, whether by Lancium, the public, or others.  I also address other opinions provided by Plaintiffs' expert Dr. Stan McClellan, and provide opinions regarding other technical issues.

---

[1] I understand that Mr. Storms is the sole owner of BearBox.

2.      To summarize, it is my opinion that:  (1) Mr. Storms should not be named as the sole inventor or a joint inventor of the '433 patent because it is well documented that Messrs. McNamara and Cline independently developed the inventions claimed in the '433 patent without the utilization of any information allegedly provided by Mr. Storms; (2) the communications from Mr. Storms to Mr. McNamara did not disclose the claim elements of the '433 patent and, at most, consisted of nothing more than general principles that were well-known to Mr. McNamara, Lancium, and others, at the time of Mr. Storms' communications; (3) Mr. Storms/BearBox were not in possession of the inventions of the '433 patent as of May 9, 2019—the date of the last communication between Mr. Storms and Mr. McNamara; and (4) Defendants have not and did not convert the alleged BearBox technology, and have not been unjustly enriched as a result of the alleged BearBox technology.  The bases for these and my other opinions are provided below.

3.      The opinions provided in this report and the bases for those opinions are as of the date of this report.  Based on further review of the materials in this case, including the testimony and/or opinions of other expert witnesses or additional discovery that may be provided, I may offer revised and/or additional opinions.

4.      My educational background, publications, and relevant experience and qualifications are summarized below, and in my curriculum vitae, which is attached as Exhibit A to this report.

## II.      BACKGROUND AND QUALIFICATIONS

5.      For nearly 40 years, I have conducted research, and taught classes involving electrical power.  My research and expertise includes, among other areas, power systems, power grid technologies, power electronics, renewable power systems, grid scale energy storage systems, dynamic loads, and their related technologies, such as variable value storage from the grid power generation.



---

[211] Storms Depo., at 214:14-215:14.



188.    I understand that Mr. Storms now states he considered the Excel spreadsheet attached to the May 9, 2019 email to Mr. McNamara to be confidential.[213]

---

[212] Storms Depo., at 149:13-151:6.

[213] Storms Depo., at 217:20-23.

[214] *Id.* at 214:9-13; 212:71-19. I compared the heading of the spreadsheet ▮▮▮▮▮▮▮ with the headings of the spreadsheet ▮▮▮▮▮▮▮

[215] *Id.* at 186:17-187:15 (referring to Defendants' Exhibit 51 BB10000911-923)

[216] *Id.* at 187:22-189:2. ▮▮▮▮▮▮▮ (Storms Depo., at 189:13-191:6; BB10000908-10).



**B.  Mr. Storms Did Not Communicate Information Claimed In The '433 Patent To Mr. McNamara Or Lancium.**

189.    It is my opinion that Mr. Storms should not be found to be the sole inventor or a joint inventor on the '433 patent because he did not communicate information to Mr. McNamara that was claimed in the '433 patent.  In my opinion, Mr. Storms made no contribution to the '433 patent, let alone a significant contribution. At most, Mr. Storms communicated well-known principles to Mr. McNamara, principles that Mr. McNamara was already aware of and documented by Lancium.  *See* Section VII above.

190.    The legal principles I applied in my analysis are recited in Section VI above.  I repeat certain legal principles relating to inventorship here to help me better frame my analysis. To be the sole inventor on a patent, the purported inventor (here, Mr. Storms) must have conceived each and every element of each of the claims.  To be considered a joint inventor, the purported joint inventor (again, Mr. Storms) must demonstrate that he (1) contributed in some *significant* manner to the conception or reduction to practice of the invention, (2) made a contribution to the claimed invention that is *not insignificant in quality, when that contribution is measured against the dimension of the full invention*, and (3) *did more than merely explain to the real inventors,*

---

[217] Storms Depo., at 233:22-235:24; BB10000020-23.

equal to or greater than the minimum power threshold associated with each time interval."[275]  I reserve the right to offer opinions regarding the SmartResponse™ software's functionality in response to Dr. McClellan's reply report if applicable.

