IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BEARBOX LLC and AUSTIN STORMS,  )
                                  )  **REDACTED PUBLIC VERSION**
        Plaintiffs,  )
                                    )
    v.  )  C.A. No. 21-534-MN-CJB
                                    )
LANCIUM LLC, MICHAEL T. MCNAMARA,  )
and RAYMOND E. CLINE, JR.  )
                                    )
        Defendants.  )

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' FIRST MOTION FOR SUMMARY JUDGMENT[1]

ASHBY & GEDDES
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
amayo@ashbygeddes.com

*Of Counsel:*

Benjamin T. Horton
John R. Labbé
Raymond R. Ricordati, III
Chelsea M. Murray
MARSHALL, GERSTEIN & BORUN LLP
233 South Wacker Drive
6300 Willis Tower
Chicago, IL 60606-6357
(312) 474-6300

*Attorneys for Plaintiffs*
*BearBox LLC and Austin Storms*

Dated:  July 19, 2022

---

[1] Defendants filed 50 pages of summary judgment briefing. D.I. 149 and D.I. 168. The Scheduling Order in this case does not include a provision extending page limits for summary judgment briefs. D.I. 35. Plaintiffs' counsel, concerned that 50 pages is far in excess of the 20-page limit provided for by L.R. 7.1.3(a)(4), raised this issue with counsel for Defendants, and they responded that they understand a 50-page rule for summary judgment and *Daubert* briefs applies in this case. Plaintiffs are filing an equivalent number of pages in response to Defendants' summary judgment and *Daubert* motions. This Brief responds to Defendants' first Motion for Summary Judgment filed on June 15, 2022. D.I. 148. Plaintiffs will file a separate brief in opposition to Defendants' second Motion for Summary Judgment filed on July 8, 2022. D.I. 167.

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL BACKGROUND..............................................................................4

    A.    Storms conceived of a cryptocurrency mining system, and he has extensive corroborating evidence supporting the scope and timing of his conception ................................................................................................4

    B.    Storms communicated detailed information to Lancium describing his arbitrage method and inventions................................................................6

        1.    Storms conveyed detailed information to Lancium at the Fidelity FCAT Mining Summit in Boston, Massachusetts .......................6

        2.    Following the dinner, Storms sent more detailed information to McNamara following McNamara's request..................................8

        3.    ████████████████████████████████████ ........................................10

        4.    Lancium filed the '433 patent to monopolize Storms' portions of the system that Storms communicated to it ...............................12

III.  ARGUMENT .....................................................................................................14

    A.    Genuine issues of material fact preclude summary judgment on the issue of sole inventorship................................................................................14

        1.    Plaintiffs' experts correctly apply the plain and ordinary meaning of the claim terms "power option agreement" and "minimum power threshold," and the Court need construe these terms because there is no genuine dispute about what they mean ....................15

            a.    Power Option Agreement ..............................................17

            b.    Minimum Power Threshold ...........................................18

        2.    There are genuine issues of material fact for trial about whether Storms conceived of the inventions claimed in the '433 Patent and communicated those inventions to Defendants..........................19

            a.    Storms' system as described in the documents he communicated to Lancium meets Lancium's constructions even if there were not corrected...................................23

            b.    Lancium misrepresents both the underlying evidence and the requirements of the claims. ......................................24

        3.    Storms communicated the subject matter claimed by the terms "power option agreement" and "minimum power threshold" even if he did not use those words when communicating with Defendants ..............................................................................25

4.    In addition to the information specifically communicated by Storms to Lancium, describing the full breadth of the claimed subject matter, Storms' conception is corroborated by documents showing customized hardware and dozens of source code files................26

B.    Genuine issues of material fact preclude summary judgment on joint inventorship................................................................................27

1.    Storms has sufficient evidence to meet the "collaboration" requirement for joint inventorship .............................................27

2.    Storms may rely on evidence of his contributions to the inventions claimed in the '433 patent even if that evidence was public ...................28

C.    Conversion .................................................................................30

1.    BearBox's conversion claim is not prescribed...........................30

a.    BearBox's SAC conversion claim relates back to the original complaint because all claims are based on the same Lancium conduct, and the same transactions between the parties, that occurred in May 2019. .................................30

b.    BearBox was not on notice of conversion of its specific arbitrage method until December 20, 2021....................................32

2.    BearBox's conversion claim is not preempted by federal patent law because it does not involve "patent-like protection" or a "determination of inventorship" .............................................33

IV.    CONCLUSION.................................................................................36

# TABLE OF AUTHORITIES

**Cases**

*Acromed Corp. v. Sofamor Danek Grp., Inc.*,
   253 F.3d 1371 (Fed. Cir. 2001) ........................................................................ 20

*Albright v. City of New Orleans*,
   237 F.3d 631 (5th Cir. 2000) ............................................................................ 31

*Apotex Inc. v. Cephalon, Inc.*,
   2011 WL 6090696 (E.D. Pa. Nov. 7, 2011) ...................................................... 20

*Arbitron, Inc. v. Kiefl*,
   No. 09-CV-04013 PAC, 2010 WL 3239414 (S.D.N.Y. Aug. 13, 2010) .......................... 28

*Bailey v. Enervest Operating Co., LLC*,
   45,553 (La. App. 2 Cir. 6/30/10), 43 So. 3d 1046 .......................................... 30

*Baker v. Payne & Keller of Louisiana, Inc.*,
   390 So. 2d 1272, 1275 (La. 1980) .................................................................. 31

*Burroughs Wellcome Co. v. Barr Labs. Inc.*,
   40 F.3d 1223 (Fed. Cir. 1994) .......................................................................... 20

*Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*,
   412 F.3d 1331 (Fed. Cir. 2005) ........................................................................ 20

*Clairol Inc. v. Save-Way Indus., Inc.*,
   210 U.S.P.Q. 459 (S.D. Fla. 1980) .................................................................. 28

*Coca-Cola Co. v. Pepsico, Inc.*,
   No. CIVA 102-CV-2887-RWS, 2004 WL 4910334 (N.D. Ga. Sept. 29, 2004) ............. 28

*CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*,
   916 F.3d 1350 (Fed.Cir. 2019) ........................................................................ 20

*Coleman v. Dines*,
   754 F.2d 353 (Fed. Cir. 1985) .......................................................................... 27

*Comeaux v. Poindexter*,
   527 So. 2d 1184 (La. Ct. App. 1988) .............................................................. 30

*Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*,
   964 F.3d 1365 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2691 (2021) ................. 30

*Dileo v. Horn*,
   15-684 (La. App. 5 Cir. 3/16/16), 189 So. 3d 1189 ........................................ 34

*Ethicon, Inc. v. United States Surgical Corp.*,
    135 F.3d 1456 (Fed.Cir.1998)............................................................... 15, 26, 27

*Fina Oil & Chem. Co. v. Ewen*,
    123 F.3d 1466 (Fed. Cir. 1997)................................................................ 20, 28

*Finjan, Inc. v. Secure Computing Corp.*,
    626 F.3d 1197 (Fed. Cir. 2011)...................................................................... 15

*Hammons v. City of Tallulah*,
    30,256 (La. App. 2 Cir. 2/25/98), 708 So. 2d 502, *writ denied*, 98-0820 (La.
    5/8/98), 719 So. 2d 53 ................................................................................ 32

*Harvey v. Dixie Graphics, Inc.*,
    593 So. 2d 351 (La. 1992) ............................................................................ 32

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
    802 F.2d 1367 (Fed. Cir. 1986).................................................................... 20

*Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*,
    973 F.2d 911 (Fed. Cir. 1992).............................................................. 28, 29

*Mahurkar v. C.R. Bard, Inc.*,
    79 F.3d 1572 (Fed. Cir. 1996)...................................................................... 26

*Nexus Techs., Inc. v. Unlimited Power, Ltd.*,
    No. 1:19-CV-00009-MR, 2020 WL 6940505 (W.D.N.C. Nov. 25, 2020)................. 22, 25

*Oakwood Lab'ys LLC v. Thanoo*,
    999 F.3d 892 (3d Cir. 2021).......................................................................... 35

*Pontchartrain Med. Labs, Inc. v. Roche Biomedical Lab'ys, Inc.*,
    95-2260 (La. App. 1 Cir. 6/28/96), 677 So. 2d 1086 .................................... 35

*Price v. Symsek*,
    988 F.2d 1188 (Fed.Cir.1993)...................................................................... 20

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,
    264 F.3d 1344 (Fed. Cir. 2001).................................................................... 26

*Serrano v. Republic Servs., Inc.*,
    227 F. Supp. 3d 768 (S.D. Tex. 2017) .......................................................... 32

