IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BEARBOX LLC and AUSTIN STORMS,

                Plaintiffs,

       v.

LANCIUM LLC, MICHAEL T.
MCNAMARA, and RAYMOND E.
CLINE, JR.,

                Defendants.

C.A. No. 21-534-GBW

---

Andrew C. Mayo, ASHBY & GEDDES, Wilmington, Delaware; Benjamin T. Horton, John R. Labbe, Raymond R. Ricordati III, Chelsea M. Murray, MARSHALL, GERSTEIN & BORUN LLP, Chicago, Illinois

    *Counsel for Plaintiffs*

Chad. S.C. Stover. Mark C. Nelson, Darrick J. Hooker, Adam M. Kaufmann, Dana Amato Sarros, David M. Lisch, BARNES & THORNBURG LLP, Wilmington, Delaware

    *Counsel for Defendants*

## MEMORANDUM OPINION

UNSEALED 1/12/2023
November 14, 2022
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Plaintiffs BearBox LLC and Austin Storms (collectively, "BearBox") filed this action against Defendants Lancium LLC, Michael T. McNamara, and Raymond E. Cline, Jr. (collectively, "Lancium"), seeking to correct the inventorship of United States Patent No. 10,608,433 ("the '433 patent"), which is assigned to Lancium and lists Michael T. McNamara ("McNamara") and Raymond E. Cline, Jr. ("Cline") as inventors. Additionally, BearBox seeks to recover for Lancium's conversion of BearBox's technology, which is alleged to have been implemented into Lancium's Smart Response™ software. Pending before the Court is Lancium's First Motion for Summary Judgment as to all of BearBox's claims. D.I. 148. The Court has reviewed the parties' respective briefing, statement of facts, and responses thereto. *See, e.g.*, D.I. 148; D.I. 149; D.I. 150; D.I. 151; D.I. 176; D.I. 177; D.I. 178; D.I. 179; D.I. 195; D.I. 196. For the reasons explained below, Lancium's First Motion for Summary Judgment is granted-in-part and denied-in-part.

## I.   BACKGROUND

BearBox and Lancium are technology companies at the crossroads of the cryptocurrency and renewable energy industries. Their dispute centers around a meeting and subsequent communications between BearBox's founder, Austin Storms, and Lancium's CEO, Michael T. McNamara, beginning at the Fidelity FCAT Mining Summit in Boston, Massachusetts on May 3, 2019. Based on this string of communications from May 3 to May 9, 2019, BearBox filed this suit against Lancium, asserting claims of sole inventorship, or alternatively, joint inventorship, of the '433 patent, theft of trade secrets, conversion, and unjust enrichment. D.I. 1; D.I. 103.

The Court struck BearBox's trade secret claims on April 22, 2022. D.I. 111. Shortly thereafter, Lancium filed a Motion to Dismiss BearBox's conversion and unjust enrichment claims

(D.I. 120), which the Court granted-in-part and dismissed the unjust enrichment claim. D.I. 212; D.I. 213. Lancium then filed its First Motion for Summary Judgment related to all remaining claims (D.I. 148), and later filed its Second Motion for Summary Judgment Regarding Damages and its Motion to Exclude Opinions of BearBox's Expert David Duski (D.I. 167). On October 31, 2022, Lancium filed its Motion to Bifurcate BearBox's Patent Inventorship Claims from BearBox's Conversion Claims, and requested expedited consideration. D.I. 222.

Lancium's First Motion for Summary Judgment ("Lancium's Motion") asserts that BearBox's inventorship claims fail as a matter of law because there is no evidence that Austin Storms conceived of, communicated, or collaborated on the inventions of the '433 patent. D.I. 149 at 1-2. Additionally, Lancium's Motion argues that BearBox's conversion claim fails as a matter of law because it is barred by Louisiana's one-year statute of limitations and, alternatively, is preempted by federal patent law. D.I. 149 at 30-36. BearBox disputes Lancium's Motion. D.I. 176; D.I. 177; D.I. 178; D.I. 179. To aid in the resolution of Lancium's Motion, the Court held a *Markman* hearing on October 20, 2022, and later issued a Markman opinion construing two disputed terms of the '433 patent: "power option agreement" and "minimum power threshold." D.I. 218; D.I. 219. Lancium's Motion is now ripe for resolution.

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* "The burden on the moving party may be discharged by pointing out to the district court that there is an absence of

evidence supporting the non-moving party's case." *Peloton Interactive, Inc. v. iFIT Inc.*, C.A. No. 20-1535-RGA, 2022 WL 1523112, at *1 (D. Del. May 13, 2022) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## III.   DISCUSSION

Lancium argues that the Court must grant summary judgment as to BearBox's claims of sole and joint inventorship because BearBox has failed to produce any evidence that Austin Storms conceived of, or communicated to Lancium, the inventions claimed in the '433 patent. D.I. 149 at 9, 30. Separately, Lancium asserts that it is also entitled to summary judgment as to BearBox's joint inventorship claim because BearBox fails to proffer evidence that Austin Storms collaborated

4

with the named inventors of the '433 patent.  Finally, Lancium argues that the Court must grant summary judgment as to BearBox's conversion claim because it is time-barred by Louisiana's one-year statute of limitations, or that BearBox's conversion claim is preempted by federal patent law.  *Id.* at 30-36.  BearBox disputes each of Lancium's arguments, asserting that the record is replete with genuine disputes of material fact that preclude summary judgment on all of BearBox's claims.  *See* D.I. 176.  The Court finds that there are genuine issues of material fact precluding summary judgment as to BearBox's sole and joint inventorship claim.  However, the Court finds that Lancium is entitled to summary judgment as to BearBox's conversion claim.

