## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BEARBOX LLC and AUSTIN STORMS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-534-GBW-CJB |
| | ) | |
| LANCIUM LLC, MICHAEL T. MCNAMARA, and RAYMOND E. CLINE, JR. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' RESPONSE POST-TRIAL BRIEF

Dated:  January 25, 2023

BARNES & THORNBURG LLP
Chad S.C. Stover (No. 4919)
222 Delaware Avenue, Suite 1200
Wilmington, Delaware 19801-1050
Telephone: (302) 300-3474
E-mail: chad.stover@btlaw.com

Mark C. Nelson (admitted *pro hac vice*)
David Lisch (admitted *pro hac vice*)
2121 N. Pearl Street, Suite 700
Dallas, TX  75201
Tel:  (214) 258-4140
E-mail:  mark.nelson@btlaw.com
              david.lisch@btlaw.com

Adam M. Kaufmann (admitted *pro hac vice*)
Darrick Hooker (admitted *pro hac vice*)
Dana Amato Sarros (admitted *pro hac vice*)
One North Wacker Drive, Suite 4400
Chicago, IL 60606
Tel:  (312) 214-8319
Email: adam.kaufmann@btlaw.com
Email: darrick.hooker@btlaw.com
Email: dana.sarros@btlaw.com

*Attorneys for Defendants Lancium LLC, Michael T. McNamara, and Raymond E. Cline Jr.*

## TABLE OF CONTENTS

REPRESENTATIVE CLAIM ................................................................................ iv

TABLE OF ABBREVIATIONS ........................................................................... v

DUPLICATE EXHIBITS ..................................................................................... vi

I.      THE PARTIES AND THEIR COMMUNICATIONS .................................... 2

II.     ARGUMENT ............................................................................................. 5

        A.      Applicable legal principles ............................................................ 5

        B.      Storms Is Not the Sole Inventor of the '433 Patent. ..................... 6

                1.      Storms Did Not Conceive The '433 Patent's Inventions Because Those Inventions Are Fundamentally Different Than Storms' Technology. ............................................................................ 6

                2.      Storms Did Not Communicate The Claimed Inventions To Lancium. ...... 8

                3.      The independent claims – 1, 17, and 20 ................................... 9

                        a.      Preamble and Element [a] "a set of computing systems …" .......... 9

                        b.      Elements [b] and [b1] – "[b] a control system configured to: [b1] monitor a set of conditions" ............................................... 10

                        c.      Element [b2] "receive power option … " ..................................... 10

                        d.      Element [b3] "responsive to receiving the power option data, …" .................................................................................. 12

                        e.      [b4] "provide instructions … based on [] performance strategy" ......................................................................... 13

                4.      The Dependent Claims ......................................................... 13

                        a.      Dependent claims 2-5 ..................................................... 13

                        b.      Dependent claims 6-8, 13-14, and 19 ............................. 14

                        c.      Dependent claims 9-12, and 18 ..................................... 14

                        d.      Dependent claim 16 ...................................................... 14

                5.      Lancium Independently Conceived Each Element And Many Of The Elements Were Conceived Before McNamara Met Storms. .................... 15

        C.      Storms Is Not a Joint Inventor of the '433 Patent ..................... 16

                1.      Storms And Lancium Did Not Collaborate. ........................ 16

                2.      Storms Cannot Demonstrate That He Made Any Contributions, Let Alone Contributions That Were Significant In Quantity Or Quality ........ 17

        D.      Plaintiffs' Dubious Conduct/Character and Their Expert's Lack of Credibility Seriously Undermine Their Case ............................... 17

1.      Plaintiffs' Statements and Conduct Demonstrate a Lack of Credibility. ............................................................................... 17

2.      Plaintiffs' Criticisms of Lancium Lack Merit............................................ 19

III.    CONCLUSION.................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acromed Corp. v. Sofamor Danek Group, Inc.*,
    253 F.3d 1371 (Fed. Cir. 2001)................................................................6, 16, 17

*Advanced Magnetic Closures, Inc. v. Rome Fastener Corp*,
    2008 WL 2787981 (S.D.N.Y. 2008)................................................................20

*Allergan, Inc. v. Barr Labs., Inc.*,
    808 F. Supp. 2d 715 (D. Del. 2011)................................................................19

*Bayer AG v. Housey Pharm., Inc.*,
    386 F. Supp. 2d 578 (D. Del. 2005)................................................................19

*Bianco v. Globus Med., Inc.*,
    30 F. Supp.3d 565 (E.D. Tex. 2014)................................................................16, 17

*Doda v. Waste Mgmt, Inc.*,
    No. 17-604, 2023 WL 179932 (D. Del. Jan. 13, 2023) ................................................................19

*Eli Lilly & Co. v. Aradigm Corp.*,
    376 F.3d 1352 (Fed. Cir. 2012)................................................................5

*Ethicon, Inc. v. U.S. Surgical Corp.*,
    135 F.3d 1456 (Fed. Cir. 1998)................................................................5

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*,
    383 F.3d 1352 (Fed. Cir. 2004)................................................................6, 16

*General Elec. Co. v. Wilkins*,
    750 F.3d 1324 (Fed. Cir. 2014)................................................................10, 19

*Iceotope Grp. Ltd. v. LiquidCool Sols., Inc.*,
    No. 20-CV-2644, 2022 WL 204923 (D. Minn. Jan. 24, 2022)................................................................5

*Scott v. Zimmer, Inc.*,
    889 F. Supp. 2d 657 (D. Del. 2012)................................................................5, 6

## REPRESENTATIVE CLAIM

1.   A system comprising:

[a] a set of computing systems, wherein the set of computing systems is configured to perform computational operations using power from a power grid;

[b] a control system configured to:

[b1] monitor a set of conditions;

[b2] receive power option data based, at least in part, on a power option agreement, wherein the power option data specify: (i) a set of minimum power thresholds, and (ii) a set of time intervals, wherein each minimum power threshold in the set of minimum power thresholds is associated with a time interval in the set of time intervals;

