# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BEARBOX LLC and AUSTIN STORMS, ) | |
|     Plaintiffs, ) | |
| v. ) | |
| ) | C.A. No. |
| LANCIUM LLC, MICHAEL T. ) | 21-534-MN-CJB |
| MCNAMARA, and RAYMOND E. CLINE, ) | |
| JR. ) | |
|     Defendants. ) | |

- - - -

Wilmington, Delaware
Wednesday, December 7, 2022
Trial Transcript
*Volume II*

- - - -

BEFORE: HONORABLE GREGORY B. WILLIAMS
       UNITED STATES DISTRICT COURT JUDGE

- - - -

Michele L. Rolfe, RPR, CRR

265

APPEARANCES:

      ASHBY & GEDDES
      BY: ANDREW C. MAYO, ESQ.

        -and-

      MARSHALL, GERSTEIN & BORUN LLP
      BY: BENJAMIN T. HORTON, ESQ.
         JOHN LABBE, ESQ.
           For the Plaintiffs

      BARNES & THORNBURG LLP
      BY: WILLIAM BURTON, ESQ.
         MARK C. NELSON, ESQ.
         ADAM M. KAUFMANN, ESQ.
         DARRICK HOOKER, ESQ.
           For the Defendants

266

- - - - -

P R O C E E D I N G S

(REPORTER'S NOTE: The following trial was held in Courtroom 6-B, beginning at 9:30 a.m.)

THE COURT: Good morning.

ALL COUNSEL: Good morning, Your Honor.

THE COURT: You may be seated.

All right. So the Court has reviewed the parties' submissions regarding Dr. McClellan and the Court is going to allow Dr. McClellan to testify. We're going to take it -- we're going to allow him to testify on a conditional basis.

Based upon my review thus far of the parties' submissions, BearBox was able to cite to places in his expert report that arguably you can find some basis in his opinion for.

But, with that said, let me tell you that what I am clear on is that -- a couple of things.

Dr. McClellan was previously of the opinion that the load, not the power entity, held the option in the Power Option Agreement that Dr. McClellan was previously of the opinion that a load was not required to use the minimum power threshold. And that thus he, in his opening report, in his reply report, did not explain how BearBox's system

267

operated by maintaining a minimum amount of power, a load you must use during associated time intervals; i.e., the minimum power threshold as defined by the Power Option Agreement.

So, I wanted to clarify those things so that even if, you know, as I told Lancium yesterday, you'll have an opportunity to cross-examine. And to the extent that you believe that Dr. McClellan is testifying inconsistent with his prior -- his original report and his reply report, you should cross-examine him to point that out.

And in the end, you know, I think this goes to credibility as opposed to admissibility, so those are the confines that the Court gives the parties on that issue.

So with that, are we ready to begin?

MR. RICORDATI: Yes, Your Honor.

THE COURT: Okay.

MR. RICORDATI: Plaintiffs call Dr. Stan McClellan.

(Dr. McClellan, having been sworn, testified as follows:)

MR. RICORDATI: Your Honor, may I give a brief transitional statement?

THE COURT: Yes.

MR. RICORDATI: Dr. McClellan is a professor in the Ingrim School of Engineering at Texas State University

268

in the electrical and computer engineering program.

He's here today to testify about Mr. Storms' conception of the inventions recited in the '433 patent and his communication of those inventions to Lancium as well as Lancium's reaction to that information.

DIRECT EXAMINATION

BY MR. RICORDATI:

**Q.** Would you please state your name for the record.

**A.** Stan Dr. McClellan.

**Q.** Dr. McClellan, did you prepare some demonstrative slides to accompany your testimony today?

**A.** Yes.

**Q.** Before we begin, I'd like to direct your attention to TX19. It should be in your binder.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It's my CV.

