# EXHIBIT 8

1                 IN THE UNITED STATES DISTRICT COURT

2                IN AND FOR THE DISTRICT OF DELAWARE

3

    BEARBOX LLC and AUSTIN STORMS,       )
4          Plaintiffs,          )
    v.                        )
5                         )  C.A. No.
    LANCIUM LLC, MICHAEL T.       )  21-534-MN-CJB
6    MCNAMARA, and RAYMOND E. CLINE,   )
    JR.                      )
7         Defendants.          )

8

9                      - - - -

10                 Wilmington, Delaware
11                 Tuesday, December 6, 2022
                    Trial Transcript
12                 VOLUME I

13                   - - - -

14

15

16   BEFORE:  HONORABLE GREGORY B. WILLIAMS
              UNITED STATES DISTRICT COURT JUDGE
17

18                  - - - -

19

20

21

22

23

24

25                   Michele L. Rolfe, RPR, CRR

APPEARANCES:



                    ASHBY & GEDDES
                    BY: ANDREW C. MAYO, ESQ.

                         -and-

                    MARSHALL, GERSTEIN & BORUN LLP
                    BY: BENJAMIN T. HORTON, ESQ.
                       JOHN LABBE, ESQ.
                              For the Plaintiffs


                    BARNES & THORNBURG LLP
                    BY:  WILLIAM BURTON, ESQ.
                       MARK C. NELSON, ESQ.
                       ADAM M. KAUFMANN, ESQ.
                       DARRICK HOOKER, ESQ.
                              For the Defendants

```
 1              Dr. McClellan's slides now purport to, you know,

 2    indicate that he will testify regarding Your Honor's claim

 3    construction.

 4              And then if you turn to slide PDX 3.34.  And, I

 5    guess, Your Honor, I should ask --

 6              THE COURT:  Four?

 7              MR. KAUFMANN:  Well, plaintiffs changed the

 8    numbers of their demonstrative, so I'm not sure which

 9    version they submitted to you, if their PDX3.something or 4.

10    something.  But I believe it's slide PDX3.34, is a slide

11    titled "Mr. Storms communicated the features of Claim 1."

12              At the top of that slide is an excerpt of the

13    claim language that includes the Power Option Agreement and

14    minimum power threshold terms that Your Honor found

15    Dr. McClellan's opening and reply reports do not explain how

16    any of the evidence in this case supports conception under

17    Your Honor's claim construction.

18              And, so, all -- you know, Your Honor, it appears

19    that from slide 3.34 through the remainder of these slides,

20    essentially, Dr. McClellan intends to walk through the claim

21    language and compare it to evidence -- or compare it to

22    documents that he sent to Mr. McNamara or other evidence in

23    the case.

24              And, Your Honor, this -- you know, and our

25    position is exactly the issue that your motion to strike was
```

meant to preclude, that this is extremely prejudicial to

defendants.  This is all new analysis.  As Your Honor found,

there was no explanation of how the -- any of the evidence

applied the properly construed terms to the evidence in this

case.

We've had no opportunity to depose Dr. McClellan

on this new analysis.  Our experts have not had the

opportunity to consider and respond to that analysis.  You

know, we understand that was the prejudice that Your Honor

found in part to justify exclusion of his supplemental

report.

And, Your Honor, I would also note that your

motion to strike -- or your ruling on the motion to strike

found that plaintiffs expressed disregard of the Court's

scheduling order indicated bad-faith in the serving of that

supplemental report.

Your Honor, we have filed two motions addressing

how Dr. McClellan's opinions pertain to the claim

construction.  Your Honor has granted our motion to strike.

You granted our motion in limine to preclude testimony

inconsistent with the claim construction ruling.

And now, you know, two days before trial,

plaintiffs again have served demonstratives that suggest

they are going to elicit testimony that we believe is

inconsistent with both of your rulings on our motion to

1   strike and our motion in limine number one.

2          THE COURT:  Well, the motion says strike --

3   struck the supplemental expert report.  That -- we struck

4   that.  And we said that Dr. McClellan cannot testify

5   inconsistent with the Court's claim construction.