## XI.    CONVERSION AND UNJUST ENRICHMENT

349.    Dr. McClellan offers opinions regarding Bearbox's alleged trade secrets relating to power arbitrage in paragraphs 295-309 of his report. It is my understanding that the Court struck Plaintiffs' trade secret misappropriation allegations from the case.  I, therefore, offer no opinions at this time regarding those allegations.

350.    It is also my understanding that Plaintiffs' are currently asserting that Lancium converted Bearbox's alleged technology and/or was unjustly enriched by it.  Dr. McClellan does not appear to offer opinions on these issues.  I reserve my right to offer opinions if Dr. McClellan addresses these issues in his Reply report.

351.    I also make certain observations on Bearbox's allegedly confidential arbitrage technology that Dr. McClellan alleges is being used by Lancium.  I note that Bearbox publicly distributed much of the materials that Dr. McClellan relied upon to identify Bearbox's alleged trade secrets.  For example, I understand the Mr. Storms posted the drawing that appears on page 87 (paragraph 256) of Dr. McClellan's report on Twitter.[276]  I understand that Mr. Storms did not consider BB00000090-96 to be confidential.[277]  I understand that the only document that Mr. Storms communicated to Mr. McNamara that Mr. Storms considered confidential was

---

[275] *See* Defendants' Response to Plaintiffs' Interrogatory No. 6 (Rog 10), at 6.

[276] BB00000717-718; Storms Depo., at 247:8-248:21.

[277] Storms Depo., at 204:11-205:6; 212:7-214:13.

BB00000097 (the Excel spreadsheet that Dr. McClellan refers to as a ".CSV" file).[278]



352.    In my opinion, Mr. Storms' conduct is inconsistent with these materials and ideas being considered confidential, but instead indicate that Mr. Storms was not seeking to protect his information or ideas.

---

[278] *Id.* at 214:6-217:23.

[279] *Id.* at 214:14-215:14.

[280] *Id.* at 217:2-12; 71:24-72:9 (footer is standard on all his emails).

[281] *Id.* at 186:17-189:2.  *See* BB10000911-912; *see also* 72:10-73:21.

[282] *Id.* at 189:13-190:20; BB10000908-910; *see also id.* at 232:2-19.

[283] *Id.* at 233:23-239:21; BB10000020-23.

[284] *Id.* at 16:19-117:8.

████████████████████████████████████████████████████████

████████████████████████████[285]

353.    In my opinion, any information that Mr. Storms provided to Mr. McNamara was provided voluntarily by Mr. Storms to Mr. McNamara with no reasonable expectation of confidentiality.  Also, as stated above, although it is my opinion that Mr. McNamara was already aware of everything that Mr. Storms alleges to have communicated to him before the date of Mr. Storms' communications, in my opinion nothing Mr. McNamara or Lancium did or did not do prevented Mr. Storms from utilizing his alleged "system" and/or otherwise capitalizing on the ideas he allegedly communicated.  Neither Mr. Storms nor Dr. McClellan identify any money or opportunity that Mr. Storms lost because of materials and/or information provided to Lancium, and neither have identified any opportunity that Mr. Storms lost as a result of Lancium's alleged use of the alleged Bearbox technology.

354.    I also note that Dr. McClellan attempts to make a comparison of Lancium's software functionality with BearBox's alleged functionality as set forth in BearBox's spreadsheet by citing to LANCIUM00033143 as an example of a feature that was allegedly implemented in Lancium's Smart Response™ software (McClellan Report, at ¶¶ 304-305) and Mr. Cline's explanation of Lancium's power arbitrage (*Id.* at ¶ 306).  Based on my understanding, Lancium's SmartResponse™ functionality in this area is different than Mr. Storms' simulation's functionality.  For example, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████    Mr. Storms' simulation, on the other hand, ████████████████

---

[285] *Id.* at 237:11-239:21; 145:16-146:19.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 6th day of May, 2022, in College Station, Texas.