*Southwall Technologies, Inc. v. Cardinal IG Co.*,
    54 F. 3d 1570 (Fed. Cir. 1995)...................................................................... 18

*Tiller v. Atl. Coast Line R. Co.*,
    323 U.S. 574, 65 S. Ct. 421, 89 L. Ed. 465 (1945)...................................... 31, 32

*Trovan, Ltd. v. Sokymat SA, Irori,*
    299 F.3d 1292 (Fed. Cir. 2002)........................................................................... 27

*Univ. of Colorado Found., Inc. v. Am. Cyanamid Co.,*
    342 F.3d 1298 (Fed. Cir. 2003)..................................................................... 14, 15

*Univ. of Pittsburg of Commonwealth Sys. of Higher Educ. v. Hedrick,*
    2008 WL 8627085 (C.D. Cal. June 9, 2008) .................................................. 20

*University of Utah v. Max-Planck-Gesellschaft Zur Foerderung Der Wissenschaften E. V.,*
    851 F.3d 1317 (Fed. Cir. 2017)........................................................................... 29

*Vanderbilt Univ. v. ICOS Corp.,*
    601 F.3d 1297 (Fed. Cir. 2010)........................................................................... 28

*Wawrzynski v. H.J. Heinz Co.,*
    728 F.3d 1374 (Fed. Cir. 2013)........................................................................... 35

## I.       INTRODUCTION

The Court should deny summary judgment because numerous factual disputes remain for trial about whether Plaintiff Austin Storms ("Storms") should be named as the sole inventor or at least a joint inventor of Defendants' '433 Patent and whether Defendants are liable for conversion of Plaintiffs' property. The Defendants' emphasis on the clear-and-convincing standard for inventorship is misplaced because Storms has extensive testimonial *and* documentary evidence to support his claim of inventorship including evidence demonstrating that he conceived the claimed inventions on his own and communicated those inventions to the Defendants (before the Defendants even contend that they conceived the claimed inventions). ("SSF") ¶ 16.[2]

In 2018, Storms conceived of an idea that would forever change the way Bitcoin miners operate, and in late 2018 and early 2019 he tirelessly worked to develop his idea. SSF ¶ 3. Storms spent hundreds of hours and tens of thousands of dollars of his own money, wrote thousands of lines of source code, built custom power distribution units, constructed a container to house it all, modeled both the input and output data for the system, and in early 2019, had a complete, working prototype. SSF ¶ 4. Remarkably, Storms' BearBox system, in addition to making money while miners mined Bitcoin, also could *make money when the miners were turned off* (*i.e.*, not receiving power). Storms was a 28-year-old newcomer to the Bitcoin industry, so in early May 2019 he set off to a conference in Boston in search of a partner to buy or invest in his system and help commercialize it.

Meanwhile, in the same time frame, Defendant Lancium 

SSF ¶ 2. When demand was high and prices were high, Lancium would

---

[2] Citations to "SSF" are citations to Plaintiffs' Separate Concise Statement of Material Facts for Trial filed herewith. All Exhibits cited in this brief are attached to the Declaration of Chelsea Murray filed herewith, unless otherwise noted.



. At that time, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. SSF ¶ 1. Lancium's self-professed fast ramping technology (*i.e.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. SSF ¶ 4. It is not surprising, then, that when Storms found Lancium at that Boston conference in May 2019, Lancium's CEO and CFO pretended to be the partners Storms' needed.

After Lancium met Storms in Boston everything began to change. Lancium's CEO and CFO listened to Storms describe the BearBox system in detail over dinner on May 3, 2019, and later asked Storms to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Storms obliged, believing Lancium was interested in working together. SSF ¶ 5. But after Storms gave Lancium the goods, Lancium cut Storms off. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, leading Lancium to file the patent application that would mature into the '433 patent, even paying extra fees to expedite it, in the hopes of keeping anyone else from discovering or using Storms' system, including Storms himself. SSF ¶ 11.

Storms' proof of conception of his inventions claimed in the '433 patent includes hundreds of pages of source code, white board notes, photos of physical hardware and computing systems,

data, and drawings. SSF ¶ 3. Lancium is unable to produce any evidence of conception prior to that of Storms, conceding that Lancium's alleged conception date is somewhere between August through October of 2019, after Storms disclosed his system to Lancium. Even then, Lancium's attempt to prove its too-little-too-late conception is based primarily on a few emails, and no technical documents (nor could it be, as McNamara and Cline, Lancium's improperly named inventors, did not write any source code or build any hardware). SSF ¶ 17.

When the dust had settled on Lancium's sprint to the Patent Office and rush to commercialize Storms' system, ████████████████████████████████. Armed with Storms' system and an ill-gotten patent, ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████ SSF ¶ 9.

In this lawsuit, Lancium called Storms' BearBox system "████████." ██████████████████ ████████████████████████████████████████████████████████ and ██████████████████████████████████████ Lancium breathlessly updated its investors that Lancium had previously ████████████ was now ████████████ and that Lancium would ████████ going forward. Lancium, dependent on Storms' BearBox system, ██████████████████████, ██████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████

## II.   FACTUAL BACKGROUND

### A.   Storms conceived of a cryptocurrency mining system, and he has extensive corroborating evidence supporting the scope and timing of his conception

In late 2018, Storms conceived of and began developing a Bitcoin mining system and method that could mine Bitcoin at scale when it was profitable to do so, or sell the energy (or options for the energy capacity) that might have been consumed mining when energy prices spiked. D.I. 151 Ex. 3, McClellan Report at ¶172; Ex. A, BB00000001-5, 11-18, 21-28. Storms started by designing a custom power distribution unit ("PDU").  *See, e.g.*, Ex. A, BB00000001-5, 11-18, 21-28.  That custom PDU employed multiple, individually-controllable relays that each powered an associated set of Bitcoin miners (i.e. computing systems).  *See, e.g.*, Ex. A, BB00000005 (showing interface for control of 12 relays, both individually and in various subsets) and BB00000021 (showing custom built PDU) (reproduced below).



BB00000005                          BB00000021

To communicate with and control various aspects of the cryptocurrency miners, Storms utilized the industry standard, open-source software referred to as "cgminer"—███████████ ████████████████████████████████████████████  Ex. B, BB00000091 (referring to cgminer software); Ex. C, Baer Report at ¶¶40 and 111 and Appendix G (showing cgminer's capability to turn miners on/off, retrieve operational/performance data, set operational parameters such as frequency, etc.); Ex. D.I. 151 Ex. 3, McClellan Report at ¶¶ 57, 60, 64, 67, 70, 75, 80, 86,

105, 110, 117, 141, 153 and Appendix at [A.2] and [A.5]; Ex. D, LANCIUM00015068 (showing Lancium's use of same cgminer software). Storms' design enabled fine-grain load control—such as the ability to turn on some, but not all of the miners—so that power usage and/or system performance could be dynamically manipulated in response to changing conditions. *See, e.g.,* Ex. E, Storms Dep. at 99:24-100:19; D.I. 151 Ex. 3, McClellan Report at 19-22, 56.

Continuing into early 2019, Storms also developed a control system that monitored various conditions, utilizing application programing interface (or API) calls to retrieve relevant information such as real-time and day-ahead energy prices, Bitcoin price and hashing difficulty information, and the like. Ex. B, at BB00000092. This control logic processed this information to determine mining profitability. As reflected in his annotated system diagram, based on conditions, the Bearbox system either instructs miners to mine Bitcoin (depicted with orange "B"s on the right of the diagram) or sells power to the grid (depicted with green dollar signs in the middle of the diagram). *Id*. The diagram indicates that the system may periodically (e.g. every 5-minutes, hourly, or the like) re-evaluate the monitored conditions and implement a performance strategy (*i.e.*, mine at



Ex. B, at BB00000092.

a particular power threshold or sell energy to the grid) based on those conditions.

Storms designed his system with different types of miners having different operational characteristics, such as power thresholds, operating frequencies, and more. D.I. 151 Ex. 3, McClellan

¶ 177; Ex. B, at BB00000091 (referring to 272 miners consisting of a collection "Bitmain s9, Dragonmint T1 or the similar" miners). For example, by May 3, 2019, Storms had already created over 40 different source code files implementing various aspects of the system, such as determining breakeven costs for miners that operate at different power thresholds. D.I. 151 Ex. 3, McClellan Report at 99 (describing source files as essentially the same except for use of different power thresholds associated with different types of miners (*e.g.,* one file using "Bitmain S9 or similar units ("S9145") units producing 14.5 TH/s @ 1,315w each" and another using "MicroBt ("WM") units producing 48 TH/s @ 2,200w each")).