### A.    Sole Inventorship

Lancium moves for summary judgment as to BearBox's sole inventorship claim, arguing that BearBox has failed to produce any evidence that Austin Storms conceived of, or communicated to Lancium, the inventions claimed in the '433 patent.  D.I. 149 at 9.  In response, BearBox asserts that there exists genuine issues of material fact regarding Storms' conception of the inventions claimed in the '433 patent that preclude summary judgment.  D.I. 176 at 19.  Further, BearBox avers that summary judgment must be denied because both testimony and documents produced as evidence corroborate BearBox's claim that Storms communicated the entirety of the inventions claimed in the '433 patent to Lancium.  *Id.* at 25.  Because the Court finds that the parties have genuine disputes of material fact as to what Austin Storms conceived of and what was communicated to Lancium, Lancium's Motion as to BearBox's sole inventorship claim is denied.

"Patent issuance creates a presumption that the named inventors are the true and only inventors."  *Caterpillar Inc. v. Sturman Industries, Inc.*, 387 F.3d 1358, 1377 (Fed. Cir. 2004) (citing *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997)).  However, a party may rebut this presumption by proving, through clear and convincing evidence, that he is entitled to be named as an inventor and, thus, should have been included on the patent.  *See Eli*

*Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004); *Checkpoint Systems, Inc. v. All–Tag Sec. S.A.*, 412 F.3d 1331, 1338 (Fed. Cir. 2005).  Although failure to include an actual inventor on a patent is ordinarily grounds for invalidating that patent, 35 U.S.C. § 256 explicitly permits a court to order the patent's correction. *See Checkpoint Sys., Inc.*, 412 F.3d at 1338 ("If a patentee can demonstrate that inventorship can be corrected as provided by [35 U.S.C. § 256], a district court must order correction of the patent, thus saving it from being rendered invalid." (quoting *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed. Cir. 1998))).

A claim of sole inventorship is predicated on proving that the proposed inventor conceived of the total patented invention. *Ferring B.V. v. Allergan, Inc.*, 166 F. Supp. 3d 415, 424 (S.D.N.Y. 2016); *see also Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick*, 2008 WL 8627085, at *7 (C.D. Cal. June 9, 2008) ("Plaintiffs must show that they conceived of every claim of the patent and that any contribution by [the named inventors] to the conception of each and every claim was insignificant.").  "Conception is the touchstone of inventorship, the completion of the mental part of invention," and is generally understood to be "a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227-28 (Fed. Cir. 1994) (internal quotations omitted).  A party may demonstrate conception "only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Id.* at 1228.  Notably, "an inventor need not know that his invention will work for conception to be complete," but rather "need only show that he had the idea; the discovery that an invention works is part of its reduction to practice." *Id.* (citations omitted).

6

As a claim of sole inventorship requires proof by clear and convincing evidence, the party seeking to be added as an inventor "must prove his conception by corroborating evidence, preferably by showing a contemporaneous disclosure." *Id.* at 1228. This is so because of "the temptation for even honest witnesses to reconstruct, in a manner favorable to their own position, what their state of mind may have been years earlier." *Hess*, 106 F.3d at 980 (internal quotations and citations omitted). Therefore, "[a]n alleged co-inventor's testimony, or the testimony of the inventor himself, standing alone, cannot provide clear and convincing evidence of conception." *Univ. of Pittsburg*, 2008 WL 8627085, at *9 (citing *Caterpillar Inc.*, 387 F.3d at 1377). Instead, the inventor must independently corroborate its alleged conception through "testimony of a witness . . . to the actual reduction to practice," or "evidence of surrounding facts and circumstances independent of information received from the inventor." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1171 (Fed. Cir. 2006). Documentary or physical evidence made contemporaneously with the inventive process generally provides the most reliable proof of corroboration. *See Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350-51 (Fed. Cir. 2001). Ultimately, the Court evaluates the sufficiency of the corroborating evidence under a "rule of reason" analysis, which requires evaluating all pertinent evidence so that a sound determination of credibility of the alleged inventor's story may be reached. *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1464 (Fed. Cir. 1998).

The '433 patent comprises of twenty claims that generally relate to systems and methods for adjusting the amount of power available on the electrical grid based on interactions with the ancillary services markets. *See* '433 patent at Abstract. BearBox alleges that Austin Storms alone conceived of the subject matter in the '433 patent because Lancium merely commercialized Austin Storms' systems and methods—through Lancium's Smart Response™ software—after unlawfully

7

obtaining BearBox's proprietary technical documents during and after the Fidelity FCAT Mining Summit. D.I. 176 at 6-12. BearBox bases its sole inventorship claim on the following evidence: (1) a Product Details document emailed to Lancium which describes features related to a system operating at a maximum power load and having different power usage capabilities over specified periods of time, *see, e.g.*, D.I. 178 at ¶ 5; D.I. 179, Ex. E at 112:4-115:13 at 95:12; *id.* at Ex. B; (2) a diagram titled "BearBox Automatic Mining System Version 1.0," showing alternative periods of mining Bitcoin and curtailment based on external variables such as price of power, *see* D.I. 179, Ex. B; (3) an expert report detailing how BearBox's annotated diagram shows a system that "would operate with power generation assets and the software would continually determine whether it was more profitable to use the electricity from the generation assets to mine Bitcoin or to sell the electricity at the day-ahead or real-time LMP pricing," *see* D.I. 179, Ex. C at ¶ 64; *see also* D.I. 151, Ex. 3 at 53-80; (4) a proprietary .CSV file manipulating and modeling data to show mining or curtailment decisions being determined at regular time intervals, *see* D.I. 179, Ex. B; *see also id.*, Ex. H at 139-150; (5) and Storms' own detailed testimony related to his purported conception of the claimed invention and the events surrounding Storms and McNamara's communications, *see* D.I. 179, Ex. E at 86-113.