[b3] responsive to receiving the power option data, determine a performance strategy for the set of computing systems based on a combination of at least a portion of the power option data and at least one condition in the set of conditions, wherein the performance strategy comprises a power consumption target for the set of computing systems for each time interval in the set of time intervals, wherein each power consumption target is equal to or greater than the minimum power threshold associated with each time interval; and

[b4] provide instructions to the set of computing systems to perform one or more computational operations based on the performance strategy.

iv

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| '433 Patent | U.S. Patent No. 10,608,433 (TX1) |
| '632 App. or '632 Application | International Application No. PCT/US20 18/0 17950, published as WO 2019/139632 (TX163) |
| Baer | Mr. Nicolas Baer |
| Cline | Dr. Raymond (Ray) Cline |
| DF | Defendants' Proposed Findings of Fact |
| the Dinner | The May 3, 2019 dinner attended by Austin Storms and Michael McNamara |
| Ehsani | Dr. Mark Ehsani |
| ERCOT | Electric Reliability Council of Texas |
| FAC | First Amended Complaint |
| GAM | Great American Mining |
| Hakes | Mr. Benjamin Hakes |
| Lancium | Lancium LLC |
| LMP | locational marginal price |
| LR | load resource |
| McCamant | Mr. Frank McCamant |
| McClellan | Dr. Stanley McClellan |
| McNamara | Mr. Michael McNamara |
| MPT | Minimum Power Threshold as construed by the Court |

| PF | Plaintiffs' Proposed Findings of Fact |
|---|---|
| Plaintiffs | Mr. Austin Storms and BearBox LLC |
| POA | Power Option Agreement as construed by the Court |
| POSA | person of ordinary skill in the art |
| Ps' Br. | Plaintiffs Opening Post-Trial Brief (D.I. 256) |
| RTMB | real-time market balancing |
| SAC | Second Amended Complaint |
| Storms | Mr. Austin Storms |

## DUPLICATE EXHIBITS

| | |
|---|---|
| Lancium Deck - I Squared | TX266 / TX778 |
| Storms' Email / the Email | TX157 / TX887, TX887-1 / TX170-TX175 |
| Storms' Drawing / the Drawing | TX157.03 / TX171 at 14750 / TX887 at 92 |
| Storms' Spreadsheet / the Spreadsheet | TX157.08-.25 / TX175 / TX887 at 97, TX887-1 |
| Storms/Hakes Text Messages | TX14 / TX947 |
| Storms/McNamara Text Messages | TX742 / TX950 |

Storms is not the sole inventor of the '433 patent. Plaintiffs' "technology"/"system"[1] is directed at the energy market—a market for buying/selling power where a load may pre-purchase power in the day-ahead market and then, based on maximizing profitability, choose to (i) use that power to, for example, turn all the miners on to mine Bitcoin, or (ii) not use the power (turn all the miners off), and instead sell the power in the real-time market ("sell-back"). DF23, 25. The technology claimed in the '433 patent is fundamentally different—as Plaintiffs' expert conceded "the '433 patent ***doesn't contemplate selling [the power] back at all***." DF25.[2]

The '433 patent claims systems and methods that incorporate constraints of the ancillary services market where a load ***cannot sell*** the amount of power it is awarded (the "award"), but must instead ***use*** the awarded power regardless of profitability. DF9, 24. The Court's construction of "power option agreement" and "minimum power threshold" (D.I. 218, at 6, 12) confirms these requirements, which Storms admits ***are not*** present in Plaintiffs' technology:

> Q:      And nowhere in any of these materials [referring to TX887 – Storms' email to McNamara] is there an indication that your simulat[ed] mining build must utilize at least a specified amount of power for a specified time period, regardless of whether it is profitable to mine Bitcoin for such power at that specified time period?
>
> A:      That is correct, yes. [Tr. 145:24-146:5; DF39, 40, 42].

Plaintiffs' expert (McClellan) concurs: "***That doesn't make any sense***" to require the system [referring to Storms' technology] to use a required amount of power regardless of profitability—"***this*** [referring to Plaintiffs' documents/simulation] ***doesn't teach that***" … [t]he purpose of the simulation was to show how much money you could make by effectively mining Bitcoin." Tr. 406:3-23; DF25. Moreover, as established at trial, McNamara and Cline conceived many of the recited limitations ***before*** McNamara's happenstance dinner with Storms (DF4-6, 38), thus

---

[1] Plaintiffs' "technology"/"system" includes Storms' Email to McNamara and its attachments (TX887/TX157), as well Plaintiffs' source code/simulation and other materials presented at trial.

[2] All emphasis is added unless otherwise noted.

1

providing a second, independent reason why Storms cannot be the sole inventor.

Nor is Storms a joint inventor. Storms made no contribution to the claim inventions, let alone a contribution that is significant in quality when measured against the full invention, as required by the law. And there was no collaboration between Storms and McNamara. DF20.

Finally, Plaintiffs' conduct and its witnesses' lack of credibility undermine its allegations. For example, the ideas Storms maintains are his originated with third-parties (Hakes and Labij). DF33-DF37. Storms repeatedly made his purportedly valuable technology public, including putting his Drawing on Twitter. DF32. Storms brought this case only after learning of Layer1's settlement with Lancium, and Storms' uncensored messages reveal his true motivation for bringing suit— to "blackball" McNamara from the industry. DF44-45, 49. Finally, Plaintiffs' evolving theories and definitions of their purported technology (*compare* D.I. 1, 19, 103), combined with their expert McClellan's repeatedly inconsistent testimony must be considered under the rule of reason. DF46-47. He who seeks equity must do equity. Plaintiffs do not abide by that maxim.

## I.   THE PARTIES AND THEIR COMMUNICATIONS

**Plaintiffs.** BearBox was founded by Storms in late 2018. DF12. BearBox makes no products, has one employee (Storms), and has no assets. DF12. Throughout its history, BearBox sold one mining container (box) for no profit. DF12. Prior to May 3, 2019, Storms had never met or heard of McNamara or Lancium. DF13.