**Q.** Where do you currently work?

**A.** I work for Texas State University.

**Q.** What do you do?

**A.** I'm a professor in the Ingrim School of Engineering at Texas State. I was -- I'm also the codirector of a large-scale industry initiated called the connected infrastructure initiative. As well as the director of a

269

1 multiyear multimillion dollar program to provide engineering
2 technology and science support to NASA's Johnson Space
3 Center.
4 Q. What type of projects do you work on under the
5 connected infrastructure program?
6 A. The connected infrastructure program is a
7 consortium-type activity that's funded by the state of Texas
8 for the purposes of economic and technology development in
9 the Central Texas area.
10 The programs -- so as it's a consortium type of
11 entity, it maintains a membership and the members are
12 municipalities, service providers, nongovernment entities,
13 as well as industry partners. And those -- all of those
14 partners in that program collaborate to define projects that
15 have direct impact on employability of students on critical
16 priority issues that face the Central Texas area and so on.
17 A lot of those projects are focused on --
18 focused in the areas of water and energy.
19 Q. Do you have any other responsibilities at Texas State
20 University?
21 A. Yeah. As a member of the faculty, I was recruited
22 out of industry to Texas state in about 2007, 2008 time
23 frame to start the school of engineering. I was the first
24 tenured faculty member there in the school. As the
25 associate director and then later as the director of the

270

1 school, I oversaw a number of -- development of a number of
2 programs, including new graduate programs, new under
3 graduate programs that are cross-cutting and
4 multidisciplinary.
5 In particular, as a director, I oversaw the
6 development and initial accreditation of the electrical
7 engineering and computer engineering programs which were
8 accredited by -- all engineering programs have to be
9 accredited to have value. And so those two programs in
10 particular were submitted for accreditation by the
11 electric -- by ABET or Accreditation Board for Engineering
12 and Technology programs.
13 And as result of the -- the focus of those
14 programs on longitudinal design integration throughout the
15 curriculum. And particularly the senior design sequence,
16 the involvement of industry and the direct applicability of
17 design elements, design validation, design documentation and
18 so on. Those two programs were selected as international
19 exemplars by ABET for programs of that nature.
20 Q. Where do you live?
21 A. I currently live in Virginia.
22 Q. Can you briefly describe your educational history?
23 A. I have a bachelor's, master's and doctoral degrees
24 from the department of electric and computer engineering at
25 Texas A&M University.

271

1 Q. What type of research did you go in grad school?
2 A. In grad school, my research was focused on data
3 compression, signal processing, signal speech, imagine,
4 video processing for the purpose of communications -- you
5 know, communication of similar sorts of things between end
6 points.
7 Q. Over the course of your career, has there been a
8 particular focus of your work?
9 A. Yeah, my work is -- well, my work is focused
10 primarily on the optimization of distributed systems.
11 Q. What's a distributed system?
12 A. A distributed system one that uses some form of
13 network to communicate between typically geographically
14 somewhat colocated or geographically disparate systems.
15 They are performing a common task or are tasked with
16 observation of some phenomenon or processing of some
17 information.
18 Q. Have you ever worked on projects involving smart grid
19 technology?
20 A. Yes, as a -- as I said, I was recruited out of
21 industry, so I worked for -- I was distinguished
22 technologist at Hewlett-Packard. And as such, I was
23 involved in development, deployment and commercialization of
24 technologies related to computing and communications
25 technologies worldwide.

272

1 And in that process, I was involved in the
2 construction of networks, of systems and of conglomerations
3 of systems, including datacenters, that manage large-scale
4 computing and communications activities.
5 In the development of things like datacenter, it
6 became clear to me that there was some -- there was a gap
7 between the communication that's done typically in
8 large-scale computer systems where they have what's called a
9 back channel or some low-level communications for monitoring
10 health and providing low-level command and control and the
11 electrical grid which didn't have such.
12 So when I -- I noticed this issue. And it
13 became an issue when we were optimizing distributed
14 datacenters for heat loads, primarily. Datacenters -- a lot
15 of computers in a small space create a lot of heat and
16 consume a lot of electricity. And one of the big issues in
17 datacenters and central other offices and other types of
18 facilities like this in the telecommunications network is
19 the management of the temperature of the computing systems
20 so that they continue to operate in an optimal fashion.
21 So a datacenters sits on top of a raised floor
22 and the raised floor has cold air underneath it and the cold
23 air kind of comes out of the floor and is sucked into the
24 computer systems and exhausted out of the top.
25 Cold air doesn't rise very well even in a