6          MR. KAUFMANN:  Yes, Your Honor.

7          THE COURT:  I'm not so sure I went so far as how

8   you're characterizing it now.  But let me hear from

9   plaintiffs' attorney response.

10          MR. HORTON:  Yes, Your Honor.  Thank you.

11   That's exactly what I was going to say is we didn't think

12   that the Court's words went that far.  We understand that

13   the supplement is out.  We intend to introduce testimony --

14   testimony and opinions from Dr. McClellan that are supported

15   by his original reports only, and deposition testimony

16   asking him questions about those original reports.

17          And so, that is -- that is all we intend to do.

18          THE COURT:  All right.  So Dr. McClellan can't

19   come to trial now and give new opinions that aren't

20   supported by his original report.

21          MR. HORTON:  That's correct, Your Honor.

22          THE COURT:  You understand that?

23          MR. HORTON:  Absolutely.

24          MR. KAUFMANN:  Your Honor, if I may.  You know,

25   part of our concern about these slides as well is the

 1                          - - - - -

 2                     P R O C E E D I N G S

 3

 4          (REPORTER'S NOTE:  The following trial was held in

 5   Courtroom 6-B, beginning at 9:30 a.m.)

 6                THE COURT:  Good morning.

 7                ALL COUNSEL:  Good morning, Your Honor.

 8                THE COURT:  You may be seated.

 9                All right.  So the Court has reviewed the

10   parties' submissions regarding Dr. McClellan and the Court

11   is going to allow Dr. McClellan to testify.  We're going to

12   take it -- we're going to allow him to testify on a

13   conditional basis.

14                Based upon my review thus far of the parties'

15   submissions, BearBox was able to cite to places in his

16   expert report that arguably you can find some basis in his

17   opinion for.

18                But, with that said, let me tell you that what I

19   am clear on is that -- a couple of things.

20                Dr. McClellan was previously of the opinion that

21   the load, not the power entity, held the option in the Power

22   Option Agreement that Dr. McClellan was previously of the

23   opinion that a load was not required to use the minimum

24   power threshold.  And that thus he, in his opening report,

25   in his reply report, did not explain how BearBox's system

DIRECT EXAMINATION - DR. MCCLELLAN

1        MR. RICORDATI:  Okay.  We can remove that.

2        MR. KAUFMANN:  Your Honor, we request to strike

3   the testimony of the last slide as well.

4        THE COURT:  Okay.  That's granted.

5   BY MR. RICORDATI:

6   Q.    Okay.  I'd like to move to the next slide.

7        Now, Dr. McClellan, in your view, did any of the

8   claim terms in the '433 patent require construction when you

9   did your initial analysis?

10  A.    My understanding during the initial analysis is that

11  the two sides had agreed that there would be plain and

12  ordinary meaning applied to the terms.

13  Q.    And since your report, you've been made aware that

14  the Court has construed two particular claim terms, Power

15  Option Agreement and minimum power threshold; is that

16  correct?

17  A.    Yes, I think that arose in my deposition where I

18  thought it was kind of strange that there hadn't been a

19  *Markman* hearing at that point.

20        MR. KAUFMANN:  Objection, Your Honor.  This was

21  the issue of Dr. McClellan's supplemental report.  It's the

22  only place where he discusses the Court's claim construction

23  which Your Honor struck.

24        THE COURT:  Yeah, but this is just the Court's

25  claim construction, right, so it's -- he -- this is just the

DIRECT EXAMINATION - DR. MCCLELLAN

1    claim construction.  So this demonstrative is fine.

2    BY MR. RICORDATI:

3    Q.     Did the Court's constructions change any of your

4    opinions?

5    A.     No.

6    Q.     Based on your review of Mr. Storms' system as of

7    early May 2019, did you form an opinion as to whether

8    Mr. Storms conceived of the inventions claimed in the '433

9    patent?