_____

Mark Ehsani, Ph.D., P.E., LF. IEEE, F. SAE, M. AAAS

### SHORT RESUME
### M. Ehsani



M. Ehsani received the B.S. and M.S. degrees from the University of Texas at Austin in 1973 and 1974, respectively, and the Ph.D. degree from the University of Wisconsin-Madison in 1981, all in electrical engineering.

From 1974 to 1977 he was with the Fusion Research Center, University of Texas, as a Research Engineer. From 1977 to 1981 he was with Argonne National Laboratory, Argonne, Illinois, as a Resident Research Associate, while simultaneously doing the doctoral work at the University of Wisconsin-Madison in energy systems and control systems. Since 1981 he has been at Texas A&M University, College Station, Texas where he is now a Professor of electrical engineering and Director of Advanced Vehicle Systems Research Program and the Power Electronics and Motor Drives Laboratory. He is the author of over 400 publications in pulsed-power supplies, high-voltage engineering, power electronics, motor drives, and advanced vehicle systems and is the recipient of the Prize Awards in Static Power Converters and motor drives at the IEEE-Industry Applications Society 1985, 1987, and 1992 Annual Meetings, as well as over 140 other honors and recognitions. In 1984 he was named the Outstanding Young Engineer of the Year by the Brazos chapter of Texas Society of Professional Engineers. In 1992, he was named the Halliburton Professor in the College of Engineering at A&M. In 1994, he was also named the Dresser Industries Professor in the same college. In 2001 he was selected for Ruth & William Neely/ Dow Chemical Faculty Fellow of the College of Engineering for 2001-2002, for "contributions to the Engineering Program at Texas A&M, including classroom instruction, scholarly activities, and professional service". In 2003 he was selected for BP Amoco Faculty Award for Teaching Excellence in the College of Engineering. He was also selected for the IEEE Vehicular Society 2001 Avant Garde Award for "Contributions to the theory and design of hybrid electric vehicles". In 2003 he was selected for IEEE Undergraduate Teaching Award "For outstanding contributions to advanced curriculum development and teaching of power electronics and drives." In 2004 he was elected to the Robert M. Kennedy endowed Chair in Electrical Engineering at Texas A&M University. In 2005 he was elected as the Fellow of Society of Automotive Engineers (SAE). He is the co-author of 20 books on power electronics, motor drives and advanced vehicle systems, including Vehicular Electric Power Systems, Marcel Dekker, Inc. 2003 and "Modern Electric Hybrid Vehicles and Fuel Cell Vehicles – Fundamentals, Theory, and Design", CRC Press, 2004. He is also the co-author of over 400 publications and has over 30 granted or pending US and EC patents. He has also been consultant to over 60 companies, US government agencies and internationals organizations. His current research work is in energy systems, power electronics, motor drives, hybrid vehicles and their control systems, and sustainable energy engineering.

Dr. Ehsani has been a member of IEEE Power Electronics Society (PELS) AdCom, past Chairman of PELS Educational Affairs Committee, past Chairman of IEEE-IAS Industrial Power Converter Committee and past chairman of the IEEE Myron Zucker Student-Faculty Grant program. He was the General Chair of IEEE Power Electronics Specialist Conference for 1990. He is the founder of IEEE Power and Propulsion Conference, the founding chairman of the IEEE VTS Vehicle Power and Propulsion and chairman of Convergence Fellowship Committees. In 2002 he was elected to the Board of Governors of VTS. He has also served on the editorial board of several technical journals and was the associate editor of IEEE Transactions on Industrial Electronics and IEEE Transactions on Vehicular Technology. He is a Life Fellow of IEEE, a past IEEE Industrial Electronics Society and Vehicular Technology Society Distinguished Speaker, IEEE Industry Applications Society and Power Engineering Society Distinguished Lecturer. He is also a registered professional engineer in the State of Texas.