## B.   Storms communicated detailed information to Lancium describing his arbitrage method and inventions

### 1.   Storms conveyed detailed information to Lancium at the Fidelity FCAT Mining Summit in Boston, Massachusetts

On May 3, 2019, Storms met McNamara at a Fidelity FCAT Mining Summit in Boston, Massachusetts.  Ex. E, Storms Dep. at 74 and 86.  While there, Storms talked to McNamara about his Bearbox container builds and his ideas about utilizing excess wind and renewable energy in Texas.  SSF ¶ 5; Ex. E, Storms Dep. at 84.  Storms summarized their initial conversations as follows:

Q.      And what did you talk to Mr. McNamara and CFO about?

A.      What I was working on at BearBox, what I developed and kind of my vision on how you could build out something like this … to really utilize renewable energy.

Q.      When you say "something like this," what do you mean?

A.      Something like … the BearBox containers. They're … building containers is great, but you could utilize the same … type of software in a large like super structure build.  It's not specific to the housing in which the machines run.

Q.      Did you tell Mr. McNamara that?

A.      Yes.

Q.    What -- tell me everything you remember talking to either Mr. McNamara or his CFO.

A.    Yeah, so I talked with them about like their current physical infrastructure and what they were looking at from an electrical standpoint.  I talked with them about … ██████████████ ███████████████████████████████████████ and why I thought it was a bad idea as well.  I talked to them about physical characteristics of my BearBox units and why I thought that they were different than other offerings in the market, and I talked with them about … some of the software that I was working on to offer flexibility for those units and … their load and how they … could be controlled and how you could really maximize the profitability depending on the setup.

Q.    Anything else?

A.    There's … a lot that goes into that and some of the ideas around kind of … how the development took place … from the physical side of the power distribution units to me writing the software and understanding how electricity moves through the market.

SSF ¶ 5; Ex. E, Storms Dep. at 95-97.

Storms also described the physical characteristics of his BearBox and control software that Storms believed provided fine grain load control over the mining machines within the build (i.e. the ability to turn on or off a subset of miners). Ex. E, Storms Dep. at 99-100. Storms explained that, dependent on variables such as power pricing, one could determine a strategy for how many machines to use mining, the break-even costs and the opportunity costs of those machines and how to calculate those values. Ex. E, Storms Dep. at 104-105. In other words, Storms explained that the BearBox system could be used to "maximize profitability" by determining when it is most profitable to utilize the power to mine Bitcoin or curtail activities and sell the power back to the grid, in both the day-ahead and real-time markets and could utilize a variety of commercial arrangements to do so:

A:    . . . And then utilizing, you know, different configurations and kind  of some of the break-even calculations around the machines within your build determine when it's most profitable to effectively mine Bitcoin at that location or utilize the power and sell it back to the grid but in both the day-ahead and real-time markets.

> Q.      In the context you're talking about, **who sells the power back to the grid**?
>
> A.      **Variety of different options there. It could be the generator sells the power back. It could be the mining facility sells the power back. It could be a different market participant depending on the ISO**.
>
> Q.      And what we've just been discussing, is that part of what you maintain you talked to Mr. McNamara about regarding how load can be controlled to maximize profitability?
>
> A.      Yes.

Ex. E, Storms Dep. at 104:22-105:15 (emphasis added).

Storms discussions with McNamara and Lancium's CFO were "[e]xtremely specific":

> I shared with them how to design database tables for a miner management system that could effectively pull in individual data from individual miners that were mapped to PDUs and relays within the build to determine what the break-even cost is there, and then the power distribution unit and control system could at the same time toggle relays on or off or send a command to the miner to, you know, power on or power off or stop mining or change the mode which it's operating depending upon the power and price and things of that nature.

Ex. E, Storms Dep. at 105-106. Conversely, McNamara's recollection of the dinner is "vague." Ex. F, McNamara Dep. at 133-135.

### 2.      Following the dinner, Storms sent more detailed information to McNamara following McNamara's request

Following this conference, McNamara asked Storms multiple times for additional details about BearBox's technology, declaring that Storms and Lancium had " ███████████████ Ex. G, at BB10004960; D.I. 145, Ex. C. On May 9, 2019, Storms ultimately provided component specifications, the annotated system diagram described above, and a proprietary modeled data set based on real-world Bitcoin variables such as Bitcoin price and network hashrate, energy prices, time intervals, and power thresholds, and computed profitability figures. SSF ¶ 5; Ex. E, Storms Dep. at 112-115; Ex. B, BB00000090-97 (Email and attachments from A. Storms to M. McNamara dated

May 9, 2019).

Storms' modeled data set was provided as a comma-separated value (.CSV) file that described in explicit detail the various conditions monitored by the system, including Bitcoin price, Bitcoin block height, real time and day ahead energy prices, an estimated network hash rate and a network difficulty. Ex. B, at BB00000097. This proprietary .CSV file also showed how to determine a generated mining revenue ("mining_rev") figure to be expected from using power to mine Bitcoin, a real time revenue ("real_time_LMP_rev") figure based on selling energy to the grid at the current real time energy price, a day ahead revenue ("day_ahead_LMP_rev") figure based on selling energy to the grid in the future at the day ahead energy price, and a realized revenue figure ("realized_rev") that represented the most profitable of the three. *Id*. Lancium's Chief Computing Officer, and allegedly named inventor on the '433 patent, Dr. Raymond E. Cline, had no problem understanding the functionality of the spreadsheet. SSF ¶ 8; Ex. H, Cline Dep. at 146:24-150:16.

As shown in the accompanying graph based on the data in Storms' modeled data set, in some instances, the most profitable option (highlighted in pink) was to mine Bitcoin (shown as the red line), while in other instances, the most profitable option was to sell energy to the grid when the current price of energy spiked (shown as the green line). Ex. B, at BB00000097.



As the above diagram shows—and as Lancium could see on May 9, 2019—when energy prices spiked, the Bearbox system was its most profitable.

3.    **Lancium changed its entire business model to take advantage of Storms' BearBox system**

Prior to meeting Storms, ███████████████████████████████████████████████

███████████████████████████████ SSF ¶ 2; Ex. I, Patent Application No. WO2019/139632

(the "'632 Application") at ¶ [0053] (describing mining when energy price is negative); Ex. J, Ehsani

Report at ¶ 76 (███████████████████████████████████████); Ex. K,

Ehsani Dep. at 31-35 (same); D.I. 151 Ex. 4, McClellan Reply at ¶¶14-16. In other words, unlike

Storms' system, ██████████████████████████████████ SSF ¶ 1.

Upon receiving Storms' email, Lancium immediately began the fundamental shift of its

business around Storms' concepts and methods. SSF ¶ 3. Within three minutes of receipt, McNamara

forwarded Storms' BearBox information to key employees—including Lancium's Chief Technology

Officer and named defendant Raymond Cline—touting Storms capabilities:



Ex. L, LANCIUM00014645.

██████████████████████████████ Ex. M, LANCIUM00033741 (May 10, 2019

email from McNamara). ██████████████████████████████████████

██████████████████████████████████████████████████████an

ERCOT-registered qualified scheduling entity ("QSE") that brokers energy transactions, including

demand response transactions, with the ERCOT grid. *Id.* Over the next few months, ████████

████ continued to

Ex. F, McNamara Dep. at 60-61.



SSF ¶ 3; Ex.O, at LANCIUM00028482.

Ex. P, LANCIUM00033064-065.

Ex. Q, at LANCIUM00028496-97. Just like Storms' BearBox system,

. *Id.*

SSF ¶ 12; Ex. R, LANCIUM00033139

The process for registering a CLR within

ERCOT was largely administrative and well-known at this time. Ex. S, Siddiqi Report at 26; Ex. W,

Siddiqi Dep. at 40-41. Though according to Lancium it would be the first Bitcoin mining operation

(e.g. "load-only") to be designated a CLR, the CLR designation had been available within ERCOT for nearly twenty years. Ex. S, at 31.

The CLR designation would allow Lancium's Bitcoin mining datacenters, once registered, to operate as Storms' BearBox system and ███████████████████████████████████

███████████████████████. *Id*. at 24-28. ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████. SSF ¶ 11; Ex.

R, LANCIUM00033139

; Ex. Y, at

LANCIUM00031222                                                                ; Ex. H, Cline

Dep. at 166.  A few days later, Lancium filed an application for the '433 Patent.