Viewing the evidence in the light most favorable to BearBox and drawing all reasonable inferences in its favor, *Wishkin*, 476 F.3d at 184, the Court finds that BearBox, at a minimum, has demonstrated the existence of genuine issues of material fact related to Austin Storms' conception of the subject matter of the '433 patent. At this stage, the present record is replete with testimony and documents that could support a factfinder's reasonable inference that Austin Storms conceived of the '433 patent's subject matter, as properly construed by this Court, prior to Lancium's purported conception. *See* D.I. 178 at ¶ 5; *see also* D.I. 179, Ex. A (undated images of BearBox's

hardware and software, and images of whiteboard drawings depicting BearBox's purported conception of the subject matter claimed in the '433 patent). Specifically, Storms testifies extensively to the details shared over dinner with McNamara, including a concept for software that provides fine grain control over mining machines and a system that could maximize profitability by calculating the most profitable times to mine for Bitcoin or curtail activities and sell power back to the grid. D.I. 179, Ex. E at 95:12-105:16. Acknowledging that an alleged inventor's own testimony is viewed with suspicion, *see Sandt Tech.*, 264 F.3d at 1350-51, BearBox corroborates the substance of Storms' communications through the Product Details document and the proprietary .CSV file, both of which were undisputedly emailed to Lancium following the dinner with McNamara. *See* D.I. 150 at ¶ 13; D.I. 177 at ¶ 13; D.I. 178 at ¶ 5. Using these documents, BearBox's expert, Dr. McClellan, maps each limitation claimed in the '433 patent to the systems and methods allegedly conceived by Storms.[1] *See* D.I. 151, Ex. 3 at 57-80.

Furthermore, Dr. McClellan identifies over forty functional source code files Storms disputedly created prior to his communications with McNamara, which BearBox alleges proves Storms' conception of all the claimed aspects of the '433 patent, including the retrieval of data from remote sources, profitability determinations, and controlling relays to power on miners. D.I. 176 at 26-27; *see also* D.I. 151, Ex. 3 at ¶¶ 54-169; D.I. 151 at Appendix A. BearBox asserts that, while Lancium never obtained these source code files, these files demonstrate a reduction to practice that is indicative of Storms' conception of the '433 patent's subject matter. D.I. 176 at 26-27; *see also Trovan, Ltd. V. Sokymat SA, Irori*, 299 F.3d 1292, 1309 (Fed. Cir. 2002)

---

[1] To the extent Lancium argues that the corroborating documents BearBox cites do not use the terms, as properly construed, that are explicitly used in the '433 patent, it is understood that the original inventor need only demonstrate possession of the claimed subject matter—the inventor need not use a particular claim term. *Apotex Inc. v. Cephalon, Inc.*, 2011 WL 6090696, at *18 (E.D. Pa. Nov. 7, 2011), *aff'd*, 500 F. App'x 959 (Fed. Cir. 2013).

("[R]eduction to practice alone is evidence that [plaintiff] had a definite and permanent idea of the complete and operative invention."). In essence, BearBox's submissions with respect to the conception of the '433 patent's subject matter present ample analysis of, and support for, his claim of sole inventorship, as well as extensive analysis of both the scientific processes at issue and of the language in the patents themselves. Additionally, BearBox has demonstrated the potential for adequate corroboration, through both direct and circumstantial evidence, that Storms conceived of each limitation claimed in the '433 patent prior to Storms' communications with McNamara. *See, e.g.*, D.I. 151, Ex. 3 at 57-80; D.I. 151 at Appendix A; D.I. 150 ¶¶ 13, 17; D.I. 177 at ¶¶ 13,17. As such, BearBox has established the existence of genuine issues of material fact that preclude Lancium's Motion as to sole inventorship.

While Lancium contends that the present record is devoid of any evidence that supports BearBox's claim that Storms conceived of the entirety of the claimed subject matter of the '433 patent, Lancium's argument centers on disputes about the substance and weight of the testimony and corroborating documents that BearBox cites. D.I. 149 at 19-24; D.I. 195 at 11-15. Stated another way, Lancium disputes material facts that are essential to the resolution of who conceived of the subject matter of the '433 patent. At this stage, the Court is not equipped to weigh the volumes of evidence, especially in light of the fact that BearBox has established the existence of genuine issues of material fact. *See BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 963 (Fed. Cir. 2020) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence . . . ." (internal quotation marks and citation omitted)). Additionally, Lancium conflates the required proof for corroboration. Lancium contends that the Federal Circuit in *Wagner v. Ashline*, 2021 WL 5353889 (Fed. Cir. Nov. 17, 2021) held that evidence corroborating only that the named inventor and alleged inventor met and discussed other topics is insufficient to meet the

10

corroboration standard. D.I. 149 at 23; D.I. 195 at 15. But, *Wagner* was not decided so narrowly. Rather, the Federal Circuit was concerned that the only probative evidence corroborating the alleged inventor's claim was from a non-party who testified that the meeting was focused on topics outside of the scope of the asserted patents. *Wagner*, 2021 WL 5353889, at *4-5. In fact, applying a "rule of reason" analysis, the Federal Circuit held that only testimony corroborating that the named inventor and alleged inventor met and discussed other topics, ***without additional documentary or testimonial evidence***, is by itself insufficient to meet the corroboration standard. *Id.* at *5 (emphasis added). Here, unlike *Wagner*, BearBox does not corroborate its inventorship claim solely through the testimony of Storms or a non-party; rather, BearBox offers testimonial evidence, expert reports, and contemporaneous technical documents to support its claim. *See, e.g.*, D.I. 151, Ex. 3 at 57-80; D.I. 151 at Appendix A; D.I. 178 at ¶¶ 4, 5.

Although BearBox's case for sole inventorship of the '433 patent may be less convincing with respect to some contributions or claims than it is for others, diving into the factual morass of analyzing each claim, a litany of technical documents, and source code files is not a task appropriate for the Court at the summary judgment stage. It is enough that the parties' respective submissions on this issue indicate the existence of disputed material facts that go directly to the heart of BearBox's claim of sole inventorship. Faced with all of the available documentary evidence, expert testimony, and disputed facts, the Court cannot say that no reasonable fact finder could find that there is clear and convincing evidence establishing Storms' right to be named as the sole inventor on the '433 patent. Summary judgment as to BearBox's sole inventorship claim is denied.