**Defendants.** McNamara and Cline are co-founders of Lancium, which was formed in November 2017. DF1-3. McNamara is Lancium's CEO. DF1. Cline, who has a Ph.D., personally mined Bitcoin from approximately 2015-2017, and has experience in computer programming and smart grid technology. DF2. Lancium's initial vision was to put flexible datacenters (*e.g.*, Bitcoin miners) next to windfarms (*i.e.*, co-locate) to take advantage of the windfarms' highly variable power output and the highly variable power prices. DF3. Specifically, when power prices were

high, Lancium would ramp-down (curtail) its datacenters to allow the windfarm to sell that power to the grid, but when power prices were low Lancium would ramp-up its datacenters to provide the windfarm with a market for such low-priced power. DF3.

From the beginning, Lancium focused on protecting its inventions. DF4. The '632 application, for example, has a priority date of January 2018, and taught, among other things, a set of computing systems (*e.g.*, Bitcoin miners) configured to perform computational operations, a control system that monitored conditions, including directives, economic considerations (*e.g.*, real-time price of power, Bitcoin price), and other information that permitted Lancium to determine when a ramp-up condition was met based on the monitored conditions, to set a strategy for targeted power consumption, and to issue instructions to the computing systems (*e.g.*, individual miners or groups of miners) to perform computing operations. DF4.

By Summer and Fall of 2018 Lancium had built and successfully tested a working system at its R&D facility with 120 miners that were controlled using Lancium-modified software from Tier44 and ServiceNow. DF5. By this time, Lancium had conceived of (i) monitoring information, including power price, Bitcoin price, global hashrate, LMP, and ERCOT parameters, (ii) calculating the breakeven price for different types of miners, (iii) implementing a performance strategy based on the foregoing information, and (iv) instructing the miners in accordance with that strategy. DF4-DF5. Lancium successfully tested its system in September 2018. DF5.

Lancium continued to develop its technology and by May 1, 2019, had developed its own software (the Lancium Brain) and conceived of a system (referred to as Soft Load Control (DF6)) that, among other things, (i) used APIs to pull information (*e.g.*, LMP data from ERCOT), (ii) monitored signals from the windfarm, ERCOT, the miners themselves (*e.g.*, their actual power utilization), the Bitcoin price, global hashrate, and block height, (iii) used that information to

determine a target power level, and (iv) sent instructions to some or all of the computing devices (*i.e.*, miners) to suspend or restart their hashing algorithms accordingly. DF6. Lancium's system also continued to monitor the signals such that if a Load Limit Setpoint (LLS) changed (*e.g.*, decreased or increased) the software would respond by incorporating the new information into its calculus and reduce/increase the power utilization accordingly to below the new LLS value within the compliance period. DF6 (Figure 4-1 of TX320 at 24333-34).

Lancium was also working with JV Driver/Ready Engineering on designing and manufacturing mining containers, and as of May 1, 2019, Lancium was considering 40' boxes holding 1428 miners using 2MW power, that met applicable safety/security standards. DF7.

McNamara first learned about demand response programs and how they can reduce the effective price of power by May 2, 2019 (before meeting Storms) and the natural progression of these discussions and Lancium's further investigation led to McNamara and Cline learning about ancillary services (a type of demand response), which, in turn, led to McNamara and Cline's conception of using their miner ramping technology to provide ancillary services, under the constraint of a power option agreement, ultimately leading to the '433 patent.  DF8-9, 13

**The Parties' Communications.** On May 3, 2019, Storms attended a Bitcoin mining conference in Boston to try to sell his Bitcoin mining container. DF13. McNamara attended the same conference. DF13. After being introduced at the happy hour, McNamara, Storms, and approximately six others went to a casual business dinner with friendly competitors talking shop. DF13-14. There was drinking and talking among the attendees, including between Storms and McNamara, and both spoke in normal tones of voice. DF14, DF20. Storms did not provide McNamara any documents during dinner, but contact information was exchanged. DF15, DF20.

Storms and McNamara communicated by text message after the dinner. DF15, 17-18, 20.

McNamara texted that he thought Storms' boxes might have some benefits over the JV Driver boxes Lancium was considering. DF15. Storms responded that he would send specs on the "boxes/PDUs/logic design." DF15. After not receiving the specs, McNamara sent another text requesting the "box design specs." DF17. McNamara did not request PDU, logic design, or other information from Storms, and Storms considered the PDUs/logic design to be different than the boxes, but tried to recant at trial. DF17, 19; Tr. 123:9-124:18. Storms sent an email on May 9, 2019 with attachments: a one-page bullet-point spec and a one-page drawing, brochures on third-party filters/fans, and a hard-coded spreadsheet of a simulation Storms had run. DF17, 20.

McNamara reviewed Storms' materials upon receiving them for no more than three minutes, found Storms' box "very expensive," and forwarded the email to Cline and others who were more directly involved with box-manufacturer decisions. DF17. Cline concurred Storms' box was expensive and that it was inferior to the JV Driver-designed box Lancium was considering. DF17. Neither McNamara nor Cline remember discussing Storms or his materials again until this lawsuit; and there are no other Lancium documents referring to Storms or BearBox. DF21.

## II. ARGUMENT

### A.    Applicable legal principles

Patent issuance creates a presumption that the named inventors are the true and only inventors, and that people not named are not to be inventors. *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). Plaintiff must establish that "(1) the erroneously omitted inventor conceived the invention claimed in the patent *and* (2) the named inventor on the patent did *not* conceive the invention." *Iceotope Grp. Ltd. v. LiquidCool Sols., Inc.*, No. 20-2644, 2022 WL 204923, at *2 (D. Minn. Jan. 24, 2022). Storms "must meet the ***heavy burden*** of proving his case by clear and convincing evidence." *Scott v. Zimmer, Inc.*, 889 F. Supp. 2d 657, 662 (D. Del. 2012) (citing *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2012)).

Conception is the touchstone of inventorship. *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1381 (Fed. Cir. 2004). Conception is "the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention." *Id*. A would-be inventor's contribution must have been to the conception of the claims, not something outside the claims. *Scott*, 889 F. Supp. 2d, at 662. "To prove [his or her] contribution, the purported inventor must provide corroborating evidence of any asserted contributions to the conception." *Acromed Corp. v. Sofamor Danek Group, Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001). The sufficiency of the corroborating evidence is evaluated under a rule of reason analysis, which requires that an evaluation of all pertinent evidence be made so that a sound determination of the credibility of the alleged inventor's story may be reached. *Gemstar*, 383 F.3d at 1382.