525

1 TX163, TX223, TX169, TX057, TX061.
2  MR. NELSON: Same objection, unless these were
3 shown to the witness that -- and it's known that he knows
4 about them or not. I don't know -- I didn't -- I thought he
5 was pulling up -- using documents that I used. I have not
6 seen these documents, the witness hasn't verified them.
7  THE COURT: He did use those documents during
8 his cross.
9  MR. NELSON: He did, okay.
10  What is Your Honor's preference for the day
11 here?
12  THE COURT: We're done with this witness?
13  MR. NELSON: We're done.
14  THE COURT: All right.
15  So you may step down, Dr. Cline.
16  THE WITNESS: Thank you.
17  THE COURT: So we have seven minutes left. So
18 let's -- who is your next witness?
19  MR. NELSON: So if we have 11 or 12 minutes
20 left, we were going to play a video deposition clip of Denis
21 Labij, the GlidePath 30(b)(6) representative that was
22 deposed in this case. I'm sorry, it's 22 minutes.
23  THE COURT: Oh, 22 minutes. No, we're not going
24 to do that.
25  So let's start with that first thing in the

526

1 morning, if you'd like.
2  Let's talk about tomorrow. Remember that by
3 tomorrow morning the parties proposed scheduling order for
4 post-trial briefing is due. I understand the parties had
5 previously mentioned that you didn't want it to start until
6 after the holiday. And the Court is fine with that. We
7 just don't want it to linger on once it starts. We want the
8 deadlines to be consistent with the briefing schedule and
9 the local rules. And as in the scheduling order, max 20
10 pages for the opening, 20 pages for the answering and 10
11 pages for reply.
12  MR. NELSON: Your Honor had given us a
13 sur-reply, too, I think.
14  THE COURT: And sur-reply.
15  What can we expect tomorrow? We have that video
16 and then what else?
17
18  MR. NELSON: So, Mr. McNamara will testify,
19 Mr. Baer will testify and I believe that Mr. Ehsani will
20 testify. We have to figure out where we are with respect to
21 time as well.
22  We also have Mr. Siddiqi and we have a
23 deposition of Mr. Ben Hakes which we may or may not get to
24 depending on time constraints.
25  THE COURT: Okay. Let's give the parties' --

527

1 their remaining time.
2  So defendant has 2 hours and 40 minutes left.
3 Plus 38 minutes for closing.
4  And plaintiff has 28 minutes left, plus
5 42 minutes for closing.
6  With respect to demonstratives tomorrow, any
7 issues with -- have those been exchanged? Any issues with
8 any of that tomorrow?
9  MR. HORTON: Demonstratives for the witnesses
10 tomorrow?
11  THE COURT: Yes.
12  MR. HORTON: I don't believe we have any
13 objections.
14  THE COURT: You haven't gotten them yet?
15  MR. HORTON: Those we've received. We have no
16 objections.
17  THE COURT: Okay. No problem.
18  Okay. So it doesn't sound like --
19  MR. HORTON: Your Honor, objections aren't due
20 until 7 o'clock tonight, so we might, but as of right now,
21 we don't.
22  THE COURT: All right. So anything else the
23 parties want to bring to my attention?
24  MR. NELSON: No, Your Honor.
25  MR. HORTON: No, Your Honor.

528

1  THE COURT: Okay. All right. So we'll start
2 again tomorrow morning at 9:30. We are adjourned for the
3 night.
4  (Whereupon, the following proceeding concluded
5 at 5:27 p.m.)
6  I hereby certify the foregoing is a true
7 and accurate transcript from my stenographic notes in the
8 proceeding.
9  /s/ Michele L. Rolfe, RPR, CRR
    U.S. District Court