10   A.     Yes.

11   Q.     What was the basis for your opinion?

12   A.     The basis for the opinion was the review of the

13   patent claims, the patent claims, the filing history and the

14   materials that were provided to me related to Storms'

15   activity in developing the BearBox system as well as the

16   simulation outcomes and so on.

17   Q.     In your opinion, did Mr. Storms conceive of the

18   inventions claimed in the '433?

19   A.     Yes.

20   Q.     Based on your review of Mr. Storms' system as of

21   early May 19th -- early May 2019, did you form an opinion as

22   to whether Mr. Storms communicated information disclosing

23   the inventions claimed in the '433 patent to Lancium?

24   A.     Yes.

25   Q.     What was the basis for your opinion?

DIRECT EXAMINATION - DR. MCCLELLAN

1    some economic considerations are what to do with Bitcoin,

2    but that's not specific -- it's not specified in the '632

3    application.  The only economic consideration taught or even

4    suggested in the '632 application is using energy when it's

5    available at a negative price or when you're losing money by

6    using it.

7            So it doesn't mention Bitcoin, it doesn't talk

8    about cryptocurrency or breakeven calculations or a

9    performance strategy to instruct a set of computing systems.

10   Q.    Just to be clear, you said that the '632 patent

11   describes only purchasing energy when it's at a negative

12   price; is that right?

13   A.    Right.

14   Q.    Doesn't explicitly describe any other economic

15   consideration, does it?

16   A.    I don't -- I don't think so.

17   Q.    Okay.  Now, in his report, Dr. Ehsani claims that --

18   that Raymond Cline had a supposed flash of insight that lead

19   to conception in late August 2019 when he noted:  "The

20   quote, award received after offering into an Ancillary

21   Services program and received as part of the establishment

22   of the Power Option Agreement, (is essentially an)

23   "obligation to our [Lancium's part] that we consume the

24   amount of power that ERCOT could curtail."

25           Based on that, Dr. Ehsani argues that Mssrs.

1          MR. NELSON:  So before we end here, there's some

2     notebooks up there with some other exhibits that you've

3     looked at.  And since they are not -- these exhibits are not

4     objected to, I just want to get -- get him to verify that

5     he's not -- knows them and then I want to move exhibits in.

6     BY MR. NELSON:

7     Q.     So can you look at TX266, and just let me know if

8     you've seen it before.  Actually, maybe I'll do this, would

9     you just look through -- look through the notebooks

10    generally and confirm that you've seen the exhibits and

11    you're familiar with them, and maybe we'll just move them

12    all in at once along with the ones that -- that we referred

13    to here in the outline.

14          MR. NELSON:  Just for the record, a lot of them

15    are, like, the -- the ready engineer reports that we've

16    referred to, the ones that are in between the ones that we

17    used as exhibits.  And some other things.

18          THE COURT:  Okay.  Any objections?

19          MR. HORTON:  Yeah, Your Honor, we object to the

20    extent that Dr. Cline is not going to say anything about

21    these documents.  We don't mind moving exhibits in at the

22    end of his testimony, to the extent he testified to them.

23    But I -- I don't agree that he can just sort of push a bunch

24    of documents in the record.

25          MR. NELSON:  Well, I think I've laid the

DIRECT EXAMINATION - MR. CLINE

 1    foundation for them, and these aren't objected to.

 2    Counsel -- both sides agreed they are admissible.

 3                THE COURT:  If he hasn't testified about the

 4    document in any manner, that's their objection.

 5                MR. NELSON:  Yeah, I understand that.  But, Your

 6    Honor, we -- you know, we're asked to basically show

 7    development of 20 separate claims in eight hours, as well as

 8    defend against Mr. Storms' stuff.

 9                None of these exhibits are objected to.  Like

10    the Ready Engineering ones, for example, I think I laid a

11    foundation of those, those are -- there's a whole slew of

12    these reports on this page that are the same daily -- the

13    monthly reports, and other versions of that overview.  So I

14    guess I --

15                THE COURT:  Okay.  So why don't you just take

16    them as a group, I mean.