**BIOGRAPHICAL DATA**

- Ehsani, Mehrdad (Mark)
- Professor, Electrical Engineering
- Birth date: 10/9/50
- Citizenship: U. S.
- Marital Status: Married
- Number of Children: Three
- Last Security Clearance: Secret

**ADDRESS**

Work:   Texas A&M University
        Department of Electrical Engineering
        College Station, Texas 77843

**PROFESSIONAL INTERESTS**

- Electronics
- Solid State Power Systems
- Power Electronics
- Motor Drives
- Specialized Power Systems
- Control Systems
- Energy Storage Systems
- High Voltage Direct Current (HVDC) Power Transmission
- Applications of Microcomputers to Power Control
- Pulsed Power Systems
- Electric Hybrid Vehicles
- High Voltage Engineering
- Electrical Failures and Hazards
- Advanced Vehicle Power and Propulsion Systems
- Novel Electromagnetic Machines
- Sustainable Energy and Transportation

**EDUCATION**

- Ph. D., Electrical Engineering, University of Wisconsin, Madison, 1981
- M. S., Electrical Engineering, University of Texas, Austin, 1974
- B. S., Electrical Engineering, University of Texas, Austin, 1973

**EXPERIENCE**

- **Educational**

  1. Assistant Professor, Electrical Engineering, Texas A&M University, August 1981-1987

  2. Associate Professor of Electrical Engineering, Texas A&M University, September 1987-1992

# EXHIBIT 2

Page 1

1            IN THE UNITED STATES DISTRICT COURT
                  DISTRICT OF DELAWARE

2
      BEARBOX, LLC; and AUSTIN        )
3     STORMS,                         )
                                      )
4          Plaintiffs,                )
                                      )
5       vs.                           ) No. 21-534-MN-CJB
                                      )
6     LANCIUM, LLC; MICHAEL T.        )
      McNAMARA; and RAYMOND E. CLINE,)
7     JR.,                            )
                                      )
8          Defendants.                )
9            The Videotaped Videoconference Deposition
10    of MARK EHSANI, Ph.D., called by the Plaintiff for
11    examination pursuant to notice and pursuant to the
12    Rules of Civil Procedure for the United States
13    District Courts pertaining to the taking of
14    depositions, taken before Steven Stefanik, a notary
15    public within and for the County of DuPage and
16    State of Illinois, on the 6th day of June 2022.
17
18
19
20
21
22
23
24

Page 2

```
 1    REMOTE APPEARANCES:
 2       MARSHALL GERSTEIN & BORUN, LLP, by
         MR. BENJAMIN T. HORTON
 3       RAYMOND R. RICORDATI, III
         233 South Wacker Drive, Suite 6300
 4       Chicago, Illinois 60606-6357
         (312) 474-6300
 5       bhorton@marshallip.com
         rricordati@marshallip.com
 6          for the Plaintiffs via
            videoconference;
 7
         BARNES & THORNBURG, LLP, by
 8       MR. MARK C. NELSON
         2121 North Pearl Street, Suite 700
 9       Dallas, Texas 75201
         mnelson@btlaw.com
10       (214) 258-4200
            for the Defendants via
11          videoconference.
12
13
14
         ALSO PRESENT:  (Via videoconference)
15
            Mr. Steven Troncone, Videographer
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
         WITNESS:                   PAGE
 2
         MARK EHSANI, Ph.D.
 3
         Examination by:
 4          Mr. Horton            5
 5
 6
 7
 8
              E X H I B I T S
 9    NUMBER            FOR IDENTIFICATION
10    Ehsani No. 99          4
11    Ehsani No. 100        33
12    Ehsani No. 101        36
13    Ehsani No. 102       112
14    Ehsani No. 103       132
15    Ehsani No. 104       147
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1            (Whereupon, Deposition
 2            Exhibit No. 99 was
 3            marked for identification
 4            as of this date.)
 5       THE VIDEOGRAPHER:  We are now on the video
 6    record.  The today is June 6th, 2022.  The time is
 7    approximately 9:04 a.m. central time.
 8            We are here in the matter of BearBox,
 9    LLC, et al., versus Lancium, LLC, et al., to take
10    the deposition of Mark Ehsani.
11            Will counsel please identify themselves
12    for the record.
13       MR. HORTON:  Benjamin Horton, counsel for the
14    plaintiffs, and with me co-counsel Ray Ricordati.
15       MR. NELSON:  Mark Nelson, counsel for
16    defendants.
17       THE VIDEOGRAPHER:  The court reporter may
18    proceed.
19       THE REPORTER:  I'm Steve Stefanik.  I'm the
20    court reporter.
21            The attorneys participating in this
22    deposition acknowledge that I am not physically
23    present in the deposition room and that I will be
24    reporting this deposition remotely.
```