### 4.      Lancium filed the '433 patent to monopolize Storms' portions of the system that Storms communicated to it

About two months after first commercializing some of Storms' BearBox system features, Lancium filed a provisional patent application that would eventually support the '433 Patent. D.I. 151 Ex. 17, '433 Patent at cover page. In general, the '433 Patent discloses example embodiments which enable a computing system to adjust power consumption based on a power option agreement, and using some combinations of power thresholds, time intervals, and monitored conditions. The '433 Patent provides an overview of this aspect of the disclosure:

> Examples relate to adjusting load power consumption based on a
> power option agreement. A computing system may receive power
> option data that is based on a power option agreement and specify
> minimum power thresholds associated with time intervals. The
> computing system may determine a performance strategy for a load
> (e.g., set of computing systems) based on a combination of the power
> option data and one or more monitored conditions. The performance
> strategy may specify a power consumption target for the load for
> each time interval such that each power consumption target is equal
> to or greater than the minimum power threshold associated with each

time interval. The computing system may provide instructions the set
of computing systems to perform one or more computational
operations based on the performance strategy.

D.I. 151 Ex. 17, '433 Patent, 1:6-25.

Just like Storms' system, the '433 Patent explains that it offers to buy (e.g. use) or sell energy

in both the real-time and day-ahead markets:

> In some embodiments, the power entity 1140 may correspond to a
> qualified scheduling entity (QSE). A QSE may submit bids and offers
> on behalf of resource entities (REs) or load serving entities (LSEs),
> such as retail electric providers (REPs). QSEs may submit offers to
> sell and/or bids to buy power (energy) in the Day-Ahead Market
> (e.g., the next 24 hours) and the Real-Time Market. As such, the
> remote master control system 262 or another computing system may
> communicate with one or more QSEs to engage and control one or
> more loads in accordance with one or more power option agreements.

D.I. 151 Ex. 17, '433 Patent, 46:20-30.

Figure 11 of the '433 Patent is described by Plaintiff's Expert as "a system for implementing

control strategies based on a power option agreement." D.I. 151 Ex. 17, '433 Patent at 7:38-40 and

Figure 11; Ex. J, Ehsani Report at ¶ 106. As shown below, Figure 11 includes nearly all of the same

components described in Storms' annotated system diagram. Ex. B, at BB00000092. Both include a

set of computing systems disposed in a housing (compare elements 1102, 1004 and 1106 in Figure

11 to physical box shown in annotated diagram), control software monitoring Bitcoin and energy

prices and related parameters (compare elements 262, 1122, 1124, 1126, and 1128 in Figure 11 to

software management clouds shown in annotated diagram) as well as power entity components

(compare element 1140 in Figure 11 to generation assets shown in annotated diagram). The following

is a mapping of the reference numerals used in Figure 11 as applied to their corresponding elements

on the BearBox annotated system diagram:



D.I. 151 Ex. 17, '433 Patent at Figure 11; Ex. B, at BB00000092 (annotations added).

## III.    ARGUMENT

### A.    Genuine issues of material fact preclude summary judgment on the issue of sole inventorship

Genuine issues of material fact remain for trial about whether Storms should be named as the sole inventor of the '433 Patent. The system that Storms developed before he ever met Lancium encompasses the very subject matter claimed in the '433 Patent including power thresholds and usage associated with time intervals and curtailment by a power delivery entity. To prevail on sole inventorship at trial, Plaintiffs must prove (1) that Storms independently conceived the inventions claimed in the '433 Patent, and (2) that he communicated those inventions to Defendants and contribution by Defendants, if any, to the conception of any claimed invention was insignificant. *Univ. of Colorado Found., Inc. v. Am. Cyanamid Co.*, 342 F.3d 1298, 1308–09 (Fed. Cir. 2003). With respect to the second prong, activities that occur after conception—whether to confirm the operability of an invention or to reduce the original inventor's idea to practice—do not support joint inventorship.

*Id.* at *8 (citing *Ethicon*, 135 F.3d at 1460). Thus, Storms' communication of the complete invention to Lancium—over three months before Lancium's commercialization efforts alleged to be inventive acts—satisfies this prong.[3]

1. **Plaintiffs' experts correctly apply the plain and ordinary meaning of the claim terms "power option agreement" and "minimum power threshold," and the Court need construe these terms because there is no genuine dispute about what they mean**

Lancium, fifteen months into this case, for the first time in their Motion for Summary Judgment, asks this Court to adopt a 71-word construction of "power option agreement" and a 14-word construction of "minimum power threshold." Plaintiffs maintain that no construction is necessary and the plain meaning applies, the same position both parties had adopted by not previously asking the Court to construe claim terms in this case. Under *O2 Micro*, the Court need not construe claim terms where the Court can reject a party's proposed construction in favor of the plain meaning, with no further construction required. *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1206-07 (Fed. Cir. 2011). Lancium's sudden interest in claim construction is based on an argument that BearBox's expert, Dr. McClellan, incorrectly interprets the terms "power option agreement" and "minimum power threshold." D.I. 149 at 12-19.

Lancium's pretext for claim construction during summary judgment briefing, however, ignores Dr. McClellan's detailed analysis of these claim terms in his expert reports, and instead cites to out-of-context responses to confusing questions asked during his deposition. D.I. 149 at 15, 18-19 and 21. Yet even Dr. McClellan's responses to Lancium's gotcha deposition questions are consistent

---

[3] It is unclear if Lancium is alleging a conception date of ███████████████████, or some other time thereafter. Ex. J, Ehsani Report at ¶ 116. All of those times are well after Storms' conception and communications with Lancium.

with the plain meaning of these claim terms.[4]

The Court should reject Lancium's attempt to construe claim terms in favor of the plain meanings for two reasons. First, Lancium should not at this late date be allowed to manufacture a claim construction dispute. From the outset of this case Lancium has been adamant that claim construction is unnecessary, and even asked that claim construction dates be removed from the joint scheduling order in favor of a date by which the parties would notify the Court of any later-realized dispute and, should one arise, "the parties will propose a claim construction schedule for the Court's consideration." Ex. T, June 23, 2021 email with attachment. Defendants, however, at no time identified a dispute or proposed a claim construction schedule to Plaintiffs, or the Court, as they were required to do. Defendants instead argue that "during expert discovery it [became] apparent that Plaintiffs seek to ignore the clear plain meaning of power option agreement" and "minimum power threshold." D.I. 149 at 12-14. But expert discovery ended June 6, 2022, six weeks ago. Defendants at no time prior to this motion raised any claim construction issues with Plaintiffs or the Court. More importantly, Defendants have been aware of Plaintiffs' application of the plain and ordinary meaning of these terms since at least November 9, 2021, when Plaintiffs provided detailed charts mapping Plaintiff's conception evidence to each and every limitation of the '433 patent claims. Dr. McClellan

---

[4] Lancium's attempt to manufacture any discrepancy in Dr. McClellan's testimony is unavailing. In response to a flawed line of questioning assuming "received power" must be "used" (e.g. must be directed to the Bitcoin miners to mine Bitcoin), Dr. McClellan simply noted that there are other ways to "consume" power without "using" it, such as directing received power to ground.  Ex. U, McClellan Dep at 84:10-13 ("And consume doesn't mean use. Consume means purchase. Whether I use that power to do something with or whether I sell that power to somebody else, that's separate from the power option agreement.") and 166:4-8 ("For example, if you have a wind turbine, you have a contract with the service provider, and if they're not going to take the power, you shunt it to ground. . . so they don't have to take the power."). ██████████████████████. Ex. I, '632 Application at ¶¶ [0051]-[00052] (describing usefulness of shunting power to ground). Lancium also implies the same flawed argument in connection with "minimum power threshold;" it also should be rejected in connection with that claim element.

applies this very same analysis in his expert reports. In fact, in Defendants' expert's rebuttal report, Dr. Mark Ehsani, in offering his criticisms of Dr. McClellan's opinions, performs no claim construction of his own, and says nothing of McClellan's application of the "plain and ordinary meaning of the claim terms." Ex. J, Ehsani Report at ¶ 43.

Second, the Court should reject Lancium's proposed constructions of the terms "power option agreement" and "minimum power threshold" because they clash with the plain language of the claims and the intrinsic record.[5]

### a.      Power Option Agreement

Defendants proposed construction for "power option agreement" is inconsistent with the term's plain and ordinary meaning because the phrase, "such that the load must use at least the amount of power subject to the option during the time interval" is internally inconsistent with the plain language of the claim and not supported by the specification.

Lancium's proposed definition is internally inconsistent because it does not allow for scenarios in which the option is exercised by a power entity. Specifically, if the power entity "reduces the amount of power delivered to the load" during a time interval, that power is no longer accessible to the load, and it is impossible for the load to continuing using the diverted power. Yet under Lancium's proposed construction, the load still "must" use that power for the duration of the time interval. In other words, Lancium's proposal requires the system to use power it is <u>not</u> receiving.