**B.   Joint Inventorship**

Separately, Lancium argues that BearBox's joint inventorship claim fails as a matter of law because BearBox has failed to meet its burden of proving Storms collaborated on the inventions

claimed in the '433 patent. D.I. 149 at 24. As such, Lancium asserts that it is entitled to summary judgment on BearBox's joint inventorship claim. *Id.* at 24-30. BearBox disagrees, arguing that summary judgment is precluded because there exist multiple genuine issues of material fact related to Storms' contribution to the '433 patent's subject matter. D.I. 176 at 27. The Court agrees with BearBox that there are genuine issues of material fact that preclude summary judgment on BearBox's joint inventorship claim.

Like sole inventorship, a purported joint inventor who was erroneously omitted from a patent may seek the correction of the patent in federal court. *See* 35 U.S.C. § 256. However, the purported joint inventor must overcome the presumption that the named inventors of a patent are correct by meeting the heavy burden of proving his case by clear and convincing evidence. *Hess*, 106 F.3d at 980. To satisfy this standard, the claimed joint inventor must provide evidence corroborating his testimony concerning conception of the invention, including contemporaneous documentary or physical evidence, oral testimony of others, and circumstantial evidence. *See Ethicon, Inc.*, 135 F.3d at 1461; *Trovan, Ltd.*, 299 F.3d at 1303. The Court evaluates the sufficiency of the claimed joint inventor's corroborating evidence under a "rule of reason" analysis, whereby the Court views all evidence before making a sound determination as to the credibility of the claimed inventor's story. *See Trovan, Ltd.*, 299 F.3d at 1295.

Joint inventorship differs from sole inventorship in that "[a] joint invention is the product of a collaboration between two or more persons working together to solve the problem addressed." *Burroughs Wellcome*, 40 F.3d at 1227 (citing 35 U.S.C. § 116; *Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 917 (Fed. Cir. 1992)). People may be joint inventors "even though they do not physically work on the invention together or at the same time, and even though each does not make the same type or amount of contribution." *Id.* However, the "individual must

make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention." *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997); *see also Eli Lilly & Co.*, 376 F.3d at 1358; *Ethicon Inc.*, 135 F.3d at 1460. There is no "lower limit on the quantum or quality of the inventive contribution required for a person to qualify as a joint inventor," and a meaningful contribution to the conception of even one claim in a patent can suffice to establish inventorship. *Id.* (citation and quotation marks omitted); *Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1373 (Fed. Cir. 2006); *Eli Lilly & Co.*, 376 F.3d at 1358-59 (referring to the inventors having "some open line of communication during or in temporal proximity to their inventive efforts."). That is to say that joint inventors need not (1) "physically work together or at the same time," (2) "make the same type or amount of contribution," or (3) "make a contribution to the subject matter of every claim of the patent." *Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1302 (Fed. Cir. 2010) (citation omitted); *Kimberly-Clark*, 973 F.2d at 917 (joint behavior may include "collaboration or working under common direction, one inventor seeing a relevant report and building upon it or hearing another's suggestion at a meeting."). Ultimately, "[t]he determination of whether a person is a joint inventor is fact specific, and no bright-line standard will suffice in every case." *Fina Oil & Chem.*, 123 F.3d at 1473.

The crux of Lancium's argument is that the record is devoid of any evidence that there was "joint behavior" or "collaboration" between Storms and the named inventors, McNamara and Cline.[2]  D.I. 149 at 25.  In fact, Lancium asserts that the only communications between the

---

[2] Lancium further argues that "Storms cannot be a joint inventor as a matter of law because . . . he did not contribute in any significant manner (or at all) to any claims of the '433 patent. Storms' 'system' was fundamentally different from the system claimed in the '433 patent." D.I. 195 at 16. However, the evidence offered to establish that Storms conceived of the entirety of the subject matter claimed in the '433 patent (i.e., to establish BearBox's sole inventorship claim) is identical

parties—a conversation at a group dinner following the Fidelity FCAT Mining Summit, a series of text messages between Storms and McNamara from May 3 to May 9, 2019, and an email Storms sent to McNamara with five attachments—fail, as a matter of law, to establish collaboration between the parties. *Id.* Notably, Lancium contends, and BearBox does not dispute, that four of the five attachments emailed to McNamara were publicly available, which Lancium asserts further weighs against a finding of collaboration. *See* D.I. 150 at ¶ 18; D.I. 177 at ¶ 18 (conceding that the attachments, except the .CSV file, are not confidential by themselves, but asserting that the entirety of the email, including all attachments, are confidential by virtue of the "Confidentiality Notice" at the bottom of that email).

Ultimately, rather than contest that there was no corroborating evidence supporting a finding of collaboration, Lancium's argument relates to the quantity and quality of the communications between the parties.   In doing so, Lancium ignores the undisputed fact that McNamara communicated with Storms for the week following the Fidelity FCAT Mining Summit, including soliciting product details and supporting documents from Storms via text message.  D.I. 150 at ¶ 12; D.I. 177 at ¶ 12; *see* D.I. 179, Ex. G (McNamara's text messages to Storms, stating "I also think your boxes may have some benefits vs the ones we are doing with JB driver. Lots of stuff to collaborate on. . . . Storms, can you send me those box design specs please! . . . Also, have you ever looked at building a GPU box?").  This exchange corroborates Storms' testimony that

---

to the evidence that would be offered to prove a significant contribution to the conception of the invention that is required for a claim of joint inventorship.  Lancium does not dispute the overlap in evidence, and in fact cites to the section of its brief arguing that the record is devoid of any evidence that Storms conceived of the entire claimed invention (i.e., the sole inventorship claim) in support of its contention that Storms made no significant contribution to warrant a finding of joint inventorship.  D.I. 149 at 30.  As such, the Court will not reiterate the genuine issues of material fact that exist related to Storms' conception of the subject matter claimed in the '433 patent. *See supra* Section III.A.