**B.    Storms Is Not the Sole Inventor of the '433 Patent.**

**1.    Storms Did Not Conceive The '433 Patent's Inventions Because Those Inventions Are <u>Fundamentally Different</u> Than Storms' Technology.**

The '433 patent relates to systems and methods for adjusting the amount of power available on the electrical grid, by giving a power entity, such as a grid operator like ERCOT, the ability to set the minimum amount of power a load (*i.e.*, set of computing system) must use. *See* D.I. 149 at 3-5. The Court confirmed as much through its construction of "power option agreement" and "minimum power threshold to mean:

| "power option agreement" | "an agreement between a power entity associated with the delivery of power to a load and the load, wherein the load provides the power entity with the option to reduce the amount of power delivered to the load up to an agreed amount of power during an agreed upon time interval such that the load must use at least the amount of power subject to the option during the time interval unless the power entity exercises the option" |
|---|---|
| "minimum power threshold" | "a minimum amount of power a load must use during an associated time interval" |

Storms simply did not conceive of the '433 patent's systems and methods. His "technology" is

6

fundamentally different and relates to maximizing profitability using the energy markets, not stabilizing the grid (*e.g.*, through ancillary services). DF22, 23, 25-31. Prior to claim construction, Plaintiffs ignored (or did not appreciate) these fundamental differences, as their expert McClellan took the position that the load, not the power entity, held the option in the "power option agreement," and that the load did not need to "use" the "minimum power threshold." DF46; *see* D.I. 149, 195 (*Markman* and Reply). At trial, Plaintiffs manufactured a new theory in an attempt to shoehorn Storms' technology into the Court's claim construction. Their arguments fail.

First, Storms conceded that in his newly-redefined, contemplated system the generator does not own the mining equipment, and he initially conceded that the generator is making decisions for itself (Tr. 141:5-11), before reversing course and testifying that the generator is somehow making decisions for the Bitcoin miner that it does not own based on the value of potential Bitcoin that the generator also would not own. Tr. 141:6-142:12. But even in this imaginary scenario, there is no evidence that the Bitcoin mine (the load) must use a specified amount of electricity during an associated time period that the windfarm could curtail (*i.e.*, no "power option agreement" and no "minimum power threshold"); rather, as McClellan conceded it "doesn't make any sense" to mine Bitcoin if you were losing money doing so, and Storms' Email "doesn't teach that." DF25.[3]

Second, Storms admits that "maintaining the load level above a certain value was not important … because the intent was the build would run at 100 percent if it was profitable to mine and 0 percent if it was more profitable to sell power back." Tr. 148:25-129:5, DF25. McClellan admitted that Storms' simulated system had no telemetry, and thus no way to measure the amount of power the system was actually using in real time. Tr. 423:10-19. Storms' system looked at

---

[3] That Storms' simulation and code were for controlling a Bitcoin miner, not a generator (DF25; Tr. 149:10-150:21) further undercuts Storms' contention that he conceived that the generator had the option to determine whether the Bitcoin miner would or would not mine.

economic considerations (power prices and the Bitcoin breakeven price)—not specified minimum power thresholds—to determine whether to mine or sell-back power. DF25-29. This is simply different than the '433 patent, as McClellan acknowledged: "I don't believe it [the '433 patent] contemplates selling back." DF25, Tr. 416:4-12.

Finally, Storms' concept of contracting (and co-locating flexible datacenters) with/at windfarms to permit the windfarms to sell their power to the flexible datacenters (*e.g.*, Bitcoin miners) when the power prices are low and sell their power to the grid when the power prices are high was Lancium's original concept from 2017, which it had repeatedly demonstrated to windfarms throughout 2018 and early 2019, and reduced to practice in the '632 application and at its Thomas Road R&D facility in 2018. DF3-7; D.I. 13 & 28 (Answers). It is thus no surprise that after meeting McNamara, Storms admitted to Hakes that "The guys at Lancium ***are doing*** what we ***are trying to do exactly***, but they don't have a container builder or software team yet."[4] DF16. That concept was "old news" to Lancium in May 2019, was included in Lancium's earlier-filed patents and applications, and is different than the inventions of the '433 patent.

### 2.    Storms Did Not Communicate The Claimed Inventions To Lancium.

Plaintiffs cannot prove (clearly and convincingly or otherwise) that Storms communicated every element of the claimed inventions to McNamara. First, as established above, Storms did not conceive the claimed inventions and thus could not have communicated them. Second, because Storms did not provide McNamara any source code, or any of the photographs of the whiteboards, hardware, or other equipment Plaintiffs presented at trial (DF20), the focus of this analysis is limited to the actual communications, *i.e.*, Storms' oral communications at the business dinner (which Plaintiffs do not focus on and provided no evidence of any details, much less corroborating

---

[4] Storms also admits that he did not know whether Lancium had a software team or what Lancium was doing from the software side. DF21.

evidence from any of the other dinner attendees), the text messages, and the lone email containing the specification, drawing, and spreadsheet (collectively, "the Email"). With respect to the '433 patent, the evidence establishes that, at most, the Email communicated concepts known in the prior art—concepts that Lancium knew prior to McNamara's happenstance dinner with Storms.[5] DF38.

### 3.   The independent claims – 1, 17, and 20[6]

#### a.   Preamble and Element [a] "a set of computing systems …"

Bitcoin miners (*i.e.*, a set of computing systems configured to perform computational operations) were well known, including by Lancium, prior to Storms' communication with McNamara. DF2-7. The '632 application, for example, discloses flexible data centers consisting of a set of computing systems (computers) configured to perform computational operations (*e.g.*, mining Bitcoin) using electrical power, including from the grid. DF4. Lancium's R&D facility, which was grid connected, was also using computing systems to mine Bitcoin throughout much of 2018 and into 2019. DF5-6. Communication of this element was thus nothing more than communicating what was known in the art, including by McNamara and Cline.