17                MR. NELSON:  That's what I was trying to do.  I

18    guess -- okay, can you look at the Ready Engineering ones,

19    real quick.  So it would be TX191 through 195.  They should

20    all be in the same binder.

21    BY MR. NELSON:

22    Q.    And just confirm that you are familiar with all of

23    the Ready Engineering ones that are in that binder.

24    A.    Yes.

25    Q.    There should be another one that is other technical

DIRECT EXAMINATION - MR. CLINE

1    documents, a TCPIP and Python e-mail, a base load design

2    document, communications between you and Vitor, which we've

3    talked about some of them in the e-mail -- in the -- during

4    the testimony regarding the MP-awarded power, and a

5    discussion of -- further discussion, I think, of demo day

6    that was -- that we talked about.

7    A.    Yes, I'm familiar with those documents.

8    Q.    There's another one that is an ERCOT market

9    participant agreement, Exhibit 711 and 712, are you familiar

10   with Lancium becoming an ERCOT market participant?

11   A.    Yes.  In fact, I filled out a version of one of those

12   applications.

13            THE COURT:  So, Mr. Nelson, in addition to

14   asking him if he's familiar with it, you might want to ask

15   him what is it.

16            MR. HORTON:  Your Honor, he might also want to

17   look at it.  He's sort of not even looking at them.

18            MR. NELSON:  Counsel, you didn't object to these

19   exhibits.  I mean, I appreciate the need, but you're going

20   to try to make me burn a half an hour for exhibits that you

21   didn't object to at all.

22            MR. HORTON:  I didn't object to them being on

23   your exhibit list --

24            MR. NELSON:  You didn't object to them being

25   admissible, Counsel.

DIRECT EXAMINATION - MR. CLINE

1            MR. HORTON:  Your Honor, we -- we didn't object

2     to them being on the exhibit list, but that wasn't

3     permission to introduce them in evidence in bulk with the

4     witness not even looking at them.

5            MR. NELSON:  He's looking at them now.

6            THE COURT:  So direct your comments to the

7     Court.

8            MR. NELSON:  Sorry, Your Honor.

9            THE COURT:  But they didn't object to them.  And

10    I understand that you have limited time, but you do got to

11    have him at least testify to some extent about the documents

12    so that he's familiar with it, he knows what it is, and

13    gives us quick summary of what it is.

14            MR. NELSON:  Okay.

15    BY MR. NELSON:

16    Q.     Okay.  So let's do it this way, Dr. Cline.  So pick

17    up the Ready Engineering notebook, please.

18    A.     That's the first notebook.

19    Q.     Okay.  So TX191 through TX195, can you confirm that

20    those are Ready Engineering report documents and that you

21    are familiar with them?

22    A.     Yes, 191 is an e-mail and some attachments that I'm

23    familiar with describing some meeting schedules.  192 is a

24    design document from Ready Engineering, which I have

25    reviewed and made comments to.

DIRECT EXAMINATION - MR. CLINE

1           The 193 is another Ready Engineering design

2   document -- well, it's a design document received from a

3   fabricator or -- that was working with JV Driver and I've

4   reviewed and had input into that.

5           194 is a description of the fire suppression

6   system options and summary, which I've reviewed and had

7   input into.

8           195 is the Lancium datacenter control narrative

9   draft, one of them that we discussed.

10  Q.      So the next ones are 204 through 208.

11  A.      204 is an exchange of e-mail from our finance

12  department and includes Ready Engineering.  I am familiar

13  with that document and I've reviewed it.

14          205 is a Ready Engineering progress report and

15  I've reviewed those multiple progress reports.

16          206 is an invoice that shows the charges for

17  work done by Ready Engineering and I've had -- I've reviewed

18  those.

19          207 is another progress report from Ready

20  Engineering, which I've reviewed.

21          208 is an invoice from Ready Engineering, which

22  I've reviewed.

23          210 is a substation connection document from

24  Ready Engineering which I've reviewed.  And --

25          MR. NELSON:  Let's stop there.  So 210.  Go

DIRECT EXAMINATION - MR. CLINE

1     to -- go to TX356.