Page 5

```
 1            They further acknowledge that, in lieu
 2    of an oath administered in person, the witness will
 3    verbally declare his or her testimony in this
 4    matter is under penalty of perjury.  The parties
 5    and their counsel consent to this arrangement and
 6    waive any objections to this manner of reporting.
 7            Please indicate your agreement by
 8    stating your name and your agreement on the record.
 9            Mr. Horton?
10       MR. HORTON:  Benjamin Horton, I agree.
11       MR. NELSON:  Mark Nelson, I agree.
12            (Witness sworn.)
13            MARK EHSANI, Ph.D.,
14    called as a witness herein, having been first duly
15    sworn, was examined and testified as follows:
16            EXAMINATION
17            BY
18            MR. HORTON:
19       Q.  Good morning, Dr. Ehsani.  My name is
20    Ben Horton.  I represent the plaintiffs in this
21    case, and we're going to have a deposition today.
22            Can you confirm for me, Dr. Ehsani, that
23    you don't have any applications or documents open
24    on the computer in front of you other than what's
```

2 (Pages 2 - 5)

Page 166

1 you're being loose and fast with words.
2        Generation asset?  You mean rotating
3 generation?  Reserve generation?  Spinning
4 generation?  Peaking generation?  A renewable
5 generation?
6        What kind of generation are you talking
7 about?
8   Q.  Let's do it this way, Dr. Ehsani.
9        Is it your opinion that Claim 1 is
10 limited to only direct grid connections?
11   A.  I'm not a lawyer, but if it says power from
12 the grid, does that mean only grid and nothing
13 else?  I'm not a lawyer to answer that.
14        However, if I read the whole
15 specification with your question in mind, I may
16 find passages that will enrich that power -- power
17 from the grid to see if it could be behind the
18 meter on the, for example, renewable power source,
19 which is, by the way, something you didn't ask.
20   Q.  I'm sorry.  What didn't I ask?
21   A.  Renewable power source.
22   Q.  In your opinion, Dr. Ehsani, does Claim 1,
23 in addition to covering grid connections, cover
24 renewable asset connections?

Page 167

1   A.  I don't have any opinion other than what is
2 in this claim in view of the specifications as
3 reported in my declaration.
4   Q.  Dr. Ehsani, if we could go to Paragraph 182
5 of your report, please.
6   A.  Yes, sir.  I'm there.
7   Q.  In Paragraph 182, you write that,
8 Dr. McClellan states that the diagram indicates
9 that the system may periodically, such as every
10 five minimums or hourly, reevaluate the monitored
11 conditions and implement a performance strategy
12 based on those conditions.  And then you write, I
13 disagree.
14        Do you see that?
15   A.  Where are you reading?
16   Q.  The first sentence of Paragraph 182.
17   A.  Okay.
18   Q.  First two sentences of Paragraph 182.
19   A.  I see that, and I agree with what I said.
20   Q.  Okay.
21   A.  And I reemphasize that.
22   Q.  And you testified earlier, Dr. Ehsani, that
23 you reviewed the diagram collectively with the
24 Excel spreadsheet that Mr. Storms provided to

Page 168

1 Mr. McNamara, correct?
2   A.  I have reviewed all of these things, yes.
3 [REDACTED]
4 [REDACTED]
5 [REDACTED]
6 [REDACTED]
7 [REDACTED]
8 [REDACTED]
9   Q.  Okay.  Paragraph 188, Dr. Ehsani, if you
10 could please look at that.  It's on Page 95.
11   A.  Yes, sir.
12 [REDACTED]
13 [REDACTED]
14 [REDACTED]
15 [REDACTED]
16 [REDACTED]
17 [REDACTED]
18 [REDACTED]
19 [REDACTED]
20 [REDACTED]
21 [REDACTED]
22 [REDACTED]
23        Do you see that?
24   A.  I do.