Lancium's proposed definition is also inconsistent with the remaining language of the claim, inviting confusion.  The terms Lancium cherry-picked for construction are set forth within a larger limitation recited in claim 1, specifically that the system "receive power option data based, at least in part, on a power option agreement, wherein the power option data specify: (i) a set of minimum

---

[5] Even if the Court does adopt Lancium's proposed constructions for these two terms, it would not affect Plaintiffs' experts' opinions, or impact Plaintiffs' ability to meet its burdens of proof.

power thresholds, and (ii) a set of time intervals, wherein each minimum power threshold in the set of minimum power thresholds is associated with a time interval in the set of time intervals." The claim itself defines the "power option agreement" in terms of its "data," which includes "minimum power thresholds," a term for which Defendants also have requested a construction.  Thus, Plaintiffs propose that any construction of the term "power option agreement" continue to use the term "minimum power threshold" so that "minimum power threshold" is not interpreted or applied inconsistently in one portion of the claim versus another. *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F. 3d 1570, 1579 (Fed. Cir. 1995).

Finally, Lancium's construction is inconsistent with the specification. As explained in the following section, the '433 Patent contemplates using "minimum power thresholds" of zero, such that the load may use no energy for a given time period.  D.I. 151 Ex. 17, '433 Patent at 54:13-21. Because the specification explicitly teaches that the load may use all or none of the energy and still maintain compliance with a power option agreement, any proposed construction also needs to allow for a "minimum power threshold" to include zero. *Id.*

For these reasons, the Court should adopt the plain meaning of "power option agreement."

### b.    Minimum Power Threshold

Lancium's construction of "minimum power threshold" is incorrect because, as explained above, the plain meaning of minimum power threshold is recited in the claim itself: the amount of power subject to the power option agreement, i.e. the agreed upon amount of power by which the power entity may reduce power delivered to the load. Defendants' construction is internally inconsistent, and inconsistent with the language of the claim characterizing the "minimum power threshold" as a term of the "power option agreement."

The '433 Patent explicitly teaches that the "minimum power threshold" may be zero for some or all of the duration of power option agreement:

In some examples, the minimum power threshold for a time interval may be zero during the duration of a power option agreement. As such, the load may use any amount of power from the power grid in accordance with the power option agreement, *including no power at all during this time interval*. When the price for power is high during this time frame, the load may ramp down power usage to zero MW to avoid paying the high price for power while still being in compliance with the power option agreement.

D.I. 151 Ex. 17, '433 Patent at 54:13-21 (emphasis added). Similarly, the '433 Patent also explains that a power option agreement may <u>not</u> specify *any* "minimum power threshold" for certain time intervals. *Id*. at 51:5-7.  An annotated version of Figure 12 showing an embodiment in which a "minimum power threshold" may be zero or omitted at times is shown below in red:



D.I. 151 Ex. 17, '433 Patent at Figure 12 (annotated to show periods data set where minimum power threshold is set to zero or omitted as taught by the specification).

In light of these issues, the Court should reject Lancium's proposed construction and adopt the plain meaning of the term "minimum power threshold."

> **2.    There are genuine issues of material fact for trial about whether Storms conceived of the inventions claimed in the '433 Patent and communicated those inventions to Defendants**

Storms' contemporaneous documentation establishing the subject matter of a "power option agreement" and a "minimum power threshold" create a genuine issue of material fact about his conception of these claim limitations that precludes summary judgment. SSF ¶ 3. "Inventorship is a question of law with underlying factual issues." *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 412 F.3d

1331, 1338 (Fed. Cir. 2005). "Conception is the touchstone of inventorship." *CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1358–59 (Fed.Cir. 2019) (citing *Acromed Corp. v. Sofamor Danek Grp., Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001)). "[Conception] is 'the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.'" *Burroughs Wellcome Co. v. Barr Labs. Inc.,* 40 F.3d 1223, 1228 (Fed. Cir. 1994) (quoting *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376 (Fed. Cir. 1986)).  Conception does not require conclusive experiments, proof, or confirmation of operability of the concept or idea in the inventors' minds. *Burroughs,* 40 F.3d at 1227–28, 1230. All of the conception evidence must be considered as a whole, and "the entire invention need not be reflected in a single document." *Univ. of Pittsburg of Commonwealth Sys. of Higher Educ. v. Hedrick*, 2008 WL 8627085, at *8-9 (C.D. Cal. June 9, 2008) (citing *Price v. Symsek*, 988 F.2d 1188, 1196 (Fed.Cir.1993)).

There is a presumption that the inventors named on an issued patent are correct, so nonjoinder of inventors must be proven by facts supported by clear and convincing evidence. *See Fina Oil & Chem. Co. v. Ewen,* 123 F.3d 1466, 1472 (Fed. Cir. 1997). "The original inventor must have understood the features of his invention, however, the original inventor need not recognize his "invention in the same terms as those recited in the [claims]" as the invention is not the claim language, but, rather, the subject matter of those claims." *Apotex Inc. v. Cephalon, Inc.*, 2011 WL 6090696, at *18 (E.D. Pa. Nov. 7, 2011), *aff'd*, 500 F. App'x 959 (Fed. Cir. 2013).

To prove conception, the original inventor need only demonstrate possession of the claimed subject matter; the inventor need not use a particular claim term. *Apotex,* 2011 WL 6090696, at *18. The subject matter of the "power option agreement" and "minimum power threshold" limitations— (1) amounts of energy, (2) time intervals (3) associations between time intervals and amounts of power, and (4) alternating periods of power usage at a given level by a load and curtailment by a

power delivering entity—are explicitly disclosed in Storms' documents. Questions of fact preclude summary judgment at least because Storms' documents disclose *all* of this subject matter.

For example, all of that subject matter was explicitly described in the Product Details document and proprietary .CSV file provided to Lancium. Ex. B, at BB0000091-92 and 97. The BearBox Product Details document describes "Software Management" features including "PDU/relay mapping (full automation)" [amounts of energy], explains that the system may operate at a maximum load of "~373kW" per hour [amounts of energy and time intervals], references two different miners (Bitmain S9j and Dragonmint T1) that have different power usage capabilities [amounts of energy], lists various time intervals, including day-ahead (i.e. 24-hour), hourly and 5-minute intervals [time intervals], and shows power generation assets depicted by windmills [power delivery entity]. Ex. B, at BB00000091-92. The annotated diagram also shows alternating periods of mining (shown with Bitcoin symbols) and curtailment/sellback activities (shown with dollar signs), as even Defendants' expert admits. D.I. 151 Ex. 3, McClellan Report at ¶177; Ex. C, Baer Report at ¶64 ("As the diagram demonstrates, the system that the BearBox source code was modeling was one where the system would operate with power generation assets and the software would continually determine whether it was more profitable to use the electricity from the generation assets to mine Bitcoin or to sell the electricity at the day-ahead or real-time LMP pricing.").

Similarly, the propriety .CSV file explains in detail over its thousands of time-stamped rows of data showing mining or curtailment/sellback decisions being determined every 5-minutes. Ex. B, at BB00000097. As the data shows, every 5 minutes [time intervals], the system determined whether 30.94 kW of power



(i.e. the 5-minute total at a rate of ~373kW/hour) [associated amounts of power] are either used to generate revenue by either (1) mining Bitcoin or (2) curtailing power usage to sell power at real-time or day-ahead market prices [alternating periods of constant power usage or curtailment]. *Id*. This behavior is shown in the graph generated from the .CSV file Storms provided to Lancium. During most of its runtime (shown in red with pink highlighting), Storms's system was designed to use a constant amount of energy mining Bitcoin for 5-minute intervals; however, the generator fully curtails power distribution to the Bearbox system for future time intervals when energy price spikes (shown in green with pink highlighting). Ex. B, at BB00000097 (Graph constructed from data in BB00000097.).

These disclosures create genuine issues for trial about the subject matter of the "power option agreement" and "minimum power threshold" limitations. *Nexus Techs., Inc. v. Unlimited Power, Ltd.*, No. 1:19-CV-00009-MR, 2020 WL 6940505, at *13 (W.D.N.C. Nov. 25, 2020) (denying summary judgment regarding inventorship due to fact issues).

The annotated diagram reflects that, in such situations, the selling of power could be performed by the generation assets/windmills. As shown in the diagram, the money made from selling energy is depicted as emanating (expanding to the right side) from the windfarm/generation assets (highlighted in green). Ex. B, at BB00000092 (annotations added). Storms used the same expanding-to-the-right visual



technique to show the Bitcoin emanating from the box of miners (highlighted in orange) and the various functionality of his software (highlighted in purple). Because the generator business model is to generate, sell and deliver power to the grid, a POSA would have understood (1) the generator already had both the functional capacity and compliance with existing regulatory/administrative requirements to do so, and (2) that this disclosure reflects the generator curtailing power delivered to the Bearbox in order to perform the sellback operation. As Dr. McClellan explained:

> Q: But what is the entity selling the power back?
> A: The thing that's not doing the bitcoin mining.
> Q: So the generator?
> A: Yeah, that's selling the power that you've contracted to provide. That's passing the power through to the market rather than using it to mine bitcoin. That's the markup on the pass through. This data here [the .CSV file provided to Lancium] is just -- this lays out the whole scheme. It's great.