McNamara showed interest in BearBox's technology and believed that Storms may be valuable to McNamara's ongoing and future projects. D.I. 179, Ex. E at 95:12-110:6; 114:7-11 (Storms testifying that McNamara was interested in BearBox's technology during their dinner conversation). Also, it is undisputed that Storms responded to McNamara's texts by emailing McNamara five attachments, including the Product Details document and a proprietary .CSV file, which disputedly demonstrates Storms' conception of the claimed inventions of the '433 patent. D.I. 150 at ¶ 17; D.I. 177 at ¶ 17; D.I. 179, Ex. B; *see also supra* Section III.A. Despite the fact that the parties did not physically work on the invention together, Storms and McNamara plainly had an "open line of communication . . . in temporal proximity to their inventive efforts." *Eli Lilly & Co.*, 376 F.3d at 1359; *see also CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1359-60 (Fed. Cir. 2019). Moreover, there is a genuine dispute as to whether the .CSV file emailed to McNamara, and later forwarded to Cline, was incorporated or implemented, in part or in whole, into the claimed invention of the '433 patent. *See* D.I. 179, Ex. H at 139-150 (Cline testifying that when the .CSV file was forwarded to him, he understood the column headers, numerical values, and their respective mathematical relationships).

Lancium's reliance on *Rubin v. General Hospital Corp.*, 2011 WL 1625024 (D. Mass. Apr. 28, 2011), to cast doubt on the collaboration is misplaced. D.I. 195 at 16-17. In *Rubin*, the purported joint inventors and named inventors never had any direct communication. *Id.* at *2, *6. To show collaboration, the purported joint inventors relied on their awareness of the named inventors' research and their claim that one of the named inventors read their journal abstract. *Id.* at *6. However, the Court found this evidence insufficient to establish collaboration, noting that the purported joint inventors filed their own provisional patent application after the alleged collaboration without including the named inventors. *Id.* at *7. From this, the Court inferred that

the purported joint inventors did not consider themselves to be collaborating with the named inventors. *Id.* In the present case, however, the Court cannot conclude that no reasonable fact finder could find that there is clear and convincing evidence establishing collaboration between Storms and McNamara based on the following communications: (1) Storms and McNamara's dinner conversation after the Fidelity FCAT Mining Summit—to which the parties dispute the extent of what information regarding BearBox's technology, if any, was shared, *see, e.g.*, D.I. 150 at ¶ 11; D.I. 177 at ¶ 11; D.I. 179, Ex. E at 95:12-114:11; D.I. 179, Ex. F at 133-135; (2) Storms and McNamara's exchange of text messages from May 3 to May 9, 2019, where McNamara undisputedly solicited information about BearBox's product, *see, e.g.*, D.I. 150 at ¶ 12; D.I. 177 at ¶ 12; D.I. 179, Ex. G; and (3) responsive to McNamara's solicitation, Storms sent an email to McNamara with five attachments including the Product Details document and the proprietary .CSV file, *see, e.g.*, D.I. 150 at ¶ 17; D.I. 177 at ¶ 17; D.I. 179, Ex. B.

Finally, Lancium's assertion that the public availability of four of the five attachments emailed to McNamara precludes a finding of collaboration is based on a selective interpretation of *Univ. of Utah v. Max-Planck-Gesellschaft zur Foerderung der Wissenschaften e.V.*, 851 F.3d 1317 (Fed. Cir. 2017). *See* D.I. 149 at 25-26. In *Univ. of Utah*, the Federal Circuit agreed with the district court's finding that a published article, which was prior art to the claimed inventions, "could not, on its own, support a finding of collaboration." 851 F.3d at 1321. However, and contrary to Lancium's proposition, the Federal Circuit—just three paragraphs later—reiterated that "one inventor seeing a relevant report and building upon it might be an element of joint behavior supporting collaboration." *Id.* at 1321-22 (citing *Kimberly-Clark*, 973 F.2d at 917). Therefore, the public nature of a document does not, by itself, preclude a finding of collaboration. *See Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*, 964 F.3d 1365, 1371-72 (Fed. Cir. 2020), *cert.*

*denied*, 141 S. Ct. 2691 (2021) ("Inventorship of a complex invention may depend on partial contributions to conception over time, and there is no principled reason to discount genuine contributions made by collaborators because portions of that work were published prior to conception for the benefit of the public."). Because there are genuine issues of material fact surrounding the extent of Storms, McNamara, and Cline's collaboration related to the subject matter claimed in the '433 patent, Lancium's Motion as to BearBox's joint inventorship claim is denied.

### C.   Conversion

#### 1.   Statute of Limitations

Lancium moves for summary judgment of BearBox's conversion claim, arguing that the claim is barred by Louisiana's one year statute of limitations. D.I. 149 at 30-33. Specifically, Lancium contends that BearBox's currently pled conversion claim, which was brought with its Second Amended Complaint filed on February 16, 2022, falls outside the one-year prescriptive period because BearBox purportedly admits that it became aware of Lancium's conversion on August 17, 2020, when BearBox reviewed the Lancium-Layer1 lawsuit. *Id.*; D.I. 195 at 18-19. Thus, Lancium argues that BearBox knew, or at a minimum, should have known, of Lancium's conversion because the Lancium-Layer1 lawsuit explains Lancium's method of arbitraging power to maximize profitability, which is allegedly identical to the conduct underlying the currently pled conversion claim. *See, e.g.*, D.I. 149 at 32; D.I. 195 at 18-19. Further, Lancium argues that BearBox's operative conversion claim cannot benefit from the Original Complaint's April 14, 2021 filing date (D.I. 1), thereby evading the one-year statute of limitations, because the currently pled conversion claim does not relate back to the originally pled conversion claim. *Id.*