---

[5] Prior to addressing Storms' communications in connection with the claim language, Plaintiffs lob two criticisms of Lancium's conduct. Both lack merit. First, relying on *Blue Gentian*, Plaintiffs argue that McNamara's second request for the box spec, subsequent review, quick forwarding of the email to Cline, and subsequent lack of follow-up supports Plaintiffs' position. Ps' Br., at 5. But *Blue Gentian* is distinguishable. There, unlike here, the named inventor (Berardi) was not experienced in the technology of the invention (hose design) and admitted that he only had a nebulous idea prior to a meeting with would-be inventor (Ragner), (ii) at the meeting Ragner (who was experienced in hose design) lectured Berardi "like a professor" and presented "excruciatingly detailed graphics and photographs" to Berardi, (iii) within a day or two after their meeting, Berardi was able to build a prototype and admitted that he "might have subconsciously remembered some of the things that Ragner said," (iv) Berardi's first prototype was almost identical to what Ragner described to Berardi in their meeting, and (v) Berardi's eagerness to meet with Ragner related to the invention, (*see* 434 F. Supp.3d 203, 211-13, 217 (D.N.J. 2020)), as opposed to McNamara's text indicating a desire to receive a data point regarding box prices. DF15, DF17. Second, contrary to Plaintiffs' argument (Ps' Br., at 5), Cline's deposition testimony about downloading the spreadsheet was consistent with his trial testimony. Tr. 491:11-16, 518:4-519:8.

[6] Plaintiffs' analysis for claims 17 and 20 (except for the "grid" power) is the same as for claim 1.

**b.    Elements [b] and [b1] – "[b] a control system configured to: [b1] monitor a set of conditions"**

Storms' purported conception of this element is of no moment. As set forth above, long before McNamara met Storms, Lancium had conceived and reduced to practice a control system that monitored Bitcoin-related and other conditions. DF3-DF6, and *infra* at 14-15.

**c.    Element [b2] "receive power option … "**

Plaintiffs' Email does not communicate this element, as confirmed by Dr. Ehsani. DF38, 48. Indeed, with respect to the power option agreement (POA), Plaintiffs originally asserted that Storms' Email communicated the opposite of the Court's construction, *i.e.*, a system where the load held the option and was not required to use the minimum power threshold. DF46. Now, faced with the Court's claim construction, Plaintiffs effectively contend that Storms' Drawing teaches every possible, known contractual relationship between a wind farm and a Bitcoin mine because it "implies that they have agreed on a contractual agreement." Ps' Br. at 8.

Plaintiffs' imagined teaching should be rejected. To begin, McClellan's opinions should be disregarded due to his multiple testimonial flip-flops. DF46; *See, e.g.*, *General Elec. Co. v. Wilkins*, 750 F.3d 1324, 1330 (Fed. Cir. 2014) (agreeing with district court's conclusion that witness in inventorship case was not credible when he was "purposefully evasive" and "repeatedly impeached during cross-examination, to the point where the veracity of even simple answers w[as] called into question"). Moreover, and flip-flops notwithstanding, Plaintiffs have not proven, much less by clear and convincing evidence, that the Email communicates a system operating under a power option agreement, as construed by the Court where the "load must use at least the amount of power subject to the option during the time interval unless the power entity exercises the option" (*i.e.*, the minimum power threshold) regardless of whether it is profitable to do so. Rather, at trial, McClellan agreed with his previous testimony that Storms' system "doesn't teach that." DF25.

Nor have Plaintiffs proven that the Email communicates ***receiving power option data***, which does not occur in Storms' system because the power level was a value fixed in the code (DF30), or ***determining a performance strategy responsive to receiving the power option data*** that Storms system never received in the first place.  DF30. McClellan, at trial, never described anything in the Email as disclosing use of a power option agreement or a minimum power threshold, let alone the detailed relationships recited in the claims. And Storms admitted that nowhere in his Email is there an indication that his system must utilize at least a specified amount of power for a specified time period, regardless of profitability (DF39) and that in his system maintaining the load level above a certain value "was not important." DF25.[7] These shortcomings and admissions are fatal.

Plaintiffs attempt to side-step these failures by arguing that going from miners ON (100% power) to miners OFF (0% power) satisfies the minimum power threshold associated with time intervals portion of the limitation. Ps' Br. at 10. But that argument fundamentally misunderstands the claimed inventions. Simply turning the miners ON/OFF based on profitability does not in any way teach that Storms' system ***must use*** a specific amount of power, let alone a specified amount of power over a specified time period or address the other glaring deficiencies. DF42; Tr. 684:2-11, 686:9-20.[8] That Storms conceded the Email does not indicate that the system even measured the power being consumed by the build at any point in time (DF39; Tr. 135:22-136:1) further highlights that the system does not "receive" power option data, use that non-received data as claimed, or even try to ensure a required amount of power was being used.[9]

---

[7] The power level was, in fact, fixed in the code. DF30.

[8] Storms' argument that the spec teaches miners of different types, which use different amounts of power (Ps' Br. at 10) is of no moment. Regardless of the miner types, there is still no evidence that his system ***required*** the use of a specific amount of power over a specific time interval.

[9] Plaintiffs' argument that the T-portion of the pipe in the Drawing indicates his system could be grid connected (Ps' Br. at 7) says nothing about whether Storms' Drawing communicated the '433 patent's inventions, and should be rejected because a POSA would not conclude the T-portion of

Plaintiffs' reliance on Storms' source code is also unavailing. Ps' Br. at 10. Storms' source code was never provided to Lancium and thus does not provide evidence of what was communicated. DF20. However, Storms' source code does demonstrate that he did not conceive of a system operating under a power option agreement or receiving power option data, including minimum power thresholds. DF26-30. Indeed, the only concept of power usage in Storms' code was the value kW_load, but that value is hard coded, does not change, is not received, does not have an associated time interval, is not a threshold value, and is not measured—it is only an overestimate of power used, which applies a 5% "fudge factor." DF30.[10]

### d.   Element [b3] "responsive to receiving the power option data, …"

Ignoring their sworn testimony, the Court's constructions and other claim language, and the evidence, Plaintiffs argue Storms communicated this element because the Email "describes the operation of Storms' source code" showing that for each of the 5-minute intervals shown in the spreadsheet the system determined a performance strategy using breakeven and revenue generation calculations (*i.e.*, it instructed the miners to mine or to stop mining). Ps' Br. at 11-12. Wrong.