2     A.     Let me coordinate notebooks here.  E-mail from Ready

3     Engineering with a progress report that I have reviewed.

4     Q.     So let's go to a different group of documents here,

5     TX354 and 355.

6     A.     54?

7     Q.     Yeah, 354 and 355.

8     A.     354 is a document about container design that I was

9     copied to and reviewed.

10             TX355 is a diagram of network communication

11    intended for a -- the Thomas Road site, which was performed

12    by my group at my direction.

13    Q.     Let's go to TX329.

14    A.     329.

15    Q.     Yeah.

16    A.     Oh, okay.

17             This is an e-mail between Ian Rock, Vitor

18    Henrique and myself talking about the Lancium control

19    narrative.  And I was copied too on that.

20    Q.     Let's go to TX56 and 57.

21    A.     TX56 --

22    Q.     56 and 57.

23    A.     Back to the first one.

24             So TX56 is an e-mail between Eric Kutscha and

25    Matthew Gasparo.  I'm copied too on this e-mail and I've

DIRECT EXAMINATION - MR. CLINE

 1    reviewed it.

 2              57 was an attachment to that e-mail I believe,

 3    which describes an overview of our operational control

 4    system.

 5    Q.    Let's go to TX109.

 6    A.    TX109.

 7    Q.    109, yeah.

 8    A.    The next document I have in my binder is TX162.

 9    Q.    It's up on the screen.  Why don't you do it that way?

10    A.    Okay.

11    Q.    Are you familiar with this document?

12    A.    Yes.  This is an e-mail that I wrote to Vitor and Ian

13    and Thomas Salvatore.

14    Q.    Let's go to TX282.  Maybe it's just easier to pull

15    them up.

16              Are you familiar with this one?

17    A.    Yes, this is an e-mail that I wrote to Michael

18    McNamara copying some of our contacts at SBI.

19    Q.    Let's go to TX266.

20    A.    TX266 is a presentation that I've reviewed and had

21    input into.

22    Q.    Let's go to TX282.  Oh, I already did this one.

23              MR. NELSON:  So, Your Honor, I move that we move

24    into evidence the group of exhibits that I just read as well

25    as TX162, TX201, TX211, TX277, TX301, TX332, TX356, TX363,

CROSS-EXAMINATION - MR. CLINE

1   TX364, TX368, TX369, TX426, TX427, TX428, TX429, TX430,

2   TX432, TX433, TX468, TX567, TX568, TX569, TX570, TX579,

3   TX582, TX583, TX585, TX709, TX712, TX754, TX756, TX757,

4   TX758, TX759, TX763, TX764, TX765, TX778, TX787, TX790,

5   TX972, TX976 and TX977.

6              MR. HORTON:  Your Honor, they might have be

7   somewhat out of order, but to the extent those were all the

8   exhibits that were discussed with Dr. Cline, no objection.

9              MR. NELSON:  And Your Honor, just to request in

10  case I missed one, we'll have try to come back and try to

11  get it admitted later, but I think we got them all.  Thank

12  you.

13                        CROSS-EXAMINATION

14  BY MR. HORTON:

15  Q.     Good afternoon, Dr. Cline.

16  A.     Good afternoon.

17  Q.     I heard you say a little while ago -- before that we

18  heard a lot about a little.  There were some things you

19  talked about that were in the documents that I didn't quite

20  see in the documents, but we'll have a chance to look at

21  that in post-trial, I think.

22              One stuck out to me, though.  If we could look

23  at TX163.

24              Do you recognize this document?

25  A.     Yes, I do.

CROSS-EXAMINATION - MR. CLINE

1    Q.    This is the '632 application, right?

2    A.    This is the patent.

3    Q.    And Mr. Nelson asked you some questions about the

4    '632 application, didn't he, just now?

5    A.    Yes, he did.

6    Q.    And I thought I heard you say that the '632

7    application teaches monitoring Bitcoin price.