Page 169

1   Q.  But, Dr. Ehsani, are you offering an
2 opinion as to what Mr. Storms considered to be
3 confidential or not?
4   A.  No, I'm offering an opinion about what
5 confidential information and the protocol or
6 nondisclosure agreement is understood in the field
7 by person of ordinary skill, by responsible people
8 and by people that consider themselves having
9 confidential technology.
10   Q.  Okay.  And the basis for that opinion is
11 what you just said, your experience in the field
12 and your knowledge of a person of ordinary skill in
13 the art?
14   A.  Among other things, but I have practiced
15 that.  I have seen numerous companies large and
16 small practice that.  They always sign an NDA
17 before they give me information, and they refuse to
18 listen to my technology if they think that it may
19 violate some technology that they are working on.
20        These things are well-established and
21 extremely professionally and carefully handled by
22 people who make a living doing this kinds (sic) of
23 stuff.
24   Q.  In your opinion, Dr. Ehsani, is it not

43 (Pages 166 - 169)

Page 170

1  possible for there to be an obligation of
2  confidentiality that exists in the absence of a
3  nondisclosure agreement?
4     A.   Repeat that again?
5  Q.   Sure.
6         Dr. Ehsani, is it your opinion that
7  confidentiality obligations cannot exist without a
8  nondisclosure agreement?
9     A.   In the space of that being broadcast to
10 other people without an NDA; in other words, sent
11 to many people and after the fact calling it a
12 confidential -- are you saying that something given
13 to someone and, after the fact, calling it
14 confidential makes it confidential; is that what
15 you said?
16 Q.   That's not what I said, but I can try
17 again.
18    A.   Please.
19 Q.   Dr. Ehsani, is it your opinion that
20 obligations of confidentiality cannot exist without
21 a nondisclosure agreement?
22    A.   That may be a loaded legal question, which
23 I defer to the attorneys, unless I have opined on
24 that as I understand that in my report.

Page 171

1         But let me tell you this, a person that
2  hears a piece of information must have the
3  option -- must have the freedom to know if they
4  would like to hear that or not, if they want to be
5  under that obligation or not.
6         An obligation for nondisclosure cannot
7  be one way.  It has to be understood by both
8  parties prior to exchange of goods, services and
9  information.
10 Q.   Yeah.  Do you think it's incumbent on the
11 receiving party to make that clear?
12    A.   The receiving party does not volunteer to
13 receive information.  The sending party is in
14 control of information and the choice to
15 disseminate that information.
16        This is my understanding based on my
17 experience.  It's not in my report.  If I am wrong,
18 I will very happily stand corrected.
19 Q.   Let's look at Paragraph 282, Dr. Ehsani, of
20 your report.
21        I'm particularly focused on the last
22 sentence in Paragraph 282 where you write,



Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

Page 174



21    MR. HORTON:  Okay.  I have nothing further.
22         Thank you, Dr. Ehsani.
23    THE WITNESS:  It's been a pleasure, Mr. Horton.
24    MR. NELSON:  Why don't we go off the record for

Page 175

1 a second here.  I'll see if I have any redirect.
2 Probably be, you know, 10, 15 minutes to go through
3 the notes we've gotten during the day.
4         I don't know if you marked the
5 transcript confidential or not, Ben.  Let's just
6 mark it confidential and sort it out later.
7    MR. HORTON:  Yeah, that's fine.
8    THE VIDEOGRAPHER:  Okay.  Go off the record at
9 3:30.
10    MR. NELSON:  Come back in about 15 minutes.
11    MR. HORTON:  Sounds good.
12         (Recess taken.)
13    THE VIDEOGRAPHER:  We are back on the record at
14 3:51.
15    MR. NELSON:  So, Dr. Ehsani, we'll reserve our
16 questions for trial, and we thank you very much for
17 your time.
18    THE WITNESS:  Thank you.
19    MR. HORTON:  Thanks again.  Thanks, everyone.
20    THE VIDEOGRAPHER:  Off the record at 3:51.
21         FURTHER DEPONENT SAYETH NOT. . .
22
23
24