Ex. U, McClellan Dep. at 215:4-12; *see also*, Ex. U, McClellan Dep. at 67:2-68:16, 164:11-166:12.

At a minimum, the documents communicated to Lancium raise a material question of fact. SSF ¶ 5.

### a. Storms' system as described in the documents he communicated to Lancium meets Lancium's constructions even if there were not corrected.

When the generator performs sell back as shown in the documentation, Storms' BearBox system literally meets each aspect of these limitations, even if Lancium's proposed construction were not modified. Specifically, Storms' BearBox system involved "an agreement between a power entity associated with the delivery of power to a load [the generator/generation assets] and the load [BearBox], wherein the load [BearBox] provides the power entity [the generator/generation assets] with the option to reduce the amount of power delivered to the load up to an agreed amount of power [full curtailment of "minimum power threshold"] during an agreed upon time interval [during a 5-minute interval when sell-back is appropriate], such that the load must use at least the amount of power subject to the option during the time interval [mine Bitcoin when energy is not being curtailed by the generator]." Storms' BearBox system also used, at least in one implementation, 30.94kW of

power as "a minimum amount of power a load must use during an associated time interval."  In other words, when the generator sells back power to the grid, it fully curtails the delivery to Storms that otherwise would have been used to mine Bitcoin—precisely the subject matter Lancium alleges is recited in the claim.  Stated yet another way, the Storms documents describe a "minimum power threshold" of 30.94 kW that is always used by Storms for mining unless the delivery of power is curtailed by the generator in accordance with a "power option agreement" between those two entities.

        **b.**        **Lancium misrepresents both the underlying evidence and the requirements of the claims.**

Lancium contends, without citation, that Dr. McClellan does not explain how the materials Storms provided "to McNamara disclose or convey the properly construed requirements of the claims." D.I. 149 at 21. This argument ignores 27 pages of Dr. McClellan's analysis in his initial report alone showing how the information Storms communicated to Lancium disclosed each and every limitation recited in the claims of the '433 Patent.  D.I. 151 Ex. 3, McClellan Report at 53-80.

Lancium also is wrong when it argues "the claims set forth requirements that a load (e.g., a Bitcoin mining operation) must use the amount of power set by the minimum power thresholds regardless of profitability." First, as noted above, Storms' system meets this element even under Lancium's construction. Second, Lancium is wrong as no claim requires mining occur "regardless of profitability," as even Lancium acknowledges. D.I. 149 at 22 ("the claim elements … have no requirements relating to profitability"). Lastly, as noted above, the '433 Patent contemplates having a "minimum power threshold" of zero for an interval or even the full duration of a power option agreement, so whether Storms' system stopped all mining is not dispositive of whether it evidenced Storms' conception or would have communicated that subject matter to a POSA. D.I. 151 Ex. 17, '433 Patent at 54:13-21.

For at least these reasons, there are genuine issues of fact that preclude summary judgment

regarding Storms' possession of the claimed invention. SSF ¶ 3, 4.

> **3.** **Storms communicated the subject matter claimed by the terms "power option agreement" and "minimum power threshold" even if he did not use those words when communicating with Defendants**

As discussed above, some of the same evidence that establishes possession of the invention by Storms—the Product details and .CSV file—was also communicated directly to Lancium. Thus, the same issues of fact that preclude summary judgment on the issue of possession also preclude summary judgment as to whether Storms communicated those inventions to Lancium. SSF ¶ 5.

In addition, Storms verbally told Mr. McNamara that, in such situations, the selling of power could be performed by a variety of market entities:

> A:   . . . And then utilizing, you know, different configurations and kind  of some of the break-even calculations around the machines within your build determine when it's most profitable to effectively mine Bitcoin at that location or utilize the power and sell it back to the grid but in both the day-ahead and real-time markets.
> Q.   In the context you're talking about, **who sells the power back to the grid**?
> A.   **Variety of different options there. It could be the generator sells the power back. It could be the mining facility sells the power back. It could be a different market participant depending on the ISO.**
> Q.   And what we've just been discussing, is that part of what you maintain you talked to Mr. McNamara about regarding how load can be controlled to maximize profitability?
> A.   Yes.

Ex. E, Storms Dep. at 104:22-105:15 (emphasis added). Conversely, McNamara's memory of this conversation is "vague." Ex. F, McNamara Dep. at 133-135.

As explained above, in such a scenario, Storms system literally meets each aspect of Lancium's proposed construction. SSF ¶ 3, 4, 5. Storms additional testimony, as supported by the documentary evidence discussed above, raises an additional question of fact to be resolved by the jury. *Nexus*, 2020 WL 6940505 at *13.

**4.      In addition to the information specifically communicated by Storms to Lancium, describing the full breadth of the claimed subject matter, Storms' conception is corroborated by documents showing customized hardware and dozens of source code files**

Lancium misstates the law on corroboration by implying all of Storms' words must be corroborated by a third-party. Instead, the fact-finder applies a "rule of reason" standard, "consider[ing] corroborating evidence in context, mak[ing] necessary credibility determinations, and assign[ing] probative weight to the evidence." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1464 (Fed. Cir. 1998). Because "there need not be corroboration for every factual issue contested by the parties," and Storms has corroborating documents for each element of each claim, Storms actually has more than what is required. *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1464 (Fed. Cir. 1998); SSF ¶ 3, 4, 5.

The purpose of the corroboration requirement is to determine if an inventor's testimony related to actual research or whether it constitutes "litigation-inspired fabrication." *Id*. (citing *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350–51 (Fed. Cir. 2001)). "Because documentary or physical evidence is created at the time of conception ... the risk of litigation-inspired fabrication or exaggeration is eliminated." *Sandt*, 264 F.3d at 1351; *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996).

Storms' verbal communications are also corroborated by extensive documentary evidence. First, the documents communicated by Storms to McNamara corroborate the details of his verbal communications. SSF ¶ 5, 15. As explained above, the information communicated from Storms to Lancium disclosed each and every limitation recited in the claims of the '433 Patent.  D.I. 151 Ex. 3, McClellan Report, at 57-80.

Storms has other documentary evidence to support his claim of conception. Indeed, at the time of his meeting with McNamara, Storms already had over 40 functional source code files

collectively implementing all the claimed aspects of the '433 Patent, including the retrieval of data from remote sources, profitability determinations, controlling relays to power on miners and the like. SSF ¶ 4; D.I. 151 Ex. 3, McClellan Report at 15-53. *Trovan, Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292, 1309 (Fed. Cir. 2002) ("reduction to practice alone is evidence that [plaintiff] had a definite and permanent idea of the complete and operative invention.").

In contrast, Lancium's supposed evidence of conception consist primarily of a "flash of insight" email of just a few sentences. Ex. J, Ehsani Report at 59. Moreover, neither currently-named inventor—McNamara and Cline— wrote any source code or built any hardware in connection with their alleged conception of the inventions claimed in the '433 patent. SSF 13, 17; Ex. F, McNamara Dep. at 53-54:16-5; Ex. H, Cline Dep. at 35:1-16; Ex. V, Henrique Dep. at 62:22-24.

For at least these reasons, summary judgment on sole inventorship should be denied.

**B.    Genuine issues of material fact preclude summary judgment on joint inventorship**

The Court should also deny summary judgment on Storms' alternative claim of joint inventorship for the same reasons discussed above in support of his claim for sole inventorship. For joint inventorship, Storms can even more easily demonstrate genuine issues of material fact. Despite Defendants' contention that the standards for sole and joint inventorship are the same (D.I. 149 at 24), the "proof of conception by joint inventors *is not the same* as proof required of a sole inventor." *Coleman v. Dines*, 754 F.2d 353, 361 (Fed. Cir. 1985) (emphasis added). This is because to prove joint inventorship, Storms need only prove that he made some contribution to the subject matter of a single claim in the patent. *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998).

**1.    Storms has sufficient evidence to meet the "collaboration" requirement for joint inventorship**

To be joint inventors, there must be "some element of joint behavior," which may include "one inventor seeing a relevant report and building upon it or hearing another's suggestion at a

meeting." *Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 917 (Fed. Cir. 1992). Defendants ignore this law by suggesting that some greater degree of collaboration is required. This error alone is enough of a reason to deny summary judgment.