BearBox vehemently disagrees. First, BearBox maintains that its conversion claim has been consistently pled as arising out of Lancium's alleged deceptive inducement of BearBox's

power arbitrage method under the guise of a potential business relationship through Storms and McNamara's communications in May 2019. D.I. 176 at 31. Thus, BearBox argues its currently pled conversion claim relates back to the date of the Original Complaint, thereby overcoming the statute of limitations. *Id.* at 31-32. Second, BearBox argues that, even if the currently pled conversion claim does not relate back to the Original Complaint, it is not barred by the one-year statute of limitations because BearBox did not learn of Lancium's theft of its specific energy arbitrage method until December 20, 2021, during Lancium's document production. *Id.* at 32-33. In support of this alternative argument, BearBox contends that the Lancium-Layer1 lawsuit does not even use the word "breakeven," and only explains "a high-level description of the bare concept of energy arbitrage" instead of disclosing, as Lancium contends, the particular arbitrage method at issue in this case. *Id.* In fact, BearBox asserts that Lancium's own expert, Dr. Siddiqui, opines that it is impossible to know how specific energy arbitrage methods are used without access to direct evidence of the actual arbitrage method. D.I. 176 at 33; D.I. 179, Ex. W at 34. Thus, BearBox argues that simply reading the Lancium-Layer1 lawsuit could not serve as actual or constructive knowledge sufficient to commence the one-year statute of limitations. *Id.*

Under Louisiana law,[3] "[a] conversion action sounds in tort and is subject to a one-year liberative prescriptive period." *Bihm v. Deca Sys., Inc.*, 226 So. 3d 466, 280 (La. App. 1st Cir. 2017) (citing LA. CIV. CODE ANN. art. 3492). Generally, the prescriptive period begins "to run from the day injury or damage is sustained." LA. CIV. CODE ANN. art. 3492. The injured party need not have actual knowledge of facts that would entitle him to bring a suit. *Bihm*, 226 So. 3d at 480 (citing *Gallant Investments, Ltd. v. Illinois Cent. R. Co.*, 7 So.3d 12, 19 (La. App. 1st Cir.

---

[3] Neither party disputes that Louisiana law applies to BearBox's conversion claim. *See* D.I. 92 at 5 n.4.

2009)).  Rather, notice sufficient "to excite attention and put the party on guard or call for inquiry"—referred to as constructive knowledge—can commence the prescriptive period. *Bihm*, 226 So. 3d at 480; *see also Hogg v. Chevron USA, Inc.*, 45 So.3d 991, 997 (La. 2010).

While claims brought outside the prescriptive period are generally barred, Louisiana explicitly grants amended claims that "relate back" to the original claim the benefit of the originally pleading's filing date. *Clark v. E. Baton Rouge Par. Dep't of Pub. Works*, 196 So. 3d 142, 146 (La. App. 1st Cir. 2016) (interpreting LA. CODE CIV. PROC. ANN. art. 1153); *see also* Fed. R. Civ. P. 15(c)(1) (an amendment relates back to the date of the original pleading if the "law that provides the applicable statute of limitations allows relation back."). Pursuant to LA. CODE CIV. PROC. ANN. art. 1153, "an amendment to a [complaint] relates back to the date of filing the original [complaint] when the action or defense asserted in the amended [complaint] arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." *Clark*, 196 So. 3d at 146. Courts are encouraged to apply the doctrine "liberally and without undue restriction by technical rules, consistent with the principle that prescriptive statutes are to be construed in favor of maintaining rather than barring actions." *Id.*; *see also Winford v. Conerly Corp.*, 897 So.2d 560, 568 (La. 2015). As such, an amended complaint is not prescribed by the statute of limitations "[i]f a comparison of the amended petition to the original petition shows that the original petition gave fair notice of the factual situation out of which the amended petition arises." *Clark*, 196 So. 3d at 146 (citing *Reese v. State Dep't of Pub. Safety and Corrections*, 866 So.2d 244, 248 (La. 2004)).

A relation back analysis requires comparing the originally pled claim with the currently pled claim. *Clark*, 196 So. 3d at 146. BearBox's original conversion claim sought recovery for "Defendants induc[ing] the Plaintiffs to disclose the BearBox Technology to them under the guise

19

of a possible business deal," which allegedly began in May 2019 through a meeting between the two parties, followed by subsequent communications through email and text. *See* D.I. 1 at ¶¶ 3-4, 32-36. The Original Complaint defined "BearBox technology" as:

> an energy-efficient cryptocurrency mining system and related methods that reduce the inefficiency and environmental impact of energy-expensive mining operations by better utilizing available energy resources to increase stability of the energy grid, minimize a mining operation's impact on peak-demand, and also alleviate electricity undersupply and/or oversupply conditions . . . [which] can be used to mine cryptocurrency, such as Bitcoin.

D.I. 1 at ¶ 2. BearBox's currently pled conversion claim seeks recovery for Lancium deceptively inducing BearBox to disclose BearBox's "system designs, documents, data, and know-how" under the guise of a business deal in May 2019. D.I. 103 at ¶¶ 3, 89.

The factual connexity between the original conversion claim and the currently pled conversion claim is readily apparent on the face of the pleadings. Both claims seek recovery for the damages resulting from Lancium's alleged deceptive conduct and theft in May 2019. *Compare* D.I. 1 at ¶¶ 32-36, *with* D.I. 103 at ¶ 89. While BearBox's currently pled conversion claim expands on both the technology purportedly converted, i.e., "system designs, documents, data, and know-how," and Lancium's conduct after the alleged conversion, i.e., using such converted technology to modify Lancium's Smart Response™ software, these amendments do not disturb the relation back doctrine because they only serve to elaborate on the facts supporting the underlying theory of conversion. D.I. 103 at ¶¶ 2, 87, 89. That is to say, the conduct supporting the original conversion claim is identical to the conduct supporting the currently pled conversion claim, regardless of the level of specificity the Second Amended Complaint provides. *Tiller v. Atl. Coast Line R. Co.*, 323 U.S. 574, 581 (1945) (the original pleading and the amended pleading "relate to the same general conduct . . . the cause of action now, as it was in the beginning, is the same.").