This claim element builds on the previous claim element and the received power option data, including minimum power thresholds. Thus, Storms' Email fails to communicate this element for the same reasons it failed to communicate the previous element. The only performance strategy in Storms' system is to maximize profitability. DF25, 42. Plaintiffs' ON/OFF theory ignores the

---

the pipe (showing pricing information) was also communicating that electricity would flow from the same path. Tr. 682:8-25, 683:1-684:1.

[10] Citing *Ex Parte Christopher*, Storms tries to evade this conclusion by arguing that his simulation with its fixed power value was simply proof of concept. Ps' Br. at 3. *Ex Parte Christopher* is easily distinguished. There, the PTAB upheld a rejection of a claim containing language requiring "assignment of a value to a variable," by noting that variables contain values. 2013 WL 4096429, at *4 (P.T.A.B. Aug. 7, 2013). Here, however, the variable in question kW_load does not represent a required amount of power that must be used (*i.e.*, the "minimum power threshold") as required by the claims, but rather an estimated power usage for the miners. DF30. The code only uses one value, KW_S9 (Tr. 660:3-661:16), and the only way that value is to "change the code." DF30.

"responsive to receiving…" and "determining a performance strategy…" limitations and effectively reads out the power consumption "target" limitation, by impermissibly reducing the claimed "target" to a "result" (*i.e.*, power on/power off).

Finally, even for its profitability analysis, Storms' Spreadsheet does not disclose ***how*** it calculates the breakeven value and thus does not communicate what its profit maximizing strategy is based on. McClellan characterized the Spreadsheet as providing "information upon which to embark on a reverse engineering exercise of what Mr. Storms' system did" that even he admitted "would be fraught with trial and error" (DF41-43), but is actually impossible. DF42-DF43. Thus, the Spreadsheet does not even communicate the strategy it actually uses.

### e.  [b4] "provide instructions … based on [] performance strategy"

Because Storms' Email does not communicate the two preceding claim elements on which this element builds, it also does not communicate this element. Furthermore, as explained above, Lancium possessed this aspect of the claim well before McNamara met Storms, including as demonstrated by Lancium's '632 application, which discloses a system where computer systems (e.g., Bitcoin miners) are issued instructions to perform computational operations based on a performance strategy the system determined based, *inter alia*, on monitored conditions. DF4-5.

### 4.  The Dependent Claims

### a.  Dependent claims 2-5

These claims add specific monitored conditions (claim 2), further limit the control systems' determination of a performance strategy (claims 3 and 5), and impose an order of operations on the computational operations based on respective priorities (claim 4). TX1 at 59:29-55. Plaintiffs rely on evidence from claim 1 to argue Storms communicated these claims to McNamara. Ps' Br. at 12-13. Plaintiffs' argument fails for all off the reasons set forth above. DF31. In addition, Plaintiffs do not address the specifics of claim 4 or present any evidence that Storms' conceived

or communicated its requirements (DF43), assert this claim requires only well-known, conventional features (DF31), and do not address Lancium's evidence that it conceived the order-based-on-respective-priorities aspect of the claim in 2018. DF5 at n.4.

> **b.**     **Dependent claims 6-8, 13-14, and 19**

Plaintiffs lump all of these claims together and rely on the same evidence relied on for claim 1. Ps' Br. at 13. Plaintiffs' arguments thus fail for the reasons sabove regarding claim 1.

> **c.**     **Dependent claims 9-12, and 18**

Plaintiffs provide a scattershot argument for these claims. For all claims, Plaintiffs argue the limitations were well-known in the art, but offer no proof that the Email communicated claim 9 (control remotely) or claim 10 (mobile device). Plaintiffs also point to no evidence the Email communicated claim 10 (QSE), but simply point to ERCOT. Tr. 389:5-390:25. Plaintiffs ignore claim 11 entirely. With respect to claim 18 (operation at increased frequency), Plaintiffs provide no evidence that the Email communicated its requirements or that Storms' software actually implemented this functionality, only that it "provided the ability" to increase frequency based on functionality in publicly available cgminer software that Storms did not write or implement. DF31, 43. Moreover, and notwithstanding Plaintiffs' arguments, the evidence establishes that Lancium had conceived each of these claims (except 12) prior to Storms' communication. DF3-6.

> **d.**     **Dependent claim 16**

Claims 16 recites that the monitored conditions further comprise the "price of power from the power grid," the "global mining hashrate," and "a price for cryptocurrency," and that the system be configured to determine the performance strategy based, *inter alia*, on these and that the performance strategy specifies for at least a subset of the computing systems to perform mining operations when the price of power is equal to or less than a revenue obtained by mining.

Storms' Email does not communicate these limitations. To begin, the Email does not

communicate the "performance strategy" for the reasons set forth above with respect to claim 1, element [b3]. In addition, Storms' Email did not communicate that a subset of miners should mine when the price of power was equal to or less than a mining revenue. Storms' system was either all on or all off. Tr. 662:18-664:10. And Storms' system would not mine if power prices were equal to mining revenue—it would sell-back. DF29. Also, Storms admits, he was not the first person to look at power cost versus mining revenue to make a mine/not-mine decision based on profitability. DF36. Indeed, Lancium demonstrated that it conceived of and reduced to practice a system using power price, global hashrate, Bitcoin price, *inter alia*, to determine whether to mine or not mine based on profitability prior to meeting Storms. DF3-DF6.

### 5.   Lancium Independently Conceived Each Element And Many Of The Elements Were Conceived <u>Before</u> McNamara Met Storms.