8          Did I hear you right?

9    A.    I -- I said it -- that monitoring Bitcoin price was

10   one of the economic considerations.

11   Q.    But you're not saying that the '632 application

12   actually includes the words "Bitcoin price," are you?

13   A.    I can look through it if you want, but I believe my

14   statement was that the economic considerations included

15   Bitcoin price.

16   Q.    Just to be clear, Dr. Cline, are you saying that the

17   words "Bitcoin price" are in the document or you're saying

18   the words "economic considerations" are in the document?

19   A.    I believe the document would talk about economic

20   considerations.  I can look through the document in its

21   entirety if you want me to check.

22   Q.    Dr. Cline --

23   A.    -- the language.

24   Q.    Dr. Cline, I think I also heard you say that the '632

25   application, TX163, teaches monitoring Bitcoin mining

513

CROSS-EXAMINATION - MR. CLINE

1    Q.      You were alleged in that lawsuit to have received

2    verbal communications and presentation materials from the

3    plaintiff in that case, weren't you?

4    A.      I believe that's so, yes.

5    Q.      I'd like to direct your attention to TX223, please.

6    This is one of those documents where I think I heard a lot

7    about a little, Dr. Cline.

8            You said this is a dashboard, right?

9    A.      This is documentation of elements that we were -- we

10   were considering as requirements for our dashboards, yes.

11   Q.      And a dashboard is nice graphics, it's meant for

12   someone to look at, right?

13   A.      It's -- this was intended for our network operation

14   system -- our network operation center where our network

15   operators would be looking at and monitoring the dashboards.

16   Q.      Those are human beings, right?

17   A.      Yes.

18   Q.      And one of the things I remember you speaking about

19   was miner status.

20           Do you remember answering questions about miner

21   status?

22   A.      I do.

23   Q.      I thought I heard you say that miner status is

24   disclosed in TX223, includes individual and collective miner

25   status.

CROSS-EXAMINATION - MR. CLINE

1              Do you remember saying that?

2      A.      Yes.

3      Q.      Does it say that here?

4      A.      It doesn't say that explicitly, but it does talk

5      about the number of miners offline, defective, and the

6      number of miners operating within test parameters --

7      Q.      Let's look at -- I'm sorry.

8      A.      Some of that is information about individual miners

9      and some of that is information about collective miners.

10     Q.      Let's look at TX169.

11              Dr. Cline, do you recognize that document?

12     A.      Yes.

13     Q.      This document is titled "The Operational Controls

14     Overview," correct?

15     A.      Yes.

16     Q.      And this is for the Lancium brain, as you were

17     calling it at that time, right?

18     A.      Yes, I believe that was the term we were using at the

19     time.

20     Q.      And if we could look at the lower right-hand corner

21     of this document.

22              The date there is May 7, 2019, correct?

23     A.      That's correct.

24     Q.      And let's look at TX057, page 5.

25              You see section B is titled "Automated

1   Control-Pricing Thresholds," correct?

2   A.      Yes.

3   Q.      And there it mentions the Lancium brain in the first

4   sentence, correct?

5   A.      Yes.

6   Q.      It gives an example A, correct?

7   A.      Yes.

8   Q.      And in the last paragraph there it says:  "If the LMP

9   goes greater than $100, all miners will receive an automatic

10  command to stop hashing."

11          Do you see that?

12  A.      Yes, I do.

13  Q.      And then the next sentence says:  "This status will

14  remain in place until LMP drops below $50," do you see that?

15  A.      Yes.

16  Q.      And then the third sentence says:  "When LMP goes

17  below $50, all miners will receive a command to start

18  hashing and will return to settings prior to event."

19          Do you see that?

20  A.      Yes.

21  Q.      And, again, this document is dated May 7, 2019?

22  A.      Yes.

23  Q.      Are there any other examples given under section B,

24  there aren't any, right?