Page 176

1 STATE OF ILLINOIS )
                   ) SS:
2 COUNTY OF DU PAGE )
3         I, Steven Stefanik, a notary public in and
4 for the County of Cook and State of Illinois, do
5 hereby certify that MARK EHSANI, Ph.D., was first
6 duly sworn to testify the whole truth, and that the
7 above deposition was recorded stenographically by
8 me and was reduced to computerized transcript under
9 my personal direction.
10        I further certify that the said deposition
11 was examined and read over by said deponent and was
12 signed by him and that the said deposition
13 constitutes a true record of the testimony given by
14 the said witness.
15        I further certify that the said deposition
16 was taken at the time and place specified and that
17 the taking of said deposition commenced on the 6th
18 day of June 2022 and was completed the same day.
19        I further certify that MR. BENJAMIN T.
20 HORTON of the firm of MARSHALL GERSTEIN & BORUN,
21 LLP, 233 South Wacker Drive, Suite 6300, Chicago,
22 Illinois, appeared as attorney for the plaintiff;
23 that MR. MARK C. NELSON of the firm of BARNES &
24 THORNBURG, LLP, 2121 North Pearl Street, Suite 700,

Page 177

1 Dallas, Texas, appeared as attorney for the
2 defendant.
3         I further certify that I am not a relative
4 or employee or attorney or counsel of any of the
5 parties, or a relative or employee of such attorney
6 or counsel, or financially interested directly or
7 indirectly in this action.
8         In witness whereof, I have hereunto set my
9 hand and affixed my seal of office, at Chicago,
10 Illinois, this 6th day of June 2022.
11
12
13
14
         Steven T. Stefanik, CSR
15        No. 084-003298
16
17
18
19
20
21
22
23
24

45 (Pages 174 - 177)

**Page 178**

```
1           Veritext Legal Solutions
               1100 Superior Ave
2                 Suite 1820
               Cleveland, Ohio 44114
3             Phone: 216-523-1313
4
   June 15, 2022
5
   To: MARK C. NELSON
6
   Case Name: Bearbox, LLC, et al. v. Lancium, LLC, et al.
7
   Veritext Reference Number: 5268995
8
   Witness: Mark Ehsani, Ph.D.      Deposition Date:  6/6/2022
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24 NO NOTARY REQUIRED IN CA
```

**Page 179**

```
1           DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
3     ASSIGNMENT REFERENCE NO: 5268995
      CASE NAME: Bearbox, LLC, et al. v. Lancium, LLC, et al.
      DATE OF DEPOSITION: 6/6/2022
4     WITNESS' NAME: Mark Ehsani, Ph.D.
5     In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____
9  Date         Mark Ehsani, Ph.D.
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
      They have read the transcript;
13    They signed the foregoing Sworn
         Statement; and
14    Their execution of this Statement is of
         their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
18    _____
      Notary Public
19
      _____
      Commission Expiration Date
20
21
22
23
24
25
```

**Page 180**

```
1           DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 5268995
3  CASE NAME: Bearbox, LLC, et al. v. Lancium, LLC, et al.
   DATE OF DEPOSITION: 6/6/2022
4  WITNESS' NAME: Mark Ehsani, Ph.D.
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9     I request that these changes be entered
   as part of the record of my testimony.
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____
   Date         Mark Ehsani, Ph.D.
14
      Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18       in the appended Errata Sheet;
      They signed the foregoing Sworn
19       Statement; and
      Their execution of this Statement is of
20       their free act and deed.
21 I have affixed my name and official seal
22 this _____ day of_____, 20____.
23 _____
24    Notary Public
      _____
25    Commission Expiration Date
```

**Page 181**

```
1      ERRATA SHEET
       VERITEXT LEGAL SOLUTIONS MIDWEST
2         ASSIGNMENT NO: 5268995
3  PAGE/LINE(S) /     CHANGE     /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
   _____     _____
20 Date         Mark Ehsani, Ph.D.
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23 _____
      Notary Public
24
   _____
25    Commission Expiration Date
```