Joint inventors need not (1) "physically work together or at the same time," (2) "make the same type or amount of contribution," or (3) "make a contribution to the subject matter of every claim of the patent." *Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1302 (Fed. Cir. 2010) (citation omitted); *see also Clairol Inc. v. Save-Way Indus., Inc.*, 210 U.S.P.Q. 459, 465 (S.D. Fla. 1980) ("give-and-take" discussions not required to establish joint inventorship). Ultimately, "[t]he determination of whether a person is a joint inventor is fact specific, and no bright-line standard will suffice in every case." *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997). Demonstrating "collaboration" or "joint behavior" is a low bar, especially on a motion for summary judgment. *See Arbitron, Inc. v. Kiefl*, No. 09-CV-04013 PAC, 2010 WL 3239414, at *5-6 (S.D.N.Y. Aug. 13, 2010) (finding that collaboration requirement is "not demanding"); *see also Coca-Cola Co. v. Pepsico, Inc.*, No. CIVA 102-CV-2887-RWS, 2004 WL 4910334, at *39 (N.D. Ga. Sept. 29, 2004) (discussing "the low threshold of collaboration" required).

Accordingly, the conversations between Storms and McNamara and the ensuing exchange of messages and emails with attachments (as discussed in greater detail above), create sufficient evidence to support Storms' claim of joint inventorship. SSF ¶ 5, 15.

## 2. Storms may rely on evidence of his contributions to the inventions claimed in the '433 patent even if that evidence was public

Lancium's entire joint inventorship argument is premised on the incorrect assertion that a document that is "publicly disclosed . . . cannot support a finding of collaboration." D.I. 149 at 29. Under this absurd proposition, anyone could file a patent application claiming as their own anything put in the public record by another. This is not the law. Lancium relies on a single case in which the

Federal Circuit did not even decide an inventorship issue, much less hold that a public document cannot serve as evidence of joint inventorship. *See University of Utah v. Max-Planck-Gesellschaft Zur Foerderung Der Wissenschaften E. V.*, 851 F.3d 1317 (Fed. Cir. 2017). The sole issue raised on appeal in *University of Utah* was whether the case was an exceptional case supporting an award of attorney fees. *Id.* at 1319.

In that case, the university argued that one of its professors was at least a joint inventor of one of the defendants' patents. The evidence of joint inventorship was so weak that the district court granted summary judgment and the university did not appeal. *Id.* at 1321. The Federal Circuit issued no rulings about the relevance of publicly available information to an inventorship dispute. Instead, the court observed that the district court had found that a published article, which the defendants admitted was prior art to the claimed inventions, *id.* at 1320, "could not, on its own, support a finding of collaboration," *Id.* at 1321. The crux of the district court's decision, however, was about the *content* of the purported inventor's review article, not its public nature. The university professor admitted at her deposition that she was aware of the defendants' publications of their work (because she served as a journal referee for them), and she admitted that it would not have "crossed [her] mind" to suggest that she was the inventor of the defendants' work. *Id.* at 1321. Thus, while the content of the professor's communications to the Defendants did not support a finding of joint inventorship, the court nevertheless recognized that "one inventor seeing a relevant report and building upon it" can support a finding of collaboration, depending on the content of the report. *Id.* at 1321-22 (citing *Kimberly-Clark*, 973 F.2d at 917).

When the Federal Circuit has actually considered the relevance of public information in inventorship disputes, it has held that evidence may be public: "Inventorship of a complex invention may depend on partial contributions to conception over time, and there is no principled reason to discount genuine contributions made by collaborators because portions of that work were published

prior to conception for the benefit of the public." *Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*, 964 F.3d 1365, 1372-73 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2691 (2021).[6]

### C.    Conversion

#### 1.    BearBox's conversion claim is not prescribed

BearBox's conversion claim is not prescribed by the 1-year statute of limitations because (1) BearBox's Second Amended Complaint ("SAC") relates back to the original complaint because the claims arise out of the same conduct, transaction, or occurrence, and (2) even if there is no relation back, BearBox did not learn of Lancium's conversion of the specific arbitrage method until Lancium's December 20, 2021 document production revealed it, and BearBox filed the SAC specifying conversion of the specific arbitrage method two months later on February 16, 2022.

##### a.    BearBox's SAC conversion claim relates back to the original complaint because all claims are based on the same Lancium conduct, and the same transactions between the parties, that occurred in May 2019.

BearBox's SAC relates back to its Original Complaint ("OC"). Under Federal Rule of Civil Procedure 15(c)(1), an amendment relates back to the date or the original pleading if the "law that provides the applicable statute of limitations allows relation back" and if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." First, Louisiana law allows relation back. The doctrine of relation back should be "liberally applied." *Bailey v. Enervest Operating Co., LLC*, 45,553 (La. App. 2 Cir. 6/30/10), 43 So. 3d 1046, 1053. Whenever "the original pleading gives fair notice of the general fact situation out of which the amended claim arises," relation back should be allowed. *Comeaux v. Poindexter*, 527 So. 2d 1184, 1189 (La. Ct. App. 1988) (citing *Baker v. Payne & Keller of Louisiana,*

---

[6] In this case, Storms contends that he had conceived his inventions before communicating them to Defendants or publicly communicating his ideas to others. Defendants do not suggest, however, that any such public disclosure created a bar to patentability under 35 U.S.C. § 102(a), which grants inventors a 1-year grace period for public disclosures, § 102(b)(1).

*Inc.*, 390 So. 2d 1272, 1275 (La. 1980)).

Second, the conversion claim in the SAC arises out of the same conduct, transaction, or occurrence as set out in the OC. BearBox originally pleaded that "Defendants induced the Plaintiffs to disclose the BearBox Technology to them under the guise of a possible business deal … the Defendants stole the BearBox Technology from Plaintiffs." D.I. 1 at ¶¶ 3-4. The conduct began in May 2019, through a meeting between the parties, and subsequent communications by text and through documents sent by email. *Id*. at 32-36. BearBox's SAC pleads exactly the same conduct, transaction, or occurrence as that of the original complaint, stating that "Defendants deceptively induced the Plaintiffs to disclose BearBox's technology to them under the guise of a possible business deal or 'collaboration'." D.I. 103 at ¶ 3. This same conduct is, once again, pleaded as occurring in May 2019. *Id*. at ¶¶ 32-36.

Defendants argue that because BearBox, following the discovery phase of the case, has identified in its SAC a theory of recovery, and a specific property converted, that the SAC conversion claim does not relate back to the original conversion claim. This is incorrect.

The Supreme Court has held that if the original pleading and amended pleading "relate to the same general conduct … the cause of action now, as it was in the beginning, is the same." *Tiller v. Atl. Coast Line R. Co.*, 323 U.S. 574, 581, 65 S. Ct. 421, 424, 89 L. Ed. 465 (1945) (affirming relation back after plaintiff added a theory of negligence that the railroad provided improper lighting, to original theories of negligence for other actions or inactions, stating the case is "the same—it is a suit to recover damages for the allegedly wrongful death of the deceased."). A plaintiff simply seeking to prove its claim by other means recited in an amended pleading does not disturb relation back. *Albright v. City of New Orleans*, 237 F.3d 631 (5th Cir. 2000) (though the theories of proof are different, "both the original and the amended complaint concern alleged discrimination"). This type of amended pleading is particularly understandable when a theory of liability is revealed for the first time during

discovery. *Serrano v. Republic Servs., Inc.*, 227 F. Supp. 3d 768, 772 (S.D. Tex. 2017). As in *Tiller*, BearBox's case is the same as it always was: a suit to recover damages for Defendants' conduct, i.e. theft stemming from transactions that occurred in May 2019.

The single case Defendants rely upon for this argument is inapplicable. In *Hammons v. City of Tallulah*, the plaintiff originally pleaded a cause of action due to a trip and fall incident on a broken sidewalk. The Plaintiff's amended complaint sought to add a conversion claim for theft of food stamps. The court, therefore, correctly held that the plaintiff did not show that the amended pleading arose from the same conduct, transaction, or occurrence, and therefore did not relate back. *Hammons v. City of Tallulah*, 30,256 (La. App. 2 Cir. 2/25/98), 708 So. 2d 502, 504, *writ denied*, 98-0820 (La. 5/8/98), 719 So. 2d 53. *Hammons* is nothing like the instant case.

> **b.    BearBox was not on notice of conversion of its specific arbitrage method until December 20, 2021**

Even if the SAC conversion claim does not relate back, it is not prescribed because BearBox did not learn of the theft of its specific energy arbitrage method until December 20, 2021 when defendants produced documents revealing that theft, and BearBox's claim for conversion was amended to specify this method as a basis of its conversion claim two months later, on February 16, 2022. *Harvey v. Dixie Graphics, Inc.*, 593 So. 2d 351, 354 (La. 1992) (prescription period will not run until the plaintiff knew or reasonably should have known it suffered harm due to a tortious act).