Furthermore, the Court is not persuaded by Lancium's assertion that BearBox's own admissions are fatal to finding that the currently pled conversion claim relates back to the original claim.  D.I. 149 at 33.  As an initial matter, Lancium's selective citation to BearBox's counsel's statement that the Original Complaint "had nothing to do with energy value arbitrage methods" omits a key consideration—BearBox's counsel was distinguishing between the first Complaint's underlying trade secret, i.e., system architecture, and the proposed amendment supporting BearBox's new trade secret claims.  *See* D.I. 151, Ex. 22 at 22:16-24:6.  And even if BearBox counsel's characterization of the facts underlying each complaint differ, Lancium's conclusion ignores that the conduct underlying the currently pled conversion claim is identical to the conduct pled in the original conversion claim—the deceptive inducement of BearBox's methods and systems through Storms and McNamara's May 2019 communications.  Such a rigid comparison of the two conversion claims, as Lancium proffers, is contrary to the general principle that LA. CODE CIV. PROC. ANN. art. 1153 should be liberally construed to do substantial justice.  *Reese*, 866 So.2d at 249.  As such, the original conversion claim was sufficient to put Lancium on notice that BearBox was seeking recovery for conversion of its technology in May 2019.  The currently pled conversion claim created no surprise or prejudice to Lancium, and merely clarified the facts supporting its theory of conversion, including the specific property converted and Lancium's incorporation of the converted property into its Smart Response™ software—all facts which BearBox contends were only brought to light during discovery, which led BearBox to promptly amend its conversion claim.  *See* D.I. 176 at 31.

BearBox's currently pled conversion claim can therefore benefit from the Original Complaint's April 14, 2021 filing date.  Therefore, it follows that BearBox's currently pled conversion claim was brought within the prescribed one-year statute of limitations.  Because the

21

Court finds that the currently pled conversion claim was brought within the prescribed one-year statute of limitations, the Court need not address Lancium's argument that BearBox knew, or should have known, of the alleged conversion based on BearBox's August 17, 2020 review of the Lancium-Layer1 lawsuit.

### 2.      Preemption Under Federal Patent Law

Separately, Lancium moves for summary judgment of BearBox's conversion claim on the ground that the conversion claim is preempted by federal patent law. *See* D.I. 149 at 33-36. The Court agrees.

Under the Supremacy Clause, state law that conflicts with federal law is without effect. U.S. Const. art. VI, cl. 2; *see, e.g., Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 168 (1989); *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1331 (Fed. Cir. 1998), *overruled in part on other grounds by Midwest Indus. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999). Preemption can take one of three unique forms: explicit, field, or conflict preemption. *See Hunter Douglas*, 153 F.3d at 1332. Because federal patent law does not provide explicit preemption, *see, e.g.*, 35 U.S.C. §§ 1–376; *Hunter Douglas*, 153 F.3d at 1332, and because Congress does not intend to exclusively occupy the field of conversion law, this case solely concerns conflict preemption. Conflict preemption occurs when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (internal quotations omitted).

Federal law preempts state law that offers "patent-like protection" to discoveries unprotected under federal patent law. *Bonito Boats*, 489 U.S. at 156. Federal patent law reflects the objectives of Congress, which includes: (1) "seek[ing] to foster and reward invention"; (2) "promot[ing] disclosure of inventions to stimulate further innovation and to permit the public to

practice the invention once the patent expires"; (3) promoting "the stringent requirements for patent protection . . . to assure that ideas in the public domain remain there for the free use of the public," *Aronson*, 440 U.S. at 262 (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480-81 (1974)); (4) providing a "clear federal demarcation between public and private property"; and (5) promoting "nationwide uniformity in patent law." *Bonito Boats*, 489 U.S. at 162-63. A state cause of action that frustrates these objectives is preempted. *Id.* at 156-57; *Aronson*, 440 U.S. at 262.

In the specific context of a conversion claim, courts have differentiated between claims that are dependent on a determination of patent inventorship or ownership and those that are based on a non-patent theory of conversion. Claims that are dependent on a determination of patent inventorship or ownership, such as a misappropriation of patent rights, are generally preempted by federal patent law. *See Smith v. Healy*, 744 F. Supp. 2d 1112, 1130 (D. Or. 2010) ("Plaintiffs' proposed conversion claim does not concern Plaintiffs' tangible property but rather their intangible idea . . . therefore . . . Plaintiffs' proposed conversion claim would be preempted by [federal] patent law."). In contrast, claims that can be established without reference to patent inventorship or ownership are generally not preempted by federal patent law. *See HIF Bio, Inc. v. Yung Shin Pharms. Industrial Co.*, 600 F.3d 1347, 1354 (Fed. Cir. 2010) (suggesting that plaintiffs could establish a conversion claim not preempted by federal law by basing their claim on defendants' alleged misappropriation of experiments, experimental data, and non-public drafts of papers).

BearBox's conversion claim begins by incorporating by reference the allegations from BearBox's correction of inventorship claims. D.I. 103 at ¶ 84. BearBox then explains how Lancium's "unlawful exercise of dominion over confidential BearBox technology, including system designs, documents, data, and know-how not otherwise found to be a trade secret, or having value beyond the value of the trade secret(s), has permanently interfered with [BearBox's] valuable

property rights." D.I. 103 at ¶ 88. Finally, BearBox outlines that it "[has] suffered and will continue to suffer damages and other financial harms" because Lancium "[has] not compensated or recognized [BearBox] for the use of BearBox's technology." D.I. 103 at ¶¶ 89-90.

By its wording, it is clear that BearBox's conversion claim is "patent-like" in nature and also turns on a determination of inventorship regarding the subject matter of the '433 patent. *See Smith*, 744 F. Supp. 2d at 1130. Although conversion under Louisiana law does not necessarily implicate patent law, the theory underlying BearBox's conversion claim—the theft of BearBox's system designs, documents, data, and know-how which was integrated and monetized by Lancium through its Smart Response™ software, without compensating or recognizing BearBox—seeks protection and remedial compensation for the alleged misappropriation of BearBox's novel ideas. D.I. 103 at ¶ 89. In other words, BearBox's claim that Lancium "has permanently interfered with [BearBox's] valuable property rights" by misappropriating BearBox's technology is a second bite of the apple to correct inventorship if the Court were to find that Storms is neither a sole nor joint inventor of the '433 patent.