Plaintiffs argue Lancium could not independently conceive of the '433 patent's inventions after receiving Storms' Email (Ps' Br. at 14), but provide no legal or evidentiary support. To the contrary, even if Storms' Email disclosed the claimed inventions—it does not—McNamara and/or Cline would, at the very least, have to recognize that in order for Storms to be a co-inventor. As Plaintiffs' own expert characterized it, Storms' Email provides "information upon which to embark on a reverse engineering exercise of what Mr. Storms' system did." DF43. But aside from being impossible, McNamara and Cline did not even try. Other than the price for his box, Storms' Email provided information McNamara did not want or ask for and McNamara only looked at the Email with its attachments for approximately three minutes, concluded the box was "very expensive," and forwarded it to Cline who concurred, and also recognized that Storms' box was inferior to the JV Driver box in other, important ways. DF15, 17-19.

Plaintiffs' hand-waiving dismissal of Lancium's proof of independent invention (*e.g.*, allegedly not presenting testimony regarding a problem they intended to solve and Lancium's flash

of insight (Ps' Br., at 15)) falls flat. Lancium provided detailed, unrebutted evidence that prior to meeting Storms, Lancium had conceived of numerous elements of the claims. Lancium also provided detailed evidence of its post-Storms independent conception utilizing the constraints of a power option agreement and power option data to determine and implement the control system limitations of the claims. DF3-9, 11. Cline, in particular, testified that "[i]t's an entirely different concept of operation" going from a maximum amount of power that could be used to making sure at least a minimum amount of power was used. DF9; Tr. 496:8-498:13. Indeed, the problem McNamara and Cline were trying to solve was developing a rampable datacenter that could operate within the constraints of ERCOT's ancillary services programs (DF9)—something Storms did not know anything about. DF24 n.7. Because they cannot meet their high clear and convincing evidentiary burden, Plaintiffs simply ignore this evidence.

### C.    Storms Is Not a Joint Inventor of the '433 Patent

To establish joint inventorship, Plaintiffs must prove by clear and convincing evidence that Storms contributed in some significant manner to the conception of the invention (*see Gemstar*, 383 F.3d at 1381), and that the contribution was "significant in quality as measured against the dimension of the full invention." *Acromed*, 253 F.3d, at 1379. Merely explaining to the real inventors well-known principles or the state of the art without having a firm and definite idea of the claimed combination as a whole will not suffice. *Id.* Plaintiffs must also prove by clear and convincing evidence that Storms collaborated with McNamara and/or Cline. *See Bianco v. Globus Med., Inc.*, 30 F. Supp.3d 565, 577 (E.D. Tex. 2014) (Bryson J. sitting by designation).

### 1.    Storms And Lancium Did Not Collaborate.

Storms' communications with McNamara do not satisfy the collaboration requirement. Although the inventors need not physically work together or contribute equally to the patent to be considered collaborators, simply providing documents that "reflect[] only a general idea," not the

specific claimed invention, does not meet the requirement. *See Bianco*, 30 F. Supp.3d at 575, 578-580 (E.D. Tex. 2014) (declining to find co-inventorship and noting several Federal Circuit cases that "illustrate the difficulty of proving that an individual should be added as a co-inventor"). Here, Storms admits he never worked with Defendants on their technology. DF21, DF11. Storms' co-inventorship claim fails the collaboration requirement.

### 2.   Storms Cannot Demonstrate That He Made Any Contributions, Let Alone Contributions That Were Significant In Quantity Or Quality.

Plaintiffs argue that Storms' purported "monitored conditions" contributions are significant because they appear in a lot of claims. But the legal test is not quantity; it is ***qualitative significance***. *Acromed*, 253 F.3d at 1379. Plaintiffs cites no authority that the number of claims in which an alleged contribution occurs equates to the quality of the contribution. Moreover, Lancium provided unrebutted evidence and testimony demonstrating that it conceived monitoring conditions, including Bitcoin price, hashrate, real-time and day-ahead prices for electricity, power usage and status of miners, and other conditions prior to Storms' meeting with McNamara, and that it conceived using such information to determine a performance strategy for at least a subset of miners to perform mining operations when the price of power from the grid was equal to or less than the revenue obtained from mining  as recited, for example, in claim 16. DF3-7. Thus, even if Storms' communicated any of this information, he does not qualify as a joint inventor of any of the claims, including claim 16, because Lancium already knew the information prior to Storms' alleged conveyance. *Acromed*, 253 F.3d at 1379.

### D.   Plaintiffs' Dubious Conduct/Character and Their Expert's Lack of Credibility Seriously Undermine Their Case.

### 1.   Plaintiffs' Statements and Conduct Demonstrate a Lack of Credibility.

Plaintiffs' conduct and its witnesses' lack of credibility undermine its allegations. To begin, the idea that Storms asserts Lancium took was not even his own—it originated with third-parties

Hakes and Labij/GlidePath. DF33-37. Hakes gave Storms the idea to write code to "determine whether or not to mine based on the price of power," and explained LMP and the day-ahead price to Storms. DF33. After getting his model running, Storms credited Hakes for the idea, but still had questions so he emailed Denis Labij, who then explained the logic of calculating the Bitcoin breakeven price and comparing it to profitability of sell-back that is implemented in Storms' code. DF33-34. Although, at trial, Storms testified that Labij "gave a long-winded answer to things I was already working on" (Tr. 73:25-74:3), at the time of their communication (in a less guarded moment) Storms thanked Labij profusely and, after receiving Labij's response, wrote to Hakes "*I* [thus claiming ill-deserved credit] figured out [the] breakeven calcs … easy to integrate that logic…." TX14.35 at 5:09pm. Storms titled several of his simulation files "denis_logic.py" and admitted that this code relates to his conversation with Labij. DF35. None of his simulation code predates the "denis_logic" files. DF29.