25  A.      No.

CROSS-EXAMINATION - MR. MCNAMARA

1  says:  "A load-only CLR, however, would ramp down, i.e.,

2  stop or reduce its electricity consumption by, for

3  example" --

4     And then let's go to the next page, TX4.

5     -- "reducing Bitcoin mining operations.  When

6  this occurs, the load-only CLR, i.e., flexible datacenter,

7  receives the difference in the value of the Real-Time

8  electricity price versus the datacenter's preexisting power

9  purchase agreement price."

10     Do you see that?

11  A.  I do see that.

12  Q.  Mr. McNamara, you believe that the power option

13  agreement limitation in the claims of the '433 patent was

14  met by Layer1's CLR demand response contract, right?

15  A.  I'm sorry, can you say that again.

16  Q.  Sure.  You believed that the power option agreement,

17  as recited in the claims of your '433 patent, that

18  limitation was met by the demand response contract of

19  Layer1's CLR, correct?

20  A.  I'm not sure I'd agree that that statement is

21  exhaustive.  I'd need to think about it.

22  Q.  Well, let's look at TX17.

23     MR. HORTON:  Let's go to the next page, please.

24  BY MR. HORTON:

25  Q.  Do you recognize this document, Mr. McNamara?

CROSS-EXAMINATION - MR. MCNAMARA

1    A.      It looks like a claim chart, yes.

2    Q.      Okay.  And you approved this claim chart for filing

3    with the complaint against Layer1 in the Federal District

4    Court in the Western District of Texas, correct?

5    A.      I'm sure I approved it, but I will say this:  It was

6    drafted by a team of outside counsel.

7    Q.      You understand that a claim chart maps your '433

8    patent claims to the accused Layer1 system, correct?

9    A.      I would just like to make a statement, this was a

10   preliminary claim chart and the case was settled shortly

11   thereafter, so I'm sure this would be subject to change.

12   But yes, this is our claim chart.

13   Q.      This is a representation of what Lancium believed was

14   infringing the claims of its '433 patent, right?

15   A.      That was our initial claim char, yes.

16               MR. HORTON:  Okay.  Let's look at Page 6,

17   please.  Let's zoom on limitation B2(I).

18   BY MR. HORTON:

19   Q.      That limitation reads:  "Receive power option data

20   based at least in part on a Power Option Agreement," do you

21   see that, sir?

22   A.      I do see that.

23   Q.      Okay.  Let's -- you can see that on the right, this

24   is describing Layer1's system, but I want to go to the next

25   page because it continues on.

CROSS-EXAMINATION - MR. MCNAMARA

1          MR. HORTON:  So TX17, Page 7.  If we can zoom in

2     on the right.

3     BY MR. HORTON:

4     Q.     It's continuing that discussion of that Power Option

5     Agreement limitation.  And the last paragraph there,

6     Mr. McNamara, do you see that it reads:  "Upon information

7     and belief, Layer1's demand response contracts are Power

8     Option Agreements."

9               Do you see that, sir?

10    A.     I do see that.

11    Q.     You agree with that statement?

12    A.     Um, yeah, I would say I probably wouldn't phrase it

13    this way today.  But I see that now, yes.

14    Q.     Let's look at TX96, please.  Mr. McNamara, you

15    mentioned during your direct examination SBI?

16    A.     Yes.

17    Q.     SBI was the first Lancium investor; is that correct?

18    A.     No.  We -- we had a friends and family seat around in

19    December of 2017.

20    Q.     And was SBI the first outside investor; is that fair

21    to say?

22    A.     They are a series A investor, yes.

23    Q.     And SBI owns approximately 25 percent of Lancium; is

24    that right?

25    A.     Yes, that's right.

CROSS-EXAMINATION - DR. EHSANI

1          Do you see that?

2   A.      I do.

3   Q.      A power generation source could include a wind farm,

4   correct?

5   A.      You do not exercise Power Option Agreement, as

6   defined in the patent, with a wind farm.  You do it with the

7   power provided -- the grid power provider.  Because it has

8   to be curtailable --

9   Q.      Dr. Ehsani --

10  A.      -- on request in a granular way.

11  Q.      My question is:  A power generation source could

12  include a wind farm, correct?