Defendants argue that BearBox knew, or should have known, that defendants were illegally using BearBox's specific Bitcoin miner breakeven value-based arbitrage method as of August 2020, because defendants filed a Complaint alleging patent infringement by Layer1 Technologies, LLC, and that complaint detailed Defendants' use of the arbitrage method. Defendants' complaint, however, describes only that during "periods of high electricity demand" "a load-only CLR … would … stop (or reduce its electricity consumption) … [and] receiv[e] the difference in value of the real-

time electricity versus the data center's pre-existing power purchase agreement price." The specific cryptocurrency mining energy arbitrage method is not revealed in any publicly-available filing in defendants' lawsuit against Layer1. In fact, Lancium's Layer1 complaint does not even use the word "breakeven," let alone disclose the particular arbitrage method at issue in this case. SSF at ¶ 14.

What is revealed in Lancium's complaint against Layer1 is a high-level description of the bare concept of energy arbitrage. The document Lancium points to is silent as to the specific method, particular variables, and the breakeven values, or their determination, that Lancium would use to determine "periods of high electricity demand" or how Lancium decides when to "stop or reduce its electricity consumption." In other words, the Layer1 complaint describes Lancium's end result, i.e. "reduce energy consumption … [and] receiv[e] the difference in value," but gives no indication as to how Lancium got there. BearBox could not, therefore, have known from the Layer1 complaint that BearBox's particular arbitrage method had been converted. SSF ¶ 14.

Defendants' own expert, Dr. Siddiqi, with nearly 30 years of experience with ERCOT and controllable loads, confirms that without access to direct evidence of the actual arbitrage method being performed, it is impossible to know how specific energy arbitrage methods are being used. Ex. W, Siddiqi Dep. at 34

” SSF ¶ 8, 10.

### 2.     BearBox's conversion claim is not preempted by federal patent law because it does not involve "patent-like protection" or a "determination of inventorship"

In June 2021, Lancium moved to dismiss conversion from BearBox's First Amended Complaint, which Magistrate Judge Burke recommended granting on January 18, 2022, though without prejudice and giving BearBox leave to amend. In the Report and Recommendation, the Court acknowledged that patent law preemption is limited only to those instances in which a state law claim seeks "patent-like protection" or to define "rights based on inventorship." D.I. 92 at 4. Judge Burke

also found that the original conversion claim, "by its wording, is dependent on a determination of patent inventorship," and on that basis alone found preemption. D.I. 92 at 5.[7] The Court recognized that a BearBox amendment could fix the issue. D.I. 92 at 12 ("it is not clear that allowing the opportunity to amend would be a futile act"). Notably, whether or not the converted property was confidential was not part of the Court's analysis, nor should it have been. *Dileo v. Horn*, 15-684 (La. App. 5 Cir. 3/16/16), 189 So. 3d 1189, 1198 ("Conversion is committed when one wrongfully does any act of dominion over the property of another in denial of or inconsistent with the owner's rights."). The Court's decision also clarified that "conversion claims that are based on *non*-patent-ownership theory of conversion are generally not preempted by federal patent law." D.I. 92 at 5, n.5 (emphasis added).

In its SAC, then, BearBox explained that its conversion claim is based on the theft of material that is *not* included in the '433 Patent, and therefore does *not* seek "patent-like" relief, or turn on questions of patent inventorship or ownership, which the Court properly concluded would not be preempted by patent law. *See, e.g.*, D.I. 103 ¶ 46 ("Not all aspects of BearBox's technology that was stolen and used by Defendants was described and claimed in the '433 Patent."). As a result, when Lancium filed yet another motion to dismiss, this time directed to the SAC, including BearBox's conversion claim, it did not ask the court to consider preemption again. D.I. 121.

Lancium's argument that Louisiana conversion can only be premised on the theft of documents describing confidential information is wrong. If the "ideas and materials allegedly provided to [the defendant] are not found in [a] patent … nothing in federal patent law now stands in the way of [the plaintiff] pursuing his state law claims." *Wawrzynski v. H.J. Heinz Co.*, 728 F.3d

---

[7] Plaintiffs did not object to the Report and Recommendation, and Your Honor adopted it on February 2, 2022. Plaintiffs subsequently filed their Second Amended Complaint on February 16, 2022.

1374, 1381 (Fed. Cir. 2013).

The only cases Lancium cites in support of its argument that BearBox's claims of confidentiality fail "as a matter of law" involve trade secrets which, unlike conversion, *do* require an element of confidentiality or secrecy, and have a specific legal framework from which confidentiality is determined. *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (must establish "the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret"). Conversion has no such requirement.

To the extent confidentiality is at issue elsewhere in the case, however, it cannot be resolved against BearBox "a matter of law," as Defendants suggest.  SSF ¶ 8, 10; D.I. 149 at 35.  BearBox's email to defendants included a confidentiality notice. And while BearBox did not have an express non-disclosure agreement with Lancium, BearBox's desired confidentiality was explicit in its email footer. Mr. McNamara confirmed that he observes such confidentiality footers, even in the absence of an NDA:

> Q.
>
> A.
>
> Q.
>
> A.
>
> Q.
>
> A.

Ex. F, McNamara Dep. at 128-129; SSF ¶ 6. In addition, implied obligations of confidentiality are fact-specific, and do not require a contract under Louisiana law. *Pontchartrain Med. Labs, Inc. v. Roche Biomedical Lab'ys, Inc.*, 95-2260 (La. App. 1 Cir. 6/28/96), 677 So. 2d 1086, 1090 ("express

or implied contractual or confidential relationship existed between the parties which obligated the party receiving the secret information not to use or disclose it").

Further evidence that Defendants understood the information BearBox provided to defendants in May 2019 to be confidential is found in defendants' treatment of BearBox's information after receiving it, and even in the context of this litigation. At all times defendants have marked not only BearBox's documents reflecting the information as HIGHLY-CONFIDENTIAL ATTORNEYS' EYES ONLY, but defendants own version of the information as well.[8] Lancium even demanded a protective order in this case with more protection than what is afforded in a typical protective order, telling this Court of the "fast moving industry and potentially a very lucrative industry" with "huge concern" for "a fishing expedition into [defendants'] highly confidential information by a competitor." Ex. X, Transcript Sept. 8, 2021 Hearing, at 11-12. Defendants knew at all times that what BearBox provided was confidential, proprietary, and "very lucrative." *Id*.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny summary judgment.

*Of Counsel:*                                                ASHBY & GEDDES

                                                            */s/ Andrew C. Mayo*

                                                            _____
                                                            Andrew C. Mayo (#5207)
                                                            500 Delaware Avenue, 8th Floor
                                                            P.O. Box 1150
                                                            Wilmington, DE  19899
                                                            (302) 654-1888
                                                            amayo@ashbygeddes.com

---

[8] Plaintiffs' expert, McClellan, compared the documents BearBox disclosed to defendants (Ex. L, LANCIUM00014645-52), with defendants' own internal            (Ex. P, LANCIUM00033064-65), and Defendants' subsequent investor presentation (Ex. Z, LANCIUM00035821), and concluded that each describes "the same thing," which is "Storms' arbitrage method." D.I. 151 Ex. 4, McClellan Reply Report at ¶¶ 218-220. These are Defendants' documents, and Defendants have labeled them with the highest designation of confidentiality under the Protective Order.

Benjamin T. Horton
John R. Labbé
Raymond R. Ricordati, III
Chelsea M. Murray
MARSHALL, GERSTEIN & BORUN LLP
233 South Wacker Drive
6300 Willis Tower
Chicago, IL 60606-6357
(312) 474-6300

*Attorneys for Plaintiffs*
*BearBox LLC and Austin Storms*

Dated:  July 19, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of July, 2022, the attached **PLAINTIFFS' BRIEF IN**

**OPPOSITION TO DEFENDANTS' FIRST MOTION FOR SUMMARY JUDGMENT** was

served upon the below-named counsel of record at the address and in the manner indicated:


Chad S.C. Stover, Esquire                          <u>VIA ELECTRONIC MAIL</u>
Barnes & Thornburg LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801

Mark C. Nelson, Esquire                            <u>VIA ELECTRONIC MAIL</u>
Barnes & Thornburg LLP
2121 N. Pearl Street, Suite 700
Dallas, TX 75201

Adam M. Kaufmann, Esquire                          <u>VIA ELECTRONIC MAIL</u>
Barnes & Thornburg LLP
One N. Wacker Drive, Suite 4400
Chicago, IL 60606-2833



*/s/ Andrew C. Mayo*

_____
Andrew C. Mayo