BearBox's attempt to differentiate its conversion claim as relying on a non-patent theory of recovery is unsuccessful. While the Court recognizes that BearBox amended its pleading to allege that "[n]ot all aspects of BearBox's technology that was stolen and used by Defendants was described and claimed in the '433 Patent," *see* D.I. 103 at ¶ 46, this allegation cannot serve as the basis for a non-patent theory of recovery. This is because BearBox's own expert, Dr. McClellan, concedes that regardless of whether the '433 patent actually discloses BearBox's power arbitrage method, BearBox is barred from using its power arbitrage method because it may likely infringe the '433 patent. *See* D.I. 196-1, Ex. 30 at 231:10-232:1. Stated another way, the alleged converted property is described and disclosed in the '433 patent. *See id.* at 231:18-232:1 ("If [Storms] were

to use his [power arbitrage method], it might be infringing the ['433] patent anyway. Even if he used his system—because the arbitrage adds onto the capabilities disclosed in the patent. It adds some things onto that aren't specifically disclosed in the patent, but they're hinted at. . . . even if you implemented a system like this, . . . you may end up infringing the patent regardless."). Further, BearBox's attempt to reconcile its conversion claim as a non-patent theory of recovery is further belied by its own arguments and headings in its Answering Brief. For example, BearBox's heading stating that "Lancium filed the '433 patent to monopolize Storms' portions of the system that Storms communicated to it," *see* D.I. 176 at 12, supports the reasonable conclusion that all the communications sent to Lancium served as the foundation for the '433 patent. This contradicts BearBox's own assertion that not everything communicated, and therefore converted, served as the basis for the '433 patent. *See* D.I. 103 at ¶ 46. The Court's conclusion is also supported by the fact that BearBox's conversion claim begins by incorporating by reference its inventorship claims. D.I. 103 at 84.

That BearBox's conversion claim seeks to recover patent-like damages further supports that it is preempted by federal patent law. There is no dispute that, under Louisiana law, "[t]he measure of damages for wrongful conversion is the return of the property, or if it cannot be returned, the value of the property at the time of conversion." *Capers v. NorthPro Properties Mgmt, LLC*, 321 So. 3d 502, 514 (La. App. 2d Cir. 2021). However, rather than solely demand the return of its allegedly converted property, BearBox repeatedly pursues monetary damages akin to a royalty-like payment. D.I. 103 at ¶¶ 6, 89, "Prayer for Relief" at ¶ G. BearBox's Second Amended Complaint is also replete with assertions advancing the theme that BearBox is entitled to monetary damages because of Lancium's purported failure to compensate or recognize BearBox for the use of BearBox's converted technology. *See, e.g., id.* at ¶ 6 ("Plaintiffs bring this action to

recover damages caused by Defendants' theft and unauthorized use, and subsequent exploitation of Plaintiffs system design, data, documents, and know-how."); *id.* at ¶ 50 ("Defendants have used BearBox's technology, including the stolen system designs, diagrams, data, and know-how, and its subsequently-modified Smart Response™ software . . . to allow Defendants to profit significantly from use, license, sale, and investments related to its modified Smart Response™ software. ***Defendants are not, and have never, been entitled to these profits.***") (emphasis added); *id.* at ¶ 87 ("Without Plaintiffs' consent, Defendants intentionally and willfully assume dominion and control over BearBox's technology, including system designs, documents, data, and know-how, and improperly used it to modify their Smart Response™ software . . . and subsequently used, sold, licensed, and procured investments related to, and otherwise monetized, that software for substantial profit."); *id.* at ¶ 89 ("Despite providing Defendants with the system designs, documents, data, and know-how that allowed Defendants to modify their Smart Response™ software, and corresponding system designs, ***Defendants have not compensated or recognized Plaintiffs for the use of BearBox's technology***. Defendants' actions constitute an improper and unauthorized use of Plaintiffs' property.") (emphasis added); *id.* at 90 ("As a result of Defendants' improper and unauthorized use of Plaintiffs' system designs, documents, data, and know-how to reconstruct and use BearBox's technology, Plaintiffs ***have suffered and will continue to suffer damages and other financial harms*** in an amount to be proven at trial.") (emphasis added).

By these allegations' wording, it is clear that BearBox's damages are predicated on the resolution of inventorship or ownership of the technology disclosed in the '433 patent. That BearBox seeks patent-like damages is further supported by BearBox's own damages expert, David Duski, who both reaffirms that BearBox seeks monetary damages in, effectively, a repackaged form of a royalty payment, and reasserts BearBox's theme that monetary damages are necessary

to compensate or recognize BearBox for use of BearBox's converted technology.  D.I. 170, Ex. 25 at 8 ("[T]he value of the Converted Property may be determined by calculating the present value of the future cash flows Lancium expected to receive attributable to the Converted Property at the time of conversion."); *id.* at 14 ("I understand that through the use of the Converted Property, Lancium will be able to craft voluntary reduction and/or bid strategies that ensure maximum profits."); *see, e.g., Speedfit LLC v. Woodway USA, Inc.*, 226 F. Supp. 3d 149, 160 (E.D.N.Y. 2016) (concluding that the plaintiffs' conversion claim was preempted by federal patent law, where plaintiffs' underlying conversion claim sought royalty-like damages that ultimately required a determination of inventorship).   Therefore, considering the totality of evidence, BearBox's conversion claim is preempted by federal patent law because the right involved here and compensated for relies on a theory of conversion that is "patent-like" in nature.  Lancium's Motion related to BearBox's conversion claim being preempted by federal patent law is granted, and BearBox's conversion claim (Count V) is dismissed with prejudice.

## IV.    LANCIUM's PENDING MOTIONS

In addition to Lancium's First Motion for Summary Judgment (D.I. 148), Lancium also filed a Second Motion for Summary Judgment Regarding Damages combined with a Motion to Exclude Opinions of David Duski (D.I. 167), and a Motion to Bifurcate BearBox's Patent Inventorship Claims from the Conversion Claims (D.I. 222) (collectively, "Lancium's Pending Motions").   However, as both of Lancium's Pending Motions solely depend on BearBox's conversion claim—which has now been dismissed with prejudice—the Court will deny Lancium's Pending Motions as moot.

The Court will issue an order consistent with this Memorandum Opinion.