Storms' ulterior motive for this lawsuit and Plaintiffs' evolving litigation theories and definitions of their purported technology further undermine their claims. After learning of the Layer1 lawsuit, Storms told co-workers at GAM he thought they should "make a public spectacle of [Lancium]," and three days later sent Layer1's lawyers the same information Storms provided to McNamara. DF44, 49. But despite being aware of the allegations Storms asserted in this case at the time he learned of the Layer1 case, and despite speaking to Layer1's lawyers for "quite some time," Storms never intervened in that lawsuit. DF44, 49. Storms, instead, brought this case *eight months* later *after* learning of the Layer1 settlement, and after telling his then boss that he/Storms was "going to blackball [McNamara] from the industry…." Storms also got GAM to pay for this lawsuit by telling GAM that a Lancium patent [apparently not the '433 patent] affects GAM. DF45. Plaintiffs' definition of their technology has also been a continually moving target. *Compare* D.I.

18

1 (Complaint), D.I. 19 (FAC), D.I. 103 (SAC).

McClellan's lack of credibility also undermines Plaintiffs' claims.  The Court found prior to trial that McClellan's opinions, before claim construction, did not explain how Storms' system operated under the Court's claim constructions. DF46. Nonetheless, faced with the Court's claim constructions, McClellan testified at trial that Storms conceived and communicated the inventions of the '433 patent, even though such testimony took the opposite view of the meaning he previously ascribed to the construed terms and, more incredibly, denied he was being inconsistent. DF46.  McClellan's testimony was inconsistent and misleading in other ways as well. DF47. His lack of credibility should be held against Plaintiffs. *See General Elec.* 750 F.3d at 1330; *Doda v. Waste Mgmt, Inc.*, No. 17-604, 2023 WL 179932, at *13 (D. Del. Jan. 13, 2023); *Allergan, Inc. v. Barr Labs., Inc.*, 808 F. Supp. 2d 715, 733-34 (D. Del. 2011); *Bayer AG v. Housey Pharm., Inc.*, 386 F. Supp. 2d 578, 580-82 (D. Del. 2005).

### 2.      Plaintiffs' Criticisms of Lancium Lack Merit.

Plaintiffs' rule-of-reasons criticisms of Lancium ignore the evidence. To begin, Plaintiffs incorrectly characterize Lancium's business prior to meeting Storms as being premised "exclusively on cheap power" to argue that Lancium's subsequent incorporation of so-called sell-back must have come from Storms. Ps' Br., at 18-19. But the evidence demonstrated (i) that Lancium's business focused on cooperatively working with renewable energy generators (*e.g.* windfarms) to provide a market (a flexible data center) when it would not be economical for the windfarm to sell power to the grid while at the same time enabling the windfarm to capture the higher priced hours, a win-win for Lancium and the generator—not simply "cheap power" (DF3), and that (ii) Lancium changing its power purchase agreement to a fixed price, allowing for sell-back, had nothing to do with Storms (DF10), the '433 patent, or its inventorship as McClellan conceded. DF25 ('433 patent does not contemplate sell-back).

19

Plaintiffs also argue that Lancium's pursuit of a CLR designation "amounted to commercializing Storms' concepts," that alleged similarity between McNamara's Excel document and Storms' Spreadsheet somehow corroborate Storms' inventorship claim, and criticize McNamara and Cline for purported being unwilling to describe "**_the_** essential function" of the '433 patent as described in a press release referencing "**_an_** essentially function."[11] TX16.03. These arguments are distractions. As discussed, Storms' system is fundamentally different than the '433 patent, so pursuing CLR had nothing to do with Storms' concepts. Next, the two documents are plainly different—McNamara's Excel file considers T&D (transmission and distribution) costs and demand response revenue that Storms did not. *Compare* TX107 *with* TX157.08. Finally, McNamara and Cline are not patent attorneys and reasonably declined to speculate on the construction of claims, a legal matter. DF1-2. Furthermore, *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp*, 2008 WL 2787981 (S.D.N.Y. 2008) is distinguishable. There, unlike here, the named inventor gave "rambling, often-incoherent testimony" and "lack[ed] any training or experience in the field" of the patent-at-issue. *Id.* at *8. That is not the case here. DF1-2.

## III.   CONCLUSION

For the reasons above, the Court should enter judgment finding Storms is NOT an inventor, either sole or joint, of the '433 patent.

---

[11] Plaintiffs remaining criticisms are also distractions. First, Plaintiffs criticize Lancium for not presenting testimony about McNamara and Cline's joint inventorship collaboration, their alleged failure to write software code, and purported failure to build or test the invention prior to filing the provisional application. Ps' Br., at 20. This argument ignores the burden of proof, which is squarely on Plaintiff. *Symantec Corp. v. Computer Assoc. Int' Inc.*, 552 F.3d 1279, 1295 (Fed Cir. 2008) (evidence questioning the named inventor's contribution "not relevant" to the question of would-be inventor's contribution). Second, Plaintiffs revert to their misleading timeline theme to suggest that certain Lancium documents referring to "new" ideas are not consistent with their characterization of Storms' documents as old news. DF16. Lancium provided detailed evidence regarding its learning about demand response and subsequent conception of the certain aspects of the '433 patent, as well as regarding its learning of the unrelated sell-back, none of which have anything to do with Storms. DF8-DF11.

Dated:  January 25, 2023

BARNES & THORNBURG LLP

*/s/ Chad S.C. Stover*
Chad S.C. Stover (No. 4919)
222 Delaware Avenue, Suite 1200
Wilmington, Delaware 19801-1050
Telephone: (302) 300-3474
E-mail: chad.stover@btlaw.com

Mark C. Nelson (admitted *pro hac vice*)
David Lisch (admitted *pro hac vice*)
2121 N. Pearl Street, Suite 700
Dallas, TX  75201
Tel:  (214) 258-4140
E-mail:  mark.nelson@btlaw.com
        david.lisch@btlaw.com

Adam M. Kaufmann (admitted *pro hac vice*)
Darrick Hooker (admitted *pro hac vice*)
Dana Amato Sarros (admitted *pro hac vice*)
One North Wacker Drive, Suite 4400
Chicago, IL 60606
Tel:  (312) 214-8319
Email:  adam.kaufmann@btlaw.com
Email:  darrick.hooker@btlaw.com
Email:  dana.sarros@btlaw.com

*Attorneys for Defendants Lancium LLC, Michael T. McNamara, and Raymond E. Cline Jr.*

21