13  A.      Connected to the grid before it arrives at the load

14  discussed in the patent.

15  Q.      Now, you didn't know Mr. McNamara before this case,

16  did you?

17  A.      No, sir.

18  Q.      Nor Dr. Cline?

19  A.      No, sir.

20  Q.      And it's your opinion that Dr. Cline and Mr. McNamara

21  had a flash of insight in about August of 2019; is that

22  right?

23  A.      Based on the information that I was given to analyze,

24  it appears that the conception occurred to them.

25  Q.      Let's look at TX --

1   A.      Around then.

2   Q.      Let's look at TX526.  And this is the document that

3   you cite, or one of them, in your expert report for this

4   flash of insight; is that right?

5   A.      I don't recall.  If you represent as such, I accept

6   your representation.

7   Q.      Here, Mr. Cline is reporting on a call that he had

8   with Tim Carter, do you see that?

9   A.      I read there that "we had a call with Tim Carter."

10  Q.      And Mr. Cline explains in the next paragraph:  "An

11  important point, which didn't come across in our

12  conversations, is that the award is essentially an

13  obligation on our part that we consume that amount of power

14  that ERCOT could curtail.  If we routinely use less than our

15  award, we could suffer a penalty."

16          This is Mr. Cline explaining -- Dr. Cline

17  explaining a Power Option Agreement to Mr. McNamara,

18  correct?

19  A.      This is part of their learning curve, yes.

20  Q.      Reporting on his call to Tim Carter, correct?

21  A.      Mr. Cline is writing this e-mail to Mr. McNamara,

22  this -- analyzing this part of the Power Option Agreement,

23  yes.

24  Q.      It's not your opinion that Dr. Cline invented Power

25  Option Agreements, is it?

1  A.      Sir, Mr. Cline and Mr. McNamara invented the control

2  of power to a datacenter based on Power Option Agreement, as

3  they define it in their patent and is construed by the

4  Court.  It's the combination of two technologies.  That is

5  the essence of the patent.

6  Q.      But neither of them invented Power Option Agreements,

7  correct?

8  A.      Power Option Agreement, as defined in the patent, is

9  an element of the claimed inventions.

10               MR. LABBE:  No further questions, Your Honor.

11                       REDIRECT EXAMINATION

12  BY MR. NELSON:

13  Q.      This is figure 2 that was up just a little while ago,

14  do you see that?

15  A.      Yes, sir.

16  Q.      Does figure 2 show separate grid and behind-the-meter

17  connections?

18  A.      Separate grid?

19  Q.      Yeah.  Well, is it your opinion that figure 2 shows

20  separate grid and separate behind the -- that the grid

21  connections and the behind-the-meter connections are

22  separate?

23  A.      No, it's all an integrated grid that benefits from

24  power from different places.

25               MR. NELSON:  All right.  No further questions.

1          THE COURT:  And that should be 14 point font.

2          MR. NELSON:  Just one other housekeeping matter.

3          THE COURT:  Yes.

4          MR. NELSON:  At the pretrial conference, we had

5    talked about sort of the equivalent of directed motions in a

6    bench trial, so we made the Rule 52 equivalent motions, and

7    we talked at that time about briefing that.

8          I don't know if Your Honor wants briefing on

9    that.

10          THE COURT:  No, because I'm sure you understand

11   the standard is the same as if, you know, I'm deciding it at

12   the end of the case, so your submissions are going to meet

13   that, so we don't need additional briefing on that.

14          MR. NELSON:  Thank you, Your Honor.

15          THE COURT:  All right.  So with that, we are

16   done.  I appreciate everybody's time.

17          (Whereupon, the following proceeding concluded

18   at 3:48 p.m.)

19          I hereby certify the foregoing is a true

20   and accurate transcript from my stenographic notes in the

21   proceeding.

22                              /s/ Michele L. Rolfe, RPR, CRR
                                   U.S. District Court
23

24

25